IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISSTRICT OF CALIFORNIA

**FILED**

E-filing

MAR 2 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kenneth Dowell | |
|     Petitioner | ) |
| | ) CASE NO. |
| v. | ) |
| | ) CALIFORNIA SUPREME COURT NUMBER |
| Board of Prison Hearings | ) S160060 |
|     Respondent | ) SUPERIOR COURT #BH004727 |
| | ) CALIFORNIA APPELLATE #B204310 |

CV 08     1683

CW

WRIT OF HABEAS CORPUS

(Pk,

Kenneth Dowell
C-78669, 1-N-26U
San Quentin Prison
San Quentin, CA.
    94974

VERIFICATION

STATE OF CALIFORNIA )
                    )
COUNTY OF MARIN_____)

 (C.C.P. section 446 & 2015.5; 28 U.S.C. section 1746)

I, KENNETH DOWELL, declare under penalty of perjury that:

  I am a party in the above-entitled action; I have read the foregoing documents and know the contents thereof; and the same is true of my own knowledge, except as to matters stated therein upon information and belief, and as to those matters I believe they are true.

  Executed this     day of       at San Quentin State Prison, San Quentin, California 94974.

S/S *Kenneth Dowell*
Kenneth Dowell

i.

# TABLE OF CONTENTS

VERIFICATION                                                           i.

TABLE OF CONTENTS                                                      ii.

TABLE OF AUTHORITIES                                                  iii-iv.

MEMORANDUM OF POINTS AND AUTHORITIES                                  1-26
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS


INTRODUCTION                                                          1-7


ARGUMENT  I -  SOME EVIDENCE                                          8-23


    a. Consequences of actions and magnitude                      9
    1. Especially atrocioius dispassionate & calculated          11
    2. Inexplicable and Trivial                                  14
    3. Unstable tumultuous relationships                         15
    4. Parole plans/Vocationally upgrade                         16
    5. Self-help and therapy                                     18
    6. Psychological report doesn't support parole               18

ARGUMENT II - PREPONDERANCE OF EVIDENCE                               20-23

CONCLUSION                                                           24-26

EXHIBITS


PROOF OF SERVICE

## TABLE OF AUTHORITIES

| Cases | Pages |
|---|---|
| Anderson v.  Smith, 97 F.2d 239 | 21. |
| Armstrong v. Davis, 275 F.3d 849 | 8. |
| Biggs v. Terhune (9th Cir.2003) 334 F.3d 910 | 5,8,24. |
| Bolani v. Immigrations, 9 F.2d 1157 | 22. |
| Carson v. Block, 790 F.2d 562 | 20. |
| Caldwell v. Miller, 790 F.2d 589 | 21. |
| Envil.Def.Ctr. Inc. v. EPA (2003) 344 F.3d 832 | 9. |
| Greenholtz v. Inmates, (1979) 442 U.S. 1 | 8. |
| Hayward v. Marshall, (9th Cir. 2008) No.06=55392 | 5. |
| In re Capistran (2003) 107 Cal.App.4th 1299 | 8. |
| In re Dannenberg (2005) 34 Cal.4th 1061 | 13,15. |
| In re DeLuna (2005) 126 Cal.App.4th 585 | 10. |
| In re Elkins, 144 Cal.App.4th 475 | 5. |
| In re George Scott, DJDAR 12450 | 11. |
| In re Lowe, 130 Cal.App.4th 1405 | 12. |
| In re Montgomery, 2d CIVIL No. B192544 | 6. |
| In re Ramirez (2001) 94 Cal.4th 549 | 8. |
| In re Rosenkrantz (2002) 29 Cal.4th 616 | 5,6,8,10,11,12,22. |
| In re Rosenkrantz, (2000) 80 Cal.App.4th | 21. |
| In re Scott, 119 Cal.App.4th 871 | 5,8,10,13. |
| In re Smith, 109 Cal.App.4th 503 | 8. |
| In re Van Houten, 11 Cal.App.4th 329 | 13. |
| Jancsek, 833 F.3d 1390 | 8. |
| McQuillion v. Duncan (9th Cir.2002) 306 F.3d 895 | 8. |

McBee v. Bonner, 296 F.2d 235                                    22.

Morton . Ruiz, 415 U.S. 199                                     21.

Pearce v. Director, 647 F.2d 716                                21.

People v. Bridgehouse, 47 Cal.2d 406                            14.

People v. Burnick, 14 Cal.3d 30                                 19.

People v. Neol (2005) Cal.App. Lexis 711, 148                   9.

Rosenkrantz v. Marshall, 444 F.Supp 2d 1063                5,13,24.

Superintendent v. Hill (1985) 472 U.S. 445                 8,14,22.

Services v. Dulles, 354 U,.S. 363                               21.

Taylor v. U.S., 734 F.2d 1152                                   22.

Turner v. Henman, 829 F.2d 612                                  21.

VanderMolen v. Stetson, 571 F.2d 617                            21.

Wolff v. McDonell, 418 U.S. 539                                 21.

## STATE STATUTES

Penal  Code § 3003                                              17.
Penal Code § 3041                                               21.
Penal  Code § 3043                                              15.
Penal  Code § 11177                                             17.
Penal Code § 5079                                               20.
Cal.Code of Regs., tit. 15 § 2000                         21,22,23.
Cal.Code of Regs., tit. 15 § 2181                               23.
Cal.Code of Regs. tit. 15 §2322                                 15.
Cal.Code of Regs. tit. 15 § 2326                                15.
Cal.Code Regs, tit. 15 §2402                        2,3,10,11,1,18.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


Kenneth Dowell )
      Petitioner )
    )     Case No.
  v. )
   )
Board of Prison Hearings )
     Respondent )


## WRIT OF HABEAS CORPUS


### INTRODUCTION

      Petitioner, Kenneth Dowell, was convicted pursuant to Penal Code § 187, murder in the second degree.  On March 24, 1982, petitioner acting in self-defense, killed James Winnet, the boyfriend of petitioner's wife.

      Petitioner's wife complained that her boyfriend was attempting to trade her vehicle for a van and motorcycle. Petitioner acting on her behalf, took his wife to Parkman's Bail Bondsman, the place where the vehicle was to be traded, however, the establishment was closed.  On their way back to Norwalk, California, petiitioner noticed his wife's boyfriend following them, so he drove into the Zody's parking lot, and as he did, the victim pulled up behind them.  As petitioner stepped from his vehicle, Winnet shot at him.  Petitioner in an act of self-defense retrieved a hand gun from his pick

1.

up and fired back. The victim was shot four or five times. After the shooting, petitioner waited for the police, and according to the probation officer's report, petitioner stated, "I never had any intention of killing anyone. I'm sorry it happened." (Exhibit A p.10.)

The Board hearing record is in conflict with the foregoing. The District Attorney's representative stated: "In regards to his statements in regards to the crime, he claims self-defense, but the evidence is against him,..." (Exh. B p.73.) The District Attorney further influences the Board by claiming that petitioner kidnapped his wife. (Exh. B p.74) However, according to the probation report, petitioner's wife made it clear that she was not kidnapped. (Exh. A. pp.4-5) The Board Commissioner read into the record the Statement of Facts from the Probation Officer's Report, then found contrary to the probation officer's report (Exh. B p.89) when stating, "he (the victim) tried to give up." There is nowhere within the probation officer's report indicating the victim was trying to "give up." (Exh. B p.10 also see Exh. A p.10)

It will be pointed out within the Board Hearing Record, that there are numerous contradictions. It will also be shown that the Board of Prison Hearings held nothing more than a summary hearing, and failed to address California Code of Regulations, title 15 § 2402, and the factors therein in relation to finding suitability or unsuitability in a parole hearing, which is required by law.

2.

Moreover, the Board of Prison Hearings used the same reasons to deny parole on six (6) previous parole consideration hearings, and has failed to take into account that petitioner has for twenty-five years, maintained a stellar prison record.

The specific factors applicable to the Board's decisions are set forth in Penal Code section 3041 and the Board's regulations (promulgated pursuant to subdivision (a) of section 3041) established criteria for determining suitability for release on parole. (Cal. Code Regs., Tit. 15 [CCR-15] section 2402.) The factor statutorily required to be considered, and of most importance, is public safety. As stated in subdivision (b) of Penal Code section 3041, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual..." The factors required to be considered by the Board regulations are for the most part, specified in section 2402.

On November 30, 2006, Petitioner appeared before the Board of Prison Hearings (BPH). The board denied Petitioner parole for three years for the following reasons: (1) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the offense was carried out in a dispassionate manner such as an executon style murder. (2) The motive for the crime was

3.

inexplicable in relation to the offense. (3) History of unstable or tumultuous relationships. (4) Parole plans/Failed to upgrade vocationally. (5) Need self-help or therapy. (6) Psychological report (The Board chose to set aside the most recent psychological report dated, May 2, 2006, which supported parole, and use a 2000 psychological report.)(Exhibit B, pp.88-98.)

There are no negative differences between the 2000 board hearing and the November 30, 2006, board hearing. There is, however, positive advances by petitioner. Petitioner has not received disciplinary write-ups. Petitioner continues to take personal responsibility for his crime. Petitioner has viable parole plans. Petitioner continues to participate in self-help programs (AA and Positive Attitude). The psychological assessment of May 02, 2006 is supportive of release. "Petitioner would pose a low risk if he were to be released at this time." (See Exhibit C.)

The Board's decision is not in accord with a proper reading of the relevant statutes, regulations and case law. Although the "some evidence" standard of review provides broad discretion to the Board, it is in fact bound by three requirements: (1) the evidence must be drawn from the factors enumerated in the statutory and regulatory framework; (2) the evidence must be deemed relevant and reliable; and (3) the evidence must reasonably speak to whether the inmate poses a current public safety threat.

Although there is no question that under Rosenkrantz

4.

and Dannenberg the statutory "commitment offense" factor is relevant, and at times may be enough to deny parole, it may in some circumstances rise to the level of a due process violation. That conclusion is consistent with the concern raised by the Ninth Circuit in Biggs v. Terhune, 334 F.3d 910 (9th Cir.2003): that reliance on an ever-frozen, unchanging factor in denying parole may in certain instances violate due process.

