# EXHIBIT   1 (Part 1)

COPY

## IN THE CALIFORNIA SUPERIOR COURT

## IN AND FOR THE COUNTY OF LOS ANGELES

Kenneth Dowell )
    Petitioner )
   )
v. )
   )
Board of Prison Hearings )
   Respondent )

CASE NO.

CHARGED OFFENSE NUMBER IN THE
SUPERIOR COURT OF LOS ANGELES
#A-454394 (1982)



RECEIVED
JUN 13 2007

WRIT OF HABEAS CORPUS

Kenneth Dowell
C-78669, 1-N-26U
San Quentin Prison
San Quentin, CA.
    94974

VERIFICATION

STATE OF CALIFORNIA )
                    )
COUNTY OF MARIN     )

(C.C.P. section 446 & 2015.5; 28 U.S.C. section 1746)

I, KENNETH DOWELL, declare under penalty of perjury that:

I am a party in the above-entitled action; I have read the foregoing documents and know the contents thereof; and the same is true of my own knowledge, except as to matters stated therein upon information and belief, and as to those matters I believe they are true.

Executed this 16th day of April 2007, at San Quentin State Prison, San Quentin, California 94974.

S/S _Kenneth Dowell_
    Kenneth Dowell

i.

## TABLE OF CONTENTS

VERIFICATION                                                    i.

TABLE OF CONTENTS                                              ii.

TABLE OF AUTHORITIES                                        iii-iv.

MEMORANDUM OF POINTS AND AUTHORITIES                           1-
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS


INTRODUCTION                                                  1-5


ARGUMENT  I - SOME EVIDENCE                                  5-18

        a. Consequences of actions and magnitude              7
        1. Especially atrocioius dispassionate & calculated   9
        2. Inexplicable and Trivial                          12
        3. Unstable tumultuous relationships                 13
        4. Parole plans/Vocationally upgrade                 14
        5. Self-help and therapy                             16
        6. Psychological report doesn't support parole       17

ARGUMENT II - PREPONDERANCE OF EVIDENCE                     18-21

CONCLUSION                                                 21-23

EXHIBITS


PROOF OF SERVICE

TABLE OF AUTHORITIES

Cases                                                              Pages

Anderson v.  Smith, 97 F.2d 239                                      19.

Armstrong v. Davis, 275 F.3d 849                                     4.

Biggs v. Terhune (9th Cir.2003) 334 F.3d 910                    5,8,22.

Bolani v. Immigrations, 9 F.2d 1157                                 20.

Caldwell v. Miller, 790 F.2d 589                                    19.

Envil.Def.Ctr. Inc. v. EPA (2003) 344 F.3d 832                      77.

Greenholtz v. Inmates, (1979) 442 U.S. 1                             5.

In re Capistran (2003) 107 Cal.App.4th 1299                          6.

In re Dannenberg (2005) 34 Cal.4th 1061                          10,13.

In re DeLuna (2005) 126 Cal.App.4th 585                              8.

In re George Scott, DJDAR 12450                                      9.

In re Lowe, 130 Cal.App.4th 1405                                    10.

In re Ramirez (2001) 94 Cal.4th 549                                  6.

In re Rosenkrantz (2002) 29 Cal.4th 616    5,6,8,9,10,11,14,20,22

In re Rosenkrantz, (2000) 80 Cal.App.4th                            19.

In re Scott, 119 Cal.App.4th 871                             5,8,11,12.

In re Smith, 109 Cal.App.4th 503                                   6,9.

In re Van Houten, 11 Cal.App.4th 329                                11.

Jancsek, 833 F.3d 1390                                               8.

McQuillion v. Duncan (9th Cir.2002) 306 F.3d 895                   5,8.

McBee v. Bonner, 296 F.2d 235                                       20.

Morton . Ruiz, 415 U.S. 199                                        19.

Pearce v. Director, 647 F.2d 716                                    12.

People v. Bridgehouse, 47 Cal.2d 406                                 9.

iii.

People v. Burnick, 14 Cal.3d 306                           17.

People v. Neol (2005) Cal.App. Lexis 711, 148              7.

Rosenkrantz v. Marshall, 444 F.Supp 2d 1063           5,11,22.

Superintendent v. Hill (1985) 472 U.S. 445            6,12,20.

Services v. Dulles, 354 U,.S. 363                          19.

Taylor v. U.S., 734 F.2d 1152                              20.

Turner v. Henman, 829 F.2d 612                             17.

VanderMolen v. Stetson, 571 F.2d 617                       19.

Wolff v. McDonell, 418 U.S. 539                            19.

## STATE STATUTES

Penal  Code § 3003                                     15.
Penal Code § 3041                                      19.
Penal  Code § 3043                                     13.
Penal  Code § 11177                                    15.
Penal Code § 5079                                      18.
Cal.Code of Regs., tit. 15 § 2000              19,20,21.
Cal.Code of Regs., tit. 15 § 2181                      21.
Cal.Code of Regs. tit. 15 §2322                        13.
Cal.Code of Regs. tit. 15 § 2326                       13.
Cal.Code Regs, tit. 15 §2402              2,3,8,9,14,16.

IN THE SUPERIOR COURT OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES

Kenneth Dowell         )
      Petitioner    )
                       )     Case No.
   v.               )
                       )
Board of Prison Hearings )
      Respondent    )

## WRIT OF HABEAS CORPUS

### INTRODUCTION

Petitioner, Kenneth Dowell, was convicted pursuant to Penal Code § 187, murder in the second degree. On March 24, 1982, petitioner acting in self-defense, killed James Winnet, the boyfriend of petitioner's wife.

Petitioner's wife complained that her boyfriend was attempting to trade her vehicle for a van and motor cycle. Petitioner acting on her behalf, took his wife to Parkman's Bail Bondsman, the place where the vehicle was to be traded, however, the establishment was closed. On their way back to Norwalk, California, petiitioner noticed his wife's boyfriend following them, so he drove into the Zody's parking lot, and as he did, the victim pulled up behind them. As petitioner stepped from his vehicle, Winnet shot at him. Petitioner in an act of self-defense retrieved a hand gun from his pick

1.

up and fired back. The victim was shot four or five times. After the shooting, petitioner waited for the police, and according to the probation officer's report, petitioner stated, "I never had any intention of killing anyone. I'm sorry it happened." (Exhibit A p.10.)

The Board hearing record is in conflict with the foregoing. The District Attorney's representative stated: "In regards to his statements in regards to the crime, he claims self-defense, but the evidence is against him,..." (Exh. B p.73.) The District Attorney further influences the Board by claiming that petitioner kidnapped his wife. (Exh. B p.74) However, according to the probation report, petitioner's wife made it clear that she was not kidnapped. (Exh. A. pp.4-5) The Board Commissioner read into the record the Statement of Facts from the Probation Officer's Report, then found contrary to the probation officer's report (Exh. B p.89) when stating, "he (the victim) tried to give up." There is nowhere within the probation officer's report indicating the victim was trying to "give up." (Exh. B p.10 also see Exh. A p.10)

It will be pointed out within the Board Hearing Record, that there are numerous contradictions. It will also be shown that the Board of Prison Hearings held nothing more than a summary hearing, and failed to address California Code of Regulations, title 15 § 2402, and the factors therein in relation to finding suitability or unsuitability in a parole hearing, which is required by law.

2.

Moreover, the Board of Prison Hearings used the same reasons to deny parole on six (6) previous parole consideration hearings, and has failed to take into account that petitioner has for twenty-five years, maintained a stellar prison record.

The specific factors applicable to the Board's decisions are set forth in Penal Code section 3041 and the Board's regulations (promulgated pursuant to subdivision (a) of section 3041) established criteria for determining suitability for release on parole. (Cal. Code Regs., Tit. 15 [CCR-15] section 2402.) The factor statutorily required to be considered, and of most importance, is public safety. As stated in subdivision (b) of Penal Code section 3041, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual..." The factors required to be considered by the Board regulations are for the most part, specified in section 2402.

On November 30, 2006, Petitioner appeared before the Board of Prison Hearings (BPH). The board denied Petitioner parole for three years for the following reasons: (1) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the offense was carried out in a dispassionate manner such as an executon style murder. (2) The motive for the crime was

3.

inexplicable in relation to the offense. (3) History of unstable of tumultuous relationships. (4) Parole plans/Failed to upgrade vocationally. (5) Need self-help or therapy. (6) Psychological report. (The Board chose to set aside the most recent psychological report dated, May 2, 2006, which supported parole, and use a 2000 psychological report.)(Exhibit B, pp.88-98.)

There are no negative differences between the 2000 board hearing and the November 30, 2006, board hearing. There is, however, positive advances by petitioner. Petitioner has not received disciplinary write-ups. Petitioner continues to take personal responsibility for his crime. Petitioner has viable parole plans. Petitioner continues to participate in self-help programs (AA and Positive Attitude). The psychological assessment of May 02, 2006 is supportive of release. "Petitioner would pose a low risk if he were to be released at this time. (See Exhibit C.)

The Board's decision is not in accord with a proper reading of the relevant statutes, regulations and case law. Although the "some evidence" standard of review provides broad discretion to the Board, it is in fact bound by three requirements: (1) the evidence must be drawn from the factors enumerated in the statutory and regulatory framework; (2) the evidence must be deemed relevant and reliable; and (3) the evidence must reasonably speak to whether the inmate poses a current public safety threat.

Although there is no question that under Rosenkrantz

4.

and Dannenberg the statutory "commitment offense" factor is relevant, and at times may be enough to deny parole, neither Rosenkrantz and Dannenberg stands for the principle that the commitment offense is always enough by itself. In fact, both cases affirmatively state that reliance of the commitment offense alone might in some circumstances rise to the level of a due process violation. That conclusion is consistent with the concern raised by the Ninth Circuit in <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir.2003): that reliance on an ever-frozen, unchanging factor - such as the commitment offense - in denying parole may in certain instances violate due process.

A second degree murder (the offense in this case) requires malice - an element which by its nature suggests a certain degree of cruelty and callousness - the facts used by the Board must show the crime is beyond the minimum elements for a second degree murder and establish that the crime is in fact especially heinous, atrocious or cruel. As will be shown, the Board's findings were not in accord with <u>In re Rosenkrantz</u>, 29 Cal.4th 616; <u>Ronsenkrantz v. Marshall</u>, 444 F.Supp.2d 1063; <u>In re Elkins</u>, case no. A111925, 10/31/06 First Appellate District and <u>In re Scott</u>, 119 Cal.App.4th 871.

THE BOARD OF PRISON HEARINGS
FAILED TO UPHOLD
THE SOME EVIDENCE REQUIREMENTS
RESULTING IN A VIOLATION OF
PETITIONER'S DUE PROCESS

While there is no federal constitutional right to parole, (Greenholtz v. Inmates of Nebraska Penal (1979) 442 U.S. 1, 11-12) both federal and state courts have recognized that California's parole scheme bestows on prisoners a cognizable liberty interest in parole that is protected by due process. Biggs v. Terhune (9th Cir. 2004) 334 F.3d 910, 914; Armstrong v. Davis (9th Cir. 2001) 275 F.3d 849, 864; McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 903; and In re Rosenkrantz (2002) 29 Cal.4th 616, 655-659 [prisoner's have a liberty interest in parole protected by due process.]

Within the context of parole consideration in California, due process requires that "some evidence" support a decision by the Board to deny parole. (Superintendent v. Hill (1985) 472 U.S. 445, 456; Biggs, supra, 334 F.3d at 915; Rosenkrantz, supra, 29 Cal.4th at 667; In re Smith, 109 Cal.App.4th at 501-503; In re Capistran (2003) 107 Cal.App.4th 1299, 1305; In re Ramirez (2001) 94 Cal.4th 549, 564; In re George Scott (2005) DJDAR 12450.)

