# EXHIBIT   1 (Part 2)

34

1    BMWs.

2           DEPUTY COMMISSIONER FILANGERI:  Really all

3    different kinds of bikes.

4           INMATE DOWELL:  Yes.

5           DEPUTY COMMISSIONER FILANGERI:  It wasn't

6    any particular specialty?

7           INMATE DOWELL:  Mostly on Harley-Davidsons,

8    redoing the valves on the older machines.

9           DEPUTY COMMISSIONER FILANGERI:  They go

10   through valves pretty quick, do they?

11          INMATE DOWELL:  Yeah, but you can't -- you

12   couldn't -- at that time you couldn't buy them

13   so--

14          DEPUTY COMMISSIONER FILANGERI:  So you were

15   turning new valves?

16          INMATE DOWELL:  Yeah.  I was converting car

17   valves to fit into the motorcycles.

18          DEPUTY COMMISSIONER FILANGERI:  Wow.  Wow,

19   that's pretty sophisticated.  Okay.  Let me see,

20   what else did I see in here?  Well, your

21   disciplinary history is very noteworthy in terms

22   of its absence of anything.  I guess you got a

23   general counseling chrono for possession of

24   dangerous property in 2002.  What kind of property

25   was that?

26          INMATE DOWELL:  Those were actually

27   screwdrivers and some pliers that were in a locker

35

1    that I had control of.

2         DEPUTY COMMISSIONER FILANGERI:   Was that in

3    the ·industries area, or your job site --

4         INMATE DOWELL:   No --

5         DEPUTY COMMISSIONER FILANGERI:   -- or was it

6    at your house?

7         INMATE DOWELL:   -- at that time, I was doing

8    clerical work at that time and they were in a

9    locker in the office that I shared with an

10   officer.

11        DEPUTY COMMISSIONER FILANGERI:   You just

12   can't stop fixing things, can you?

13        INMATE DOWELL:   No.   And the write-up was

14   because I had a inmate combination lock on the

15   locker.

16        DEPUTY COMMISSIONER FILANGERI:   I see.

17        INMATE DOWELL:   Even though they all had

18   keys for it, but --

19        DEPUTY COMMISSIONER FILANGERI:   Yeah.

20        INMATE DOWELL:   -- they give -- they said

21   that that gave me sole access to the tools.

22        DEPUTY COMMISSIONER FILANGERI:   Oh, so they

23   weren't your tools?

24        INMATE DOWELL:   No, they belonged to one of

25   the officers -- two of the officers.

26        DEPUTY COMMISSIONER FILANGERI:   The officers

27   put them in there?

36

1        **INMATE DOWELL:** Yeah.

2        **DEPUTY COMMISSIONER FILANGERI:** Did you say

3   that at your --

4        **INMATE DOWELL:** Yeah, they knew that.

5        **DEPUTY COMMISSIONER FILANGERI:** Why'd they

6   give you a counseling chrono?

7        **INMATE DOWELL:** Because they were supposed

8   to have a -- an inventory sheet on them and nobody

9   -- everybody failed to put an inventory sheet on

10  them.

11       **DEPUTY COMMISSIONER FILANGERI:** So just to

12  cover their backsides.

13       **INMATE DOWELL:** Yes.

14       **DEPUTY COMMISSIONER FILANGERI:** I see.  I

15  didn't see anything else remarkable about the

16  probation -- sorry, the correctional counselor's

17  report.  I want to turn now to the psychological

18  evaluation.  It's dated May 2, 2006.  It's

19  provided by Michelle Lynn Inaba, I-N-A-B-A, Ph.D.

20  Under -- on page 2, under "Clinical Assessment,"

21  she describes you as functioning within normal

22  limits.  She does mention a history of dyslexia

23  and that you commented, that you still have

24  difficulty sounding out some words for reading,

25  but that seemed to be the only -- anything outside

26  the norm.  Axis I diagnostic impression was

27  Bereavement, Alcohol Abuse in a Controlled

1    Environment, and Adult Antisocial Behavior by

2    History;   Axis II, No Contributory Personality

3    Disorder, and she gives you a Global Assessment of

4    Functioning Score of 78.   Then she goes into an

5    assessment of dangerousness.   Under "Violence

6    History," she says that you grew up in an

7    environment in which you had ready access to

8    firearms, you handled guns at a young age, guns

9    were seen as a necessary tool for ranch work, and

10   you had a weapons charge prior to the commitment

11   offense.   The commitment offense involved shooting

12   the victim.   As an older man, however, you no

13   longer feel the need to handle conflict situations

14   aggressively, she notes.   Under "Controlled

15   Environment," you've remained disciplinary free

16   since your last appearance before the Board.   In

17   fact, you've been disciplinary free through your

18   whole institutional history, and she says that you

19   would be expected to be at a low risk of violence

20   in a controlled environment.   If released to the

21   community, she says you -- she makes notes of

22   static risk factors: history of alcohol abuse,

23   male gender, male victim, previous criminality,

24   past use of firearm, and victim injury.   On the

25   other hand, she says that you have no present

26   dynamic risk factors, such as loss of control or

27   impulsive behavior, lack of compassion, anger, or

38

1   paranoid or violent thoughts.  Also noted that she

2   believes your plans for how to use your time if

3   paroled seem to be constructive and realistic.  In

4   her "Comments and Summary" she says you're not a

5   person who is comfortable talking about or

6   expressing your feelings, and she believes you no

7   longer need to display the same level of

8   aggression.  "He participated in self-help,

9   religious activities," and they've helped give you

10  the skills to conduct yourself in a sober and

11  nonviolent manner across settings.  She mentions

12  you regularly attend AA.  I should speak to that,

13  because, you know, I only saw one chrono about AA

14  and it was in December of 2005, or the fourth

15  quarter of 2005.  Are you still in AA?

16          INMATE DOWELL:  Yes, I am.

17          DEPUTY COMMISSIONER FILANGERI:  How come

18  they're not sending chronos?  They used to send

19  chronos like --

20          INMATE DOWELL:  I don't know why --

21          DEPUTY COMMISSIONER FILANGERI:  -- every

22  couple of three months.

23          INMATE DOWELL:  -- it's not in the record.

24          DEPUTY COMMISSIONER FILANGERI:  Did you

25  bring any?

26          INMATE DOWELL:  Yeah, I have some in my

27  self-help side.

39

1        DEPUTY COMMISSIONER FILANGERI:  Okay.  Let

2   me see.  We're down on the bottom of page 4 now I

3   think.  The examiner says, "With greater maturity,

4   it would be expected that a man would have more

5   consistent behavior control and a lessening of the

6.   anger."  She thought you fell into this category.

7   Overall, your risk of violent recidivism would be

8   low at the present time providing you remain

9   abstinent from use of alcohol and drugs, and any

10   return to use of intoxicants would change your

11   prognosis.  In looking over the rest of your file

12   I found a couple of things that I thought we worth

13   noting.  For instance, your last test of Adult

14   Basic Education reading level was two point three.

15   That was February of 2003.

16        INMATE DOWELL:  Two point three?

17        DEPUTY COMMISSIONER FILANGERI:  Two point

18   three.

19        INMATE DOWELL:  That's pretty low, isn't it?

20        DEPUTY COMMISSIONER FILANGERI:  Well, I just

21   wondered if you'd care to comment on that?

22        INMATE DOWELL:  I was given a special test.

23        DEPUTY COMMISSIONER FILANGERI:  A special

24   test.

25        INMATE DOWELL:  Yeah.  Because they wanted

26   me to take the GED exam, and so I took the whole

27   thing, and I failed my math because I have a

40

1   problem transposing the numbers.

2        DEPUTY COMMISSIONER FILANGERI:  Okay.

3        INMATE DOWELL:  And so they gave me a

4   special test to give me an extra 30 minutes on the

5   math portion of the test so that I wouldn't have

6   to worry about hurrying on it and transposing my

7   numbers.

8        DEPUTY COMMISSIONER FILANGERI:  The

9   documents I saw didn't show any math score at all.

10  It just showed the reading score.

11       INMATE DOWELL:  Yeah.

12       DEPUTY COMMISSIONER FILANGERI:  Two of them.

13       INMATE DOWELL:  The scores that I've seen in

14  the past, like on the TABE test, was always been

15  eleven point five and a twelve point something.

16       DEPUTY COMMISSIONER FILANGERI:  Well, I did

17  see one in July of 2002 for twelve point nine.

18       INMATE DOWELL:  Yeah.

19       DEPUTY COMMISSIONER FILANGERI:  Which

20  would've been maxing it.

21       INMATE DOWELL:  Yeah.

22       DEPUTY COMMISSIONER FILANGERI:  Just for

23  reading.

24       INMATE DOWELL:  Yeah.

25       DEPUTY COMMISSIONER FILANGERI:  And I

26  noticed you were in a pre-GED class, according to

27  the chronos, between '97 and '99.

41

1      **INMATE DOWELL:**  Yeah.  I took -- they wanted

2  me to prepare for the GED test, and so I was

3  taking this pre-course, and but even though I was

4  taking this pre-course, I signed up for the GED

5  three times, but they never allowed me to take the

6  test.

7      **DEPUTY COMMISSIONER FILANGERI:**  Why not?

8      **INMATE DOWELL:**  Because they said because of

9  the dyslexia that it wasn't going to allow me

10  until they gave me this special test or something,

11  and they never did do the special test, and that

12  was under the -- I can't remember the testing

13  person's name now, I can't remember his name, but

14  he passed away here last year, and that's the last

15  that -- that's when all the -- everything stopped,

16  so I was never allowed to continue with whatever,

17  if they're going to give me the math portion test

18  over again for the extended time on it or not, I'm

19  not sure.

20      **DEPUTY COMMISSIONER FILANGERI:**  Well, I saw

21  that you were in pre-GED from '97 to '99, a couple

22  years, got positive chronos in that.  They said

23  that you were enthusiastic, but of course your

24  dyslexia --

25      **INMATE DOWELL:**  Yeah.

26      **DEPUTY COMMISSIONER FILANGERI:**  -- was

27  difficult for you to deal with, and that seemed

42

1   almost inconsistent with the July of 2002 twelve

2   point nine score, and then that certainly seemed

3   consistent with the February 2003 two point three

4   score, but all I can do is ask you to comment on

5   it and you seemed to have that.  Anything else you

6   want to say about that?

7       INMATE DOWELL:  No.  I didn't even know what

8   the score was on that test.  This was the first

9   time that I'd ever taken it.  It was a special

10  test, it wasn't a regular reading test, or a

11  regular math test or anything.  They weren't like

12  any other test I've ever taken.

13      DEPUTY COMMISSIONER FILANGERI:  Okay.

14  Anything else about your prison behavior you want

15  to call the panel's attention to?

16      INMATE DOWELL:  I have taken five other

17  self-help programs.

18      DEPUTY COMMISSIONER FILANGERI:  Do you want

19  to comment on those?

20      INMATE DOWELL:  Yeah.  Well, I took one on

21  Parenting and it helped me a lot on how to deal

22  with my own grief and everything, of how my crime

23  affected my children and everything, and also on

24  how to present it in a way to my children that

25  would allow us to be --

26      DEPUTY COMMISSIONER FILANGERI:  Sorry, I got

27  to turn the tape over.

43

1          INMATE DOWELL:  Okay.

2          DEPUTY COMMISSIONER FILANGERI:  I hate to

3     interrupt you like this, but the good news is this

4     aggravating beeping --

5          [Thereupon, the tape was turned over.]