A second degree murder (the offense in this case) requires malice — an element which by its nature suggests a certain degree of cruelty and callousness — the facts used by the Board to show the crime is beyond the minimum elements must establish that the crime is in fact especially heinous, atrocious or cruel, to which petitioner's crime of self-defense does meet the forgoing. As will be shown, the Board's findings were not in accord with In re Rosenkrantz, 29 Cal.4th 616; Ronsenkrantz v. Marshall, 444 F.Supp.2d 1063; In re Elkins (2006) 144 Cal.App.4th 475; In re Scott, 119 Cal.App.4th 871 and Hayward v. Marshall, (9th Cir. 2008) No. 06-55392

In April 2007 this writ of habeas corpus was forwarded to the Los Angeles County Superior Court. On November 19, 2007, the Superior Court denied the writ of habeas, and found contrary to the record and exhibits attached hereto; and stated that petitioner "forced his ex-wife into his vehicle," drove around searching for his ex-wife's boyfriend, and that it was petitioner who retrieved a handgun and shot first, killing

5.

him.    The court went on to find that there was "some evidence" to deny parole: "The record reflects that Petitioner was convicted of public drunkenness, possession of narcotics, brandishing a firearm, drunk driving, and pandering.    The court further found that petitioner "has not sufficiently participated in self-help programs. In addition, Petitioner has not upgraded academically...    Petitioner's proposed parole plans consist of residing with his brother in Oregon. (Not his commitment county.)    In addition, Petitioner does not have an offer of employment...    Every factor considered by the Board need not be stated, especially if it is not persuasive." (Exhibit E, pp. 2&3.)

What the lower court failed to recognize is that out of state parole plans are acceptable (P.C. § 3003), nor it is necessary to have a job offer. (See Cal. Code of Regs., tit. 15 § 2402 Understanding and Plans for Future.)   Moreover, prior convictions must be violent. (Cal. Code of Regs., tit. 15 Previous Record of Violence.)

Of great importance is that the lower court's findings are contrary to the State Appellant  Court's decision in In re Michael Montgomery, 2d Civil No. B192544 11/7/07.    "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted." (In re Rosenkrantz, 29 Cal.4th 616, 683.) (Id. p.14.)

As stated, the Superior was wrong when determining it was petitioner who sought out the victim with the intend to kill him. The record is clear in this regard, petitioner and his ex-wife were returning from Long Beach when petitioner found the victim was following him. Pulling into a parking lot, the victim stepped from his vehicle and started shooting.

As was found in Montgomery, this petitioner has an exemplary prison record and the almost unanimous opinions of prison psychologists that petitioner poses a low risk for violence, the only rational conclusion is that petitioner poses no threat to public safety.

Of further interest to this Court is that the Superior Court totally ignored the "Preponderance of Evidence" argument herein. The Board of Prison Hearings is required by law to uphold its own rules and regulations and its failure to do so is a violation of petitioner's due process rights.

On January 08, 2008, the California Appellant Court summarily denied petitioner's writ of habeas corpus. And on March 12, 2008, the California State Supreme Court summarily denied petitioner's petition for review. (Exhibit E.)

7.

THE BOARD OF PRISON HEARINGS
FAILED TO UPHOLD
THE SOME EVIDENCE REQUIREMENTS
RESULTING IN A VIOLATION OF
PETITIONER'S DUE PROCESS

While there is no federal constitutional right to parole, (Greenholtz v. Inmates of Nebraska Penal (1979) 442 U.S. 1, 11-12) both federal and state courts have recognized that California's parole scheme bestows on prisoners a cognizable liberty interest in parole that is protected by due process. Biggs v. Terhune (9th Cir. 2004) 334 F.3d 910, 914; Armstrong v. Davis (9th Cir. 2001) 275 F.3d 849, 864; McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 903; and In re Rosenkrantz (2002) 29 Cal.4th 616, 655-659 [prisoner's have a liberty interest in parole protected by due process.]

Within the context of parole consideration in California, due process requires that "some evidence" support a decision by the Board to deny parole. (Superintendent v. Hill (1985) 472 U.S. 445, 456; Biggs, supra, 334 F.3d at 915; Rosenkrantz, supra, 29 Cal.4th at 667; In re Smith, 109 Cal.App.4th at 501-503; In re Capistran (2003) 107 Cal.App.4th 1299, 1305; In re Ramirez (2001) 94 Cal.4th 549, 564; In re George Scott (2005) DJDAR 12450.)

Accordingly, this Court must undertake a fact specific inquiry of whether there is evidence to deny parole under California law. (McQuillion, supra, 306, F.3d at 904-906; Biggs, supra, 334 F.3d at 915.) Specifically, the Court must determine whether there is some evidence that petitioner would

8.

currently present an "unreasonable risk of danger to society" if released on parole. (Cal.Code Regs., tit. 15 §2402(a); Penal Code, §3041(b).

## THE BPT HEARING RECORD

### a. Consequences of actions and magnitude

The Rosenkrantz court held the "some evidence" standard is not met when the Board minimizes culpability. It did so after (1) delving into the entire record before the Board as to the relevant issue in question; (2) specifically reviewing evidence that the Board had omitted in making its determination; and (3) assessing the reasonableness of the Board's interpretation of the entirety of there circumstances.

The court will find after reviewing all the evidence before the Board on this issue, no reasonable interpretation of the circumstances would justify finding "some evidence." Indeed, the Board's failure to consider all relevant evidence is consistently deemed, in a variety of contexts, to be arbitrary and capricious and abuse of discretion. See e.g., Envil. Def. Ctr. Inc. v. EPA (2003) 344 F.3d 832, 858 n.35 (holding federal agency has acted in arbitrary and capricious fashion if the agency has "entirely failed to consider an important aspect... [or] its decision... runs counter to the evidence." According to People v. Neol (2005) Cal.App. Lexis 711, at 148, "The trial Court was not permitted to substitute its conclusion... under circumstances where it could not explain

9.

how this... bit of evidence trumped the otherwise overwhelming counterrailing credible evidence..." This is the same as the Board has done in petitioner's case.

The evidence relied on by the Board must be " reliable," (Regs.. §§ 2402, subd. (b), 2281, subd. (b)); it must have "'"some indicia of reliability."'" (In re Scott (2005) 133 Cal.App.4th 573, 591, 34 Cal.Rptr.3d 905; Biggs, 334 F.3d at 915; McQuillon, 306 F.3d at 904; Jancsek, 833 F.3d at 1390.), Additionally, the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the discretionary authority of the Board. (In re Rosenkrantz (2002) 29 Cal.4th 585, 655. A prisoner is entitled to "an individualized consideration of all relevant factors." (In re DeLuna, 126 Cal.App.4th at p. 591.) The Board's decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious," and this requirement was not accomplished during petitioner's hearing. There is nowhere in the record that shows the Board used the California Code of Regulations, title 15 § 2402, and individually cited each factor in relation to their findings. In order for the Board to meet procedural due process embodied in the California Constitution it must address all fifteen (15) factors, and not give six (6) turgid reasons without implementing the applicable factors for each one.

Petitioner will now address each in numerical order:

10.

(1) Especially atrocious dispassionate and calculated

The California court implemented what is known as the "beyond the minimum necessary" in relation to the death of a victim (In re Rosenkrantz, 29 Cal.4th at 683.); and the question here is, what evidence indicates that any particular second degree murder was somehow "beyond the minimum necessary to sustain a conviction?" In other words, what evidence indicates the commitment offense was "especially atrocious, dispassionate and calculated," given that there typically must be a finding of some level of heinousness, in order for anyone to have been convicted of second degree murder in the first place? Cal.Code Regs tit. 15 § 2402(c)(1); Smith 114 Cal.App.4th at 366-67 (noting that "all second degree murders by definition involve some callousness-i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others."

In order for a crime to be "atrocious, dispassionate and calculated" and meet the "minimum necessary to sustain a conviction," the offense must have been carried out execution-style. Rosenkrantz, supra, 29 Cal.4th at p. 683. Moreover, there had to be multiple victims attacked, injured or killed in the same or separate incidents. ( See Cal.Code Regs, tit. 15 § 2402(a)(1)(A).)

The court in In re George Scott, 133 Cal.App.4th (#) (Oct. 18, 2005) held "[it] is necessary to remember that denial of parole based upon the nature of the offense may

11.

rise to the level of a due process violation, as where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (Rosenkrantz, supra, 29 Cal.4th at p.683.)    Therefore an unsuitability determination must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances went beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety." (In re Dannenberg, supra, 34 Cal.4th at p. 1098.) The Scott court went on to explain comparisons, "[in] Rosenkrantz... a full week of careful preparation, rehearsal and execution" took place, "[the] prisoner, fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement, carried out the crime with planning, sophistication or professionalism," is more aggravated or violent, and meets the "minimum necessary." (Rosenkrantz, at p.678.)    Similarly, there was evidence of premeditation in In re Lowe (2005) 130 Cal.App.4th 1405, which also involved a second degree murder conviction. There the prisoner purchased the gun shortly before the murder, entered his victim's bedroom in the middle of the night while he was asleep, unsuspecting, and in a special relationship of confidence and trust with his killer, 'shot him five times in the head and chest, execution style.' (Id. at p. 1414.)    As this court stated,

12.

this evidence showed the murder 'was a cold-blooded execution' and that the prisoner's 'egregious acts [were] far more aggravated than the minimum necessary to sustain a second degree murder conviction.'" (In re Scott, 119 Cal.App.4th 871, 889-892; In re Van Houten (2004) 116 Cal.App.4th 339; Rosenkrantz v. Marshall, 444 F. Supp.2d 1063; In re Dannenberg, 34 Cal.4th at p. 1098.))

Moreover, the circumstances of petitioner's crime are significantly less egregious than those in other cases in which the nature of the offense was found to support a finding of suitability. (See Rosenkrantz v. Marshall, supra, 444 F. Supp.2d 1063.)

There is no evidence petitioner "tormented, terrorized, or injured his victim before ... shooting him, or that he gratuitously increased or unnecessarily prolonged his pain and suffering." (See In re Scott, 119 Cal.App.4th 871, 892.) Because the relevant evidence shows no more callous disregard for human suffering than is shown by most second degree murder offenses, the Board's use of this factor to conclude that petitioner committed his offense in an "especially atrocious dispassionate and calculated manner" and that the murder was "execution style," is arbitrary and capricious. (In re Rosenkrantz, supra, 29 Cal.4th at 655.)