Accordingly, this Court must undertake a fact specific inquiry of whether there is evidence to deny parole under California law. (McQuillion, supra, 306, F.3d at 904-906; Biggs, supra, 334 F.3d at 915.) Specifically, the Court must determine whether there is some evidence that petitioner would

6.

currently present an "unreasonable risk of danger to society" if released on parole. (Cal.Code Regs., tit. 15 §2402(a); Penal Code, §3041(b).

## THE BPT HEARING RECORD

### a. Consequences of actions and magnitude

The Rosenkrantz court held the "some evidence" standard is not met when the Board minimizes culpability. It did so after (1) delving into the entire record before the Board as to the relevant issue in question; (2) specifically reviewing evidence that the Board had omitted in making its determination; and (3) assessing the reasonableness of the Board's interpretation of the entirety of there circumstances.

The court will find after reviewing all the evidence before the Board on this issue, no reasonable interpretation of the circumstances would justify finding "some evidence." Indeed, the Board's failure to consider all relevant evidence is consistently deemed, in a variety of contexts, to be arbitrary and capricious and abuse of discretion. See e.g., Envil. Def. Ctr, Inc. v. EPA (2003) 344 F.3d 832, 858 n.35 (holding federal agency has acted in arbitrary and capricious fashion if the agency has "entirely failed to consider an important aspect... [or] its decision... runs counter to the evidence.") According to People v. Neol (2005) Cal.App. Lexis 711, at 148, "The trial Court was not permitted to substitute its conclusion... under circumstances where it could not explain

how this... bit of evidence trumped the otherwise overwhelming counterrailing credible evidence..." This is the same as the Board has done in petitioner's case.

The evidence relied on by the Board must be "reliable," (Regs.. §§ 2402, subd. (b), 2281, subd. (b)); it must have "'"some indicia of reliability."'" (In re Scott (2005) 133 Cal.App.4th 573, 591, 34 Cal.Rptr.3d 905; Biggs, 334 F.3d at 915; McQuillon, 306 F.3d at 904; Jancsek, 833 F.3d at 1390.), Additionally, the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the discretionary authority of the Board. (In re Rosenkrantz (2002) 29 Cal.4th 585, 655. A prisoner is entitled to "an individualized consideration of all relevant factors.") (In re DeLuna, 126 Cal.App.4th at p. 591.) The Board's decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious," and this requirement was not accomplished during petitioner's hearing. There is nowhere in the record that shows the Board used the California Code of Regulations, title 15 § 2402, and individually cited each factor in relation to their findings. In order for the Board to meet procedural due process embodied in the California Constitution it must address all fifteen (15) factors, and not give six (6) turgid reasons without implementing the applicable factors for each one.

Petitioner will now address each in numerical order:

8.

**(1) Especially atrocious dispassionate and calculated**

The California court implemented what is known as the "beyond the minimum necessary" in relation to the death of a victim (In re Rosenkrantz, 29 Cal.4th at 683.); and the question here is, what evidence indicates that any particular second degree murder was somehow "beyond the minimum necessary to sustain a conviction?" In other words, what evidence indicates the commitment offense was "especially atrocious, dispassionate and calculated," given that there typically must be a finding of some level of heinousness, in order for anyone to have been convicted of second degree murder in the first place? Cal.Code Regs tit. 15 § 2402(c)(1); Smith 114 Cal.App.4th at 366-67 (noting that "all second degree murders by definition involve some callousness-i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others."

In order for a crime to be "atrocious, dispassionate and calculated" and meet the "minimum necessary to sustain a conviction," the offense must have been carried out execution-style. Rosenkrantz, supra, 29 Cal.4th at p. 683. Moreover, there had to be multiple victims attacked, injured or killed in the same or separate incidents. ( See Cal.Code Regs, tit. 15 § 2402(a)(1)(A).)

The court in In re George Scott, 133 Cal.App.4th ~~(#) (Oct. 18, 2005) held "[it] is necessary to remember that~~ denial of parole based upon the nature of the offense may

9.

rise to the level of a due process violation, as where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (Rosenkrantz, supra, 29 Cal.4th at p.683.) Therefore an unsuitability determination must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances went beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety." (In re Dannenberg, supra, 34 Cal.4th at p. 1098.) The Scott court went on to explain comparisons, "[in] Rosenkrantz... a full week of careful preparation, rehearsal and execution" took place, "[the] prisoner, fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement, carried out the crime with planning, sophistication or professionalism," is more aggravated or violent, and meets the "minimum necessary." (Rosenkrantz, at p.678.) Similarly, there was evidence of premeditation in In re Lowe (2005) 130 Cal.App.4th 1405, which also involved a second degree murder conviction. There the prisoner purchased the gun shortly before the murder, entered his victim's bedroom in the middle of the night while he was asleep, unsuspecting, and in a special relationship of confidence and trust with his killer, 'shot him five times in the head and chest, execution style.' (Id. at p. 1414.) As this court stated,

10.

this evidence showed the murder 'was a cold-blooded execution' and that the prisoner's 'egregious acts [were] far more aggravated than the minimum necessary to sustain a second degree murder conviction.'" (In re Scott, 119 Cal.App.4th 871, 889-892; In re Van Houten (2004) 116 Cal.App.4th 339; Rosenkrantz v. Marshall, 444 F. Supp.2d 1063; In re Dannenberg, 34 Cal.4th at p. 1098.))

Moreover, the circumstances of petitioner's crime are significantly less egregious than those in other cases in which the nature of the offense was found to support a finding of suitability. (See Rosenkrantz v. Marshall, supra, 444 F. Supp.2d 1063.)

There is no evidence petitioner "tormented, terrorized, or injured his victim before ... shooting him, or that he gratuitously increased or unnecessarily prolonged his pain and suffering." (See In re Scott, 119 Cal.App.4th 871, 892.) Because the relevant evidence shows no more callous disregard for human suffering than is shown by most second degree murder offenses, the Board's use of this factor to conclude that petitioner committed his offense in an "especially atrocious dispassionate and calculated manner" and that the murder was "execution style," is arbitrary and capricious. (In re Rosenkrantz, supra, 29 Cal.4th at 655.)

Petitioner's commitment offense was a result of stress. The stress came from his wife leaving him, and taking his two children away, for the love of another man. The fear

11.

came as a result of the victim shooting at him.   (Exh. A p.10)
These  circumstances  are  almost  identical  to  those  in  <u>In re
Scott</u>,  supra,  119 Cal.App.4th 871, 894.  ([t]he  record   shows
that his unpremeditated offense resulted from some provocation
on  the  part  of  the  victim ...  the  circumstances  are  similar
to  those  which  have  reduced  criminal  liability  from  murder
to manslaughter, as the emotional pain caused by the departure
or  infidelity  of  a  loved  one  is  often  seen  by  juries  as
diminishing self-control.) (see, e.g., <u>People v.  Bridgehouse</u>
(1956) 47 Cal.2d 406, 414 [303 P.2d 1018].)

The  record is clear, petitioner did not plan, rehearse
and commit the offense with sophistication and professionalism.
Thus the  Board's denial does not meet the "minimum necessary"
standard  as  set  forth  in  Rosenkrantz,  or  the  "some  evidence"
standard  in  <u>Superintendent  v.  Hill</u>,  supra,   (1985)  472  U.S.
445.

(2) Inexplicable and trivial

As  to  "inexplicable  and  trivial,"  the  Scott  court
continued to say, "To fit the description of very trivial in
relation to the offense requires comparisons; the motive must
be materially less significant (or more "trivial") than those
which  drive  people  to  commit  the  offense  in  question,  and
therefore  more  indicative  of  a  risk  of  danger  to  society  if
the prisoner is released than is ordinarily presented."  (119
Cal.App.4th at 894.)   If the Scott court's reasoning is

12.

correct, the "inexplicable and trivial" standard does not meet the "some evidence" criteria in the Board's findings - for the victim's actions, when shooting at petitioner, were directly related to petitioner's conduct of acting in self-defense.

## (3) History of unstable, tumultuous relationships

The Board found "Petitioner has a history of assaultive behavior and unstable, tumultuous relationship with others (Exh. B p.89). The Board may consider misconduct only if it is reliably documented. Within Penal Code § 3043.5, the Board is required when deciding whether to release the person on parole, to "review all information received... to insure that... all current and <u>past convicted offenses</u> have been given adequate consideration." (Emphasis added.) <u>In re Dannenberg</u>, 34 Cal.4th at 1084.

California Code of Regulations, title 15 § 2322 sets forth the criminal history to be considered by the Board, to which, if the crime is over five years old it cannot be used to extend the total period of confinement.

Cal.Code of Regs, tit. 15 § 2326 requires the circumstances surrounding the charge to be reliably documented and an integral part of the crime for which the prisoner is currently committed to prison.

The BPH when finding petitioner unsuitable for parole stated: "your record of public drunkennes, drunk driving,

13.

brandishing a firearm and pandering, all have led up to the life crime." (Exh. B p.89)  First, how does drunk driving lead to murder?  Second, the record explains the brandishing charge, to which petitioner makes it clear that the weapon was a knife, not a firearm. (pp.64-65)  And third, the pandering charge has nothing to do with murder, nor is it a violent crime against the victim, which is required by Cal.Code of Regs, tit. 15 § 2402(c)(2).  Moreover, the Board's "reliance on an unchanging factor, the circumstance of the offense and <u>conduct prior</u> to imprisonment, runs contrary to rehabilitative goals espoused by the prison system, and resulted in a due process violation." <u>In re Rosenkrantz</u>, 29 Cal.4th at 689,

**(4) Petiitoner needs to upgrade vocationally/Needs parole plans**

One of the factors under Cal.Code Regs, tit. 15., 15. § 2204(d)(8) in finding a prisoner suitable for parole is "the prisoner has made realistic plans for release <u>or</u> has developed marketable skills that can be put to use upon release." (Emphasis added.)  It is not required to have both, one is sufficient.

The record is indisputable, petitioner received a certificate of achievement in the Maintenance and Operation of High Pressure Boilers, Vocational Machine Shop and Millwright Machinist. (Exh B pp.31-33)

As to parole plans, the Court will find petitioner submitted letters of support from his brother in Oregan, and

14.

an Aunt in the Los Angeles area. (Exh. B pp.46-47)  The Board however, refused to accept the parole plans from Oregan, speculating that petitioner's brother had weapons in his house. This analogy is ludicrous.  Guns can be acquired in any city within California, and for the Board to reason that petitioner cannot be parole to his brother's house because he might have a gun in the house is without merit.  Moreover, during petitioner's previous board hearing, the commissioner encouraged this petitioner to obtain "an interstate transfer to Oregan!" (Exh. D p.68) .

The United States Congress in 1934 (Penal Code § 11177) set forth an act granting the consent to any two or more states to enter into agreements of compacts.  Penal Code § 11177(c) states: "That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this compact (herein called "sending state"), to permit any person convicted of an offense... and placed on... parole to reside in any other state party to this compact... (a) [If] such person is in fact a resident or has his family residing within the receiving state..."  Also see Penal Code § 3003(b)(i) "An inmate may be paroled to another state pursuant to any law."

As previously mentioned, the title 15 § 2402 subd.(d)(8) only requires to have parole plans or a marketable skill.  Not both.

15.

5) Petitioner's need for further beneficial self-help and therapy

        The Court is directed to the Cal.Code of Regs., tit. 15 § 2402(c)(5) where it is clear "The prisoner [must have] a lengthy history of severe mental problems related to the offense." There is nowhere within the record showing petitioner has a mental history related to the offense. Nor is there anywhere within the title 15 § 2402, requiring a prisoner to participate in self-help programs.

        More importantly, the Board Commissioner recognizes that self-help programs may not be available (Exh. B p.97), and fails to recognize the psychological report at page 4, where Doctor Inaba addresses self-help: "It would seem that in the intervening years, Mr. Dowell has participated in self-help and religious activities that have given him the skills to conduct himself in a sober and non-violent manner across settings. He regularly attends AA and is on the waiting list for Kairos." The Board during petitioner's July 2003 hearing commended petitioner for his participation in self-help therapy programs. (Exh. D p.65) How is it, then, that the 2006 Board can find petitioner unsuitable for parole for failing to attend self-help programs?