6          DEPUTY COMMISSIONER FILANGERI:  This is side

7     two of the tape recorded hearing transcript for

8     Kenneth Dowell, D-O-W-E-L-L, C like Charles,

9     78669.  This is a Subsequent Parole Consideration

10    Hearing.  You were going to tell me about this

11    grief --

12         INMATE DOWELL:  Yeah.

13         DEPUTY COMMISSIONER FILANGERI:  -- class?

14         INMATE DOWELL:  The Parenting class that I--

15         DEPUTY COMMISSIONER FILANGERI:  Parenting.

16         INMATE DOWELL:  -- I've taken.  Well, it

17    helped me to deal with the grief that I was

18    feeling, because the grief of the hardships and

19    everything that I caused my children and

20    everything, and it helped me deal with them in a

21    way that we could be as friends, and father and

22    son, and father and daughter, you know, with my

23    one -- this -- with Charlotte and --

24         DEPUTY COMMISSIONER FILANGERI:  Yeah.  I saw

25    that you got self-help activities noted by the

26    counselor in '96, Alternative to Violence; in '94,

27    the Self-Esteem Program; in '95, Human Growth and

44

1  Development. Has there been any self-help since

2  '95?

3        INMATE DOWELL: Well, I go to self-help

4  every Sunday now. It's put on by the LDS church.

5        DEPUTY COMMISSIONER FILANGERI: I see.

6        INMATE DOWELL: Yeah. We go --

7        DEPUTY COMMISSIONER FILANGERI: So you go to

8  church.

9        INMATE DOWELL: -- we go services and also

10  we -- there -- it's a self-help group meeting.

11        DEPUTY COMMISSIONER FILANGERI: Is that

12  documented in any way?

13        INMATE DOWELL: Just the one letter from our

14  -- from Mr. Guthrie, the bishop.

15        DEPUTY COMMISSIONER FILANGERI: This appears

16  to be letterhead from James W. Guthrie,

17  G-U-T-H-R-I-E, dated August 1, 2005?

18        INMATE DOWELL: Yeah.

19        DEPUTY COMMISSIONER FILANGERI: Has there

20  been any documentation since the last time you

21  appeared before the panel?

22        INMATE DOWELL: He was going to send another

23  letter for this hearing here, but I guess he got

24  busy and failed to do so.

25        DEPUTY COMMISSIONER FILANGERI: Okay. And

26  do you remember what this letter says?

27        INMATE DOWELL: Just basically that I've

45

1   been there, that even though I'm not a member of

2   the church at this time, I attend services and

3   self-help group.

4         **DEPUTY COMMISSIONER FILANGERI:** I don't see

5   anything in here about self-help.

6         **INMATE DOWELL:** Oh.

7         **DEPUTY COMMISSIONER FILANGERI:** It says that

8   though you're not a member of the church, you've

9   taken part in discussions of gospel principles and

10   on occasion has even taught lessons to the group.

11         **INMATE DOWELL:** It's on the movement sheet

12   that way I guess, yeah. I guess he failed to put

13   it in the letter, so that's my mistake.

14         **DEPUTY COMMISSIONER FILANGERI:** Yeah,

15   there's nothing in the letter that seems to sound

16   anything more than church. Well, I mean this is

17   your hearing to --

18         **INMATE DOWELL:** Yeah.

19         **DEPUTY COMMISSIONER FILANGERI:** -- for you

20   to clarify that sort of stuff.

21         **INMATE DOWELL:** Yeah.

22         **DEPUTY COMMISSIONER FILANGERI:** Okay. So I

23   guess I should say, other than the AA and other

24   than the church-going --

25         **INMATE DOWELL:** Yeah.

26         **DEPUTY COMMISSIONER FILANGERI:** -- has there

27   been any self-help since '95?

46

1           INMATE DOWELL:  No.

2           DEPUTY COMMISSIONER FILANGERI:  All right.

3    Anything else you want to bring the panel's

4    attention to about your prison behavior?

5           INMATE DOWELL:  No, not that I -- I can't

6    think of anything else.

7           DEPUTY COMMISSIONER FILANGERI:  Miss

8    Hawkins, is there anything you wanted to point our

9    attention to, bring to our attention --

10          ATTORNEY HAWKINS:  No.

11          DEPUTY COMMISSIONER FILANGERI:  -- about

12   prison behavior?

13          ATTORNEY HAWKINS:  It's been covered.

14          DEPUTY COMMISSIONER FILANGERI:  Thanks.

15   Then I'll give it back to Commissioner Eng.  Thank

16   you.

17          PRESIDING COMMISSIONER ENG:  Let's talk

18   about your parole plans, Mr. Dowell.  What are

19   they?

20          INMATE DOWELL:  Well, I want to go live with

21   brother in Oregon.

22          PRESIDING COMMISSIONER ENG:  Is that Bryan,

23   B-R-Y-A-N, Dowell?

24          INMATE DOWELL:  Yes.

25          PRESIDING COMMISSIONER ENG:  Okay.  And for

26   the record, that you did submit a letter, and this

27   dated 11/16/05, from your brother Bryan Dowell,

47

1   D-O-W-E-L-L, in Mehama, M -- how do you pronounce

2   that?

3           INMATE DOWELL:  Mehama.  Mehama.

4           PRESIDING COMMISSIONER ENG:  M-E-H-A-M-A.

5           INMATE DOWELL:  Mehama.

6           PRESIDING COMMISSIONER ENG:  Mehama.

7           INMATE DOWELL:  Yeah.

8           PRESIDING COMMISSIONER ENG:  Mehama, Oregon.

9   Okay.  And in this letter he states that you are

10  welcome to stay in his home with his son and

11  himself any time that you want and for as long as

12  you wish.  He has a drug and alcohol free home and

13  feels that it would be a good home for you.  How

14  old's his son?

15          INMATE DOWELL:  His son?  Twelve or fifteen,

16  I think.

17          PRESIDING COMMISSIONER ENG:  Is your brother

18  divorced, or widowed, or --

19          INMATE DOWELL:  Separated.

20          PRESIDING COMMISSIONER ENG:  Separated?

21          INMATE DOWELL:  Yeah.

22          PRESIDING COMMISSIONER ENG:  Does he own his

23  own home?

24          INMATE DOWELL:  Yes.

25          PRESIDING COMMISSIONER ENG:  How large is

26  it?

27          INMATE DOWELL:  Three-bedroom, I believe.

48

1   PRESIDING COMMISSIONER ENG: He only has the

2 one son?

3   INMATE DOWELL: One child.

4   PRESIDING COMMISSIONER ENG: Okay. What

5 does your brother do?

6   INMATE DOWELL: He's a millwright for one of

7 the sawmill companies up there, a warehouser I

8 believe.

9   PRESIDING COMMISSIONER ENG: How old is he,

10 your brother?

11   INMATE DOWELL: Forty-seven, I think.

12   PRESIDING COMMISSIONER ENG: So what would

13 you do up there?

14   INMATE DOWELL: I'll find a job in a machine

15 shop, or I'll buy and sell equipment (inaudible).

16   PRESIDING COMMISSIONER ENG: Is your brother

17 in a position to support you financially for an

18 indefinite amount of time?

19   INMATE DOWELL: Yeah, I'm sure he is. I

20 mean I don't plan on not going without employment

21 for, you know, for very long.

22   PRESIDING COMMISSIONER ENG: Have you ever

23 talked to your brother about what type of impact

24 it could have on his son by you moving in with

25 them?

26   INMATE DOWELL: Yeah, I've written him a

27 couple of times. He doesn't seem to think that --

49

1  his son I think stays with his mom two or three

2  days a week, I think, so I don't think there'd be

3  a -- you know, any inconvenience or anything.

4      PRESIDING COMMISSIONER ENG:  So I'm assuming

5  -- because you stated that the way you were raised

6  was with a lot guns.  Is that -- I'm assuming that

7  your brother was raised the same way.

8      INMATE DOWELL:  Yeah.  I don't even think he

9  has any guns, or Bryan, I don't think has any

10  guns.

11      PRESIDING COMMISSIONER ENG:  Do you know for

12  a fact through how he's raised his son in -- I

13  don't know if that's a small town in Oregon.

14      INMATE DOWELL:  It's a very small town.

15  It's about I think 2300 population, I believe.

16  It's bigger than -- it's bigger than Fall City,

17  which is where my mom and dad have their house --

18  had their house at, just shortly away -- a short

19  distance from there, and that was a city of only

20  like 300 population, the same size town that I

21  grew up in.

22      PRESIDING COMMISSIONER ENG:  You understand

23  why I asked you these questions about the weapons?

24      INMATE DOWELL:  Yeah, I understand it.

25      PRESIDING COMMISSIONER ENG:  Having weapons

26  in and around you was part of your everyday life.

27      INMATE DOWELL:  Yeah.

50

1      PRESIDING COMMISSIONER ENG:   I can only

2   assume that your brother continues to abide by

3   that, living in a small town.

4      INMATE DOWELL:   Oh.

5      PRESIDING COMMISSIONER ENG:   It concerns the

6   panel --

7      INMATE DOWELL:   Yeah.

8      PRESIDING COMMISSIONER ENG:   -- that you

9   would want to go and live in that same type of

10   situation where you're going to be surrounded by

11   weapons again.

12      INMATE DOWELL:   I don't think my brother has

13   any guns.

14      PRESIDING COMMISSIONER ENG:   Sir, I'm sure

15   you --

16      INMATE DOWELL:   Yeah.

17      PRESIDING COMMISSIONER ENG:   -- could

18   understand the concern that --

19      INMATE DOWELL:   Yeah.

20      PRESIDING COMMISSIONER ENG:   -- the panel

21   might have with that, and the thought.

22      INMATE DOWELL:   Yeah.

23      PRESIDING COMMISSIONER ENG:   Okay.   And I'm

24   not saying it does, I don't know.

25      INMATE DOWELL:   Yeah.

26      PRESIDING COMMISSIONER ENG:   But it is a

27   thought.   Okay.   So we've got that letter.   We

51

1    also have a letter that's dated October 21st of

2    2005 from Julia Perales,

3    P-E-R-A-L-E-S.  So who is this woman?

4         INMATE DOWELL:  A aunt by marriage.

5         PRESIDING COMMISSIONER ENG:  She states that

6    she's known you for over 30 years, ex-husband to

7    her niece, Pauline.  Okay.  And were does she

8    live?

9         INMATE DOWELL:  Los Angeles.

10        PRESIDING COMMISSIONER ENG:  Los Angeles.

11   Okay.  But I think that the -- it looks like this

12   is just a general support letter, unless I'm

13   missing something.

14        INMATE DOWELL:  No, I think that's what it

15   is right here.

16        PRESIDING COMMISSIONER ENG:  Okay.

17        INMATE DOWELL:  I mean --.

18        PRESIDING COMMISSIONER ENG:  Okay.

19        INMATE DOWELL:  -- I could stay there if I

20   -- but I wouldn't want to burden her to stay

21   there.

22        PRESIDING COMMISSIONER ENG:  Okay.  And then

23   we also have -- I don't know who the -- this is

24   from a Margaret -- how do you -- A-N-D-A-V-A-Z-O?

25        INMATE DOWELL:  Yeah.  I'm not sure how to

26   pronounce that.

27        PRESIDING COMMISSIONER ENG:  And there's no

52

1   date, there's no signature.  I don't know where

2   she's from.  So why don't you tell me who this is.

3           INMATE DOWELL:  That's Pauline's sister.

4           PRESIDING COMMISSIONER ENG:  Pauline's

5   sister?

6           INMATE DOWELL:  Yes.  But she's married to

7   somebody else.

8           PRESIDING COMMISSIONER ENG:  Okay.

9           INMATE DOWELL:  Married to someone.

10          PRESIDING COMMISSIONER ENG:  Okay.  We have

11  a letter.  It's just a -- it's general letter.