Petitioner's commitment offense was a result of stress. The stress came from his wife leaving him, and taking his two children away, for the love of another man. The fear

13.

came as a result of the victim shooting at him.   (Exh. A p.10)
These circumstances are almost identical to those in In re
Scott, supra, 119 Cal.App.4th 871, 894. ([t]he record   shows
that his unpremeditated offense resulted from some provocation
on the part of the victim ... the circumstances are similar
to those which have reduced criminal liability from murder
to manslaughter, as the emotional pain caused by the departure
or infidelity of a loved one is often seen by juries as
diminishing self-control.) (see, e.g., People v.  Bridgehouse
(1956) 47 Cal.2d 406, 414 [303 P.2d 1018].)

The record is clear, petitioner did not plan, rehearse
and commit the offense with sophistication and professionalism.
Thus the  Board's denial does not meet the "minimum necessary"
standard as set forth in Rosenkrantz, or the "some evidence"
standard in Superintendent v. Hill, supra,  (1985) 472 U.S.
445.


## (2) Inexplicable and trivial

As to "inexplicable and trivial," the Scott court
continued to say, "To fit the description of very trivial in
relation to the offense requires comparisons; the motive must
be materially less significant (or more "trivial") than those
which drive people to commit the offense in question, and
therefore more indicative of a risk of danger to society if
the prisoner is released than is ordinarily presented." (119
Cal.App.4th at 894.)   If the Scott court's reasoning is

14.

correct, the "inexplicable and trivial" standard does not meet the "some evidence" criteria in the Board's findings — for the victim's actions, when shooting at petitioner, were directly related to petitioner's conduct of acting in self-defense.

### (3) History of unstable, tumultuous relationships

The Board found "Petitioner has a history of assaultive behavior and unstable, tumultuous relationship with others (Exh. B p.89). The Board may consider misconduct only if it is reliably documented. Within Penal Code § 3043.5, the Board is required when deciding whether to release the person on parole, to "review all information received... to insure that... all current and past convicted offenses have been given adequate consideration." (Emphasis added.) In re Dannenberg, 34 Cal.4th at 1084.

California Code of Regulations, title 15 § 2322 sets forth the criminal history to be considered by the Board, to which, if the crime is over five years old it cannot be used to extend the total period of confinement.

Cal.Code of Regs, tit. 15 § 2326 requires the circumstances surrounding the charge to be reliably documented and an integral part of the crime for which the prisoner is currently committed to prison.

The BPH when finding petitioner unsuitable for parole stated: "your record of public drunkennes, drunk driving,

15.

brandishing a firearm and pandering, all have led up to the life crime." (Exh. B p.89) First, how does drunk driving lead to murder? Second, the record explains the brandishing charge, to which petitioner makes it clear that the weapon was a knife, not a firearm. (pp.64-65) And third, the pandering charge has nothing to do with murder, nor is it a violent crime against the victim, which is required by Cal.Code of Regs, tit. 15 § 2402(c)(2). Moreover, the Board's "reliance on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to rehabilitative goals espoused by the prison system, and resulted in a due process violation." In re Rosenkrantz, 29 Cal.4th at 689,

## (4) Petiitoner needs to upgrade vocationally/Needs parole plans

One of the factors under Cal.Code Regs, tit. 15., 15. § 2204(d)(8) in finding a prisoner suitable for parole is "the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. " (Emphasis added.) It is not required to have both, one is sufficient.

The record is indisputable, petitioner received a certificate of achievement in the Maintenance and Operation of High Pressure Boilers, Vocational Machine Shop and Millwright Machinist. (Exh B pp.31-33)

As to parole plans, the Court will find petitioner submitted letters of support from his brother in Oregan, and

16.

an Aunt in the Los Angeles area. (Exh. B pp.46-47)  The Board
however, refused to accept the parole plans from Oregan,
speculating that petitioner's brother had weapons in his house.
This analogy is ludicrous.  Guns can be acquired in any city
within California, and for the Board to reason that petitioner
cannot be parole to his brother's house because he might have
a gun in the house is without merit.  Moreover, during
petitioner's previous board hearing, the commissioner encouraged
this petitioner to obtain "an interstate transfer to Oregon."
(Exh. D p.68)

The United States Congress in 1934 (Penal Code §
11177) set forth an act granting the consent to any two or
more states to enter into agreements of compacts.  Penal Code
§ 11177(c) states: "That it shall be competent for the duly
constituted judicial and administrative authorities of a state
party to this compact (herein called "sending state"), to permit
any person convicted of an offense... and placed on... parole
to reside in any other state party to this compact... (a) [If]
such person is in fact a resident or has his family residing
within the receiving state..."  Also see Penal Code § 3003(b)(i)
"An inmate may be paroled to another state pursuant to any
law."

As previously mentioned, the title 15 § 2402
subd.(d)(8) only requires to have parole plans or a marketable
skill.  Not both.

17.

5) Petitioner's need for further beneficial self-help and therapy

The Court is directed to the Cal.Code of Regs., tit. 15 § 2402(c)(5) where it is clear "The prisoner [must have] a lengthy history of severe mental problems related to the offense." There is nowhere within the record showing petitioner has a mental history related to the offense.   Nor is there anywhere within the title 15 § 2402, requiring a prisoner to participate in self-help programs.

More inportantly, the Board Commissioner recognizes that self-help programs may not be available  (Exh. B p.97), and fails to recognize the psychological report at page 4, where Doctor Inaba addresses self-help:   "It would seem that in the intervening years, Mr. Dowell has participated in self-help and religious activities that have given him the skills to conduct himself in a sober and non-violent manner across settings.   He regularly attends AA and is on the waiting list for Kairos."   The Board during petitioner's July  2003 hearing commended petitioner for his participation in self-help therapy programs. (Exh. D p.65)  How is it, then, that the 2006 Board can find petitioner unsuitable for parole for failing to attend self-help programs?

(6) The Board found the Psychological report is not supportive of release

The Court is directed to petitioner's psychological

18.

evaluation, where Doctor Inaba states, "He has **no** present dynamic risk factors such as loss of control or impulsive behavior, lack of compassion, anger, or parnoid or violent thoughts." Under: V. Clinician Comments and Summary, Doctor Inaba also found petitioner's "risk of violent recidivism would be low." (Exh C., May 02, 2006, psychological evaluation at page 4)

The Board chose to reject the foregoing and put itself in the position of a Psychologist (Exh. B pp.90-91) and use their own reasoning to deny parole, then assess petitioner as a risk to society.

The State Supreme Court in People v. Burnick, 14 Cal.3d 306, 327; 121 Cal.Rptr. 488; 535 P.2d 352, found "The evidence, as well as the consensus of opinion by responsible scientific authorities, is now unequivocal." (Diamond, the Psychiatric Prediction of Dangerousness (1975) 123 U.Pa. L.Rev. 439, 451.) In the words of spokesmen for the psychiatric profession itself, "Unfortunately, this is the state of art. Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or 'dangerousness.' Neither has any special psychiatric 'expertise' in this area been established." (Task Force Report, Clinical Aspects of the Violent Individual (American Psychiatric Assn., 1974) p.28) And the same studies which proved the inaccuracy of psychiatric predications have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err;

19.

they predict acts of violence which will not in fact take place ("false positives"), thus bringing as "dangerous" many persons who are in reality totally harmless. (See generally id. at pp.23-30.)

It is hard to believe that the Board would set aside a recent Psychological evaluation (May 2006), which support parole, then use an evaluation from September 2000 (Exh. B p.90) to find unsuitability for parole.

What may be of further interest to the Court is that psychiatric evaluations and, "The recommendation shall be submitted to the Director of Corrections and shall not be effective until approved by the director." Penal Code § 5079. In that this is the case, petitioner's psychological evaluations are invalid — for the Director of Corrections did not review and approve the recommendations.

### THE BPH IS REQUIRED TO USE THE PREPONDERANCE OF EVIDENCE STANDARD DURING A PAROLE HEARING

The California Board of Hearings' failure to follow its procedures is fundamentally unfair, and a violation of the Fifth Amendment.

The United States Constitution requires states and their agencies to comply with all the procedures they establish. Carson v. Block, 790 F.2d 562, 565-6. A violation of the BPH's rules authorizes relief in this proceeding if the rules are themselves essential components of due process of law — that

20.

is, if the procedures used by the BPH violates the Constitution. Under 18 U.S.C. § 4218, a parole board's failure to follow administrative rules and regulations violates constitutional provisions. Turner v. Henman, 829 F.2d 612.

Numerous federal courts, including the United States Supreme Court have found "an inmate is entitled to expect the Bureau of prisons to follow its own policies." Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2925, 41 L.Ed.2d 935. In re Rosenkrantz (2000) 80 Cal.App.4th 409, 424-425 also found the Board must determine parole suitability by following its own rules and regulations.

According to Caldwell v. Miller, 790 F.2d 589, 09, "An agency must conform its actions to the procedures that it has adopted." See Pearce v. Director, Office of Workers' Compensation, 647 F.2d 716; VanderMolen v. Stetson, 571 F.2d 617, 624; see also Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.) Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; Services v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403. "An inmate, too, has the right to expect prison officials to follow its policies and regulations." Anderson v. Smith, 697 F.2d 239. Here the proper procedure for the BPH and courts to follow is the "preponderance of evidence" standard within the Cal.Code of Regs. tit. 15 § 2000(50).

21.

Section 2000(a) states: "The following rules of construction apply to the regulations contained in this division..." At the end of § 2000 reference is made to Penal Code § 3041 - thus all prison inmates have a liberty interest pursuant to Cal.Code of Regs. tit. 15 § 2000(50) preponderance of evidence, and not the more stringent "some evidence" standard, which is not mandated by the California State Legislature.

Whenever an abuse of discretion is made by an administrative agency, reviewing courts cannot set it aside unless the court has a definite and firm conviction that a clear violation in judgment has not taken place. Taylor v. United States Parole Commission, 734 F.2d 1152, 1154; Bolani v Immigration & Naturalization Service, 669 F.2d 1157, 1160; McBee v. Bonner, 296 F.2d 235, 237.

Although numerous courts are using the "some evidence" standard as set forth in Superintendent v. Hill, supra, 472 U.S. 445, and In re Rosenkrantz supra, 29 Cal.4th 616, the "some evidence" standard is in direct conflict with the Cal.Code of Regs. tit. 15 § 2000(50). The fact is, the law is what it is, and the "some evidence" standard should not be allowed to supersede the mandated preponderance of evidence within the Cal.Code of Regs. title 15 § 2000.