(6) The Board found the Psychological report is not supportive of release

        The Court is directed to petitioner's psychological

evaluation, where Doctor Inaba states, "He has no present dynamic risk factors such as loss of control or impulsive behavior, lack of compassion, anger, or paranoid or violent thoughts." Under V. Clinician Comments and Summary, Doctor Inaba also found petitioner's "risk of violent recidivism would be low." (Exh C., May 02, 2006, psychological evaluation at page 4)

The Board chose to reject the foregoing and put itself in the position of a Psychologist (Exh. B pp.90-91) and use their own reasoning to deny parole, then assess petitioner as a risk to society.

The State Supreme Court in <u>People v. Burnick</u>, 14 Cal.3d 306, 327; 121 Cal.Rptr. 488; 535 P.2d 352, found "The evidence, as well as the consensus of opinion by responsible scientific authorities, is now unequivocal." (Diamond, the Psychiatric Prediction of Dangerousness (1975) 123 U.Pa. L.Rev. 439, 451.) In the words of spokesmen for the psychiatric profession itself, "Unfortunately, this is the state of art. Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or 'dangerousness.' Neither has any special psychiatric 'expertise' in this area been established." (Task Force Report, Clinical Aspects of the Violent Individual (American Psychiatric Assn., 1974) p.28) And the same studies which proved the inaccuracy of psychiatric predications have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err;

17.

they predict acts of violence which will not in fact take place ("false positives"), thus bringing as "dangerous" many persons who are in reality totally harmless. (See generally id. at pp.23-30.)

It is hard to believe that the Board would set aside a recent Psychological evaluation (May 2006), which support parole, then use an evaluation from September 2000 (Exh. B p.90) to find unsuitability for parole.

What may be of further interest to the Court is that psychiatric evaluations and, "The recommendation shall be submitted to the Director of Corrections and shall not be effective until approved by the director." Penal Code § 5079. In that this is the case, petitioner's psychological evaluations are invalid - for the Director of Corrections did not review and approve the recommendations.

### THE BPH IS REQUIRED TO USE THE PREPONDERANCE OF EVIDENCE STANDARD DURING A PAROLE HEARING

The California Board of Hearings' failure to follow its procedures is fundamentally unfair, and a violation of the Fifth Amendment.

The United States Constitution requires states and their agencies to comply with all the procedures they establish. Carson v. Block, 790 F.2d 562, 565-6. A violation of the BPH's rules authorizes relief in this proceeding if the rules are themselves essential components of due process of law - that

18.

is, if the procedures used by the BPH violates the Constitution. Under 18 U.S.C. § 4218, a parole board's failure to follow administrative rules and regulations violates constitutional provisions. Turner v. Henman, 829 F.2d 612.

Numerous federal courts, including the United States Supreme Court have found "an inmate is entitled to expect the Bureau of prisons to follow its own policies." Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2925, 41 L.Ed.2d 935. In re Rosenkrantz (2000) 80 Cal.App.4th 409, 424-425 also found the Board must determine parole suitability by following its own rules and regulations.

According to Caldwell v. Miller, 790 F.2d 589, 09, "An agency must conform its actions to the procedures that it has adopted." See Pearce v. Director, Office of Workers' Compensation, 647 F.2d 716; VanderMolen v. Stetson, 571 F.2d 617, 624; see also Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.) Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; Services v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403. "An inmate, too, has the right to expect prison officials to follow its policies and regulations." Anderson v. Smith, 697 F.2d 239. Here the proper procedure for the BPH and courts to follow is the "preponderance of evidence" standard within the Cal.Code of Regs. tit. 15 § 2000(50).

19.

Section 2000(a) states: "The following rules of construction apply to the regulations contained in this division..." At the end of § 2000 reference is made to Penal Code § 3041 - thus all prison inmates have a liberty interest pursuant to Cal.Code of Regs. tit. 15 § 2000(50) preponderance of evidence, and not the more stringent "some evidence" standard, which is not mandated by the California State Legislature.

Whenever an abuse of discretion is made by an administrative agency, reviewing courts cannot set it aside unless the court has a definite and firm conviction that a clear violation in judgment has not taken place. Taylor v. United States Parole Commission, 734 F.2d 1152, 1154; Bolani v Immigration & Naturalization Service, 669 F.2d 1157, 1160; McBee v. Bonner, 296 F.2d 235, 237.

Although numerous courts are using the "some evidence" standard as set forth in Superintendent v. Hill, supra, 4/2 U.S. 445, and In re Rosenkrantz supra, 29 Cal.4th 616, the "some evidence" standard is in direct conflict with the Cal.Code of Regs. tit. 15 § 2000(50). The fact is, the law is what it is, and the "some evidence" standard should not be allowed to supersede the mandated preponderance of evidence within the Cal.Code of Regs. title 15 § 2000.

If the Legislature intended for the "some evidence" to be the applicable standard, the Cal.Code of Regs. tit. 15 § 2000(50) would have been repealed.

20.

The Cal.Code of Regs. title 15 § 2402 set forth six (6) factors in finding an inmate unsuitable for parole: (1) Commitment Offense; (2) Previous Record of Violence; (3) Unstable Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors and (6) Institutional Behavior. § 2402 mandates nine (9) "Circumstances Tending to Show Suitability" which are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for Future and (9) Institutional Behavior.

As shown, there are a total of fifteen factors the Board must use to find suitability or unsuitability. If the Board implements the Cal.Code of Regs. title 15 § 2000(50) and uses the preponderance of evidence standard, eight of the above mentioned factors is required to find petitioner unsuitable for parole, not five as was done during the hearing.

According to the Cal.Code of Regs. title 15 § 2281(d)(7) the parole suitability determination process only requires that part one, or part two of § 2402 be satisfied, which is in conflict with the policy of using just one factor to deny parole.

## CONCLUSION

The Board found during petitioner's seventh (7th) parole consideration hearing that petitioner was unsuitable for parole based upon the gravity of the crime. The Ninth Circuit and California Supreme Court made it clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 917; Rosenkrantz, supra, 29 Cal.4th at 689.)

In the circumstances of this case, the Board's reliance upon the facts of petitioner's crime and his commitment offense as a reason to deny parole after 25 years of incarceration, violates due process. First, a continued reliance upon these unchanging factors makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest. Second, the circumstances of the crime and petitioner's criminal history do not amount to some evidence supporting the conclusion that petitioner poses an unreasonable risk of danger if released.

As the Central District Court in Rosenkrantz v. Marshall, 444 F. Supp.2d 1063, 1081 stated:

> Whether the facts of the crime of conviction or other unchanged criteria, affect the parole eligibility decision can only be predicated on the "predictive value" of the unchanged circumstance. Otherwise, if the unchanged circumstance per se can be used to deny parole eligibility, sentencing is taken out of the hands of the judge and totally

22.

deposited in the hands of the BPT. That is, parole eligibility could be indefinitely and forever delayed based on the nature of the crime even though the sentence given set forth the possibility of parole - a sentence given with the facts of the crime fresh in the mind of the judge. While it would not be a constitutional violation to forego parole altogether for certain crimes, what the state cannot constitutionally do is have a sham system where the judge promises the possibility of parole, but because of the nature of the crime, the BPT effectively deletes such from the system. Nor can a parole system, where parole is mandated to be determined on someone's future potential to harm the community, constitutionally exist where despite 20 or more years of prison life which indicates the absence of danger to the community in the future, the BPT commissioners revulsion towards the crime itself, or some other unchanged circumstance, constitutes the alpha and omega of the decision. Nobody elected the BPT commissioners as sentencing judges. Rather, in some realistic way, the facts of the unchanged circumstance must indicate a present danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearings, but counterpoised against the backdrop of prison events. (<u>Bair v. Folsom State Prison</u>, 2005 WL 2219220, *12 n.3 (E.D.Cal. 2005), <u>report and recommendation adopted by</u>, 2005 WL 3081634 (E.D.Cal. 2005).)

A review of all of petitioner's parole suitability hearings will reveal each board commissioner used the same factors to deny parole; and failed to realize that the commitment offense will never change. Does this constitute that the jury's findings of second degree murder, and the possibility of parole were a sham? What is there about the Penal Code pursuant to "Double Jeopary" that the Board doesn't understand when continuing to retry petitioner's case over

23.

and over, from his first parole consideration hearing in 1992 to the present?

The matrix for a second degree murder such as petitioner's, requires 16, 17 or 18 years of incarceration. Taking into account "good time credits," petitioner has now been incarcerated equivalent to 33 years. The question must be asked, is petitioner sentenced to life in prison without the possibility of parole?

It is, therefore, respectfully requested that this Honorable Court find that there is no evidence to support "an unreasonable risk to society," and order petitioner's immediate release.

Dated: April 16, 2007

*Kenneth Dowell*
Kenneth Dowell
Litigant Pro-se

EXHIBITS

EXHIBIT   A

COUNTY OF LOS ANGELES
PROBATION OFFICER'S REPORT

URT'S COPY [ORIGINA

REPORT SEQUENCE NO. 1

| DEFENDANT'S NAME(S) | COURT | JUDGE | COURT CASE NO |
|---|---|---|---|
| KENNETH RAY DOWELL | DEPT. SE-F | MC GINLEY | A454394 |

| ADDRESS | HEARING DATE | DEFENSE ATTY. | PROSECUTOR |
|---|---|---|---|
| TRANSIENT | 11-15-83 | URBAN | FRIEDENBER |

| BIRTHDATE | AGE | SEX | RACE | DPO | AREA OFFICE | PHONE NO. |
|---|---|---|---|---|---|---|
| 10-6-46 | 37 | M. | CAUC. | VARTANIAN | RIO HONDO | 692-7011 |

| CITIZENSHIP STATUS | DRIVER'S LICENSE / EXP. DATE |
|---|---|
| U.S. | S02299927/ |

| PROBATION NO. | CII NO. | BOOKING NO. |
|---|---|---|
| X-831389 | 2771712 | 6555492 |

TYPE REPORT
X  Probation and sentence
___ Pre-Conviction (131.3 CCP)
___ Post sentence
___ Diversion (Specify) _____

| DAYS IN JAIL THIS CASE | CUSTODY STATUS/RELEASE DATE |
|---|---|
| ☐ ESTIMATED ☒ VERIFIED  237 | JAIL |

## PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

CT. 1, 187 PC (MURDER), USE ALLEGATION 1203.06(A)(1) PC AND 12022.5 PC
CT. 2, 207 PC (KIDNAPPING)

FILED

DEC 2 1 1983

JOHN J. CORCORAN, County Clerk
By _____ 
Deputy

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

CT. 1, 187 PC (MURDER), 2ND DEGREE PLUS USE ALLEGATION 1203.06(A)(1)
PC AND 12022.5 PC.

| DATE OF OFFENSE | TIME | CONVICTED BY | DATE OF CONVICTION/ACQUITTAL |
|---|---|---|---|
| 3-24-82 | UNKNOWN | JURY | 10-13-83 |

COUNT(S) CONTINUED TO P & S FOR DISPOSITION
NONE-CT. 2, FOUND NOT GUILTY

| PROPOSED PLEA AGREEMENT | SOURCES OF INFORMATION |
|---|---|
| 5 YRS. TO LIFE PLUS 2 YRS. CONSECUTIVE FOR USE. | D.A. FILE, DEFENDANT |

DEFENDANT:
☐ ON PROBATION     ☐ ON PAROLE-REMAINING TIME _____
☒ PENDING PROBATION VIOLATION  ☐ PENDING NEW CASE   HOLDS/WARRANTS: ☒ YES ☐ NO
(SEE PRIOR RECORD SECTION)