12          INMATE DOWELL:  Yeah.

13          PRESIDING COMMISSIONER ENG:  Okay.  Okay.

14  She down in Los Angeles too?

15          INMATE DOWELL:  Yes.

16          PRESIDING COMMISSIONER ENG:  And then again

17  that -- we've got a general support letter dated

18  August 1st, 2005 from James Guthrie, G-U-T-H-R-I-E,

19  that Commissioner Filangeri has also stated on the

20  record, and this gentleman is with the Church of

21  Jesus Christ of Latter Day Saints, and it's a

22  general support letter.  So, okay.  Sir, do you

23  have any plans whatsoever for parole within Los

24  Angeles County or within California?

25          INMATE DOWELL:  I would have -- really have

26  no place to live in L.A. County.  If I went, I

27  would have to -- if I was to ask my aunt there to

53

1    live with her, well, I would -- I'd feel that I

2    was putting her out and would not -- and I would

3    -- I wouldn't feel comfortable doing that, and I

4    would have to live in a halfway house or something

5    of that nature, when I first went out there, to go

6    live there because --

7         PRESIDING COMMISSIONER ENG:  Have you made

8    any inquiries into --

9         INMATE DOWELL:  Well --

10        PRESIDING COMMISSIONER ENG: . -- alternatives

11   within California?

12        INMATE DOWELL:  Actually I did for 2005

13   hearing that I had, the last hearing, and none of

14   -- all of those people right there, until I

15   actually had a date would they even accept an

16   application.

17        PRESIDING COMMISSIONER ENG:  It would help

18   if we could see the letters that you had written--

19        INMATE DOWELL:  Yeah.

20        PRESIDING COMMISSIONER ENG: -- to show us,

21   to show the panel --

22        INMATE DOWELL:  Yeah.

23        PRESIDING COMMISSIONER ENG: -- the level of

24   effort that you're making in terms of --

25        INMATE DOWELL:  Yeah.

26        PRESIDING COMMISSIONER ENG:  -- trying to

27   set yourself up.

54

1          INMATE DOWELL:  Yeah.

2          PRESIDING COMMISSIONER ENG:  It's very

3    important, which I'm sure you understand, that the

4    more documentation you can supply to the panel, it

5    shows us, versus you just sitting there and

6    telling us --

7          INMATE DOWELL:  Yeah.

8          PRESIDING COMMISSIONER ENG:  -- that you're

9    taking control and that you have plans and goals

10   and how your -- you know, what are the steps that

11   you're taking towards that goal.

12         INMATE DOWELL:  Yeah.

13         PRESIDING COMMISSIONER ENG:  Because

14   obviously you want to be able to be

15   self-sufficient --

16         INMATE DOWELL:  Yes.

17         PRESIDING COMMISSIONER ENG:  -- okay, once

18   you're paroled, so we urge that -- you know, we

19   need to see the documentation to show us that

20   you're, you know  --

21         INMATE DOWELL:  Yeah.

22         PRESIDING COMMISSIONER ENG:  -- you've got

23   things set up, and also for financial support.

24   It's very, very important.  It's very difficult,

25   even without having a record of incarceration, for

26   people to find positions and employment out there

27   so -- and the panel does understand that it's

55

1  very, very difficult for anyone who's incarcerated

2  to line up jobs.  However, we want to see, again,

3  documentation as to who are you contacting out

4  there, what organizations are you trying to use to

5  seek employment, a lot of different things that

6  you can do --

7          INMATE DOWELL:  Yeah.

8          PRESIDING COMMISSIONER ENG:   -- and supply

9  us with the documentation of that, okay?  But

10  again, that's why it's very, very important to

11  show that even someone who's going to offer

12  residential, okay, support to you, to also very

13  specifically state what other support are they

14  offering to you, are they offering financial

15  support in the interim until you can get on your

16  feet and find employment and start making some

17  money.  Does that make sense to you?

18          INMATE DOWELL:  Yeah.

19          PRESIDING COMMISSIONER ENG:  So -- because,

20  you know, there is a transition period that anyone

21  has to go through.  I mean --

22          INMATE DOWELL:  Right.  I'm aware of that.

23          PRESIDING COMMISSIONER ENG:  You know,

24  you've been in for 23 years.

25          INMATE DOWELL:  Yes.

26          PRESIDING COMMISSIONER ENG:  It's a

27  different world out there.

56

1       INMATE DOWELL: Yes.

2       PRESIDING COMMISSIONER ENG: So, you know,

3 nobody expects to you to all of a sudden walk out

4 the gate and have everything totally set up for

5 you.

6       INMATE DOWELL: That's --

7       PRESIDING COMMISSIONER ENG: It's a

8 transition period.

9       INMATE DOWELL: That's exactly why I wanted

10 to go to my brother's house in Oregon.

11       PRESIDING COMMISSIONER ENG: We understand

12 that, but I also believe that previous panels have

13 told you that we cannot parole you out of state --

14       INMATE DOWELL: Yeah.

15       PRESIDING COMMISSIONER ENG: Which, because

16 not knowing what the agreements are between

17 different states, you really need to have parole

18 plans specific to if not Los Angeles County,

19 another county where you've got a full support

20 network set up and where you have the best chances

21 of -- you know, to succeed out there, but we --

22 our hands are relatively tied regarding paroling

23 people out of state, okay? Have I missed anything

24 in terms of your other plans?

25       INMATE DOWELL: I don't know if my --

26       PRESIDING COMMISSIONER ENG: Anything else?

27       INMATE DOWELL: The letter I put in there

57

1    for parole plans that I gave the counselor or not.

2    I don't know if she put it in the file or not,

3    because I plan --

4         **PRESIDING COMMISSIONER ENG:**  Well, the

5    only--

6         **INMATE DOWELL:**  -- but --

7         **PRESIDING COMMISSIONER ENG:**  Yeah.

8         **INMATE DOWELL:**  My parole plans really

9    centered around going --

10         **PRESIDING COMMISSIONER ENG:**  Oregon.

11         **INMATE DOWELL:**  -- to my brother's house and

12    where I could go to the community college there

13    and learn how to operate computers and different

14    things.  Even though we have computerized machines

15    at the machine shop, those are different than the

16    computers that you run type -- you know, to do

17    typing and stuff like that on.

18         **PRESIDING COMMISSIONER ENG:**  Okay.  Well,

19    we've sent out Penal Code Section 3042 Notices,

20    and these notices go to agencies that have a

21    direct interest in your case.  I have not seen any

22    written responses from any of the agencies,

23    however, we do have a representative of the Los

24    Angeles County District Attorney's Office who is

25    ~~present via video conference and who I'm sure will~~

26    be making a statement regarding your parole

27    suitability prior to us recessing for

58

1  deliberations. Right now I don't have any further

2  questions. Commissioner Filangeri, do you have

3  any further questions to ask Mr. Dowell?

4      DEPUTY COMMISSIONER FILANGERI: Thank you,

5  Commissioner Eng. When Commissioner Eng asked you

6  about the pandering conviction, you said you

7  offered this gal an opportunity to work off some

8  money she owed you?

9      INMATE DOWELL: I didn't offer her. I told

10  her that she should go stand on the corner, or I

11  would send her to somebody that would her out.

12      DEPUTY COMMISSIONER FILANGERI: You would

13  send to her somebody that would help her out.

14      INMATE DOWELL: Yes.

15      DEPUTY COMMISSIONER FILANGERI: What did

16  that mean?

17      INMATE DOWELL: That meant that I knew

18  somebody that was in the business of pandering

19  and--

20      DEPUTY COMMISSIONER FILANGERI: She was just

21  going to make the connection?

22      INMATE DOWELL: Yeah.

23      DEPUTY COMMISSIONER FILANGERI: That was it?

24  There wasn't any other discussion?

25      INMATE DOWELL: There wasn't any other

26  discussion.

27      DEPUTY COMMISSIONER FILANGERI: Now I want

59

1    to read something out of the record then, because

2    it's -- that's not exactly consistent with what

3    the record suggests. Geez, I didn't lose it, did

4    I?

5        INMATE DOWELL: Well, I did explain to her

6    that how this person would work.

7        DEPUTY COMMISSIONER FILANGERI: Well, why

8    don't you tell me everything you think I ought to

9    know about this.

10       INMATE DOWELL: Yeah. Well, that's -- I

11   didn't know how much -- all I told her was that

12   the guy would see that nobody would hurt her or

13   anything like that, and that's all I -- and that's

14   -- and that he would always be in the next room.

15       DEPUTY COMMISSIONER FILANGERI: Anything

16   else?

17       INMATE DOWELL: No, that's it right. I --

18       DEPUTY COMMISSIONER FILANGERI: How many

19   times did you talk? How many times did you talk

20   to her about this?

21       INMATE DOWELL: One time.

22       DEPUTY COMMISSIONER FILANGERI: One time.

23   Well, it's part of the decision package here. It

24   talks about a Sergeant Nottingham,

25   N-O-T-T-I-N-G-H-A-M, and Deputy Peavey, P-E-A-V-Y,

26   responding to a victim's residence regarding a

27   complaint that she had been solicited to pander on

60

1   2/5/1980.  It says that the victim said the

2   suspect had come to the victim's residence on each

3   occasion attempting to talk her into becoming a

4   prostitute and that in this way she could pay off

5   the back rent, and that she would also be -- that

6   she would also make some money.  It says it

7   happened in Tuesday, January 29th, 1980, Friday,

8   February 1st, 1980, and Monday, February 4th, 1980.

9   She goes on to say that her mother was a part --

10   or the mother told the deputy that it was a party

11   -- that she was a party of the conversation, a

12   witness to the conversation, and that suspect

13   stated to the victim, quote, "You won't have to

14   hustle here, it will be like dates.  The guys I'll

15   send over will take you out, they're guys that I

16   owe favors.  I'll collect the money from them."

17   Does that sound familiar?

18        **INMATE DOWELL:**  I think I did on the one --

19   on the conversation that we had, yes.

20        **DEPUTY COMMISSIONER FILANGERI:**  He goes on

21   to write about how the deputies were set up to

22   surveil the apartment, and actually inside the

23   closet inside the apartment, when the victim went

24   to a phone booth and suggested that she had

25   rethought the idea of doing this and invited you

26   over to talk about it some more.  Late in the

27   afternoon, about 4:50 hours, you responded to that

61

1    location.  You and the victim seated yourselves in

2    the dinette table in the kitchen.  Suspect and

3    victim then became engaged in conversation.  The

4    following was overhead by the deputies who were in

5    the house:

6            Quote, Suspect: "If you don't want

7            to sell your ass, I don't know how

8            else you'll be able to pay the back

9            rent."  Victim: "How will it work?"

10           Suspect: "You won't have to turn

11           tricks in front of your kids.  I

12           won't be that cold.  I'll pick you

13           up and take you to a motel and I'll

14           wait in the next room.  Then I'll

15           send the customers to your room."

16           Victim: "Then what?"  Suspect:

17           "The customer will say, 'Is Kenny

18           here?' and that will let you know

19           that they're all right.  I know a

20           few prostitutes, and they tell me

21           that they get 20 or 30 dollars an

22           hour.  You can spend a couple of

23           hours with each customer, then you

24           can collect the money or they can

25           pay me, or I'll settle up with you

26           later."

27   They go on to quote the conversation.  Do you recall

62

1    anything like that?

2         INMATE DOWELL:  That was the one

3    conversation that we had with -- when her mother

4    was present, but -- and then when they came over,

5    she was telling me that the decision was not to do

6    that, and we had that conversation at that time

7    right there.

8         DEPUTY COMMISSIONER FILANGERI:  And what

9    happened next?