If the Legislature intended for the "some evidence" to be the applicable standard, the Cal.Code of Regs. tit. 15 § 2000(50) would have been repealed.

22.

The Cal.Code of Regs. title 15 § 2402 set forth six (6) factors in finding an inmate unsuitable for parole: (1) Commitment Offense; (2) Previous Record of Violence; (3) Unstable Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors and (6) Institutional Behavior. § 2402 mandates nine (9) "Circumstances Tending to Show Suitability" which are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for Future and (9) Institutional Behavior.

As shown, there are a total of fifteen factors the Board must use to find suitability or unsuitability. If the Board implements the Cal.Code of Regs. title 15 § 2000(50) and uses the preponderance of evidence standard, eight of the above mentioned factors is required to find petitioner unsuitable for parole, not five as was done during the hearing.

According to the Cal.Code of Regs. title 15 § 2281(d)(7) the parole suitability determination process only requires that part one, or part two of § 2402 be satisfied, which is in conflict with the policy of using just one factor to deny parole.

23.

## CONCLUSION

The Board found during petitioner's seventh (7th) parole consideration hearing that petitioner was unsuitable for parole based upon the gravity of the crime. The Ninth Circuit and California Supreme Court made it clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 917; Rosenkrantz, supra, 29 Cal.4th at 689.)

In the circumstances of this case, the Board's reliance upon the facts of petitioner's crime and his commitment offense as a reason to deny parole after 25 years of incarceration, violates due process. First, a continued reliance upon these unchanging factors makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest. Second, the circumstances of the crime and petitioner's criminal history do not amount to some evidence supporting the conclusion that petitioner poses an unreasonable risk of danger if released.

As the Central District Court in Rosenkrantz v. Marshall, 444 F. Supp.2d 1063, 1081 stated:

> Whether the facts of the crime of conviction or other unchanged criteria, affect the parole eligibility decision can only be predicated on the "predictive value" of the unchanged circumstance. Otherwise, if the unchanged circumstance per se can be used to deny parole eligibility, sentencing is taken out of the hands of the judge and totally

24.

deposited in the hands of the BPT. That is, parole eligibility could be indefinitely and forever delayed based on the nature of the crime even though the sentence given set forth the possibility of parole - a sentence given with the facts of the crime fresh in the mind of the judge. While it would not be a constitutional violation to forego parole altogether for certain crimes, what the state cannot constitutionally do is have a sham system where the judge promises the possibility of parole, but because of the nature of the crime, the BPT effectively deletes such from the system. Nor can a parole system, where parole is mandated to be determined on someone's future potential to harm the community, constitutionally exist where despite 20 or more years of prison life which indicates the absence of danger to the community in the future, the BPT commissioners revulsion towards the crime itself, or some other unchanged circumstance, constitutes the alpha and omega of the decision. Nobody elected the BPT commissioners as sentencing judges. Rather, in some realistic way, the facts of the unchanged circumstance must indicate a present danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearings, but counterpoised against the backdrop of prison events. (Bair v. Folsom State Prison, 2005 WL 2219220, *12 n.3 (E.D.Cal. 2005), report and recommendation adopted by, 2005 WL 3081634 (E.D.Cal. 2005).)

A review of all of petitioner's parole suitability hearings will reveal each board commissioner used the same factors to deny parole; and failed to realize that the commitment offense will never change. Does this constitute that the jury's findings of second degree murder, and the possibility of parole were a sham? What is there about the Penal Code pursuant to "Double Jeopary" that the Board doesn't understand when continuing to retry petitioner's case over

25.

and over, from his first parole consideration hearing in 1992 to the present?

The matrix for a second degree murder such as petitioner's, requires 16, 17 or 18 years of incarceration. Taking into account "good time credits," petitioner has now been incarcerated equivalent to 33 years. The question must be asked, is petitioner sentenced to life in prison without the possibility of parole?

It is, therefore, respectfully requested that this Honorable Court find that there is no evidence to support "an unreasonable risk to society," and order petitioner's immediate release.

Dated: March 15, 2008

Kenneth Dowell
Kenneth Dowell
Litigant Pro-se

26.

EXHIBITS

EXHIBIT    A

DEFENDANT'S STATEMENT:

DEFENDANT STATES THAT HE WENT TO TALK TO HIS COMMON-LAW WIFE, VICTIM DOWELL, AT HER HOME. WHILE THERE, SHE TOLD THE DEFENDANT THAT HER BOYFRIEND, VICTIM WINNET HAD TRADED HER CAR AT PARKMAN'S BAIL BONDSMAN FOR "SOMETHING". THEY DROVE TO THE BONDING COMPANY SO DEFENDANT COULD CHECK ON THE CAR. HOWEVER, THERE WAS NO ONE THERE SO THEY STARTED DRIVING BACK. HE SAW HIS EX-COMMON-LAW WIFE'S BOYFRIEND, VICTIM WINNET SO HE PARKED HIS TRUCK AND THE VICTIM PULLED UP BEHIND HIM. VICTIM WINNET STARTED SHOOTING AT HIM FIRST. DEFENDANT SAID THAT HE SHOT BACK. HE INDICATES, "I ALWAYS CARRY A GUN". HE SHOT THE VICTIM FOUR OR FIVE TIMES IN STOMACH AND VICTIM DOWELL TOOK OFF FROM THE SCENE RUNNING. ACCORDING TO THE DEFENDANT, THE POLICE CLAIMED THAT HE KIDNAPPED HIS COMMON-LAW WIFE BUT DEFENDANT SAYS THAT THIS IS NOT TRUE AND THAT SHE WENT WITH HIM ON HER OWN.

AFTER THE SHOOTING, DEFENDANT DID NOT RUN FROM THE SCENE AND SAYS, "I WAITED FOR THE POLICE. I NEVER HAD ANY INTENTION OF KILLING ANYONE. I'M SORRY IT HAPPENED."

INTERESTED PARTIES:

EFFORTS TO REACH THE INVESTIGATING OFFICER, DETECTIVE GRIGGS, LOS ANGELES SHERIFF'S DEPARTMENT HOMICIDE, 974-4341 HAVE MET WITH NEGATIVE RESULTS. HE WAS NOT AT THE OFFICE AND A TELEPHONE MESSAGE WAS LEFT FOR HIM TO CONTACT THE PROBATION OFFICER. AS OF

-10-  (DOWELL)

760692G — PROB. 5A — PS 8-82

EXHIBIT    B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )       CDC Number C-78669
Hearing of: )
 )
KENNETH DOWELL )
_____)


SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

NOVEMBER 30, 2006

10:51 A.M.

PANEL PRESENT:

Ms. Janice Eng, Presiding Commissioner
Mr. Doug Filangeri, Deputy Commissioner
J. Vieira, Board of Parole Hearings, Observer

OTHERS PRESENT:

Mr. Kenneth Dowell, Inmate
Ms. Anne Hawkins, Attorney for Inmate
Mr. James Jacobs, Deputy District Attorney
(via videoconference)
Correctional Officer(s), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No        See Review of Hearing
_____   Yes       Transcript Memorandum

**BERENICE BILLINGTON**

**NORTHERN CALIFORNIA COURT REPORTERS**

4

1    BPT Form 1073 on July 26th, 2006, and this form is

2    a Reasonable Accommodation Notice and Request in

3    accordance with the provisions of the Americans

4    with Disabilities Act, and it indicates that you

5    have checked off that you do not have any

6    disabilities under the ADA.  Is that true, sir?

7        **INMATE DOWELL:**  I'm dyslexic.

8        **PRESIDING COMMISSIONER ENG:**  You're

9    dyslexic.

10       **INMATE DOWELL:**  Yeah.

11       **PRESIDING COMMISSIONER ENG:**  Okay.

12   However--

13       **INMATE DOWELL:**  But --

14       **PRESIDING COMMISSIONER ENG:**  -- you did

15   check off that according to the ADA, though, that

16   you don't --

17       **INMATE DOWELL:**  Yeah.

18       **PRESIDING COMMISSIONER ENG:**  -- have any

19   problems.  So I just wanted to be sure that the

20   information is current and correct.

21       **INMATE DOWELL:**  I don't know.  There's no

22   disabilities that enhanders [sic] from

23   participating in this hearing.

24       **PRESIDING COMMISSIONER ENG:**  Right.  And

25   that's the important part.  Okay.  So I still have

26   to go through some basic questions regarding ADA--

27       **INMATE DOWELL:**  Yeah.

5

1        **PRESIDING COMMISSIONER ENG:**  -- okay?

2        **INMATE DOWELL:**  Right.

3        **PRESIDING COMMISSIONER ENG:**  So do you have

4    any problems walking up or down stairs or for

5    distances of 100 yards or more?

6        **INMATE DOWELL:**  No.

7        **PRESIDING COMMISSIONER ENG:**  Okay.  And I

8    see that you do have glasses.  And are those for

9    reading and distance?

10       **INMATE DOWELL:**  Yes.

11       **PRESIDING COMMISSIONER ENG:**  And are those

12   sufficient for you to be able to read any

13   documents if necessary during the hearing?

14       **INMATE DOWELL:**  Yes.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  And do

16   you have any hearing impairments?

17       **INMATE DOWELL:**  No.

18       **PRESIDING COMMISSIONER ENG:**  Okay.  Have you

19   ever been included in the Triple CMS or the EOP

20   programs?

21       **INMATE DOWELL:**  No, I have not.

22       **PRESIDING COMMISSIONER ENG:**  And you know

23   what those are?

24       **INMATE DOWELL:**  Yes, I do.

25       **PRESIDING COMMISSIONER ENG:**  So do you

26   suffer from any disability that would prevent you

27   from participating in today's hearing?

10

1    swear or affirm that the testimony that you give

2    at this hearing will be truth, the whole truth,

3    and nothing but the truth?

4         **INMATE DOWELL:**  Yes.

5         **PRESIDING COMMISSIONER ENG:**  Okay.  Thank

6    you.  I'm going to read into the record the

7    Statement of Facts, and I'm taking that from the

8    Probation Officer's Report, Page 2.

9              "At about 12:30 in the morning on

10             March 24, 1982, the defendant

11             entered the residence of victim

12             Pauline Dowell, D-O-W-E-L-L,

13             ex-common-law wife, forced her to

14             dress, and stated that he was going

15             to kill her and her boyfriend,

16             victim James Winnet, W-I-N-N-E-T.