## RECOMMENDATION:

☐ PROBATION   ☒ DENIAL        ☐ DIAGNOSTIC STUDY   ☐ CYA   ☐ OTHER _____
              ☐ COUNTY JAIL    ☐ 707.2 WIC          '83
              ☒ STATE PRISON   ☐ 1203.03 PC

C.I.M. & P CENTRAL

DEC 30 AM 9 17

| PRESENT OFFENSE: (CONTINUED) | SOURCES OF INFORMATION ( ae) D.A. FILE | | |
|---|---|---|---|
| CO-DEFENDANT(S) NONE | CASE NO. N/A | DISPOSITION N/A | |

| BOOKED AS DOWELL., KENNETH RAY. | OFFENSE 187 PC (MURDER) 207 PC (KIDNAPPING) | LOCATION IMPERIAL HWY., NORWALK | ARRESTING AGENCY NORWALK SO HOMICIDE |
|---|---|---|---|
| ARREST DATE 3-24-83 | TIME 1:35 A.M. | | |

ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:

AT ABOUT 12:30 IN THE MORNING ON MARCH 24, 1982, THE DEFENDANT ENTERED THE RESIDENCE OF VICTIM PAULINE DOWELL, EX-COMMON-LAW WIFE, FORCED HER TO DRESS AND STATED THAT HE WAS GOING TO KILL HER AND HER BOYFRIEND, VICTIM JAMES WINNET. DEFENDANT THEN FORCED HER INTO HIS RED PICKUP AND THEY DROVE LOOKING FOR VICTIM WINNET. AT THE TIME, VICTIM DOWELL DID NOT KNOW THAT THEY WERE BEING FOLLOWED, BY VICTIM WINNET. THE DEFENDANT STOPPED THE PICKUP TRUCK AND RETRIEVED A HANDGUN FROM BENEATH THE SEAT AND EXITED THE TRUCK. SEVERAL SHOTS WERE FIRED AND THE DEFENDANT TOLD VICTIM WINNET THAT HE WAS GOING TO KILL HIM. AT ABOUT 1:45 A.M. VICTIM WINNET WAS DETERMINED TO BE DEAD.

AFTER DEFENDANT SHOT VICTIM WINNET, VICTIM DOWELL RAN FROM THE SCENE TO CALL FOR HELP. THE DEFENDANT SHOUTED FOR HER TO STOP AND WHEN SHE DID NOT COMPLY HE FIRED ONE SHOT AT HER.

See Court Trans. rpt

-2- (DOWELL)

26PT25B — Prob. 19SC (Rev. 7/83)

VICTIM:

SOURCES OF INFORMATION (this page)

D.A. FILE

NAME
JAMES MICHAEL WINNET

COUNT(S)
CT. 1

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

DECEASED

INSURANCE COVERAGE

UNKNOWN.

X   VICTIM LIST CONTINUES NEXT PAGE

VICTIM STATEMENT:

VICTIM WINNET DIED AT THE SCENE.

| RESTITUTION: | | ESTIMATED LOSS TO ALL VICTIMS |
|---|---|---|
| ☒ YES  ☐ NO | | UNKNOWN |

| RESTITUTION ALREADY MADE | APPLIED FOR VICTIM INDEMNITY FUND | VICTIM(S) NOTIFIED OF P&S HEARING |
|---|---|---|
| NO | UNK. ☐ YES  ☐ NO | ☒ YES  ☐ NO |

| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION: | INSURANCE COMPANY NAME, ADDRESS/TELEPHONE NO. |
|---|---|
| ☐ YES  ☒ NO | N/A |

-3-  (DOWELL)

76P725B — Prob. 19SC (Rev. 7/83)

ADDITIONAL VICTIMS:

SOURCES OF INFORMATION (t:   age)

D.A. FILE

NAME

PAULINE IRENE DOWELL

COUNT(S)

CT. 2

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

NONE

INSURANCE COVERAGE

NONE

_____ VICTIM LIST, CONTINUES NEXT PAGE

VICTIM STATEMENT:

VICTIM STATES THAT THE DEFENDANT WAS HER COMMON—LAW HUSBAND FOR TEN YEARS. SHE HAS MIXED FEELINGS ABOUT WHAT HAPPENED. SHE FEELS A LOT OF GUILT AND FEELS THAT THE OFFENSE WAS PARTLY HER FAULT. PREVIOUSLY, THE DEFENDANT WARNED (CONTINUE PAGE 5)

NAME

COUNT(S)

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

INSURANCE COVERAGE

_____ VICTIM LIST CONTINUES NEXT PAGE

VICTIM STATEMENT:

—4—   (DOWELL)

1  <u>VICTIM</u>: (CONTINUED)

2  HER TO STAY AWAY FROM THE VICTIM, BUT SHE DID NOT. SHE IS GLAD

3  THAT THE KIDNAPPING CHARGES WERE DROPPED BECAUSE SHE NEVER FELT

4  THAT SHE WAS KIDNAPPED. SHE INDICATES THAT SHE HAS TO LIVE WITH

5  HER GUILT FOR THE REST OF HER LIFE. SHE FEELS THAT THE DEFENDANT

6  HAS LEARNED HIS LESSON. SHE WANTS HIM TO GET OFF AS EASY AS

7  POSSIBLE.

8  -5- (DOWELL)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

7SC692G — PROB. 5A — PS 8-82

PRIOR RECORD:

SOURCES OF INFORMATION (this page)
CII DATED 10-24-87  PROB. RECORDS,
DEFENDANT.

AKA'S:

JUVENILE HISTORY:

NONE.

ADULT HISTORY:

1-6-70    LYNWOOD PD - 11910 H&S (POSS. OF NARCOTICS), 12020 PC
          (CARRYING CONCEALED WEAPON) - ON CHARGE OF 417 PC
          (EXHIBITING FIREARM), 1 YR. PROB., $100 FINE.

9-7-70    HUNTINGTON PARK PD - WARRANTS - ON 10-20-70, 24252 VC
          (LIGHTING EQUIPMENT), $10 FINE SUSPENDED.  12951 VC
          (POSS. OF LICENSE), DISM.

9-26-70   LONG BEACH PD - TRAFFIC WARRANTS - ON 10-1-70, 40508 VC
          (FAILURE TO APPEAR), $20 OR 2 DAYS.  12951 VC (POSS. OF
          LICENSE), $15 OR 1 DAY.  4454(A) VC (REG. CARD), DISM.

3-6-74    ORANGE COUNTY PROB. - NON-SUPPORT - 3 YRS. PROB.

3-11-77   LONG BEACH PD - 23102(A) VC (DRUNK DRIVING) - ON 3-11-77,
          8 DAYS, $315.50 FINE.

9-11-78   SANTA ANA SO - CENTRAL ORANGE COUNTY WARRANT NO.
          78CN00792, 270 PC (NON-SUPPORT) - ON 12-18-78, DISM.
          FURTHERANCE OF JUSTICE.

2-7-80    LASO - 2661 PC (PANDERING) - THIS REFERS TO NORWALK
          SUPERIOR COURT CASE NO. A448375.  ON 5-15-80, 3 YRS.
          PROB., $350 FINE.  ON 7-29-82, PROB. REVOKED.  VIOL.
          OF PROB. TO TRAIL P&S HEARING ON CASE NO. A454394.

3-24-82   LASO - 187(A) PC (MURDER)

     (THIS REFERS TO THE PRESENT OFFENSE.)

-6-  (DOWELL)

76P725B — Prob. 195C (Rev. 7/83)

**PERSONAL HISTORY:**

| SOURCES OF INFORMATION (this page) |
| --- |
| DEFENDANT |

| RESIDENCE | TYPE RESIDENCE (LAST) | LENGTH OF OCCUPANCY | MORTGAGE/RENT. PAYMENT | RESIDES WITH/RELATIONSHIP |
| --- | --- | --- | --- | --- |
| | HOUSE | 3 YRS. | UNKNOWN | SELF |

| RESIDENTIAL STABILITY LAST FIVE YEARS | CAME TO STATE / FROM | CAME TO COUNTY / FROM |
| --- | --- | --- |
| GOOD | 1970/OREGON | 1970/OREGON |

Additional information

**FORMAL EDUCATION:**   COMPLETED THE 11TH GRADE AT EAGLE POINT HIGH SCHOOL IN THE

STATE OF OREGON; HAS TRAINING AS A MAINTENANCE MECHANIC.

| MARRIAGE / PARENTHOOD | MARITAL STATUS | NAME OF SPOUSE / COHABITANT (LAST) AKA: |
| --- | --- | --- |
| | DIVORCED | POLLY RAMIRES, PAULIN DOWELL |

| LENGTH OF UNION | NO. OF CHILDREN THIS UNION | SUPPORTED BY |
| --- | --- | --- |
| 9 YRS. | 2 | MOTHER |

| NO. PRIOR MARRIAGES / COHABITATIONS | NO. OF CHILDREN THESE UNIONS | SUPPORTED BY |
| --- | --- | --- |
| 1 | 2 | MOTHER |

Additional information      DEFENDANT STARTED LIVING WITH VICTIM POLLY RAMIRES, AKA

PAULINE DOWELL IN 1971. THEY SEPARATED IN 1980 BECAUSE THEY COULD NOT

GET ALONG. SHE IS CURRENTLY EMPLOYED AS A BOOKKEEPER. TWO CHILDREN,

CURRENT AGES NINE AND THREE WERE BORN TO THIS RELATIONSHIP.

        IN 1967, DEFENDANT MARRIED THE FORMER NEVA MC KINLEY.

THEY DIVORCED IN 1972. SHE IS EMPLOYED AS A BANK MANAGER. TWO CHILDREN

CURRENT AGES 17 AND 15 WERE BORN TO THIS MARRIAGE.

-7-  (DOWELL)

76P725B — Prob. 19SC (Rev. 7/83)

PERSONAL HISTORY:
(CONTINUED)

| SOURCES OF INFORMATION: (age) |
| DEFENDANT |

**SUBSTANCE ABUSE:**

__X__ No record, indication, or admission of alcohol or controlled substance abuse.

_____ Occasional social or experimental use of _____ acknowledged.

_____ See below:  Indication / admission of significant substance abuse problem.

Referred to Narcotic Evaluator  ☐ Yes  ☒ No                    _____ Narcotic Evaluators report attached

Additional information

**PHYSICAL / MENTAL / EMOTIONAL HEALTH:**

__X__ No indication or claim of significant physical/mental/emotional health problem.

_____ See below:  Indication / claim of significant physical/mental/emotional health problem.

Additional information

−8−   (DOWELL)

76P725B — Prob. 19SC (Rev. 7/63)

PERSONAL HISTORY:
(CONTINUED)

SOURCES OF INFORMATION (this)

DEFENDANT.

| EMPLOYMENT STATUS | ☐ EMPLOYED<br>☒ UNEMPLOYED | REFERRED TO WORK FURLOUGH<br>☐ YES ☒ NO | EMPLOYER AWARE OF PRESENT OFFENSE<br>☐ YES ☒ NO |
|---|---|---|---|

| PRESENT/LAST EMPLOYER / ADDRESS / PHONE | OCCUPATION | TIME ON JOB | GROSS MONTHLY WAGE |
|---|---|---|---|
| KEN'S MACHINE AND WELDING<br>SANTA FE SPRINGS, CA. | MANAGER | 2½ YRS. | ABOUT $1600 |
| | EMPLOYMENT STABILITY<br>LAST 5 YEARS<br>GOOD | TYPES OF PREVIOUS EMPLOYMENT<br>MOTORCYCLE MECHANIC,<br>ANIMAL FEEDER, MAINTENANCE<br>WORK. | |

Additional information

DEFENDANT WAS EMPLOYED AT THE TIME OF HIS ARREST.

| FINANCIAL STATUS | INCOME STABILITY<br>POOR | NET MONTHLY INCOME<br>NONE | |
|---|---|---|---|
| PRIMARY INCOME SOURCE<br>NONE. | SECONDARY INCOME SOURCE(S)<br>NONE | EST. TOTAL ASSETS<br>NONE | EST. TOTAL LIABILITIES<br>NONE |