10         INMATE DOWELL:  And they arrested me.

11         DEPUTY COMMISSIONER FILANGERI:  Who arrested

12    you?

13         INMATE DOWELL:  The sheriff's department

14    arrested me.

15         DEPUTY COMMISSIONER FILANGERI:  Were they

16    right there when you were having the conversation?

17         INMATE DOWELL:  No.  I went outside.  I was

18    -- I went outside, and then came outside and

19    arrested me.

20         DEPUTY COMMISSIONER FILANGERI:  So they were

21    inside where you were inside.

22         INMATE DOWELL:  Yeah.

23         DEPUTY COMMISSIONER FILANGERI:  And then

24    they stepped out to arrest you.

25         INMATE DOWELL:  Yeah.  But we already

26    decided that we weren't going to do this, and then

27    I went on outside.

1       DEPUTY COMMISSIONER FILANGERI:  So there

2   must have been more conversation than what they

3   quoted, because there wasn't anything in there --

4       INMATE DOWELL:  Yeah.

5       DEPUTY COMMISSIONER FILANGERI:  -- that said

6   you weren't going to do it.

7       INMATE DOWELL:  Yeah, well, I -- that's why

8   I went outside, and it was it, and I -- they came

9   out -- and then they came out and arrested me.

10       DEPUTY COMMISSIONER FILANGERI:  The report

11   reflects that the people in the closet gave the

12   prearranged arrest signal over the radio, which

13   then summoned the detectives, who were outside, to

14   the door.  The victim actually answered the door

15   while you were still inside the house.

16       INMATE DOWELL:  Yeah.

17       DEPUTY COMMISSIONER FILANGERI:  They entered

18   the house, and that's where you were placed under

19   arrest.

20       INMATE DOWELL:  No, I think I was out on the

21   porch and I was -- I think I was leaving, but it

22   might have been, yeah, because I can't really

23   recall every detail of it.

24       DEPUTY COMMISSIONER FILANGERI:  How about

25   this 417?  Oh, excuse me.  You were -- I should

26   point out that you were on probation from that

27   conviction when you committed the life crime.

64

1        **INMATE DOWELL:** Yes, I was.

2        **DEPUTY COMMISSIONER FILANGERI:** All right.

3    What about this 417 way back in 1970? Do you

4    remember that? Oh, 4-7 -- I'm sorry, exhibited a

5    firearm. You were convicted of exhibiting a

6    firearm?

7        **INMATE DOWELL:** Oh, yeah.

8        **DEPUTY COMMISSIONER FILANGERI:** Do you

9    recall that?

10       **INMATE DOWELL:** Yeah. That was the one that

11   I explained that where we were coming back from a

12   camping trip and we were unloading the things, and

13   then everybody was drinking and two people got in

14   argument, in a fight, and somebody called the

15   cops, and then they came there, we were out in the

16   driveway, and it was about dusk in the evening

17   hours, and it was -- I don't know, September, I

18   guess, so it was a little chilly. I had a -- my

19   friend's coat on, and -- because I had misplaced

20   mine, I didn't know if it was in the -- bundled up

21   in the stuff and everything, and his was laying on

22   the seat, so I just put it on, and he was being

23   treated for alcoholism, and so he was taking these

24   pills, and I had them in the pocket, and I had

25   ~~this knife, hunting knife on my side, and then~~

26   they arrested me, charged me with possession, took

27   me down to the -- and then they charged me

65

1  possession of a weapon, and then when it went to

2  court and everything, they said it was for

3  brandishing a firearm.  I pleaded guilty for

4  brandishing a firearm, and then we went to -- and

5  I was on probation for a year for that, and then--

6       DEPUTY COMMISSIONER FILANGERI:  You have a

7  really good memory of that.

8       INMATE DOWELL:  I done the probation.  Oh,

9  yeah, well, it actually happened --

10      DEPUTY COMMISSIONER FILANGERI:  Right.

11      INMATE DOWELL:  -- to me right there.

12      DEPUTY COMMISSIONER FILANGERI:  So you're

13 saying you pled guilty to brandishing a firearm --

14      INMATE DOWELL:  Yeah.

15      DEPUTY COMMISSIONER FILANGERI:  -- because

16 you had a sheath knife in the sheath --

17      INMATE DOWELL:  Yeah.

18      DEPUTY COMMISSIONER FILANGERI:  -- on the

19 side of your --

20      INMATE DOWELL:  Belt.

21      DEPUTY COMMISSIONER FILANGERI:  -- belt.

22      INMATE DOWELL:  Yeah.  And they said it was

23 an illegal weapon because it was covered up with a

24 coat.

25      DEPUTY COMMISSIONER FILANGERI:  And how did

26 you justify pleading guilty to brandishing a

27 firearm?

66

1      INMATE DOWELL:  Well, they said plead guilty

2   to this and you'll have probation for a year, and

3   I said okay.

4      DEPUTY COMMISSIONER FILANGERI:  Okay.  I

5   think that's -- no, I think that's all the

6   questions I had.  Thanks very much.

7      PRESIDING COMMISSIONER ENG:  Okay.  Mr.

8   Jacobs, do you have any questions to pose to Mr.

9   Dowell?

10      DEPUTY DISTRICT ATTORNEY JACOBS:  Yes, I do.

11   Mr. Dowell referred to Pauline as his wife.  Was

12   he married to her?

13      PRESIDING COMMISSIONER ENG:  Mr. Dowell,

14   were you married to Pauline?

15      INMATE DOWELL:  We were married in a common

16   law marriage.

17      PRESIDING COMMISSIONER ENG:  Did you hear

18   the response, Mr. Jacobs?

19      DEPUTY DISTRICT ATTORNEY JACOBS:  Yes.  And

20   how long did the prisoner live with her?

21      INMATE DOWELL:  From 1970 to 1979 I think it

22   was, '78 or '79.

23      PRESIDING COMMISSIONER ENG:  So eight or

24   nine years.

25      ~~INMATE DOWELL:  Yeah.~~

26      PRESIDING COMMISSIONER ENG:  You were living

27   together.

67

1        INMATE DOWELL:  Yes.

2        PRESIDING COMMISSIONER ENG:  Okay.

3        DEPUTY DISTRICT ATTORNEY JACOBS:  Why did

4    the prisoner not marry her?

5        INMATE DOWELL:  Pauline was previously

6    married to someone else already.

7        PRESIDING COMMISSIONER ENG:  So she was not

8    divorced at the time that you were living

9    together?

10       INMATE DOWELL:  No.

11       PRESIDING COMMISSIONER ENG:  All right.

12       DEPUTY DISTRICT ATTORNEY JACOBS:  The

13   prisoner I believe stated that he only hit Pauline

14   one time.  I have a police report here, this would

15   be page 8 of the Homicide Supplemental Report

16   within the Lifer Package, and it states that in

17   September of 1980, when she was living in a house

18   on Seafort Avenue, the suspect came to the house

19   and kicked in her bedroom door and began yelling

20   and threatening her.  Did that occur?

21       PRESIDING COMMISSIONER ENG:  Sir, do you

22   have any recollection of that?

23       INMATE DOWELL:  That's the argument I was

24   speaking of that we -- that when -- and I was

25   living there at the time.

26       PRESIDING COMMISSIONER ENG:  This is the one

27   that escalated to the point that you pushed her?

68

1          INMATE DOWELL:  Yeah.

2          PRESIDING COMMISSIONER ENG:  Okay.

3          DEPUTY DISTRICT ATTORNEY JACOBS:  On the

4    next page, that would be page 9, it states that

5    she said during their 12-year relationship the

6    suspect has beat her up on numerous occasions and

7    threatened anybody that she has ever gone out

8    with.  Is that true or not true?

9          INMATE DOWELL:  That's incorrect.  I don't--

10         PRESIDING COMMISSIONER ENG:  So why would

11   she make that claim?

12         INMATE DOWELL:  I have no idea.

13         DEPUTY DISTRICT ATTORNEY JACOBS:  Okay.

14   Now the prisoner has indicated that he has no

15   chronos for AA; is that correct?

16         INMATE DOWELL:  No, I have chronos for AA.

17         PRESIDING COMMISSIONER ENG:  Weren't they in

18   -- what -- you attended -- wasn't the last time I

19   thought was in '95?  Is that what you said?  Or

20   no, wait a minute.

21         INMATE DOWELL:  The last time I attended was

22   the first week of November.

23         PRESIDING COMMISSIONER ENG:  That's right.

24   That's right.  Because I have in here -- I thought

25   that you like -- there's documentation

26         DEPUTY DISTRICT ATTORNEY JACOBS:  Has he

27   got--

69

1              PRESIDING COMMISSIONER ENG:  -- from 1991 to

2     the present, correct?  That was your -- yes.  No,

3     he has them.

4              DEPUTY DISTRICT ATTORNEY JACOBS:  Okay.

5     Does he have recent chronos?

6              PRESIDING COMMISSIONER ENG:  Didn't you say

7     you had November?

8              INMATE DOWELL:  Yeah.  I have October

9     chronos.

10             PRESIDING COMMISSIONER ENG:  October

11    chronos?

12             INMATE DOWELL:  Yes.

13             DEPUTY DISTRICT ATTORNEY JACOBS:  Do you

14    have any -- does the prisoner have any other

15    chronos for the years 2006 or 2005?

16             INMATE DOWELL:  What, AA chronos?

17             DEPUTY DISTRICT ATTORNEY JACOBS:  That'll be

18    correct.

19             INMATE DOWELL:  Yeah, I believe there are

20    some in the file.

21             DEPUTY DISTRICT ATTORNEY JACOBS:

22    Commissioner, is there any in the file?  I have no

23    record of such.

24             DEPUTY COMMISSIONER FILANGERI:  I didn't --

25    I'm sorry.

26             PRESIDING COMMISSIONER ENG:  For AA, yeah.

27             DEPUTY COMMISSIONER FILANGERI:  The last AA

70

1    chrono I saw in the file, as I said earlier, was

2    in December of 2005 for the fourth quarter of

3    2005. That's the last one.

4         INMATE DOWELL: Yeah.

5         PRESIDING COMMISSIONER ENG: That's what I

6    thought.

7         DEPUTY COMMISSIONER FILANGERI: I looked for

8    more, and didn't see them, if any of you hear

9    that.

10        INMATE DOWELL: Yeah.

11        ATTORNEY HAWKINS: He meant --

12        DEPUTY DISTRICT ATTORNEY JACOBS:

13   (inaudible).

14        PRESIDING COMMISSIONER ENG: I got confused.

15        DEPUTY DISTRICT ATTORNEY JACOBS: The last

16   question is, in the 2002 hearing that the -- that

17   was held with the prisoner, does the prisoner

18   remember Commissioner Moore telling him that

19   "Although you said you had gone to AA one day a

20   month, in order to get chronos you have to

21   participate on a daily basis, or I mean on a

22   weekly basis"? Does the prisoner remember that

23   statement made to him?

24        INMATE DOWELL: Yes, something like that.

25   That was two or three hearings ago.

26        PRESIDING COMMISSIONER ENG: No, I believe

27   Mr. Jacobs is referring to the 2003 Board Hearing;

71

1    is that correct, Mr. Jacobs?

2           **DEPUTY DISTRICT ATTORNEY JACOBS:**   No, 2002

3    Board Hearing.

4           **PRESIDING COMMISSIONER ENG:**   Oh, the 2002

5    Board Hearing, I'm sorry.   Okay.

6           **DEPUTY DISTRICT ATTORNEY JACOBS:**   Yes.

7           **PRESIDING COMMISSIONER ENG:**   Yeah.