17             Defendant then forced her into his

18             red pickup and they drove looking

19             for victim Winnet.  At the time,

20             victim Dowell did not know that

21             there -- they were being followed by

22             victim Winnet.  The defendant

23             stopped the pickup truck and

24             retrieved a handgun from beneath the

25             seat and exited the truck.  Several

26             shots were fired, and the defendant

31

1    be making reference to several documents along the

2    way, the first of which is the report from the

3    correctional counselor, I. Tate, T-A-T-E.  It --

4    his signature is not dated, but the report shows

5    June 2006.  Over on post-conviction factors

6    there's a lengthy text covering your entire prison

7    experience, from 12/30/83 when you were received

8    from Los Angeles, to present.  The only thing

9    specific to your behavior since the last hearing

10   starts about five lines up from the bottom of that

11   section on page 5, saying that your period at the

12   hearing was denied two years.  The November 2005

13   hearing was postponed.  Case factors reviewed in

14   absentia for annual review, programs not modified.

15   Then we go down to therapy and self-help groups

16   since the last hearing.  It looks like you got

17   certificates from Introduction to the Lathe,

18   Introduction to Mailing Machines, Introduction to

19   Bench Work.  So you've been working in the --

20           **INMATE DOWELL**:  In vocational Machine Shop.

21           **DEPUTY COMMISSIONER FILANGERI**:  Vocational

22   Machine Shop.

23           **INMATE DOWELL**:  Right.

24           **DEPUTY COMMISSIONER FILANGERI**:  That's

25   terrific.  And I saw of interest in there was the

26   certificate of achievement from Maintenance and

27   Operation of High Pressure Boiler.  It was

32

1   actually a certificate of completion of a 12-month

2   course in that; is that right?

3       **INMATE DOWELL:** That's correct, yes.

4       **DEPUTY COMMISSIONER FILANGERI:** That was in

5   '89. And there was some sort of home study course

6   on Modern Metal Cutting that you completed in

7   September of 2002?

8       **INMATE DOWELL:** Yes.

9       **DEPUTY COMMISSIONER FILANGERI:** Was that

10  correspondence?

11      **INMATE DOWELL:** Yes, it was correspondence.

12      **DEPUTY COMMISSIONER FILANGERI:** How'd you

13  arrange that?

14      **INMATE DOWELL:** Through the vocational

15  Machine Shop.

16      **DEPUTY COMMISSIONER FILANGERI:** Now you've

17  had a lot of experience working in PIA. As I look

18  through here, I saw stuff like -- well, maybe

19  we've already covered it. I saw something in voc

20  Machine on 2002 and 2003, and it was difficult for

21  me to tell whether -- it looked like you were

22  getting vocational Machine Shop credit and

23  completing courses, but it looked like they also

24  relied on you to repair things.

25      **INMATE DOWELL:** Yes.

26      **DEPUTY COMMISSIONER FILANGERI:** Was it kind

27  of a two-way street there?

33

1         **INMATE DOWELL:**  Yes.

2         **DEPUTY COMMISSIONER FILANGERI:**  All right.

3    And you've had some experience repairing things in

4    the past.

5         **INMATE DOWELL:**  Yeah.  I started the

6    apprenticeship in 1962 actually to be a --

7         **DEPUTY COMMISSIONER FILANGERI:**  On the

8    street?

9         **INMATE DOWELL:**  On the street, to be a

10   machine -- a millwright machinist.

11        **DEPUTY COMMISSIONER FILANGERI:**  I see.  How

12   far'd you get in that?

13        **INMATE DOWELL:**  I worked in it for 12 years.

14        **DEPUTY COMMISSIONER FILANGERI:**  The

15   probation officer's report said that you were a

16   manager in a motorcycle repair shop.  Your duties

17   involved --

18        **INMATE DOWELL:**  Yeah, doing machine work.

19        **DEPUTY COMMISSIONER FILANGERI:**  Repairing

20   motorcycles.

21        **INMATE DOWELL:**  Yeah.

22        **DEPUTY COMMISSIONER FILANGERI:**  So you were

23   actually fabricating parts for bikes?

24        **INMATE DOWELL:**  That's right.

25        **DEPUTY COMMISSIONER FILANGERI:**  What kind of

26   bikes?

27        **INMATE DOWELL:**  Harley-Davidsons, Hondas,

73

1    probation officer, and did not appear intoxicated
2    to his girlfriend, who had lived with him for ten
3    years.  We now know that the prisoner has an
4    alcohol abuse problem.  So what has he done about
5    it?  He's attended AA intermittently so he could
6    maintain his pay job and attend night school, and
7    that was in the 1998 Board Report.  The prisoner's
8    problem is alcohol, and that should be his number
9    one focus.  According to his post-conviction
10   progress reports, the prisoner has attended a
11   total of 36 months of AA since 1983.  That's 36
12   months out of 276 months, or 13 percent of the
13   time.  I feel very uncomfortable with this number
14   because the prisoner was warned that in order to
15   get quarterly chronos he would have to attend AA
16   more than once a month.  If he would rather hold a
17   pay position than attend AA regularly, then he
18   shouldn't expect a parole date when it comes time
19   to review his case.  In regards to his statements
20   in regards to the crime, he claims self-defense,
21   but the evidence is against him, which was
22   believed by a jury, and that is that the prisoner
23   pulled a weapon, a handgun, fired two shots at Mr.
24   Winnet before Mr. Winnet ever armed himself.  When
25   he sufficiently wounded Mr. Winnet, and Mr. Winnet
26   raised his arms in surrender, the prisoner then
27   emptied a 12-gauge shotgun into him, which was an

88

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER FILANGERI:**  Okay.  Back

4      on record.

5          **PRESIDING COMMISSIONER ENG:**  Okay.  The time

6      is 1:03 p.m., and let the record note that

7      everyone who was in the room prior to our recess

8      has now returned.  In the matter of Kenneth

9      Dowell, the panel has reviewed all the information

10     received and relied on the following circumstances

11     in concluding that the prisoner is not suitable

12     for parole and would pose an unreasonable risk of

13     danger to society or a threat to public safety if

14     released from prison.  In reference, the

15     commitment offense was carried out in an

16     especially cruel and/or callous manner.  There

17     were multiple victims attacked, injured and/or

18     killed in the same or separate incidents,

19     basically, your common law wife and Mr. Winnet.

20     The offense was carried out in a very

21     dispassionate and calculated manner, such as

22     execution style murder.  Specifically, Mr. Winnet

23     had his hands up after the two of you were

24     exchanging gunfire, had his hands up and was

25     giving up, and you still proceeded to take your

26     shotgun and shoot him again and which caused his

27     **KENNETH DOWELL  C-78669   DECISION PAGE 1 11/30/06**

89

1  demise.  The offense was carried out in a manner

2  which demonstrates an exceptionally callous

3  disregard for human suffering, and the motive for

4  the crime is inexplicable or very trivial in

5  relation to the offense, and it was really based

6  on jealousy.  These conclusions are drawn from the

7  Statement of Facts, which I had previously read

8  into the record earlier, and again, it's very

9  difficult for us to understand what was in your

10 mind at that time where you had ample time to

11 cease and desist in the killing of Mr. Winnet.

12 The two of you, he got out of his vehicle, you got

13 out of your vehicle, you started shooting him and

14 he was trying to give up, and you proceeded to

15 grab another weapon, and ended up killing the man.

16 The prisoner has an escalating pattern of criminal

17 conduct.  Specifically, your record of public

18 drunkenness, drunk driving, brandishing a firearm

19 and pandering, that all have led up to the life

20 crime.  You've got a somewhat history of unstable

21 or tumultuous relationships with others,

22 specifically with Pauline, who was the victim and

23 your common law wife.  The inmate has failed

24 previous grants of probation, failed to profit

25 from society's attempts to correct his

26 criminality, and the attempts included adult

27 **KENNETH DOWELL  C-78669  DECISION PAGE 2 11/30/06**

1    probation, and I can't remember if you were on

2    probation at the time of the life offense or not.

3    The prisoner has programmed in a limited manner

4    while incarcerated, and failed to upgrade

5    educationally and vocationally as previously

6    recommended by the Board.  He's not sufficiently

7    participated in beneficial documented self-help

8    and/or therapy programs.  The psychological

9    report, and I'm going to refer to both of these.

10   The recent one, dated May 2nd of 2006, and the one

11   dated September 27th of 2000, because they were

12   both authored by the same doctor, Michelle Inaba,

13   I-N-A-B-A.  We found that the recent one is

14   conditionally supportive but felt that it really

15   failed to answer the previous panel's requests,

16   specifically -- let me see if I can find it.  The

17   previous panel had asked the psychologist to

18   address the significance of alcohol as it related

19   to the commitment offense, and to estimate the

20   prisoner's ability to refrain from the use of same

21   when released, the extent to which the prisoner

22   has explored the commitment offense and come to

23   terms with the underlying causes and the need for

24   future therapy programs while incarcerated.  When

25   you take a look at the psychological evaluation of

26   2006, one thing that I became very alarmed at is

27   **KENNETH DOWELL  C-78669   DECISION PAGE 3 11/30/06**

91

1   on the bottom of page 3 of the 2006 evaluation,
2   Dr. Inaba states that: "He would not expect to
3   have a problem with relapse into the use of
4   alcohol as he, quote, 'hasn't thought about
5   drinking for years,' unquote." The panel finds
6   that that is not an adequate explanation for what
7   the previous panel was asking for. So, however,
8   the 2006 report, she does go on to state that any
9   return to the use of intoxicants would change his
10  prognosis, but failed to say how that would change
11  his prognosis and what risk there would be to the
12  community, but states that he would be expected to
13  be at low risk of violence in a controlled
14  environment. The reason why I state that, go back
15  to the 2000 psychological evaluation by Dr. Inaba,
16  is that it was fairly negative but yet still
17  didn't -- the 2006 one didn't adequately address
18  any of the risks and the concerns that Dr. Inaba
19  had stated in the 2000 one. In reference to the
20  -- your parole plans, sir, we feel that the
21  prisoner lacks realistic parole plans in that he
22  does have any viable residential plans in the last
23  county of legal residence, that being Los Angeles
24  County, let alone in the state of California, your
25  parole plans are in Oregon, and he does not have
26  acceptable employment plans. Just to state that,
27  **KENNETH DOWELL  C-78669   DECISION PAGE 4 11/30/06**