MAJOR ASSETS / ESTIMATED VALUE

NONE

MAJOR LIABILITIES / ESTIMATED AMOUNT

NONE

Additional information

−9−  (DOWELL)

75P725B — Prob. 195C (Rev. 7/83)

1 | DEFENDANT'S STATEMENT:

2 |       DEFENDANT STATES THAT HE WENT TO TALK TO HIS

3 | COMMON-LAW WIFE, VICTIM DOWELL, AT HER HOME. WHILE THERE, SHE TOLD

4 | THE DEFENDANT THAT HER BOYFRIEND, VICTIM WINNET HAD TRADED HER CAR

5 | AT PARKMAN'S BAIL BONDSMAN FOR "SOMETHING". THEY DROVE TO THE

6 | BONDING COMPANY SO DEFENDANT COULD CHECK ON THE CAR. HOWEVER, THERE

7 | WAS NO ONE THERE SO THEY STARTED DRIVING BACK. HE SAW HIS

8 | EX-COMMON-LAW WIFE'S BOYFRIEND, VICTIM WINNET SO HE PARKED HIS TRUCK

9 | AND THE VICTIM PULLED UP BEHIND HIM. VICTIM WINNET STARTED SHOOTING

10 | AT HIM FIRST. DEFENDANT SAID THAT HE SHOT BACK. HE INDICATES,

11 | "I ALWAYS CARRY A GUN". HE SHOT THE VICTIM FOUR OR FIVE TIMES IN

12 | STOMACH AND VICTIM DOWELL TOOK OFF FROM THE SCENE RUNNING. ACCORDING

13 | TO THE DEFENDANT, THE POLICE CLAIMED THAT HE KIDNAPPED HIS COMMON-LAW

14 | WIFE BUT DEFENDANT SAYS THAT THIS IS NOT TRUE AND THAT SHE WENT WITH

15 | HIM ON HER OWN.

16 |       AFTER THE SHOOTING, DEFENDANT DID NOT RUN FROM THE

17 | SCENE AND SAYS, "I WAITED FOR THE POLICE. I NEVER HAD ANY INTENTION

18 | OF KILLING ANYONE. I'M SORRY IT HAPPENED."

19 | INTERESTED PARTIES:

20 |       EFFORTS TO REACH THE INVESTIGATING OFFICER, DETECTIVE

21 | GRIGGS, LOS ANGELES SHERIFF'S DEPARTMENT HOMICIDE, 974-4341 HAVE

22 | MET WITH NEGATIVE RESULTS. HE WAS NOT AT THE OFFICE AND A TELEPHONE

23 | MESSAGE WAS LEFT FOR HIM TO CONTACT THE PROBATION OFFICER. AS OF

    -10-  (DOWELL)

DICTATION, HE HAS NOT RETURNED THE CALL.

DEFENDANT WAS UNABLE TO SUPPLY THE PROBATION OFFICER WITH ANY CHARACTER REFERENCES WITH TELEPHONE NUMBERS.

EVALUATION:

ALTHOUGH THIS DEFENDANT DOES HAVE A CRIMINAL RECORD, HIS BEHAVIOR IN THE PRESENT OFFENSE APPEARS TO BE OUT OF CHARACTER FOR HIM.  HIS PAST RECORD DOES NOT INCLUDE ANY ACTS OF VIOLENCE.

IT SEEMS THAT THE DEFENDANT WAS STILL EMOTIONALLY INVOLVED WITH HIS COMMON-LAW WIFE AND THAT HIS VIOLENT BEHAVIOR RESULTED FROM JEALOUSY.  HE COMMITTED A VERY CRUEL AND CALLOUS ACT.  JUSTICE WOULD BEST BE SERVED BY HIS COMMITMENT TO STATE PRISON FOR THE MAXIMUM TIME POSSIBLE.

SENTENCING CONSIDERATIONS:

CIRCUMSTANCES IN AGGRAVATION:

1.  THE PLANNING WITH WHICH THE CRIME WAS CARRIED OUT INDICATED PREMEDITATION.

2.  THE DEFENDANT'S PRIOR CONVICTIONS AS AN ADULT ARE OF INCREASING SERIOUSNESS.

3.  THE DEFENDANT WAS ON PROBATION WHEN HE COMMITTED THE CRIME.

CIRCUMSTANCES IN MITIGATION:

THERE APPEAR TO BE NO MITIGATING FACTORS.

IF DEFENDANT IS SENTENCED TO STATE PRISON, THE HIGH-BASE TERM IS RECOMMENDED.

-11- (DOWELL)

76C592G - PROB. 5A - PS 8-82

RECOMMENDATION:

IT IS RECOMMENDED THAT PROBATION BE DENIED AND THE

DEFENDANT BE SENTENCED TO STATE PRISON WITH PREIMPRISONMENT CREDIT

OF 237 DAYS.

RESPECTFULLY SUBMITTED,

KENNETH E. KIRKPATRICK,
PROBATION OFFICER

BY _____
CHARLENE A. VARTANIAN, DEPUTY
RIO HONDO AREA OFFICE
692-7011, X285

READ AND APPROVED:

I HAVE READ AND CONSIDERED
THE FOREGOING REPORT OF THE
PROBATION OFFICER.

_____
RICHARD L. MATSON, SDPO

(SUBMITTED 11-9-83)
(RECEIVED 11-9-83)             JUDGE OF THE SUPERIOR COURT
(TYPED 11-10-83)
CAV:RC   (7)

IF PROBATION IS GRANTED, IT IS RECOMMENDED THAT THE

COURT DETERMINES DEFENDANT'S ABILITY TO PAY COST OF PROBATION SERVICES

PURSUANT TO SECTION 1203.1B PENAL CODE; AND, IF CONFINEMENT IN COUNTY

JAIL IS ORDERED AS A CONDITION OF PROBATION, THE COURT DETERMINES

DEFENDANT'S ABILITY TO PAY COST OF CONFINEMENT CHARGES PURSUANT TO

SECTION 1203.1C PENAL CODE.

-12-  (DOWELL)

75C692G — PROB. 5A — PS-8-82

EXHIBIT   B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


INMATE COPY

In the matter of the Life )
Term Parole Consideration )          CDC Number C-78669
Hearing of:              )
                         )
KENNETH DOWELL           )
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

NOVEMBER 30, 2006

10:51 A.M.

PANEL PRESENT:

Ms. Janice Eng, Presiding Commissioner
Mr. Doug Filangeri, Deputy Commissioner
J. Vieira, Board of Parole Hearings, Observer

OTHERS PRESENT:

Mr. Kenneth Dowell, Inmate
Ms. Anne Hawkins, Attorney for Inmate
Mr. James Jacobs, Deputy District Attorney
(via videoconference)
Correctional Officer(s), Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No        See Review of Hearing
_____  Yes       Transcript Memorandum

BERENICE BILLINGTON

NORTHERN CALIFORNIA COURT REPORTERS

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 10 |
| Pre-Commitment Factors | 19 |
| Post-Commitment Factors | 30 |
| Parole Plans | 47 |
| Closing Statements | 71 |
| Recess | 87 |
| Decision | 88 |
| Adjournment | 97 |
| Transcriber Certification | 98 |

--oOo--

1

1          P R O C E E D I N G S

2          PRESIDING COMMISSIONER ENG:  -- Parole

3     Consideration Hearing for Kenneth Dowell,

4     D-O-W-E-L-L, CDC numberC-78669.  Today's date is

5     November 30th, 2006, and the time is 10:51 a.m.  We

6     are located at San Quentin State Prison.  The

7     inmate was received on December 30th, 1983, from

8     Los Angeles County.  His life term began on

9     December 30th, 1983, with a minimum eligible parole

10    date of July 6th, 1992.  The controlling offense

11    for which the inmate has been committed is Murder

12    Two, case number A454394, count one, Penal Code

13    187 -- let's see, with a Shotgun, and then there's

14    another non-controlling offense, count one, Penal

15    Code 266.1, Pandering, and that was on February

16    7th, 1980.  The inmate received a total term of 15

17    years to life.  This hearing is being tape

18    recorded, and for the purpose of voice

19    identification each of us will be required to

20    state our first and last names, spelling out our

21    last name, and sir, when it comes to your turn,

22    once you've spelled out your last name, please

23    also provide us with your CDC number.  So I will

24    begin and we'll move to my right, and don't

25    forget, we have to -- we've got the Deputy DA on

26    video.  My name is Janice Eng, E-N-G,

27    Commissioner.

2

1        **DEPUTY COMMISSIONER FILANGERI:** Doug

2    Filangeri, F-I-L-A-N-G-E-R-I, Deputy Commissioner.

3        **DEPUTY DISTRICT ATTORNEY JACOBS:** James

4    Jacobs, J-A-C-O-B-S, Deputy District Attorney, Los

5    Angeles County.

6        **PRESIDING COMMISSIONER ENG:** Mr. Dowell?

7        **INMATE DOWELL:** Dowell, D-O-W-E-L-L, C

8    number, C-78669.

9        **PRESIDING COMMISSIONER ENG:** First name?

10       **INMATE DOWELL:** Kenneth.

11       **PRESIDING COMMISSIONER ENG:** Okay. Thank

12   you.

13       **ATTORNEY HAWKINS:** Anne Hawkins,

14   H-A-W-K-I-N-S, on behalf of Mr. Dowell.

15       **PRESIDING COMMISSIONER ENG:** Okay. Go

16   ahead.

17       **MS. VIEIRA:** J. Vieira, V-I-E-I-R-A, Board

18   of Parole Hearings, observing.

19       **PRESIDING COMMISSIONER ENG:** Okay. Thank

20   you. For the record, we have two correctional

21   officers present for security reasons and they

22   will not be participating in the hearing. Before

23   we begin, sir, I'd like you to read aloud the ADA

24   Rights and Self-Identification Statement in front

25   of you. You can begin at any time.

26       **INMATE DOWELL:** Okay.

3

1           "The American with Disabilities Act,

2           ADA, is a law to help people with

3           disabilities.  Disabilities are

4           problems that make it harder for

5           some people to see, hear, breathe,

6           talk, walk, learn, think, work, or

7           take care of themselves than it is

8           for others.  Nobody can be kept out

9           of public places or activities

10          because of a disability.  If you

11          have a disability, you have the

12          right to help -- to ask for help to

13          get ready for your BPT Board

14          Hearing, get to the hearing, talk,

15          read forms and papers and understand

16          the hearing process.  BPT will look

17          at what you ask for to make sure

18          that you have a disability that is

19          covered by the ADA and that you have

20          asked for the right kind of help.

21          If you do not get help or if you

22          don't think you got the kind of help

23          you need, ask for the -- for a BPT

24          1074 Grievance Form.  You can also

25          get help to fill it out."

26          PRESIDING COMMISSIONER ENG:   Okay.   Thank

27   you.   The record reflects that you did sign the

4

1    BPT Form 1073 on July 26th, 2006, and this form is

2    a Reasonable Accommodation Notice and Request in

3    accordance with the provisions of the Americans

4    with Disabilities Act, and it indicates that you

5    have checked off that you do not have any

6    disabilities under the ADA. Is that true, sir?

7             INMATE DOWELL: I'm dyslexic.

8             PRESIDING COMMISSIONER ENG: You're

9    dyslexic.

10            INMATE DOWELL: Yeah.

11            PRESIDING COMMISSIONER ENG: Okay.

12   However--

13            INMATE DOWELL: But --

14            PRESIDING COMMISSIONER ENG: -- you did

15   check off that according to the ADA, though, that

16   you don't --

17            INMATE DOWELL: Yeah.

18            PRESIDING COMMISSIONER ENG: -- have any

19   problems. So I just wanted to be sure that the

20   information is current and correct.