8           **DEPUTY DISTRICT ATTORNEY JACOBS:**   My next

9    question would be what self-help does the Latter

10   Day Saints Church provide other than regular

11   church services?

12          **INMATE DOWELL:**   Discussions of life

13   experiences.

14          **DEPUTY DISTRICT ATTORNEY JACOBS:**   I have no

15   further questions.

16          **PRESIDING COMMISSIONER ENG:**   Okay.

17   Counselor, do you have any questions that you'd

18   like to pose to your client at this point?

19          **ATTORNEY HAWKINS:**   No.

20          **PRESIDING COMMISSIONER ENG:**   Okay.   We'll

21   move on to closing statements.   Mr. Jacobs?

22          **DEPUTY DISTRICT ATTORNEY JACOBS:**   Thank you.

23   It's the position of the District Attorney's

24   Office of Los Angeles County that the prisoner

25   ~~still represents a danger to the community should~~

26   he be released on parole, and the reason for that

27   is that he minimizes his responsibility for the

72

1    murder.  Some of his statements about the crime
2    are at odds with the proof, and he has not
3    programmed in the manner requested by the Board.
4    In regards to responsibility, he tends to minimize
5    his responsibility in several ways.  With the
6    exception of the 2006 report, he refers to himself
7    as being young and foolish at the time of the
8    murder and part of the reason why he committed it.
9    I would like to point out to the Board that the
10   prisoner was 36 years of age at the time, four
11   years shy of that psychiatrically magic age of 40
12   when murder becomes unthinkable.  The man had four
13   children and had gone through one real marriage
14   and one common law marriage.  For him to even
15   attempt to use this as a mitigating circumstance
16   demonstrates that he really doesn't understand the
17   dynamics that led him to kill Mr. Winnet.  As Dr.
18   Inaba stated in her 2000 psych report, "It's
19   important for the prisoner to psychologically" --
20   let me rephrase that.  "It is important for the
21   prisoner to psychologically to maintain an image
22   of himself as a nonviolent person at the expense
23   of truly trying to understand the personality and
24   behavioral characteristics which had led to the
25   murder."  And in addition, he still attempts to
26   blame his voluntary intoxication for the crime,
27   even though he denied use of alcohol to the

73

1   probation officer, and did not appear intoxicated

2   to his girlfriend, who had lived with him for ten

3   years. We now know that the prisoner has an

4   alcohol abuse problem. So what has he done about

5   it? He's attended AA intermittently so he could

6   maintain his pay job and attend night school, and

7   that was in the 1998 Board Report. The prisoner's

8   problem is alcohol, and that should be his number

9   one focus. According to his post-conviction

10  progress reports, the prisoner has attended a

11  total of 36 months of AA since 1983. That's 36

12  months out of 276 months, or 13 percent of the

13  time. I feel very uncomfortable with this number

14  because the prisoner was warned that in order to

15  get quarterly chronos he would have to attend AA

16  more than once a month. If he would rather hold a

17  pay position than attend AA regularly, then he

18  shouldn't expect a parole date when it comes time

19  to review his case. In regards to his statements

20  in regards to the crime, he claims self-defense,

21  but the evidence is against him, which was

22  believed by a jury, and that is that the prisoner

23  pulled a weapon, a handgun, fired two shots at Mr.

24  Winnet before Mr. Winnet ever armed himself. When

25  ~~he sufficiently wounded Mr. Winnet, and Mr. Winnet~~

26  raised his arms in surrender, the prisoner then

27  emptied a 12-gauge shotgun into him, which was an

74

1   execution pure and simple.  And although Pauline's

2   girlfriend might have backtracked a bit regarding

3   her kidnapping when she talked to the probation

4   officer, she never altered her statements in

5   regards to the shooting.  Although the prisoner

6   was charged with a first degree special

7   circumstance murder, the jury gave him a break and

8   convicted him of second degree murder.

9   Disregarding the prisoner's statements of intent

10  both to Pauline and to Mr. Winnet, it is rather

11  obvious that the shooting, if not the murder, was

12  premeditated because the prisoner not only parked

13  his car behind a wall and snuck into Pauline's

14  apartment in hopes of catching her in bed with Mr.

15  Winnet, the Board recalls he entered in the dark

16  of night and yanked the blankets off of her,

17  demanding to know where Mr. Winnet was.  He also

18  searched the neighborhood for the victim, and when

19  he found him, he was armed not only with one gun,

20  which he claimed to use for protection because he

21  carried large sums of money, but two guns, both of

22  which he emptied at Mr. Winnet.  Other statements

23  peripheral to the crime intending to show the

24  prisoner in good light are his representations to

25  some correctional counselors that he owned his own

26  business, which in fact was a part-time backyard

27  fix-it shop that brought in about 250 dollars a

75

1   month, according to the probation report.  He also

2   held himself out in various reports as a high

3   school graduate but he could never produce proof

4   of such, and the probation report for the life

5   crime has him dropping out after completing the

6   eleventh grade.  The most glaring example of the

7   prisoner's inability or refusal to face the truth

8   is the statement he gave to his correctional

9   counselor (inaudible).  He claims that Pauline

10  called him the day before regarding her car, and

11  he came over in the early morning hours to discuss

12  this with her.  This is the first time the

13  prisoner has claimed Pauline contacted him and

14  asked him to come over.  In fact, when the

15  prisoner did come over to Pauline's bedroom in the

16  dark and yanked the sheets off of her, he asked

17  her, "Where is Wolf?"  He makes no mention of the

18  death threats made towards both Pauline and the

19  victim Winnet, nor does he discuss searching for

20  the victim, both at the bail bond's office and

21  twice at a local bar.  He never explained why he

22  parked his truck in the Zodi's parking lot, which

23  was separated from Pauline's apartment complex by

24  a cement block wall that was so high that Pauline

25  had to climb up on a van and have the prisoner

26  boost her onto the wall in order to get over the

27  wall from her apartment to where his pickup truck

76

1    was parked.  In fact, he tells a correctional

2    counselor that he drove back to Pauline's

3    apartment, parked in the stall in the apartment

4    parking lot, and that's when he got wedged in.

5    The only problem with that statement is that the

6    prisoner's pickup, Winnet's van, Winnet's corpse,

7    and prisoner's arrest all took place in the Zodi's

8    parking lot, which again, was separated from the

9    apartment complex that Pauline lived in by a tall

10   cinderblock wall.  He claims Winnet pulled his gun

11   first and that the prisoner -- and that he shot

12   him in self-defense.  Never happened.  Forget --

13   he forgets to mention that he emptied his .38 into

14   Winnet and Winnet attempted to surrender.  He then

15   -- the prisoner then returned to his truck, got a

16   shotgun, and emptied that into the victim.  He is

17   not required to admit the crime nor is he required

18   to discuss the crime with the Board or CDC staff,

19   however, the prisoner chose to discuss the facts

20   of this case, and as expected, he will be candid

21   and truthful.  If he is otherwise, it's a sure

22   indication that he's not ready for parole.

23   Lastly, the Board and various clinicians and

24   correctional counselors have either ordered or

25   suggested that the prisoner get a GED, yet the

26   prisoner has not yet done so.  He has attained

27   high marks in Heating and Refrigeration, and even

77

1   if he has dyslexia, he is obviously capable of

2   earning his GED, however, he might have to give up

3   his pay job in order to do so, which will cut into

4   his comfort zone.   He -- the prisoner has to make

5   a decision: does he want to comply with the

6   Board's requests and suggestions to prepare

7   himself for parole, or would he rather program in

8   a manner that suits him?   The choice is his.   I

9   also note that the motive for the murder was

10  jealousy, and Pauline said she broke up with the

11  prisoner because he beat her up.   The prisoner has

12  obvious anger and relationship issues, yet he's

13  taken only three courses in self-help outside of

14  the his occasional AA.   Dr. Inaba in his -- in her

15  2000 psych report recommended that the prisoner

16  should participate in programs that offer violence

17  prevention strategies, victim awareness, coping

18  with dyslexia, relationship skills, and substance

19  abuse relapse prevention.   The prisoner would also

20  benefit from psychotherapy which would offer an

21  opportunity -- him an opportunity to face his

22  insight into his own impulses and behavior.   He

23  could benefit from therapy and participation in

24  psycho-educational groups.   The lack of sufficient

25  programming was also noted by the 2003 panel.   In

26  summation, if the prisoner can't abide by the

27  requests and recommendations of the Board and CDC

78

1    personnel, why should we suppose that he will obey

2    the orders and suggestions of his parole officer?

3    If the prisoner is given an order that he finds

4    offensive, that interferes with his enjoyment of

5    life, why should we believe that he will go along

6    with the requests by the parole officer in the

7    community when he fails to do so in a controlled

8    environment? If he will build himself up with

9    puff pieces in prison, why should we expect him to

10    be candid with his parole officer? In almost

11    every psych report condition, their opinion of the

12    prisoner's violence potential on his abstinence

13    from alcohol but he won't regularly attend AA

14    here. Why should we believe he would do so in the

15    free society? Actions speak louder than words,

16    and the prisoner's actions shout out that he's not

17    ready for parole. Just based upon the prisoner's

18    recitation of his most recent version of the

19    crime, a multi-year denial seems warranted. Thank

20    you.

21    **PRESIDING COMMISSIONER ENG:** Thank you.

22    Miss Hawkins, closing statement?

23    **ATTORNEY HAWKINS:** As Mr. Jacobs' statement

24    makes clear and some of the questions that were

25    asked today and answers provided by Mr. Dowell, in

26    the years leading up to the commitment offense,

27    it's clear that Mr. Dowell lived an (inaudible)

79

1   life.  He had only an eighth grade education, he

2   had a drinking problem, he didn't properly know

3   how to deal with --

4        PRESIDING COMMISSIONER ENG:  Excuse me one

5   second.  Mr. Jacobs, can you put it on --

6        DEPUTY DISTRICT ATTORNEY JACOBS:  Yes.

7        PRESIDING COMMISSIONER ENG:  -- mute?  Could

8   you put yours on mute, because we can hear all the

9   papers moving.

10       DEPUTY DISTRICT ATTORNEY JACOBS:  Oh, I'm

11  sorry.

12       PRESIDING COMMISSIONER ENG:  That's all

13  right.  Thank you.  Okay.  Continue.  I'm sorry.