1   you know, you would find a job is not adequate.
2   It's really very, very important, sir, that you
3   have -- when you come to a panel, that you have
4   very -- you know, as current letters as possible.
5   Things change with people on the outside.  One day
6   people are here, the next day they may not be, so
7   you want to have the most current letters of
8   support to present to the panel, and make sure
9   that they're very, very specific in what they are
10  offering to you.  So they have to be very specific
11  about your housing and what does that mean, will
12  you have your own room, are they providing
13  transportation to you, are they providing
14  financial support indefinitely to you so that you
15  can transition?  You know, make it as specific as
16  possible.  Also in terms of employment plans,
17  provide letters that you are sending out to
18  organizations inquiring about possible employment,
19  and keep records of all that.  And I've seen many
20  inmates come in with a whole synopsis, where
21  they've got it listed the date that they sent
22  things out and when they received responses, who
23  it went to, you know, and all different things.
24  There's a lot of different things that you can do
25  to show the panel that you're in control of your
26  own destiny, along with who have you written to in
27  **KENNETH DOWELL  C-78669   DECISION PAGE 5 11/30/06**

93

1    terms of halfway houses.  We -- there are a lot of
2    other inmates in your situation that do not have
3    any support system, any family within the state of
4    California or within -- you know, let alone in the
5    last county of residence, but they have managed to
6    reach out and try to find and line up various
7    organizations that can help them, that can provide
8    a roof over their head, and they've provided us
9    with documentation about that, and I'd also highly
10   recommend that you don't just have one, that you
11   have backup plans, because if one doesn't come
12   through, what are your backup plans?  Because, you
13   know, one thing happens when there's a -- if and
14   when you're granted a date, it does go through a
15   very rigorous review process, everything has to be
16   confirmed.  So it's in your best interest to have
17   backup plans.  It would also be in your best
18   interest to give evidence of what type of support
19   network you are setting up for yourself on the
20   outside.  What we look for, sir, is every possible
21   thing that you've thought of for your success on
22   the outside, because the last thing anybody here
23   or yourself should want is for you to end up being
24   incarcerated again and in violating anything, so
25   in order for you to be successful, you need to
26   make sure that you have everything set up on the
27   **KENNETH DOWELL  C-78669   DECISION PAGE 6 11/30/06**

94

1   outside, safety nets, so to speak, so that should
2   you end up in a situation where there are weapons
3   there and there's drinking and stuff, that what do
4   you have set up for yourself to make sure that you
5   wouldn't fall back into a situation where you
6   could lose control, get angry, and end up becoming
7   violent.  Regarding 3042 responses, the District
8   Attorney of Los Angeles County has expressed
9   rather vehemently their opposition to parole at
10  this time.  The panel makes the following
11  findings.  The prisoner needs documented self-help
12  in order to face, discuss, understand and cope
13  with stress in a nondestructive manner.  Until
14  progress is made, the prisoner continues to be
15  unpredictable and a threat to others.
16  Nevertheless, the prisoner should be commended for
17  being disciplinary free for all these years, and
18  also the fact that I believe it was Commissioner
19  Filangeri stated back in January 18th of 1989 you
20  completed a 12-month course in Operation and
21  Maintenance of High Pressure Boilers, and plus,
22  you should be commended for your recent
23  re-involvement in vocational training.  However,
24  these positive aspects in your behavior do not
25  outweigh the factors of unsuitability.  In a
26  separate decision the hearing panel finds that the
27  **KENNETH DOWELL  C-78669   DECISION PAGE 7 11/30/06**

95

1    prisoner has been convicted of murder and it is

2    not reasonable to expect that parole would be

3    granted at a hearing during the next three years.

4    The specific reasons for this finding are as

5    follows.  The prisoner, again, committed the

6    offense in an especially cruel manner, and again I

7    refer back to what I read into the record from the

8    Statement of Facts, that you took your common law

9    wife, supposedly against her will, in your vehicle

10   and ended up confronting her, the man that she

11   wanted to marry, I believe, ended up confronting

12   him, taking a few shots at him with your handgun,

13   and then reaching for a shotgun after he had his

14   hands up and wanted to give up, and shooting him,

15   and ended up killing him.  Multiple victims were

16   attacked, injured and/or killed in the same

17   incident.  Basically your common law wife,

18   Pauline, was one of the victims, and obviously the

19   deceased, Mr. Winnet.  The offense was carried out

20   in a very dispassionate and/or calculated manner.

21   It was carried out in a manner, which demonstrates

22   an exceptionally callous disregard for human

23   suffering, and the motive for the crime was

24   inexplicable or very trivial in relation to the

25   offense.  It really was based on your jealousy and

26   your unwillingness to give up on your common law

27   **KENNETH DOWELL  C-78669   DECISION PAGE 8 11/30/06**

96

1    wife and two children and let them go.  The

2    prisoner's had a history of criminality or

3    misconduct that includes the public drunkenness,

4    you know, your prior record, brandishing a

5    firearm, drunken driving and pandering, and again,

6    a history of unstable, tumultuous relationships

7    with others, and this is evidenced by the claim of

8    abuse by your common law wife, Pauline, and then

9    your pandering conviction.  Again, the recent

10   psychological report dated May 2nd, 2006, and

11   authored by Dr. Inaba, I-N-A-B-A, the

12   improvements, there were a lot of improvements

13   that -- within the new report as opposed to her

14   2000 report, and again, both of these reports were

15   done by the same doctor.  There were many

16   improvements, although not well supported, and

17   basically suggests that your gains are recent and

18   would require a longer period of observation and

19   evaluation.  Again, the prisoner has not completed

20   the necessary programming, which is essential to

21   his adjustment and needs additional time to gain

22   such programming.  So again, failed to

23   participated and complete any documented

24   self-help.  Therefore, a longer period of

25   observation and evaluation of the prisoner is

26   required before the Board should find that the

27   **KENNETH DOWELL  C-78669  DECISION PAGE 9 11/30/06**

97

1  prisoner is suitable for parole.  The panel

2  recommends that the prisoner remain disciplinary

3  free; if available, upgrade vocationally and

4  educationally; also if available, participate in

5  documented self-help and therapy, again, if

6  available.  And I believe that concludes my

7  reading of the decision.  Commissioner --

8         **DEPUTY COMMISSIONER FILANGERI:**  No, thank

9  you.

10         **PRESIDING COMMISSIONER ENG:**  -- Filangeri?

11  Okay.  Okay.  This hearing is now over.  The time

12  is 1:18.

13              A D J O U R N M E N T

14                   -oOo-

15

16

17

18

19

20

21

22

23  **PAROLE DENIED THREE YEARS**

24  **THIS DECISION WILL BE FINAL ON:**____MAR 3 0 2007____

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **KENNETH DOWELL  C-78669   DECISION PG 10 11/30/06**

98

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Berenice Billington, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 97, and which recording was duly recorded at SAN QUENTIN STATE PRISON, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH DOWELL, CDC No. C-78669, on November 30, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated January 31, 2007, at Sacramento County, California.

*Berenice Billington*

_____
Berenice Billington
Transcriber
**NORTHERN CALIFORNIA COURT REPORTERS**

EXHIBIT    C

## PSYCHOSOCIAL EVALUATION
## FOR THE BOARD OF PRISON TERMS
## JUNE 2006 LIFER HEARING
## SAN QUENTIN STATE PRISON


## PSYCHOSOCIAL ASSESSMENT


I.  <u>Identifying Information:</u>    Mr. Dowell is a 59 year old (DOB 10-6-46), Caucasian male who is serving a Life sentence for murder in the second degree. He is presently serving a 15-year to life sentence at San Quentin State Prison. This report is based on a review of Mr. Dowell's central files, medical record and a face-to-face interview conducted in the staff offices of San Quentin State Prison. Mr. Dowell was informed of the limits of confidentiality in that information provided would be included in a report to the Board of Prison Terms. Mr. Dowell stated that he understood this and was able to demonstrate an understanding of the purpose of the interview. He denied any need for assistance or for any adaptive aides and stated that he was fully able to participate in the interview. Only Mr. Dowell and the examiner were present at the interview.

Mr. Dowell's developmental history, family history, psychosocial development and sexual orientation, military history, educational history, employment and income history, and substance abuse history have been thoroughly reviewed and presented in previous reports and will not be repeated here. The reader is referred to the June 2002 report by this examiner for this information.

II.   <u>Plans if Granted Release</u>:
A. <u>Housing</u>:  Mr. Dowell would be able to live with his aunt if he is paroled. She would be willing to provide housing for him until he is able to provide his own housing. If he were allowed to parole out of state, he would return to the state of Oregon where his family owns property. He believes that he would be able to work out an arrangement with his brother to live in a house that his brother owns.

B. <u>Employment</u>:  Mr. Dowell belongs to the Millwright's Union and considers himself to be employable as a Millwright. His brother works for Weyerhaeuser as an electrician and will help Mr. Dowell get employment with that company. Mr. Dowell is also in the process of researching companies in the Los Angeles area that might have jobs for which he would be qualified.

DOWELL, Kenneth  C-78669                                        May 2, 2006

Mr. Dowell would need to have approximately $5,000 worth of tools in order to start working. He believes that he might be eligible for assistance with this from the state Employment Development Department or from his family.

C. Social Support/Services:  Mr. Dowell plans to organize his social life around participation in Alcoholics Anonymous and his church. He has been participating in LDS church activities at San Quentin. He stated that he has resumed participation in religious activities after an absence of many years. He attended the Episcopal Church as a child but did not attend church after the age of fifteen.

Another inmate approached Mr. Dowell and invited him to attend an LDS group in San Quentin. Mr. Dowell reported that he had been feeling that something was missing from his life. Since attending the group, he has begun to feel more complete. He plans to become baptized when he is out of prison. Since joining this group he has given up all swearing and the use of tobacco, and caffeine and attends a group that provide guidance for living a Christian life.

Mr. Dowell is a single man and has no romantic relationships at the present time. He had a long-term relationship with a woman who died of stomach cancer in 2003. She was instrumental in getting Mr. Dowell involved in AA. after she observed that he had a drinking problem. They maintained a correspondence and close friendship for 19 years before she passed away.