21            INMATE DOWELL: I don't know. There's no

22   disabilities that enhanders [sic] from

23   participating in this hearing.

24            PRESIDING COMMISSIONER ENG: Right. And

25   that's the important part. Okay. So I still have

26   to go through some basic questions regarding ADA--

27            INMATE DOWELL: Yeah.

5

1          PRESIDING COMMISSIONER ENG:  -- okay?

2          INMATE DOWELL:  Right.

3          PRESIDING COMMISSIONER ENG:  So do you have

4    any problems walking up or down stairs or for

5    distances of 100 yards or more?

6          INMATE DOWELL:  No.

7          PRESIDING COMMISSIONER ENG:  Okay.  And I

8    see that you do have glasses.  And are those for

9    reading and distance?

10          INMATE DOWELL:  Yes.

11          PRESIDING COMMISSIONER ENG:  And are those

12    sufficient for you to be able to read any

13    documents if necessary during the hearing?

14          INMATE DOWELL:  Yes.

15          PRESIDING COMMISSIONER ENG:  Okay.  And do

16    you have any hearing impairments?

17          INMATE DOWELL:  No.

18          PRESIDING COMMISSIONER ENG:  Okay.  Have you

19    ever been included in the Triple CMS or the EOP

20    programs?

21          INMATE DOWELL:  No, I have not.

22          PRESIDING COMMISSIONER ENG:  And you know

23    what those are?

24          INMATE DOWELL:  Yes, I do.

25          PRESIDING COMMISSIONER ENG:  So do you

26    suffer from any disability that would prevent you

27    from participating in today's hearing?

6

1        **INMATE DOWELL:**  Not that I'm aware of.

2        **PRESIDING COMMISSIONER ENG:**  Okay.  Good.

3    Counselor, are there any ADA issues that you

4    believe need further discussion regarding your

5    client's ability to go on with the hearing?

6        **ATTORNEY HAWKINS:**  No.

7        **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.

8    So this hearing is being conducted pursuant to the

9    Penal Code and the rules and regulations of the

10   Board of Parole Hearings governing parole

11   consideration hearings for life inmates.  The

12   purpose of today's hearing is to once again

13   consider your suitability for parole.  In doing so

14   we'll consider the number and nature of the crimes

15   for which you were committed, your prior criminal

16   and social history, your behavior and programming

17   since your commitment, and your plans if released.

18   We've had the opportunity to review your Central

19   File, and you'll also be given an opportunity to

20   correct or clarify the record.  We will consider

21   your progress since your commitment, your

22   counselor's reports, and your mental health

23   evaluation.  We'll focus on your progress and any

24   new reports since your last hearing, so any change

25   in the parole plans should be brought to our

26   attention.  We'll reach a decision today and

27   inform you whether or not we find you suitable for

7

1    parole and the reasons for our decision.   So if
2    you are found suitable for parole, the length of
3    your confinement will be fully explained to you at
4    that time.   Before we recess for deliberation --
5    deliberations, the District Attorney's
6    representative, your attorney and you yourself
7    will have an opportunity to provide us with a
8    final statement.   Just be sure that in your final
9    statement that you focus on your suitability for
10   parole.   We'll then recess, clear the room and
11   deliberate.   And once we've completed our
12   deliberations, we'll resume the hearing and
13   announce our decision.   California Code of
14   Regulations states that regardless of time served,
15   a life inmate shall be found unsuitable for and
16   denied parole if in the judgment of the panel the
17   inmate would pose an unreasonable risk of danger
18   to society if released from prison.   So you have
19   certain rights.   Those rights include the right to
20   a timely notice of this hearing, the right to
21   review your Central File, and the right to present
22   relevant documents.   So Counselor, has your --
23   have your client's rights been met?
24          **ATTORNEY HAWKINS:**   Yes.
25          **PRESIDING COMMISSIONER ENG:**   Okay.   So you
26   have an additional right to be heard by an
27   impartial panel.   You've been introduced to the

8

1   panel.  Do you have any objections to this panel?

2          INMATE DOWELL:  No, I have no objection to

3   it.

4          PRESIDING COMMISSIONER ENG:  Counselor, do

5   you have any objections to the panel?

6          ATTORNEY HAWKINS:  No.

7          PRESIDING COMMISSIONER ENG:  So you will

8   receive a copy of our written tentative decision

9   today.  That decision becomes final within 120

10  days.  A copy of the decision and copy of the

11  transcript will be sent to you.  And on May 1st,

12  2004, regulations regarding your right to appeal a

13  decision made at this hearing were repealed.  So

14  the process now is that you must go through the

15  courts.  So if you have any questions about that

16  process and the procedure, you can talk it over

17  with your legal counsel or you can also review the

18  policy at your prison law library.  Sir, you're

19  not required to admit to or discuss your offense,

20  however, the panel does accept as true the

21  findings of the court.  So you do understand what

22  that means?

23          INMATE DOWELL:  Yes, I understand.

24          PRESIDING COMMISSIONER ENG:  So

25  Commissioner, Filangeri, is there any confidential

26  material that will be used today?

27          DEPUTY COMMISSIONER FILANGERI:  There is no

1    confidential material in the file.

2          PRESIDING COMMISSIONER ENG:  Okay.  We've

3    already reviewed the Hearing Checklist with the

4    Deputy DA in Los Angeles, and your attorney has

5    also checked this off, and we do this to make sure

6    that we all have the same set of documents for the

7    hearing, and this is labeled "Exhibit 1."

8    Counselor, are there any additional documents to

9    be submitted to the panel this morning?

10          ATTORNEY HAWKINS:  Yes.  There are a number

11   of letters of recommendation received by Mr.

12   Dowell from family members, a community religious

13   leader, as well as family friends.

14          PRESIDING COMMISSIONER ENG:  Okay.  Thank

15   you.  Do you have any preliminary objections?

16          ATTORNEY HAWKINS:  No.

17          PRESIDING COMMISSIONER ENG:  Okay.  And will

18   your client be speaking with the panel this

19   morning?

20          ATTORNEY HAWKINS:  Yes.  Mr. Dowell is

21   prepared to answer any questions the panel might

22   have.

23          PRESIDING COMMISSIONER ENG:  Okay.  Sir,

24   I'll have to swear you in.  Please raise your

25   right hand.

26          INMATE DOWELL:  (inaudible).

27          PRESIDING COMMISSIONER ENG:  Do you solemnly

10

1    swear or affirm that the testimony that you give

2    at this hearing will be truth, the whole truth,

3    and nothing but the truth?

4         INMATE DOWELL: Yes.

5         PRESIDING COMMISSIONER ENG:  Okay.  Thank

6    you.  I'm going to read into the record the

7    Statement of Facts, and I'm taking that from the

8    Probation Officer's Report, Page 2.

9              "At about 12:30 in the morning on

10             March 24, 1982, the defendant

11             entered the residence of victim

12             Pauline Dowell, D-O-W-E-L-L,

13             ex-common-law wife, forced her to

14             dress, and stated that he was going

15             to kill her and her boyfriend,

16             victim James Winnet, W-I-N-N-E-T.

17             Defendant then forced her into his

18             red pickup and they drove looking

19             for victim Winnet.  At the time,

20             victim Dowell did not know that

21             there -- they were being followed by

22             victim Winnet.  The defendant

23             stopped the pickup truck and

24             retrieved a handgun from beneath the

25             seat and exited the truck.  Several

26             shots were fired, and the defendant

11

1          told victim Winnet that he was going

2          to kill him.  At about 1:40 a.m.,

3          victim Winnet was determined to be

4          dead.  After defendant shot victim

5          Winnet, victim Dowell ran from the

6          scene to call for help.  The

7          defendant shouted for her to stop,

8          and when she did not comply, he

9          fired one shot at her."

10   Sir, is that an accurate description of what -- I

11   know it's a brief description, but is that an

12   accurate description of what happened on that

13   night?

14          INMATE DOWELL:  Yeah, that's the record of

15   the court.  I dispute one item in there.  I never

16   shot at Pauline.  But other than that, it's fairly

17   accurate, yes.

18          PRESIDING COMMISSIONER ENG:  Okay.  Because

19   I thought that she had stated that she thought

20   that you had fired at her.

21          INMATE DOWELL:  I think in the court record

22   it states where she -- doesn't it?  That it says

23   that I did not fire at her, but I could be

24   mistaken there, but --

25          PRESIDING COMMISSIONER ENG:  You were used

26   to dealing with weapons, correct?

27          INMATE DOWELL:  Yes.

12

1      **PRESIDING COMMISSIONER ENG:**  Had you grown

2  up with a lot of guns?

3      **INMATE DOWELL:**  Yes.

4      **PRESIDING COMMISSIONER ENG:**  So I'm assuming

5  that by having all those guns, you were used to

6  shooting them also?

7      **INMATE DOWELL:**  Yes.

8      **PRESIDING COMMISSIONER ENG:**  Okay.  You were

9  pretty angry at Mr. Winnet.

10      **INMATE DOWELL:**  At that time I was, yes.

11      **PRESIDING COMMISSIONER ENG:**  You were angry

12  because he was going to -- he intended to marry

13  Miss Dowell?

14      **INMATE DOWELL:**  Yeah.  It was a problem of

15  jealousy and anger, for that reason right there,

16  but he was becoming between my children and of

17  course what I thought was my wife, you know, and

18  which those feelings I know now are misgiven, but

19  at that time that's the way I felt, and but I know

20  that those feelings there could never -- you know,

21  were entirely misguided.

22      **PRESIDING COMMISSIONER ENG:**  And you were

23  separated at the time, weren't you?

24      **INMATE DOWELL:**  No.

25      **PRESIDING COMMISSIONER ENG:**  You were still

26  living together?

27      **INMATE DOWELL:**  Well, we'd been -- my

13

1    clothes were still in the closets. We hadn't

2    actually moved out apart from one another at the

3    time.

4          PRESIDING COMMISSIONER ENG: But you -- were

5    you aware that Miss Dowell intended to spit with

6    you, or to separate with you?

7          INMATE DOWELL: Yeah, we had spoke about it

8    earlier in the week, or week before that, I think

9    it was, but, you know, you never -- those

10    emotions, you never really -- it takes awhile to

11    get over them and everything and that's how -- why

12    I was still angry at the time, I think it was.

13          PRESIDING COMMISSIONER ENG: Were you

14    abusive to Mrs. Dowell?

15          INMATE DOWELL: No.

16          PRESIDING COMMISSIONER ENG: Did you ever

17    hit her in the past?

18          INMATE DOWELL: One time I did, but that was

19    almost two years prior to that.

20          PRESIDING COMMISSIONER ENG: Had you hit

21    women before in previous relationships?

22          INMATE DOWELL: Never.

23          PRESIDING COMMISSIONER ENG: What caused you

24    to hit her that one time?

25          INMATE DOWELL: A very heated argument.

26          PRESIDING COMMISSIONER ENG: Do you remember

27    what it was about?

14

1        INMATE DOWELL:  Infidelity, I believe.

2        PRESIDING COMMISSIONER ENG:  On whose part?

3        INMATE DOWELL:  On her part.

4        PRESIDING COMMISSIONER ENG:  Okay.  Can you

5    think back and remember what triggered -- do you

6    understand what I mean by that?  What triggered

7    you to actually strike out at her?

8        INMATE DOWELL:  Well, I --

9        PRESIDING COMMISSIONER ENG:  What was the

10   moment?

11       INMATE DOWELL:  I think it's when she was

12   yelling at me and actually struck me, I think, or

13   at least pushed me anyway.

14       PRESIDING COMMISSIONER ENG:  And what did

15   you do?

16       INMATE DOWELL:  I think that's when I pushed

17   her back, and I just pushed her at that time.

18   That's all I did, just pushed her.

19       PRESIDING COMMISSIONER ENG:  Did you knock

20   her down?

21       INMATE DOWELL:  No.

22       PRESIDING COMMISSIONER ENG:  So she didn't

23   fall?