14       ATTORNEY HAWKINS:  That's all right.  He

15  didn't know how to deal with emotions that seem

16  fairly commonplace to us, such as jealousy and

17  anger.  As Mr. Jacobs pointed out, he wasn't a

18  young child when he committed this offense.  At

19  the same time, given his family background, the

20  way he was raised, the community that lived in, he

21  simply was ill equipped to deal with the types of

22  situations that he was put into.  None of these

23  facts obviously forgive or excuse his actions, or

24  the murder that he committed, and Mr. Dowell is

25  not here today to suggest that; rather, it's to

26  show you the type of person that he was back then,

27  and the limited tools that he had to deal with

80

1   this situation.  It's clear that in the 23 years

2   that he's been incarcerated that he's changed,

3   that he has taken advantage of the programming

4   that has been offered to him, particularly in the

5   last three years, since the 2004 hearing, when the

6   Board recommended to him that he regularly attend

7   AA meetings.  He has not attended them

8   sporadically, as suggested, but rather made a

9   concerted effort to go on a more regular basis,

10  and he has understood, as pointed out in the psych

11  assessment, why that is important and why that

12  would be necessary when he is released back into

13  back into society to have the support of

14  Alcoholics Anonymous.  In addition to that, the

15  main constant in Mr. Dowell's life here in prison

16  has clearly been his vocational experience.  He's

17  received numerous laudatory chronos pointing out

18  his successful development, how he's helped out

19  San Quentin.  I am sure that they will be sorry to

20  see him leave, but it will be something that will

21  help him to reenter back into society to provide

22  financial stability for himself.  Throughout his

23  time in prison, Mr. Dowell's self-development has

24  gone hand-in-hand with his spiritual development,

25  and he has been -- he hasn't become a member of

26  LDS.  He'll need to be baptized in order to do

27  that, and he plans to do that when he is released,

81

1    but LDS is well known for being the type of church

2    that not only it has a well in the community but

3    is alcohol and substance free, as well as violence

4    free, and Mr. Dowell's siblings are all members of

5    the LDS church in their very small community, as

6    he explained earlier today, and he has every

7    intention to attend an LDS church whether he's

8    able to obtain an interstate transfer to Oregon,

9    or whether he is released into the Los Angeles

10   County.  Clearly, the LDS community is vibrant and

11   present in both of those communities.  Mr. Dowell

12   has worked hard during his years in prison to

13   maintain contact with his family members.  He has

14   expressed, as he explained today, a desire that

15   his children not visit him in prison, but at the

16   same time he has tried to maintain a relationship

17   with them by writing letters, as well as to

18   friends and family, despite the fact that he is

19   dyslexic.  I think there's been a lot of emphasis

20   placed on the fact that Mr. Dowell has not been

21   able to obtain his GED.  At the same time, it's

22   not true that he hasn't tried to do so.  He

23   clearly took the test recently and was unable to

24   pass the mathematics portion.  I think there may

25   be a misunderstanding about the -- his condition

26   of dyslexia, which does affect his reading

27   ability, but as he mentioned, causes him to

82

1  transpose numbers, which is indicia of dyslexia

2  and would affect his math abilities, and that he

3  has tried, through the prison system and with his

4  counselor, to figure out how to take this test in

5  a specialized manner, but has not yet been able to

6  do so, but they are among his plans. At the last

7  Board Hearing the District Attorney stated that,

8  quote, "Mr. Dowell is one of those individuals

9  that strikes me that he holds the key to his

10  prison cell," and the DA argued that Mr. Dowell

11  had not taken the actions to use that key. And at

12  the Board -- at the Board's recommendation, they

13  said to him that in two years, which has now been

14  extended to three years, if he had continued to

15  attend AA meetings and otherwise demonstrated that

16  he could remain disciplinary free, which he has

17  clearly done, that he would have demonstrated his

18  readiness to go back into society, and Mr. Dowell

19  in addition to doing those things that have been

20  asked of him, has really demonstrated that he has

21  become a more reflective person. He's able to

22  discuss the facts of the crime. He did not sit

23  here today and claim self-defense about what

24  happened. Many of the reports that were read by

25  the DA were things that were discussed in the

26  1995, 1998 time period. Since then, Mr. Dowell

27  has continued to go to AA, has continued to go to

83

1   his LDS self-help program. One would hope that in
2   eight years' time that he would be given a chance
3   to demonstrate that he has learned something, that
4   he has changed, and to simply quote passages from
5   things that have happened so long ago simply is
6   not fair, nor is it the proper assessment --
7                [Thereupon, a new tape was begun.]
8           DEPUTY COMMISSIONER FILANGERI: Side one of
9   tape two of the Parole Consideration Hearing for
10  Mr. Kenneth Dowell, D-O-W-E-L-L, C number 78669.
11  Sorry for the interruption. Go ahead.
12          ATTORNEY HAWKINS: Many of the concerns that
13  have been expressed in the psych reports in the
14  past, as well as by the Board, is an issue that
15  exists for every single inmate here in San
16  Quentin, which is basically they exist in a
17  controlled environment, how are we to know that
18  when released back into society that they will
19  continue to do certain things, continue to have
20  behavior that is acceptable, and Mr. Dowell has
21  demonstrated that those activities which he finds
22  necessary in order to survive inside are the exact
23  same things that he will do when he is released
24  out into society, those things being AA. Clearly
25  those groups exist outside. LDS, the church is
26  there for him. His family is there for him also
27  in the LDS community. His vocational expertise,

84

1    which he has clearly demonstrated, as gone through

2    by the panel here today, and will hopefully

3    transition him properly into society.  He has

4    expressed that the Oregon situation seems ideal

5    for him, and as Commissioner Eng pointed out,

6    there are -- there is clearly the additional peril

7    of obtaining interstate transfer.  Mr. Dowell has

8    looked into that situation along with his

9    counselor here at San Quentin and is in the

10   situation which he mentioned with respect to the

11   halfway houses, which is, until he has been

12   granted parole, he cannot set the wheels in motion

13   to obtain that transfer, but he has put all the

14   pieces in place so that when he is able to start

15   that process, he will be in the best position

16   possible to obtain that transfer.  Assuming that

17   doesn't happen at time, Mr. Dowell does have

18   family in the L.A. area.  His aunt has indicated

19   that she would be willing to take him in.

20   Even though he feels that it would be a burden,

21   there is still that possibility, and he has looked

22   into some halfway houses, and clearly the job

23   skills, they exist no matter where he goes.  So

24   there is a stable environment out there.  There

25   are institutions in place that are the same as the

26   ones here that will continue to help him, and it's

27   clear that while nothing can change the harm that

1    Mr. Dowell caused, and he expressed that here

2    today, that he has changed himself. He is not the

3    person that, as he stated, sometimes didn't think

4    about the repercussions of his actions, rather,

5    he's a person who now, because of the skills and

6    the tools that he's gained by being here for the

7    past 23 years, is someone who can become a

8    productive member of society, and his minimum

9    eligible parole date, as mentioned, was 1992.

10   He's gone through a lot since then. He has served

11   the time that is commensurate with his sentence

12   and demonstrated that it's time for him to be

13   released. Thank you.

14          **PRESIDING COMMISSIONER ENG:** Mr. Dowell,

15   this is your opportunity to address the panel

16   regarding your parole suitability if you so

17   choose.

18          **INMATE DOWELL:** I feel that I am suitable

19   for parole today for the simple reason that I --

20   as my attorney has stated, I have taken a number

21   of classes and everything to get in touch with my

22   inner self and my feelings about what caused me to

23   do some of these things, and my inability to have

24   the forethought of empathy before you take your

25   ~~actions of why -- of when you do something.~~

26   Before you drink two beers, or three beers, and

27   get in a car and go driving somewhere, to think

```
 1    that we should not do that because we could run
 2    over people, or fail to hit the brakes on time
 3    anyway, even though you don't attend [sic] to
 4    those things, those are things that you know that
 5    can happen to you, and by going to AA and working
 6    the steps through that, I've actually been going
 7    to AA since 1987, and when I was incarcerated in
 8    Soledad penitentiary, though I started AA there,
 9    and I carried it all the way through.  There was a
10    period of about three years here that I could not
11    attend on a regular basis to AA, but since the
12    last parole hearing prior to this one, I have
13    attended weekly for, and I've only missed -- in
14    six years I think I've missed seven meetings, and
15    I do work the steps completely, and where you take
16    your step four and you take that searching and
17    moral inventory of yourself and what brought you
18    to this point in your life, and what you've done
19    to other people, and so that all of these things,
20    every time you make a decision to do something,
21    plays a real important role in what your next step
22    and what you're going to do, and some of the
23    things, I'm not very proud of some of the things
24    that I've done over my life and everything, and
25    but I can't correct those things.  That's one
26    factor in my life that I will always have to do
27    nothing but pray that I have forgiveness in order
```

87

1    to exist in my life and everything, and I thank

2    you.

3              PRESIDING COMMISSIONER ENG:   Okay.   We'll

4    now recess for deliberation.   The time is 12:32.

5                        R E C E S S

6                        --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

88

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3          DEPUTY COMMISSIONER FILANGERI:  Okay.  Back

4     on record.

5          PRESIDING COMMISSIONER ENG:  Okay.  The time

6     is 1:03 p.m., and let the record note that

7     everyone who was in the room prior to our recess

8     has now returned.  In the matter of Kenneth

9     Dowell, the panel has reviewed all the information

10    received and relied on the following circumstances

11    in concluding that the prisoner is not suitable

12    for parole and would pose an unreasonable risk of

13    danger to society or a threat to public safety if

14    released from prison.  In reference, the

15    commitment offense was carried out in an

16    especially cruel and/or callous manner.  There

17    were multiple victims attacked, injured and/or

18    killed in the same or separate incidents,

19    basically, your common law wife and Mr. Winnet.

20    The offense was carried out in a very

21    dispassionate and calculated manner, such as

22    execution style murder.  Specifically, Mr. Winnet

23    had his hands up after the two of you were

24    exchanging gunfire, had his hands up and was

25    giving up, and you still proceeded to take your

26    shotgun and shoot him again and which caused his

27    KENNETH DOWELL  C-78669    DECISION PAGE 1 11/30/06

89

1    demise.   The offense was carried out in a manner

2    which demonstrates an exceptionally callous

3    disregard for human suffering, and the motive for

4    the crime is inexplicable or very trivial in

5    relation to the offense, and it was really based

6    on jealousy.   These conclusions are drawn from the

7    Statement of Facts, which I had previously read

8    into the record earlier, and again, it's very

9    difficult for us to understand what was in your

10   mind at that time where you had ample time to

11   cease and desist in the killing of Mr. Winnet.

12   The two of you, he got out of his vehicle, you got

13   out of your vehicle, you started shooting him and

14   he was trying to give up, and you proceeded to

15   grab another weapon, and ended up killing the man.

16   The prisoner has an escalating pattern of criminal

17   conduct.   Specifically, your record of public

18   drunkenness, drunk driving, brandishing a firearm

19   and pandering, that all have led up to the life

20   crime.   You've got a somewhat history of unstable

21   or tumultuous relationships with others,

22   specifically with Pauline, who was the victim and

23   your common law wife.   The inmate has failed

24   previous grants of probation, failed to profit

25   from society's attempts to correct his

26   criminality, and the attempts included adult

27   KENNETH DOWELL   C-78669   DECISION PAGE 2 11/30/06

90

1   probation, and I can't remember if you were on

2   probation at the time of the life offense or not.

3   The prisoner has programmed in a limited manner

4   while incarcerated, and failed to upgrade

5   educationally and vocationally as previously

6   recommended by the Board.  He's not sufficiently

7   participated in beneficial documented self-help

8   and/or therapy programs.  The psychological

9   report, and I'm going to refer to both of these.

10  The recent one, dated May 2nd of 2006, and the one

11  dated September 27th of 2000, because they were

12  both authored by the same doctor, Michelle Inaba,

13  I-N-A-B-A.  We found that the recent one is

14  conditionally supportive but felt that it really

15  failed to answer the previous panel's requests,

16  specifically -- let me see if I can find it.  The

17  previous panel had asked the psychologist to

18  address the significance of alcohol as it related

19  to the commitment offense, and to estimate the

20  prisoner's ability to refrain from the use of same

21  when released, the extent to which the prisoner

22  has explored the commitment offense and come to

23  terms with the underlying causes and the need for

24  future therapy programs while incarcerated.  When

25  you take a look at the psychological evaluation of

26  2006, one thing that I became very alarmed at is

27  KENNETH DOWELL  C-78669   DECISION PAGE 3 11/30/06

91

1   on the bottom of page 3 of the 2006 evaluation,

2   Dr. Inaba states that: "He would not expect to

3   have a problem with relapse into the use of

4   alcohol as he, quote, 'hasn't thought about

5   drinking for years,' unquote." The panel finds

6   that that is not an adequate explanation for what

7   the previous panel was asking for. So, however,

8   the 2006 report, she does go on to state that any

9   return to the use of intoxicants would change his

10  prognosis, but failed to say how that would change

11  his prognosis and what risk there would be to the

12  community, but states that he would be expected to

13  be at low risk of violence in a controlled

14  environment. The reason why I state that, go back

15  to the 2000 psychological evaluation by Dr. Inaba,

16  is that it was fairly negative but yet still

17  didn't -- the 2006 one didn't adequately address

18  any of the risks and the concerns that Dr. Inaba

19  had stated in the 2000 one. In reference to the

20  -- your parole plans, sir, we feel that the

21  prisoner lacks realistic parole plans in that he

22  does have any viable residential plans in the last

23  county of legal residence, that being Los Angeles

24  County, let alone in the state of California, your

25  ~~parole plans are in Oregon, and he does not have~~

26  acceptable employment plans. Just to state that,

27  **KENNETH DOWELL  C-78669   DECISION PAGE 4 11/30/06**

92

1   you know, you would find a job is not adequate.