**CLINICAL ASSESSMENT**

III. Current Mental Status/Treatment Needs:

Mr. Dowell appeared to be his stated age. He was well groomed and dressed in standard CDC inmate clothing. He appeared to be fully alert, and was oriented in all spheres. He was able to spell WORLD forward and backwards, in spite of having a history of dyslexia. He stated that he still has difficulty sounding out some words when reading. His thought was coherent, linear and logical with no evidence of thought disorder. His intellectual functioning appeared to be in the average range. He seemed quite nervous at first and stated that the interviews caused him to feel that way. Mood was dysthymic with some brightening as he became more engaged in the interview. Mr. Dowell was soft-spoken and spoke with some hesitancy. His is a taciturn man, not given to elaboration of speech. He reported no vegetative signs of depressed mood such as loss of appetite, fatigue or poor sleep. He became sad and emotional when discussing the death of a close woman friend. He denied any suicidal or homicidal thoughts. His judgement appeared to be adequate for most situations. He demonstrated some capacity for insight.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    V62.82  Bereavement
           305.00  Alcohol Abuse (in controlled environment)
           V71.01  Adult Antisocial Behavior (by history)

Dowell, Kenneth  C-78669        2    San Quentin              May 2, 2006

DOWELL, Kenneth  C-78669

May 2, 2006

| | |
|---|---|
| AXIS II: | V71.09  No contributory Personality Disorder (avoidant, obsessive-compulsive traits) |
| AXIS III: | Arthritis, allergies |
| AXIS IV: | Stressors: Incarceration, Loss of Social Support |
| AXIS V: | GAF = 78 |

## IV.    Assessment of Dangerousness:

The following is a risk assessment and not intended to predict future dangerousness with complete accuracy. A risk assessment is based on enumeration of factors found to be statistically associated with a greater likelihood of violent behavior. Some individuals found to have a rating of low risk for violence, become violent, while individuals who have factors suggesting high risk for violence, may never commit a future violent act.

A.  Violence History:  As presented previously, Mr. Dowell grew up in an environment In which he had ready access to firearms. He learned to handle guns at a young age. Guns were seen as a necessary tool for ranch work. He had a weapons charge prior to his commitment offense. His commitment offense involved the shooting of his victim.

As an older man, Mr. Dowell no longer feels a need to handle conflict situations aggressively. As stated by Mr. Dowell, "It's a macho thing when you're younger. You can handle it yourself. As you gain maturity, you can defuse situations." He denied that he would need to use a weapon to deal with any situation.

When asked what he would do if someone tried to harm his family member, he stated, "If you try to hurt my family, I'm going to try to stop you. I'm not going to murder you or hurt you. If you can't stand between them and stop it, you can call the police. I wouldn't handle it myself. You would use non-violent means."

B. In a Controlled Environment:
Mr. Dowell has remained disciplinary free since his last appearance before the Board. Based in his institutional record and present functioning, he would be expected to be at low risk of violence in a controlled environment.

C. If Released to the Community:
Mr. Dowell has the following static risk factors: a history of alcohol abuse, male gender, male victim, previous criminality, past use of a weapon, and victim injury. He has **no** present dynamic risk factors such as recent loss of control or impulsive behavior, lack of compassion, anger, or paranoid or violent thoughts.

Mr. Dowell readily admits that as a younger man, he "wasn't a model citizen." He now seems to feel ashamed of the things he did as a younger man. He recounted how he suggested that his tenant prostitute herself in order to pay her rent and stated that for him it was "all about the money." He believes that he now knows much more about relationships and sees things differently since he stopped drinking. He would not expect to have a problem with relapse into the use of alcohol as he "hasn't thought about drinking for years."

DOWELL, Kenneth  C-78669                                    May 2, 2006

In the community his plan for avoiding relapse would be to associate with people who don't drink; go to non-alcoholic social events, and avoid going places where alcohol is served.

Mr. Dowell has made a commitment to live a clean and sober lifestyle and has insight into problems of judgement that were caused by his use of alcohol. He comes from a family that has a history of alcoholism.

Although he owned his own business in the past, Mr. Dowell plans to be an employee in the future. He still sees himself as working long days as he states that he was "raised that way. In order to take care of yourself and be self-sufficient, you must work." He recalled that from the age of 10 or 11, if he was not in school, he was working. His leisure time would be spent in church or AA sponsored activities. He also has hobbies such as wood working that he would be interested in pursuing. His plans for how to use his time if paroled seem to be constructive and realistic.

V. Clinician Comments and Summary:
There have been some changes in Mr. Dowell's presentation since this examiner last evaluated him in 2000. Mr. Dowell has a greater understanding of the impact of his crime on the lives of others, including the victim's family and his own children. He has one son who is in prison and a son and a daughter with whom he has very little contact.

He now acknowledges that jealousy as well as alcohol was a factor in his crime. He has previously contended that the crime occurred when he was trying to help his former common-law wife get her vehicle back from her fiance. Mr. Dowell continues to relate that he does not believe that he would have sought to harm the victim had the victim not been armed with a gun when he exited his vehicle, and that he therefore acted in self-defense. His account is not consistent with eyewitness testimony.

Mr. Dowell is not a person who is comfortable talking about or expressing his feelings. He acknowledges that he was capable of violence in the past, but no longer has a need to display the same level of aggression.

It would seem that in the intervening years, Mr. Dowell has participated in self-help and religious activities that have given him the skills to conduct himself in a sober and non-violent manner across settings. He regularly attends AA and is on the waiting list for Kairos.

Mr. Dowell has suffered the loss of a close friend and has come to see the importance of accepting help from others. He continues to be hard working, mild-mannered and socially compliant. With greater maturity, it would be expected that a man would have more consistent behavioral control and a lessening of anger. This would seem to be the case with Mr. Dowell. In addition, his identification with pro-social groups such as AA and the LDS church is also a positive change that would further lessen any risk of future violent behavior. Overall, his risk of violent recidivism would be low at the present time, provided he remains abstinent from the use of alcohol and drugs.

DOWELL, Kenneth   C-78669                                                May 2, 2006

Any return to the use of intoxicants would change his prognosis.  Mr. Dowell presently experiences some emotional distress, subsequent to the death of someone who was very important to him.  He has support persons in the institution, with whom he can discuss this loss.  There is no indication that his emotional distress would increase the likelihood that he would engage in criminal or violent acts.  If anything, this loss has caused Mr. Dowell to seek support from others in a manner that would further lessen the risk of future violence.


_____                    5-2-06
Michel Lynn Inaba, Ph.D.                                            Date
Contract Psychologist

EXHIBIT    D

64

1          violence prevention strategies,

2          victim awareness, strategies for

3          coping with dyslexia, relationship

4          skills, and substance abuse relapse

5          prevention.  Mr. Dowell would also

6          benefit from intervention such as

7          psychotherapy, which would offer the

8          opportunity to increase his insight

9          into his own impulses and behavior."

10   And it was also noted in the psychiatric report

11   that was prepared in September of 1993 by

12   Dr. Dupre, D-U-P-R-E, that it was recommended that

13   the inmate continue vocational training, self-help

14   group participation, upgrading his education, and

15   disciplinary-free programming, which were all

16   thought to be helpful towards proper

17   resocialization into society, and internalization

18   of traditional societal values.  Continuing his AA

19   group meetings is strongly encouraged.  In the

20   event that the subject is paroled, a comprehensive

21   outpatient substance abuse treatment program should

22   be instituted within the treatment plan.  And as

23   was noted in the hearing today, the inmate has not

24   been participating in AA since 1996, and he has no

25   current self-help programs.  The prisoner does lack

26   realistic parole plans in that he does not have

27   **KENNETH RAY DOWELL C-78669  DECISION PAGE 4 7/17/03**

65

1    viable residential plans in the last county of

2    legal residence, and he does not have acceptable

3    employment plans.  And the Hearing Panel notes that

4    responses to 3042 notices indicate an opposition to

5    a finding of parole suitability, specifically by

6    the District Attorney of Los Angeles County.  We do

7    want to commend the prisoner for his certification

8    for operating boilers, his pre-GED class, his

9    modern metal cutting, and an Alternatives to

10   Violence class that he had taken, and a self-esteem

11   program, and human growth and development.  He is

12   also receiving above average work reports for his

13   work.  However, these positive aspects of his

14   behavior do not outweigh the factors of

15   unsuitability.  Mr. Dowell, this is going to be a

16   two-year denial at this time.  You -- It has been

17   recommended since 1993 and in 2000 by the doctor,

18   by prior Panels that you continue to stay in AA and

19   get some self-help.  And that has not occurred.  In

20   a separate decision, the Hearing Panel finds it is

21   not reasonable to expect that parole would be

22   granted at a hearing during the following two

23   years.  And the specific reasons are as follows,

24   that the prisoner committed the offense in a very

25   cruel manner.  Specifically that he sought out the

26   victim and was prepared to confront him as he had a

27   **KENNETH RAY DOWELL C-78669   DECISION PAGE 5 7/17/03**

68

1   offense, and I think you need to read all the

2   reports, specifically the transcript, so that

3   you're better prepared about what you say about

4   your crime the next time you come before this

5   Board.  I wish you good luck.

6       **PRESIDING COMMISSIONER DALY:**  And I do want

7   to state, try to get the information out.  You need

8   to start preparing right now on your parole plans.

9   Even if a hearing is postponed, anything that comes

10  in between now and your next parole hearing is

11  usable.  So you need to really try to get an answer

12  back from those.  See what you can do about getting

13  an interstate transfer if that is your wish to

14  transfer up to Oregon.  And I know that that is a

15  possibility.  But that's going to be very

16  important.  We'll conclude the hearing.  It is

17  4:35.

18      **INMATE DOWELL:**  Thank you.

19                  --oOo--

20

21

22

23

24

25  **PAROLE DENIED TWO YEARS**

26  **FINAL DATE OF THIS DECISION**_____OCT 15 2003_____

27  **KENNETH RAY DOWELL C-78669  DECISION PAGE 8 7/17/03**

69

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER


I, APRIL ALLEN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 68, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH RAY DOWELL, CDC No. C-78669, on JULY 17, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 30, 2003, at Sacramento County, California.