24       INMATE DOWELL:  No.

25       PRESIDING COMMISSIONER ENG:  How'd you feel

26   about doing that?

27       INMATE DOWELL:  I felt really, really bad

1  about it, and for a long time I really talked to

2  her several times about it and everything, because

3  I know that that really makes women feel powerless

4  and stuff.

5      PRESIDING COMMISSIONER ENG:  Do you think

6  that contributed to her wanting to split up with

7  you?

8      INMATE DOWELL:  It may have.  But mostly the

9  reason why we split up is because I never devoted

10  enough time to our relationship, and that's the

11  main reason that we --

12      PRESIDING COMMISSIONER ENG:  What caused you

13  to get to a point where you would actually shoot

14  and kill Mr. Winnet?  What caused you to get so

15  angry that night?

16      INMATE DOWELL:  Well, I think it's when -- I

17  intended to talk to Pauline about the separation

18  and everything, and then when I found out that Mr.

19  Winnet had taken her car and traded it off to some

20  impound lot or something, and I think that's what

21  really put my emotions over the top, I think.

22      PRESIDING COMMISSIONER ENG:  Why did you

23  focus on him and not on her?

24      INMATE DOWELL:  I love Pauline very much and

25  we have two children together, and, you know, you

26  can't -- you can never have looked the children in

27  the eye again if you would harm their mother or

16

1  something in a serious fashion.  You just would

2  never be able to do that.

3      PRESIDING COMMISSIONER ENG:  Did you

4  typically drive around with a loaded weapon in

5  your vehicle or on your person?

6      INMATE DOWELL:  In the vehicle most of the

7  time.

8      PRESIDING COMMISSIONER ENG:  Why?

9      INMATE DOWELL:  I was -- I grew up that way,

10  and it just carried over from my childhood I

11  guess.

12      PRESIDING COMMISSIONER ENG:  Even though

13  it's against the law?

14      INMATE DOWELL:  Well, in the state I grew up

15  in, it's not against the law as long as it's in

16  plain sight.

17      PRESIDING COMMISSIONER ENG:  I believe that

18  you had a weapon hidden.

19      INMATE DOWELL:  I had one behind the seat,

20  but it was unloaded, and that's true, and the

21  other one was laying on the floorboard.

22      PRESIDING COMMISSIONER ENG:  But even then,

23  I don't think in the County of Los Angeles --

24      INMATE DOWELL:  It's -- it was illegal.  I'm

25  not trying to argue that.

26      PRESIDING COMMISSIONER ENG:  Okay.  Okay.

27  Had you been drinking that night?

17

1          INMATE DOWELL:  Earlier.

2          PRESIDING COMMISSIONER ENG:  Did you ever do

3   drugs?

4          INMATE DOWELL:  No.

5          PRESIDING COMMISSIONER ENG:  Strictly

6   drinking?

7          INMATE DOWELL:  Yeah.

8          PRESIDING COMMISSIONER ENG:  Okay.  You used

9   to get drunk a lot?

10         INMATE DOWELL:  Sometimes, yes.

11         PRESIDING COMMISSIONER ENG:  Would you say

12  that you had a drinking problem?

13         INMATE DOWELL:  Yeah, occasionally.  I

14  mostly would go on binge drinking, you know.

15         PRESIDING COMMISSIONER ENG:  If you have any

16  recollection of those times that you went on binge

17  drinking, would you have a tendency to get easily

18  angered, do you recall?  Or has anybody ever told

19  you that?

20         INMATE DOWELL:  No.  Mostly when I would be

21  binge drinking or something, it was a traffic

22  problem or something that I would have, which is

23  -- you know, the records support that.  I --

24         PRESIDING COMMISSIONER ENG:  Right.

25         INMATE DOWELL:  I have two -- three DUIs,

26  drunk driving, and that's the biggest problem.

27         PRESIDING COMMISSIONER ENG:  Had anybody

18

1    ever told you, you know how the saying goes, that

2    some people are ugly drunks?

3       INMATE DOWELL:   Yeah.

4       PRESIDING COMMISSIONER ENG:   Okay.

5       INMATE DOWELL:   Yeah.   No.

6       PRESIDING COMMISSIONER ENG:   Where some

7    people can turn very nasty --

8       INMATE DOWELL:   Yeah.

9       PRESIDING COMMISSIONER ENG:   -- when they've

10   had a certain amount to drink, and other people --

11      INMATE DOWELL:   Yeah.

12      PRESIDING COMMISSIONER ENG:   -- sometimes

13   get very passive and --

14      INMATE DOWELL:   Right.

15      PRESIDING COMMISSIONER ENG:   -- just sort of

16   blend in with the woodwork.

17      INMATE DOWELL:   Yeah.

18      PRESIDING COMMISSIONER ENG:   So has anybody

19   ever indicated that to you about yourself?

20      INMATE DOWELL:   No, uh-uh, because I don't

21   interact with people normally when I'm drinking.

22      PRESIDING COMMISSIONER ENG:   Did it ever

23   occur to you when you were drinking and driving

24   that you could possibly kill somebody?

25      INMATE DOWELL:   Well, at the time it never,

26   but as years have went by, well, yeah, there's a

27   very likelihood that that would've happened if I

19

1   were to continue doing that.

2        PRESIDING COMMISSIONER ENG:  You said that

3   you have two children.

4        INMATE DOWELL:  Yeah.

5        PRESIDING COMMISSIONER ENG:  And people and

6   drive, you have to think in terms sometimes what

7   would -- how would you feel if a drunk driver

8   killed one of your children.

9        INMATE DOWELL:  Yeah, I understand that.

10  That's exactly what I'm talking about right there.

11       PRESIDING COMMISSIONER ENG:  Okay.  Let's

12  take a look at your prior record.  You did notate

13  that you did have some problems with drunk

14  driving.  The record indicates that you

15  (inaudible) tell that you had any juvenile record.

16  Is that true?

17       INMATE DOWELL:  That's true.

18       PRESIDING COMMISSIONER ENG:  Okay.  So you

19  really started running into problems as an adult,

20  dating back to I guess April 2nd, 1965.  Do you

21  recall that?  I guess this was in Oregon.

22       INMATE DOWELL:  Yeah.

23       PRESIDING COMMISSIONER ENG:  You were

24  arrested and convicted for public drunkenness.

25       INMATE DOWELL:  Yeah.

26       PRESIDING COMMISSIONER ENG:  Then five years

27  later, on January 6, 1970, the Lynnwood Police

20

1    Department arrests, possession of narcotics, and

2    possession of a concealed weapon.  What were you

3    doing with narcotics?  I thought you told me that

4    you didn't do drugs.

5            INMATE DOWELL:  Those were prescription

6    medication that the person that owned the coat I

7    was wearing.

8            PRESIDING COMMISSIONER ENG:  Okay.

9            INMATE DOWELL:  They were in a pocket of the

10   coat that --

11           PRESIDING COMMISSIONER ENG:  What about the

12   concealed weapon?

13           INMATE DOWELL:  It was a hunting -- knife

14   that I had on my belt.

15           PRESIDING COMMISSIONER ENG:  Okay.

16           INMATE DOWELL:  We just got back from a

17   camping trip on the Kern River and --

18           PRESIDING COMMISSIONER ENG:  How'd they end

19   up picking you up?

20           INMATE DOWELL:  The person -- not -- I

21   wasn't involved, but one of the people in the

22   party had a fight with somebody out in the middle

23   of the street, and somebody called the cops, and

24   we were unloading things there in the driveway and

25   they showed up, and so they stopped everybody and

26   searched them and everything and --

27           PRESIDING COMMISSIONER ENG:  Were you the

21

1   only one out of the group that was arrested?

2        INMATE DOWELL:  No, the other two people

3   that were in the fight also, were arrested also.

4        PRESIDING COMMISSIONER ENG:  Then in March

5   of '74, three-year county probation for failure to

6   pay support.  What was that about?

7        INMATE DOWELL:  My first wife, I missed two

8   child support payments.

9        PRESIDING COMMISSIONER ENG:  Okay.  Then in

10  '77 the Long Beach Police Department arrest for

11  drunk driving.  Found guilty of a misdemeanor and

12  fined.  And then three years later you received

13  the pandering arrest, and you were sentenced to 36

14  months of court probation.  This is the -- this

15  conviction was the one that was merged with the

16  commitment offense --

17       INMATE DOWELL:  Yeah.

18       PRESIDING COMMISSIONER ENG:  -- that I had

19  read into the record.  And that pandering, tell me

20  about that.

21       INMATE DOWELL:  The renter didn't want to

22  pay the rent, and I told her to -- I didn't care

23  how she got it, because the banks tell me that I

24  don't care how you get it, just give the money, so

25  I'm -- that was a very shameful way to do things,

26  but sometimes you just -- you don't think about

27  the repercussions and what you're actually doing

22

1    to people when you tell them things.

2            PRESIDING COMMISSIONER ENG:   Would you have

3    asked a man to --

4            INMATE DOWELL:   No, I don't think so.

5            PRESIDING COMMISSIONER ENG:    -- become a

6    pimp?

7            INMATE DOWELL:   I don't think so.

8            PRESIDING COMMISSIONER ENG:   In terms of

9    your personal history, so you were born and raised

10   in Oregon?

11           INMATE DOWELL:   Yes.

12           PRESIDING COMMISSIONER ENG:   Okay.   When did

13   you come to California?

14           INMATE DOWELL:   Seven -- '68 -- '69, '70.

15           PRESIDING COMMISSIONER ENG:   And what

16   brought you to California?

17           INMATE DOWELL:   A job.   My first wife and a

18   job.

19           PRESIDING COMMISSIONER ENG:   So in Oregon,

20   okay, you completed the eleventh grade.   Did you

21   ever graduate from high school?

22           INMATE DOWELL:   I took a completion test.

23           PRESIDING COMMISSIONER ENG:   So did you get

24   a GED, or no, or you --

25           INMATE DOWELL:   I don't --

26           PRESIDING COMMISSIONER ENG:    -- you did get

27   a diploma though?

23

1          INMATE DOWELL:  Yeah, I got a completion --

2          PRESIDING COMMISSIONER ENG:  A completion.

3  Okay.

4          INMATE DOWELL:  -- a certification of

5  completion.

6          PRESIDING COMMISSIONER ENG:  Okay.  And then

7  you did training as a maintenance mechanic also --

8          INMATE DOWELL:  Yeah.

9          PRESIDING COMMISSIONER ENG:  -- for the

10  community college.  Okay.  It states here that --

11  okay.  You had a previous marriage to Neva,

12  N-E-V-A, McKinley, M-C-capital-K-I-N-L-E-Y.  So is

13  that -- did I pronounce that correctly?  Neva or

14  Neva?

15          INMATE DOWELL:  Neva, I believe.

16          PRESIDING COMMISSIONER ENG:  Neva?

17          INMATE DOWELL:  Yeah.

18          PRESIDING COMMISSIONER ENG:  So that

19  marriage to Neva, was that up in Oregon, and then

20  you moved down here, or did you meet her down here

21  in California?

22          INMATE DOWELL:  I married her in Oregon.

23          PRESIDING COMMISSIONER ENG:  You married her

24  in Oregon.

25          INMATE DOWELL:  Yeah.

26          PRESIDING COMMISSIONER ENG:  Okay.  And --

27  okay.  So you were married for five years and you

24

1  had two children.  Were those children born in

2  Oregon or born here in California?

3       INMATE DOWELL:  One was born in Oregon and

4  one was born in California.

5       PRESIDING COMMISSIONER ENG:  Okay.  So when

6  you decided to uproot from Oregon you had one

7  child and a wife and you moved to --

8       INMATE DOWELL:  We didn't have any children

9  at that time.

10      PRESIDING COMMISSIONER ENG:  Oh.

11      INMATE DOWELL:  We moved to California, had

12  a children, moved back to Oregon, had a child,

13  moved back to California.