2   It's really very, very important, sir, that you

3   have -- when you come to a panel, that you have

4   very -- you know, as current letters as possible.

5   Things change with people on the outside. One day

6   people are here, the next day they may not be, so

7   you want to have the most current letters of

8   support to present to the panel, and make sure

9   that they're very, very specific in what they are

10  offering to you. So they have to be very specific

11  about your housing and what does that mean, will

12  you have your own room, are they providing

13  transportation to you, are they providing

14  financial support indefinitely to you so that you

15  can transition? You know, make it as specific as

16  possible. Also in terms of employment plans,

17  provide letters that you are sending out to

18  organizations inquiring about possible employment,

19  and keep records of all that. And I've seen many

20  inmates come in with a whole synopsis, where

21  they've got it listed the date that they sent

22  things out and when they received responses, who

23  it went to, you know, and all different things.

24  There's a lot of different things that you can do

25  to show the panel that you're in control of your

26  own destiny, along with who have you written to in

27  **KENNETH DOWELL  C-78669   DECISION PAGE 5 11/30/06**

93

1    terms of halfway houses.  We -- there are a lot of

2    other inmates in your situation that do not have

3    any support system, any family within the state of

4    California or within -- you know, let alone in the

5    last county of residence, but they have managed to

6    reach out and try to find and line up various

7    organizations that can help them, that can provide

8    a roof over their head, and they've provided us

9    with documentation about that, and I'd also highly

10   recommend that you don't just have one, that you

11   have backup plans, because if one doesn't come

12   through, what are your backup plans?  Because, you

13   know, one thing happens when there's a -- if and

14   when you're granted a date, it does go through a

15   very rigorous review process, everything has to be

16   confirmed.  So it's in your best interest to have

17   backup plans.  It would also be in your best

18   interest to give evidence of what type of support

19   network you are setting up for yourself on the

20   outside.  What we look for, sir, is every possible

21   thing that you've thought of for your success on

22   the outside, because the last thing anybody here

23   or yourself should want is for you to end up being

24   incarcerated again and in violating anything, so

25   in order for you to be successful, you need to

26   make sure that you have everything set up on the

27   **KENNETH DOWELL   C-78669    DECISION PAGE 6 11/30/06**

1    outside, safety nets, so to speak, so that should

2    you end up in a situation where there are weapons

3    there and there's drinking and stuff, that what do

4    you have set up for yourself to make sure that you

5    wouldn't fall back into a situation where you

6    could lose control, get angry, and end up becoming

7    violent.  Regarding 3042 responses, the District

8    Attorney of Los Angeles County has expressed

9    rather vehemently their opposition to parole at

10   this time.  The panel makes the following

11   findings.  The prisoner needs documented self-help

12   in order to face, discuss, understand and cope

13   with stress in a nondestructive manner.  Until

14   progress is made, the prisoner continues to be

15   unpredictable and a threat to others.

16   Nevertheless, the prisoner should be commended for

17   being disciplinary free for all these years, and

18   also the fact that I believe it was Commissioner

19   Filangeri stated back in January 18th of 1989 you

20   completed a 12-month course in Operation and

21   Maintenance of High Pressure Boilers, and plus,

22   you should be commended for your recent

23   re-involvement in vocational training.  However,

24   these positive aspects in your behavior do not

25   outweigh the factors of unsuitability.  In a

26   separate decision the hearing panel finds that the

27   KENNETH DOWELL  C-78669    DECISION PAGE 7 11/30/06

95

1   prisoner has been convicted of murder and it is

2   not reasonable to expect that parole would be

3   granted at a hearing during the next three years.

4   The specific reasons for this finding are as

5   follows.  The prisoner, again, committed the

6   offense in an especially cruel manner, and again I

7   refer back to what I read into the record from the

8   Statement of Facts, that you took your common law

9   wife, supposedly against her will, in your vehicle

10  and ended up confronting her, the man that she

11  wanted to marry, I believe, ended up confronting

12  him, taking a few shots at him with your handgun,

13  and then reaching for a shotgun after he had his

14  hands up and wanted to give up, and shooting him,

15  and ended up killing him.  Multiple victims were

16  attacked, injured and/or killed in the same

17  incident.  Basically your common law wife,

18  Pauline, was one of the victims, and obviously the

19  deceased, Mr. Winnet.  The offense was carried out

20  in a very dispassionate and/or calculated manner.

21  It was carried out in a manner, which demonstrates

22  an exceptionally callous disregard for human

23  suffering, and the motive for the crime was

24  inexplicable or very trivial in relation to the

25  offense.  It really was based on your jealousy and

26  your unwillingness to give up on your common law

27  **KENNETH DOWELL   C-78669    DECISION PAGE 8 11/30/06**

96

1    wife and two children and let them go.  The

2    prisoner's had a history of criminality or

3    misconduct that includes the public drunkenness,

4    you know, your prior record, brandishing a

5    firearm, drunken driving and pandering, and again,

6    a history of unstable, tumultuous relationships

7    with others, and this is evidenced by the claim of

8    abuse by your common law wife, Pauline, and then

9    your pandering conviction.  Again, the recent

10   psychological report dated May 2nd, 2006, and

11   authored by Dr. Inaba, I-N-A-B-A, the

12   improvements, there were a lot of improvements

13   that -- within the new report as opposed to her

14   2000 report, and again, both of these reports were

15   done by the same doctor.  There were many

16   improvements, although not well supported, and

17   basically suggests that your gains are recent and

18   would require a longer period of observation and

19   evaluation.  Again, the prisoner has not completed

20   the necessary programming, which is essential to

21   his adjustment and needs additional time to gain

22   such programming.  So again, failed to

23   participated and complete any documented

24   self-help.  Therefore, a longer period of

25   observation and evaluation of the prisoner is

26   required before the Board should find that the

27   **KENNETH DOWELL   C-78669     DECISION PAGE 9 11/30/06**

97

1   prisoner is suitable for parole.  The panel

2   recommends that the prisoner remain disciplinary

3   free; if available, upgrade vocationally and

4   educationally; also if available, participate in

5   documented self-help and therapy, again, if

6   available.  And I believe that concludes my

7   reading of the decision.  Commissioner --

8        **DEPUTY COMMISSIONER FILANGERI**:  No, thank

9   you.

10       **PRESIDING COMMISSIONER ENG**:   -- Filangeri?

11  Okay.  Okay.  This hearing is now over.  The time

12  is 1:18.

13              A D J O U R N M E N T

14                   -oOo-

15

16

17

18

19

20

21

22

23  PAROLE DENIED THREE YEARS

24  THIS DECISION WILL BE FINAL ON:_____MAR 3 0 2007_____

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  KENNETH DOWELL  C-78669    DECISION PG 10 11/30/06

98

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Berenice Billington, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 97, and which recording was duly recorded at SAN QUENTIN STATE PRISON, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH DOWELL, CDC No. C-78669, on November 30, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated January 31, 2007, at Sacramento County, California.

Berenice Billington
Transcriber
NORTHERN CALIFORNIA COURT REPORTERS

EXHIBIT   C

DOWELL, Kenneth C-. 369          May 2, 2006

# PSYCHOSOCIAL EVALUATION
# FOR THE BOARD OF PRISON TERMS
# JUNE 2006 LIFER HEARING
# SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

I.      <u>Identifying Information:</u>     Mr. Dowell is a 59 year old (DOB 10-6-46), Caucasian male who is serving a Life sentence for murder in the second degree. He is presently serving a 15-year to life sentence at San Quentin State Prison. This report is based on a review of Mr. Dowell's central files, medical record and a face-to-face interview conducted in the staff offices of San Quentin State Prison. Mr. Dowell was informed of the limits of confidentiality in that information provided would be included in a report to the Board of Prison Terms. Mr. Dowell stated that he understood this and was able to demonstrate an understanding of the purpose of the interview. He denied any need for assistance or for any adaptive aides and stated that he was fully able to participate in the interview. Only Mr. Dowell and the examiner were present at the interview.

Mr. Dowell's developmental history, family history, psychosocial development and sexual orientation, military history, educational history, employment and income history, and substance abuse history have been thoroughly reviewed and presented in previous reports and will not be repeated here. The reader is referred to the June 2002 report by this examiner for this information.

II.      <u>Plans if Granted Release:</u>
A. Housing: Mr. Dowell would be able to live with his aunt if he is paroled. She would be willing to provide housing for him until he is able to provide his own housing. If he were allowed to parole out of state, he would return to the state of Oregon where his family owns property. He believes that he would be able to work out an arrangement with his brother to live in a house that his brother owns.

<u>B. Employment:</u> Mr. Dowell belongs to the Millwright's Union and considers himself to be employable as a Millwright. His brother works for Weyerhaeuser as an electrician and will help Mr. Dowell get employment with that company. Mr. Dowell is also in the process of researching companies in the Los Angeles area that might have jobs for which he would be qualified.

DOWELL, Kenneth  C-   69                                      May 2, 2006

Mr. Dowell would need to have approximately $5,000 worth of tools in order to start working. He believes that he might be eligible for assistance with this from the state Employment Development Department or from his family.

C. Social Support/Services: Mr. Dowell plans to organize his social life around participation in Alcoholics Anonymous and his church. He has been participating in LDS church activities at San Quentin. He stated that he has resumed participation in religious activities after an absence of many years. He attended the Episcopal Church as a child but did not attend church after the age of fifteen.

Another inmate approached Mr. Dowell and invited him to attend an LDS group in San Quentin. Mr. Dowell reported that he had been feeling that something was missing from his life. Since attending the group, he has begun to feel more complete. He plans to become baptized when he is out of prison. Since joining this group he has given up all swearing and the use of tobacco, and caffeine and attends a group that provide guidance for living a Christian life.

Mr. Dowell is a single man and has no romantic relationships at the present time. He had a long-term relationship with a woman who died of stomach cancer in 2003. She was instrumental in getting Mr. Dowell involved in AA. after she observed that he had a drinking problem. They maintained a correspondence and close friendship for 19 years before she passed away.