_____
April Allen
Transcriber
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT     E

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 26, 2007 | | | | |
|---|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | | Deputy Clerk |
| | NONE | Bailiff | NONE | | Reporter |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
                    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceeding: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered Petitioner's application for a Writ of Habeas Corpus filed on June 12, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole. See Cal. Code Reg. tit., 15, § 2402; *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 667.

Petitioner was received in the Department of Corrections on December 30, 1983, after a conviction for second degree murder. He was sentenced to 15 years to life imprisonment. His minimum parole eligibility date was July 6, 1992. The record reflects that on March 24, 1982, Petitioner killed the victim, the boyfriend of his ex-common law wife, during a shoot out between Petitioner and the victim.

The Board found Petitioner unsuitable for release on parole after a parole consideration hearing held on November 30, 2006. Petitioner was denied parole for three years. The Board concluded that Petitioner was unsuitable for release on parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors including the circumstances of the commitment offense, Petitioner's criminal history, his unstable social history, his insufficient participation in self-help programs, and his lack of viable parole plans.

1

| Minutes Entered |
|---|
| 10/26/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## DEPT 100

| Date: | OCTOBER 26, 2007 | | | Deputy Clerk |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Reporter |
| | NONE | Bailiff | NONE | |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
                    Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

The Court finds that there is some evidence to support the Board's finding that the commitment offense was committed in an especially cruel manner in that multiple victims were attacked, injured or killed, the offense was carried out in a dispassionate and calculated manner, the offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering, and the motive for the crime was trivial in relation to the offense.  Cal. Code Regs., tit. 15, § 2402(c)(1).  The record reflects that at the time of the commitment offense, Petitioner was separated from his common law wife (ex-wife).  The ex-wife was dating another man (boyfriend), who she planned to marry. Petitioner was jealous and angry with the boyfriend, because Petitioner thought that the boyfriend was coming between Petitioner and his ex-wife and children.  On March 24, 1982, Petitioner entered the residence of his ex-wife.  Petitioner stated that he was going to kill his ex-wife and her boyfriend. Petitioner forced his ex-wife into his vehicle.  The two drove around searching for the boyfriend.  The boyfriend happened to be following Petitioner.  Petitioner stopped his vehicle and retrieved a handgun located beneath the seat.  Petitioner told the boyfriend that he was going to kill him.  Petitioner and the boyfriend fired shots.  When Petitioner's handgun no longer had any ammunition, he retrieved a shotgun from his vehicle and continued to shoot at the boyfriend.  The boyfriend was shot several times and died from the wounds.  After Petitioner shot the boyfriend, the ex-wife ran away from the scene.

The Court finds that there is some evidence to support the Board's finding that Petitioner's previous criminal record showed an escalating pattern of criminal conduct.   The Board may properly consider Petitioner's criminal history as a factor relevant to determining whether Petitioner is suitable

2

| Minutes Entered |
|---|
| 10/26/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | |
|---|---|---|---|
| Date: | OCTOBER 26, 2007 | Judge | A. ALDANA |
| Honorable: | STEVEN R. VAN SICKLEN | Bailiff | NONE |
| | NONE | | |

Deputy Clerk
Reporter

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
          Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

for release on parole.  Cal. Code Regs., tit. 15, § 2402(b).  The record reflects that Petitioner was convicted of public drunkenness, possession of narcotics, brandishing a firearm, drunk driving, and pandering.  Petitioner was on probation for the pandering offense when he committed the commitment offense.  Petitioner has failed to profit from previous grants of probation by committing new offenses.  Thus, the record contains some evidence that Petitioner was undeterred by the earlier attempts to correct his criminality.

In making its determination, the Board also noted that Petitioner has previously abused his ex-wife during their relationship.  The Court finds that there is some evidence to support the Board's finding that Petitioner has a history of unstable social relationships.  Cal. Code Regs., tit. 15, § 2402(c)(3).

The Court finds that there is some evidence to support the Board's finding that Petitioner has not sufficiently participated in self-help programs.  The Board noted that Petitioner has not participated in any recent self-help programs.  In addition, Petitioner has not upgraded academically as recommended by the Board during the last parole hearing.  The record does reflect that Petitioner has participated in several types of vocational training.

The Court finds that there is some evidence to support the Board's finding that Petitioner lacks realistic parole plans.  See Cal. Code Regs., tit. 15, § 2402(d)(7).  The record reflects that Petitioner does not have a place to reside in the last county of legal residence.  Petitioner's proposed parole plans consist of residing with his brother in Oregon.  In addition, Petitioner does not have an offer of

3

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 26, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
                         Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

employment. The lack of housing and employment offers reflect that Petitioner is not yet suitable for parole.

The Board considered several favorable factors, including Petitioner's disciplinary record and his participation in numerous vocational programs and Alcoholic Anonymous. However, the Board found that these positive factors did not outweigh the factors tending to show unsuitability.

Although the denial of a parole date based solely on the nature of the commitment offense after a long period of incarceration may raise serious questions involving an inmate's liberty interest in parole, this is only true where the inmate has shown exemplary behavior and considerable evidence of rehabilitation. *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 917. Here, the Board did not base its decision to deny parole solely on the commitment offense, but also weighed Petitioner's prior criminal record, his unstable relationship with his common law wife, his limited participation in self-help programs, and his lack of viable parole plans.

Petitioner argues that his due process rights have been violated, because the Board failed to specifically address every factor enumerated in California Rule of Regulation, title 15, section 2402, subdivisions (c) and (d). This argument is without merit. Every factor considered by the Board need not be stated, especially if it is not persuasive. *In re Ramirez* (2001) 94 C.A. 4th 549 (disapproved on other grounds by *In Re Dannenberg* (2205) 34 Cal. 4th 1061).

Based on the above factors, the Court finds that there is "some evidence" in the record to support the Board's determination that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole. Penal Code § 3041(b).

4

| Minutes Entered |
|---|
| 10/26/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 26, 2007 | | | Deputy Clerk |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Reporter |
| | NONE | Bailiff | NONE | |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
          Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Accordingly, the petition is denied.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Kenneth Dowell
C-78669
San Quentin State Prison
San Quentin, California 94964

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

5

Minutes Entered
10/26/07
County Clerk

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | **FILED**<br>LOS ANGELES SUPERIOR COURT<br><br>NOV 1 9 2007<br><br>BY _____<br>                              DEPUTY |
| PLAINTIFF/PETITIONER:<br><br>KENNETH DOWELL | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004727 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- ☐ Order Extending Time
- ☐ Order to Show Cause
- ☐ Order for Informal Response
- ☐ Order for Supplemental Pleading

- ☑ Order re: Writ of Habeas Corpus Denied
- ☐ Order
- ☐ Order re:
- ☐ Copy of Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

November 19, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
Alexandre J. Aldana

Kenneth Dowell
C-78669
San Quentin State Prison
San Quentin, California 94964

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re | B204310 |
| KENNETH RAY DOWELL | (Los Angeles County Super. Ct. No. A454394) |
| on | (Steven R. Van Sicklen, Judge) ORDER |
| Habeas Corpus. | |

BY THE COURT:

The petition for writ of habeas corpus, filed December 13, 2007, has been read and considered. Sufficient evidence supports the Board of Prison Terms denial of parole. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1080, 1082; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677; see *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 917.) Accordingly, the petition is denied.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISSTRICT OF CALIFORNIA

Kenneth Dowell            )
      Petitioner          )      CASE NO.
                          )
    v.                    )      CALIFORNIA SUPREME COURT NUMBER
                          )      S160060
Board of Prison Hearings  )      SUPERIOR COURT #BH004727
____Respondent_____)      CALIFORNIA APPELLATE #B204310


WRIT OF HABEAS CORPUS


Kenneth Dowell
C-78669, 1-N-26U
San Quentin Prison
San Quentin, CA.
         94974

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

In re

KENNETH RAY DOWELL

on

Habeas Corpus.

B204310

(Los Angeles County
Super. Ct. No. A454394)
(Steven R. Van Sicklen, Judge)
ORDER

BY THE COURT:

The petition for writ of habeas corpus, filed December 13, 2007, has been read and considered. Sufficient evidence supports the Board of Prison Terms denial of parole. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1080, 1082; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677; see *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 917.) Accordingly, the petition is denied.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISSTRICT OF CALIFORNIA

Kenneth Dowell          )
        Petitioner      )         CASE NO.
                        )
    v.                  )         CALIFORNIA SUPREME COURT NUMBER
                        )         S160060
Board of Prison Hearings )        SUPERIOR COURT #BH004727
_____Respondent_____)       CALIFORNIA APPELLATE #B204310

WRIT OF HABEAS CORPUS

Kenneth Dowell
C-78669, 1-N-26U
San Quentin Prison
San Quentin, CA.
    94974

Court of Appeal, Second Appellate District, Div. 3 - No. B204310
**S160060**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re KENNETH RAY DOWELL on Habeas Corpus

---

The petition for review is denied.

**SUPREME COURT
FILED**

MAR 1 2 2008

**Frederick K. Ohlrich Clerk**

Moreno, J., was absent and did not participate.

Deputy

GEORGE
Chief Justice

## PROOF OF SERVICE

## C.C.P. section 1013a & 2015.5; 28 U.S.C. section 1746

I, KENNETH DOWELL,  am a resident of San Quentin State Prison, in the County of Marin, State of California, am over the age of eighteen (18) years and am a party to the above-entitled action. My State prison address is San Quentin Prison, San Quentin, California 94974.

On March    , 2008, I served the foregoing information to which was a Writ of Habeas Corpus on the party(s) herein by placing a true copy(s) thereof, enclosed in sealed envelope(s), with postage thereon fully paid, in the United States mail, in a deposit box so provided by the U.S. Postal Service, addressed as follows:

Clerk of the Court
United States District Court
Northern District of California
450 Golden Gate Ave.,
San Francisco, CA  94102

Office of the Attorney General
455 Golden Gate Ave.,
San Francisco, CA  94102

There is delivery service by United States mail at the places so addressed, and/or there is regular communication by mail between the place of mailing and the place so addressed.  I declare under penalty of perjury that the foregoing is true and correct.  Executed this    th day of Maarch 2008.


SS_____
Kenneth Dowell
Petitioner Pro-se

Legal Mail

Kenneth Doxell
C-78660/11N25-0
San Quentin, CA
94974



RECEIVED

MAY 2 6 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Clerk of the Court
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco 94102