14      PRESIDING COMMISSIONER ENG:  Okay.  Okay.

15  And those two children, are they girls, boys?

16      INMATE DOWELL:  One girl, one boy.

17      PRESIDING COMMISSIONER ENG:  Okay.  And how

18  old are they now?

19      INMATE DOWELL:  Thirty-seven the boy is, and

20  34 for the girl.

21      PRESIDING COMMISSIONER ENG:  Do you stay in

22  contact with them?

23      INMATE DOWELL:  Occasionally.  We write once

24  or twice a year.

25      PRESIDING COMMISSIONER ENG:  Where are they?

26      INMATE DOWELL:  La Jolla.

27      PRESIDING COMMISSIONER ENG:  Both of them?

25

1          INMATE DOWELL:  No.  The boy, my son lives

2     in La Jolla, my -- and Dorothy lives in Arizona,

3     in a little town outside Phoenix.

4          PRESIDING COMMISSIONER ENG:  Do they both

5     have families?  Are they married or --

6          INMATE DOWELL:  Yeah, they're both married.

7          PRESIDING COMMISSIONER ENG:  And working,

8     etcetera?

9          INMATE DOWELL:  Yeah.  Right.

10          PRESIDING COMMISSIONER ENG:  Okay.  And have

11    they ever visited you in prison?

12          INMATE DOWELL:  No.  I ask that they don't.

13          PRESIDING COMMISSIONER ENG:  But you talk to

14    them?

15          INMATE DOWELL:  Yes.

16          PRESIDING COMMISSIONER ENG:  Do you ever

17    talk to them about your life crime?

18          INMATE DOWELL:  Yeah.  They understand what

19    happened.

20          PRESIDING COMMISSIONER ENG:  You also have

21    another two children that you had with Pauline

22    Ramirez Dowell, who was your common law wife.

23          INMATE DOWELL:  Right.

24          PRESIDING COMMISSIONER ENG:  Okay.  And

25    girls or boys?

26          INMATE DOWELL:  Two boys.

27          PRESIDING COMMISSIONER ENG:  Two boys.

26

1            INMATE DOWELL:  Yes.

2            PRESIDING COMMISSIONER ENG:  How old are

3    they?

4            INMATE DOWELL:  Twenty-four, the youngest

5    one, and 27 I think -- 28 I believe is the oldest

6    one.

7            PRESIDING COMMISSIONER ENG:  Are you in

8    touch with them?

9            INMATE DOWELL:  Yeah.

10           PRESIDING COMMISSIONER ENG:  Where are they?

11           INMATE DOWELL:  One lives in Los Angeles.

12           PRESIDING COMMISSIONER ENG:  Okay.

13           INMATE DOWELL:  Lives with his mother

14   actually, outside of Los Angeles.

15           PRESIDING COMMISSIONER ENG:  How about the

16   other one?

17           INMATE DOWELL:  And then the oldest one's in

18   prison.

19           PRESIDING COMMISSIONER ENG:  He's in prison.

20           INMATE DOWELL:  Uh-huh.

21           PRESIDING COMMISSIONER ENG:  For what?

22           INMATE DOWELL:  For great bodily injury.

23           PRESIDING COMMISSIONER ENG:  Okay.  So do

24   you speak with either one?

25           INMATE DOWELL:  Yeah.

26           PRESIDING COMMISSIONER ENG:  Do you ever see

27   them?  Well, obviously the one in prison you're

27

1    not going to see for a while.

2              INMATE DOWELL:  No.

3              PRESIDING COMMISSIONER ENG:  Well, what

4    about the younger one?

5              INMATE DOWELL:  No, I don't see him, but I

6    write to them, yeah.

7              PRESIDING COMMISSIONER ENG:  He's never come

8    up to visit?

9              INMATE DOWELL:  No.  I ask they don't come

10   to visit.

11             PRESIDING COMMISSIONER ENG:  You don't want

12   to see them.

13             INMATE DOWELL:  I don't want to.

14             PRESIDING COMMISSIONER ENG:  What about

15   Pauline?

16             INMATE DOWELL:  I write to her occasionally.

17   She writes to me.

18             PRESIDING COMMISSIONER ENG:  Have you talked

19   about the life crime with Pauline?

20             INMATE DOWELL:  Yes.

21             PRESIDING COMMISSIONER ENG:  And about what

22   happened?

23             INMATE DOWELL:  Yes.

24             PRESIDING COMMISSIONER ENG:  And what do you

25   think about what you put her through that night?

26             INMATE DOWELL:  I really feel really

27   terrible about it.  I apologized to her many

28

1  times. Every time I write her, matter of fact, I

2  apologize to her again, even though this is one

3  thing that through my AA I've learned to come

4  around, but you can't really make amends for this

5  kind of thing. No matter what you do for these

6  people or anything, you can't take it back, you

7  know, you just -- it's impossible, so -- and then

8  it weighs on you. Every decision you make, you

9  think about this, because it really -- it does

10  weigh on you.

11      PRESIDING COMMISSIONER ENG: Well, there are

12  consequences to everyone's actions, aren't there?

13      INMATE DOWELL: There most certainly is.

14      PRESIDING COMMISSIONER ENG: What about Mr.

15  Winnet and who he left behind?

16      INMATE DOWELL: Yeah.

17      PRESIDING COMMISSIONER ENG: What have you

18  thought about that?

19      INMATE DOWELL: He didn't have any family.

20  At least that's what I've been told. But I paid

21  for his funeral and whatever else I could do.

22      PRESIDING COMMISSIONER ENG: But what have

23  you thought about him as a victim? Regardless of

24  whether he had family living left, what have you

25  thought about?

26      INMATE DOWELL: Well, I realize that this

27  ended all his dreams, and as a person, I know that

29

1  he had dreams and which is the same as everybody

2  else did, and when you kill somebody, well, then

3  you take all that from them, and it puts a burden

4  on you, and you can't -- and since you can't erase

5  something like that, no matter what you do, no

6  matter how bad it makes you feel, or anything

7  else, you can't start -- it's over with. You

8  can't stop it.

9      PRESIDING COMMISSIONER ENG:  When you pulled

10  out that shotgun, because I -- if my recollection

11  is correct, that you had a handgun first?

12      INMATE DOWELL:  Yes.

13      PRESIDING COMMISSIONER ENG:  And I think

14  both of you were shooting at each other?

15      INMATE DOWELL:  Yes.

16      PRESIDING COMMISSIONER ENG:  Did you hit

17  anything at that point?

18      INMATE DOWELL:  I'm not sure.

19      PRESIDING COMMISSIONER ENG:  Okay.  But then

20  you went for the shotgun.

21      INMATE DOWELL:  Yeah.  Because I emptied the

22  handgun.

23      PRESIDING COMMISSIONER ENG:  Right.  At that

24  point did you want to kill him?  Was that your

25  intent?

26      INMATE DOWELL:  Well, I was in the heat of

27  the battle at that time, and, yes, I --

30

1       PRESIDING COMMISSIONER ENG:  You wanted him

2   dead?

3       INMATE DOWELL:  Yeah.

4       PRESIDING COMMISSIONER ENG:  Okay.  So is

5   there anything that I've left out in terms of your

6   personal life or your background, or in terms of

7   your previous convictions, etcetera?  Is there

8   anything that I've missed --

9       INMATE DOWELL:  I don't think so.

10      PRESIDING COMMISSIONER ENG:  -- that you'd

11  like me to add or discuss?

12      INMATE DOWELL:  Not that I'm aware of.  I

13  don't think you missed anything.

14      PRESIDING COMMISSIONER ENG:  Okay.  Okay.

15  We'll move on, and Commissioner Filangeri will go

16  over your post-conviction factors.

17      DEPUTY COMMISSIONER FILANGERI:  Thank you,

18  Commissioner.  The purpose of this segment of the

19  hearing is to detail your prison behavior since

20  the last time you appeared before the Board.  The

21  records suggest that you were postponed on

22  November of 2005 because there was no new psych

23  report as had been ordered in 2003, which was your

24  last actual hearing, July 17th.  Does that sound

25  right to you?

26      INMATE DOWELL:  That's correct, yes.

27      DEPUTY COMMISSIONER FILANGERI:  I'm going to

31

1   be making reference to several documents along the

2   way, the first of which is the report from the

3   correctional counselor, I. Tate, T-A-T-E.  It --

4   his signature is not dated, but the report shows

5   June 2006.  Over on post-conviction factors

6   there's a lengthy text covering your entire prison

7   experience, from 12/30/83 when you were received

8   from Los Angeles, to present.  The only thing

9   specific to your behavior since the last hearing

10   starts about five lines up from the bottom of that

11   section on page 5, saying that your period at the

12   hearing was denied two years.  The November 2005

13   hearing was postponed.  Case factors reviewed in

14   absentia for annual review, programs not modified.

15   Then we go down to therapy and self-help groups

16   since the last hearing.  It looks like you got

17   certificates from Introduction to the Lathe,

18   Introduction to Mailing Machines, Introduction to

19   Bench Work.  So you've been working in the --

20           INMATE DOWELL:  In vocational Machine Shop.

21           DEPUTY COMMISSIONER FILANGERI:  Vocational

22   Machine Shop.

23           INMATE DOWELL:  Right.

24           DEPUTY COMMISSIONER FILANGERI:  That's

25   terrific.  And I saw of interest in there was the

26   certificate of achievement from Maintenance and

27   Operation of High Pressure Boiler.  It was

32

1    actually a certificate of completion of a 12-month

2    course in that; is that right?

3         INMATE DOWELL:  That's correct, yes.

4         DEPUTY COMMISSIONER FILANGERI:  That was in

5    '89.  And there was some sort of home study course

6    on Modern Metal Cutting that you completed in

7    September of 2002?

8         INMATE DOWELL:  Yes.

9         DEPUTY COMMISSIONER FILANGERI:  Was that

10   correspondence?

11        INMATE DOWELL:  Yes, it was correspondence.

12        DEPUTY COMMISSIONER FILANGERI:  How'd you

13   arrange that?

14        INMATE DOWELL:  Through the vocational

15   Machine Shop.

16        DEPUTY COMMISSIONER FILANGERI:  Now you've

17   had a lot of experience working in PIA.  As I look

18   through here, I saw stuff like -- well, maybe

19   we've already covered it.  I saw something in voc

20   Machine on 2002 and 2003, and it was difficult for

21   me to tell whether -- it looked like you were

22   getting vocational Machine Shop credit and

23   completing courses, but it looked like they also

24   relied on you to repair things.

25        INMATE DOWELL:  Yes.

26        DEPUTY COMMISSIONER FILANGERI:  Was it kind

27   of a two-way street there?

33

1        INMATE DOWELL:  Yes.

2        DEPUTY COMMISSIONER FILANGERI:  All right.

3   And you've had some experience repairing things in

4   the past.

5        INMATE DOWELL:  Yeah.  I started the

6   apprenticeship in 1962 actually to be a --

7        DEPUTY COMMISSIONER FILANGERI:  On the

8   street?

9        INMATE DOWELL:  On the street, to be a

10  machine -- a millwright machinist.

11      DEPUTY COMMISSIONER FILANGERI:  I see.  How

12  far'd you get in that?

13       INMATE DOWELL:  I worked in it for 12 years.

14       DEPUTY COMMISSIONER FILANGERI:  The

15  probation officer's report said that you were a

16  manager in a motorcycle repair shop.  Your duties

17  involved --

18       INMATE DOWELL:  Yeah, doing machine work.

19       DEPUTY COMMISSIONER FILANGERI:  Repairing

20  motorcycles.

21       INMATE DOWELL:  Yeah.

22       DEPUTY COMMISSIONER FILANGERI:  So you were

23  actually fabricating parts for bikes?

24       INMATE DOWELL:  That's right.

25       DEPUTY COMMISSIONER FILANGERI:  What kind of

26  bikes?

27       INMATE DOWELL:  Harley-Davidsons, Hondas,