**CLINICAL ASSESSMENT**

III. Current Mental Status/Treatment Needs:

Mr. Dowell appeared to be his stated age. He was well groomed and dressed in standard CDC inmate clothing. He appeared to be fully alert, and was oriented in all spheres. He was able to spell WORLD forward and backwards, in spite of having a history of dyslexia. He stated that he still has difficulty sounding out some words when reading. His thought was coherent, linear and logical with no evidence of thought disorder. His intellectual functioning appeared to be in the average range. He seemed quite nervous at first and stated that the interviews caused him to feel that way. Mood was dysthymic with some brightening as he became more engaged in the interview. Mr. Dowell was soft-spoken and spoke with some hesitancy. His is a taciturn man, not given to elaboration of speech. He reported no vegetative signs of depressed mood such as loss of appetite, fatigue or poor sleep. He became sad and emotional when discussing the death of a close woman friend. He denied any suicidal or homicidal thoughts. His judgement appeared to be adequate for most situations. He demonstrated some capacity for insight.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      V62.82  Bereavement
             305.00  Alcohol Abuse (in controlled environment)
             V71.01  Adult Antisocial Behavior (by history)

DOWELL, Kenneth C- .569                                          May 2, 2006

| | | |
|---|---|---|
| AXIS II: | V71.09   No contributory Personality Disorder (avoidant, obsessive-compulsive traits) | |
| AXIS III: | Arthritis, allergies | |
| AXIS IV: | Stressors:  Incarceration, Loss of Social Support | |
| AXIS V: | GAF = 78 | |

## IV.   Assessment of Dangerousness:

The following is a risk assessment and not intended to predict future dangerousness with complete accuracy.  A risk assessment is based on enumeration of factors found to be statistically associated with a greater likelihood of violent behavior.  Some individuals found to have a rating of low risk for violence, become violent, while individuals who have factors suggesting high risk for violence, may never commit a future violent act.

A.  Violence History:  As presented previously, Mr. Dowell grew up in an environment In which he had ready access to firearms.  He learned to handle guns at a young age.  Guns were seen as a necessary tool for ranch work.  He had a weapons charge prior to his commitment offense. His commitment offense involved the shooting of his victim.

As an older man, Mr. Dowell no longer feels a need to handle conflict situations aggressively.  As stated by Mr. Dowell, "It's a macho thing when you're younger.  You can handle it yourself.  As you gain maturity, you can defuse situations."  He denied that he would need to use a weapon to deal with any situation.

When asked what he would do if someone tried to harm his family member, he stated, "If you try to hurt my family, I'm going to try to stop you.  I'm not going to murder you or hurt you.  If you can't stand between them and stop it, you can call the police.  I wouldn't handle it myself.  You would use non-violent means."

B. In a Controlled Environment:
Mr. Dowell has remained disciplinary free since his last appearance before the Board.  Based in his institutional record and present functioning, he would be expected to be at low risk of violence in a controlled environment.

C. If Released to the Community:
Mr. Dowell has the following static risk factors: a history of alcohol abuse, male gender, male victim, previous criminality, past use of a weapon, and victim injury.  He has **no** present dynamic risk factors such as recent loss of control or impulsive behavior, lack of compassion, anger, or paranoid or violent thoughts.

Mr. Dowell readily admits that as a younger man, he "wasn't a model citizen."  He now seems to feel ashamed of the things he did as a younger man.  He recounted how he suggested that his tenant prostitute herself in order to pay her rent and stated that for him it was "all about the money."  He believes that he now knows much more about relationships and sees things differently since he stopped drinking.  He would not expect to have a problem with relapse into the use of alcohol as he "hasn't thought about drinking for years."

Dowell, Kenneth   C-78669          3    San Quentin                    May 2, 2006

DOWELL, Kenneth  C-. ,69                                          May 2, 2006

In the community his plan for avoiding relapse would be to associate with people who don't drink; go to non-alcoholic social events, and avoid going places where alcohol is served.

Mr. Dowell has made a commitment to live a clean and sober lifestyle and has insight into problems of judgement that were caused by his use of alcohol.  He comes from a family that has a history of alcoholism.

Although he owned his own business in the past, Mr. Dowell plans to be an employee in the future.  He still sees himself as working long days as he states that he was "raised that way. In order to take care of yourself and be self-sufficient, you must work."  He recalled that from the age of 10 or 11, if he was not in school, he was working.  His leisure time would be spent in church or AA sponsored activities.  He also has hobbies such as wood working that he would be interested in pursuing.  His plans for how to use his time if paroled seem to be constructive and realistic.

V. Clinician Comments and Summary:

There have been some changes in Mr. Dowell's presentation since this examiner last evaluated him in 2000.  Mr. Dowell has a greater understanding of the impact of his crime on the lives of others, including the victim's family and his own children.  He has one son who is in prison and a son and a daughter with whom he has very little contact.

He now acknowledges that jealousy as well as alcohol was a factor in his crime.  He has previously contended that the crime occurred when he was trying to help his former common-law wife get her vehicle back from her fiance.  Mr. Dowell continues to relate that he does not believe that he would have sought to harm the victim had the victim not been armed with a gun when he exited his vehicle, and that he therefore acted in self-defense.  His account is not consistent with eyewitness testimony.

Mr. Dowell is not a person who is comfortable talking about or expressing his feelings.  He acknowledges that he was capable of violence in the past, but no longer has a need to display the same level of aggression.

It would seem that in the intervening years, Mr. Dowell has participated in self-help and religious activities that have given him the skills to conduct himself in a sober and non-violent manner across settings.  He regularly attends AA and is on the waiting list for Kairos.

Mr. Dowell has suffered the loss of a close friend and has come to see the importance of accepting help from others.  He continues to be hard working, mild-mannered and socially compliant.  With greater maturity, it would be expected that a man would have more consistent behavioral control and a lessening of anger.  This would seem to be the case with Mr. Dowell.  In addition, his identification with pro-social groups such as AA and the LDS church is also a positive change that would further lessen any risk of future violent behavior. Overall, his risk of violent recidivism would be low at the present time, provided he remains abstinent from the use of alcohol and drugs.

DOWELL, Kenneth   C-78669                                    May 2, 2006

Any return to the use of intoxicants would change his prognosis.  Mr. Dowell presently experiences some emotional distress, subsequent to the death of someone who was very important to him.  He has support persons in the institution, with whom he can discuss this loss.  There is no indication that his emotional distress would increase the likelihood that he would engage in criminal or violent acts.  If anything, this loss has caused Mr. Dowell to seek support from others in a manner that would further lessen the risk of future violence.


_____          6-2-06
Michel Lynn Inaba, Ph.D.                                   Date
Contract Psychologist

EXHIBIT   D

65

1    viable residential plans in the last county of

2    legal residence, and he does not have acceptable

3    employment plans. And the Hearing Panel notes that

4    responses to 3042 notices indicate an opposition to

5    a finding of parole suitability, specifically by

6    the District Attorney of Los Angeles County. We do

7    want to commend the prisoner for his certification

8    for operating boilers, his pre-GED class, his

9    modern metal cutting, and an Alternatives to

10   Violence class that he had taken, and a self-esteem

11   program, and human growth and development. He is

12   also receiving above average work reports for his

13   work. However, these positive aspects of his

14   behavior do not outweigh the factors of

15   unsuitability. Mr. Dowell, this is going to be a

16   two-year denial at this time. You -- It has been

17   recommended since 1993 and in 2000 by the doctor,

18   by prior Panels that you continue to stay in AA and

19   get some self-help. And that has not occurred. In

20   a separate decision, the Hearing Panel finds it is

21   not reasonable to expect that parole would be

22   granted at a hearing during the following two

23   years. And the specific reasons are as follows,

24   that the prisoner committed the offense in a very

25   cruel manner. Specifically that he sought out the

26   victim and was prepared to confront him as he had a

27   KENNETH RAY DOWELL C-78669 DECISION PAGE 5 7/17/03

64

1           violence prevention strategies,

2           victim awareness, strategies for

3           coping with dyslexia, relationship

4           skills, and substance abuse relapse

5           prevention.  Mr. Dowell would also

6           benefit from intervention such as

7           psychotherapy, which would offer the

8           opportunity to increase his insight

9           into his own impulses and behavior."

10   And it was also noted in the psychiatric report

11   that was prepared in September of 1993 by

12   Dr. Dupre, D-U-P-R-E, that it was recommended that

13   the inmate continue vocational training, self-help

14   group participation, upgrading his education, and

15   disciplinary-free programming, which were all

16   thought to be helpful towards proper

17   resocialization into society, and internalization

18   of traditional societal values.  Continuing his AA

19   group meetings is strongly encouraged.  In the

20   event that the subject is paroled, a comprehensive

21   outpatient substance abuse treatment program should

22   be instituted within the treatment plan.  And as

23   was noted in the hearing today, the inmate has not

24   been participating in AA since 1996, and he has no

25   current self-help programs.  The prisoner does lack

26   realistic parole plans in that he does not have

27   KENNETH RAY DOWELL C-78669  DECISION PAGE 4 7/17/03

68

1    offense, and I think you need to read all the

2    reports, specifically the transcript, so that

3    you're better prepared about what you say about

4    your crime the next time you come before this

5    Board.   I wish you good luck.

6             PRESIDING COMMISSIONER DALY:   And I do want

7    to state, try to get the information out.   You need

8    to start preparing right now on your parole plans.

9    Even if a hearing is postponed, anything that comes

10   in between now and your next parole hearing is

11   usable.   So you need to really try to get an answer

12   back from those.   See what you can do about getting

13   an interstate transfer if that is your wish to

14   transfer up to Oregon.   And I know that that is a

15   possibility.   But that's going to be very

16   important.   We'll conclude the hearing.   It is

17   4:35.

18             INMATE DOWELL:   Thank you.

19                     --oOo--

20

21

22

23

24

25   PAROLE DENIED TWO YEARS

26   FINAL DATE OF THIS DECISION_____OCT 15 2003

27   KENNETH RAY DOWELL C-78669   DECISION PAGE 8 7/17/03

69

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, APRIL ALLEN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 68, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH RAY DOWELL, CDC No. C-78669, on JULY 17, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 30, 2003, at Sacramento County, California.

_____
April Allen
Transcriber
CAPITOL ELECTRONIC REPORTING

## PROOF OF SERVICE

C.C.P. section 1013a & 2015.5; 28 U.S.C. section 1746

I, KENNETH DOWELL, am a resident of San Quentin State Prison, in the County of Marin, State of California, am over the age of eighteen (18) years and am a party to the above-entitled action. My State prison address is San Quentin Prison, San Quentin, California 94974.

On July 09, 2007, I served the foregoing information to which was a Writ of Habeas Corpus on the party(s) herein by placing a true copy(s) thereof, enclosed in sealed envelope(s), with postage thereon fully paid, in the United States Mail, in a deposit box so provided by the U.S. Postal Service, addressed as follows:

Clerk of the Court
Superior Court of Los Angeles
Central District-Clara Shortridge Foltz
Criminal Justice Center
210 West Temple St.,
Los Angeles, Caliofnria  90012

There is delivery service by United States mail at the places so addressed, and/or there is regular communication by mail between the place of mailing and the place so addressed. I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of July 2007.

SS _Kenneth Dowell_
Kenneth Dowell
Petitioner Pro-se

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 26, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

| | |
|---|---|
| BH004727 | |
| In re, | |
| KENNETH DOWELL, | Counsel for Petitioner: |
| Petitioner, | |
| On Habeas Corpus | Counsel for Respondent: |

Nature of Proceeding: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered Petitioner's application for a Writ of Habeas Corpus filed on June 12, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole. See Cal. Code Reg. tit., 15, § 2402; *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 667.

Petitioner was received in the Department of Corrections on December 30, 1983, after a conviction for second degree murder. He was sentenced to 15 years to life imprisonment. His minimum parole eligibility date was July 6, 1992. The record reflects that on March 24, 1982, Petitioner killed the victim, the boyfriend of his ex-common law wife, during a shoot out between Petitioner and the victim.

The Board found Petitioner unsuitable for release on parole after a parole consideration hearing held on November 30, 2006. Petitioner was denied parole for three years. The Board concluded that Petitioner was unsuitable for release on parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors including the circumstances of the commitment offense, Petitioner's criminal history, his unstable social history, his insufficient participation in self-help programs, and his lack of viable parole plans.

1

| Minutes Entered |
|---|
| 10/26/07 |
| County Clerk |