# EXHIBIT   3

MC-275

Name   KENNETH RAY DOWELL

Address   C78669, 1N26U

SAN QUENTIN, CA

94974

CDC or ID Number   C78669

REC'D CLS DOCKETING

## CALIFORNIA COURT OF APPEALS

## SECOND APPELLATE DISTRICT

(Court)

| | |
|---|---|
| KENNETH RAY DOWELL | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | |
| vs. | No. _____ |
| BOARD OF PRISON HEARINGS | *(To be supplied by the Clerk of the Court)* |
| Respondent | |

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

6.  **GROUNDS FOR RELIEF**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED WRIT OF HABEAS CORPUS

_____

_____

_____

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did *exactly* *what* to violate your rights at *what* time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED WRIT OF HABEAS CORPUS

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED WRIT OF HABEAS CORPUS

_____

_____

_____

_____

8. Did you appeal from the conviction, sentence, or commitment?   ☒ Yes.   ☐ No.   If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

      APPELLATE DEPARTMENT OF SUPERIOR COURT

   b. Result   DENIED   c. Date of decision:   1984

   d. Case number or citation of opinion, if known:   ACTUAL INNOCENCE

   e. Issues raised:   (1) _____

         (2) _____

         (3) _____

   f. Were you represented by counsel on appeal?   ☒ Yes.   ☐ No. If yes, state the attorney's name and address, if known:

      STATE PUBLIC DEFENDER'S OFFICE, LOS ANGELES, CA.

9. Did you seek review in the California Supreme Court?   ☐ Yes   ☒ No.   If yes, give the following information:

   a. Result _____   b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:   (1) _____

         (2) _____

         (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    THIS PETITION IS CHALLENGING DENIAL OF PAROLE

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:

      N/A

   b. Did you seek the highest level of administrative review available?   ☒ Yes.   ☐ No.
     *Attach documents that show you have exhausted your administrative remedies.*

IN THE SECOND DISTRICT COURT OF APPEALS

IN AND FOR THE STATE OF CALIFORNIA

Kenneth Dowell )
    Petitioner )     CASE NO.
)
  v. )     CHARGED OFFENSE NUMBER IN THE
)     SUPERIOR COURT OF LOS ANGELES
Board of Prison Hearings )     #A-454394 (1982)
    Respondent_____ )     SUPERIOR COURT WRIT #BH004727

WRIT OF HABEAS CORPUS

Kenneth Dowell
C-78669, 1-N-26U
San Quentin Prison
San Quentin, CA.
    94974

VERIFICATION

STATE OF CALIFORNIA  )
                     )
COUNTY OF MARIN_____)

(C.C.P. section 446 & 2015.5; 28 U.S.C. section 1746)

I, KENNETH DOWELL, declare under penalty of perjury that:

I am a party in the above-entitled action; I have read the foregoing documents and know the contents thereof; and the same is true of my own knowledge, except as to matters stated therein upon information and belief, and as to those matters I believe they are true.

Executed this 3rd day of December, 2007 at San Quentin State Prison, San Quentin, California 94974.

S/S *Kenneth Dowell*
Kenneth Dowell

i.

## CERTIFICATION OF COMPLIANCE

### Rule 8.204

Pursuant to California Rules of Court Rule 8.204(c)(1), I certify that the Petitioner's Writ of Habeas Corpus is:

Proprotionately spaced, has a typeface of 13 points or more, contains 7,765 words and does not exceed 40 pages.

Dated: December 3, 2007

Kenneth Dowell
Petitioner pro se

## TABLE OF CONTENTS

VERIFICATION                                                    i.

TABLE OF CONTENTS                                              ii.

TABLE OF AUTHORITIES                                       iii-iv.

MEMORANDUM OF POINTS AND AUTHORITIES                          1-
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS


INTRODUCTION                                                 1-7.


ARGUMENT  I -  SOME EVIDENCE                                7-23

        a. Consequences of actions and magnitude               9
        1. Especially atrocioius dispassionate & calculated   11
        2. Inexplicable and Trivial                           14
        3. Unstable tumultuous relationships.                 15
        4. Parole plans/Vocationally upgrade                  16
        5. Self-help and therapy                              18
        6. Psychological report doesn't support parole        19

ARGUMENT II - PREPONDERANCE OF EVIDENCE                     20-23

CONCLUSION                                                 24-26

EXHIBITS


PROOF OF SERVICE

# TABLE OF AUTHORITIES

| Cases | Pages |
|---|---|
| Anderson v.  Smith, 97 F.2d 239 | 21. |
| Armstrong v. Davis, 275 F.3d 849 | 4. |
| Biggs v. Terhune (9th Cir.2003) 334 F.3d 910 | 7,10,24. |
| Bolani v. Immigrations, 9 F.2d 1157 | 22. |
| Caldwell v. Miller, 790 F.2d 589 | 21. |
| Envil.Def.Ctr. Inc. v. EPA (2003) 344 F.3d 832 | 9. |
| Greenholtz v. Inmates, (1979) 442 U.S. 1 | 8. |
| In re Capistran (2003) 107 Cal.App.4th 1299 | 8. |
| In re Dannenberg (2005) 34 Cal.4th 1061 | 12,15. |
| In re DeLuna (2005) 126 Cal.App.4th 585 | 10. |
| In re George Scott, DJDAR 12450 | 11. |
| In re Lowe, 130 Cal.App.4th 1405 | 12. |
| In re Ramirez (2001) 94 Cal.4th 549 | 8. |
| In re Rosenkrantz (2002) 29 Cal.4th 616 | 5,6,10,11,12,13,16,22. |
| In re Rosenkrantz, (2000) 80 Cal.App.4th | 21. |
| In re Scott, 119 Cal.App.4th 871 | 5,10,13,14. |
| In re Smith, 109 Cal.App.4th 503 | 8,11. |
| In re Van Houten, 11 Cal.App.4th 329 | 13. |
| Jancsek, 833 F.3d 1390 | 10. |
| McQuillion v. Duncan (9th Cir.2002) 306 F.3d 895 | 5,10. |
| McBee v. Bonner, 296 F.2d 235 | 22. |
| Morton . Ruiz, 415 U.S. 199 | 21. |
| Pearce v. Director, 647 F.2d 716 | 14. |
| People v. Bridgehouse, 47 Cal.2d 406 | 11. |

iii.

People v. Burnick, 14 Cal.3d 306                              19.

People v. Neol (2005) Cal.App. Lexis 711, 148                 9.

Rosenkrantz v. Marshall, 444 F.Supp 2d 1063             5,13,23.

Superintendent v. Hill (1985) 472 U.S. 445              8,14,22.

Services v. Dulles, 354 U,.S. 363                            21.

Taylor v. U.S., 734 F.2d 1152                               22.

Turner v. Henman, 829 F.2d 612                             19.

VanderMolen v. Stetson, 571 F.2d 617                       21.

Wolff v. McDonell, 418 U.S. 539                            21.


                        STATE STATUTES


Penal  Code § 3003                                        17.
Penal Code § 3041                                         21.
Penal  Code § 3043                                        15.
Penal  Code § 11177                                       17.
Penal Code § 5079                                         20.
Cal.Code of Regs., tit. 15 § 2000                    21,22,23.
Cal.Code of Regs., tit. 15 § 2181                         23.
Cal.Code of Regs. tit. 15 §2322                           15.
Cal.Code of Regs. tit. 15 § 2326                          15.
Cal.Code Regs, tit. 15 §2402                  2,3,10,11,1,18.

IN THE SECOND DISTRICT COURT OF APPEALS

IN AND FOR THE STATE OF CALIFORNIA


Kenneth Dowell                 )
      Petitioner         )
                  )         Case No.
   v.                          )
                  )
Board of Prison Hearings       )
      Respondent           )


## WRIT OF HABEAS CORPUS


### INTRODUCTION

Petitioner, Kenneth Dowell, was convicted pursuant to Penal Code § 187, murder in the second degree. On March 24, 1982, petitioner acting in self-defense, killed James Winnet, the boyfriend of petitioner's wife.

Petitioner's wife complained that her boyfriend was attempting to trade her vehicle for a van and motor cycle. Petitioner acting on her behalf, took his wife to Parkman's Bail Bondsman, the place where the vehicle was to be traded, however, the establishment was closed. On their way back to Norwalk, California, petiitioner noticed his wife's boyfriend following them, so he drove into the Zody's parking lot, and as he did, the victim pulled up behind them. As petitioner stepped from his vehicle, Winnet shot at him. Petitioner in an act of self-defense retrieved a hand gun from his pick

1.

up and fired back. The victim was shot four or five times. After the shooting, petitioner waited for the police, and according to the probation officer's report, petitioner stated, "I never had any intention of killing anyone. I'm sorry it happened." (Exhibit A p.10.)

The Board hearing record is in conflict with the foregoing. The District Attorney's representative stated: "In regards to his statements in regards to the crime, he claims self-defense, but the evidence is against him,..." (Exh. B p.73.) The District Attorney further influences the Board by claiming that petitioner kidnapped his wife. (Exh. B p.74) However, according to the probation report, petitioner's wife made it clear that she was not kidnapped. (Exh. A. pp.4-5) The Board Commissioner read into the record the Statement of Facts from the Probation Officer's Report, then found contrary to the probation officer's report (Exh. B p.89) when stating, "he (the victim) tried to give up." There is nowhere within the probation officer's report indicating the victim was trying to "give up." (Exh. B p.10 also see Exh. A p.10)

It will be pointed out within the Board Hearing Record, that there are numerous contradictions. It will also be shown that the Board of Prison Hearings held nothing more than a summary hearing, and failed to address California Code of Regulations, title 15 § 2402, and the factors therein in relation to finding suitability or unsuitability in a parole hearing, which is required by law.

2.

Moreover, the Board of Prison Hearings used the same reasons to deny parole on six (6) previous parole consideration hearings, and has failed to take into account that petitioner has for twenty-five years, maintained a stellar prison record.

The specific factors applicable to the Board's decisions are set forth in Penal Code section 3041 and the Board's regulations (promulgated pursuant to subdivision (a) of section 3041) established criteria for determining suitability for release on parole. (Cal. Code Regs., Tit. 15 [CCR-15] section 2402.) The factor statutorily required to be considered, and of most importance, is public safety. As stated in subdivision (b) of Penal Code section 3041, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual..." The factors required to be considered by the Board regulations are for the most part, specified in section 2402.

On November 30, 2006, Petitioner appeared before the Board of Prison Hearings (BPH). The board denied Petitioner parole for three years for the following reasons: (1) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the offense was carried out in a dispassionate manner such as an executon style murder. (2) The motive for the crime was

3.

inexplicable in relation to the offense. (3) History of unstable of tumultuous relationships. (4) Parole plans/Failed to upgrade vocationally. (5) Need self-help or therapy. (6) Psychological report. (The Board chose to set aside the most recent psychological report dated, May 2, 2006, which supported parole, and use a 2000 psychological report.)(Exhibit B, pp.88-98.)

There are no negative differences between the 2000 board hearing and the November 30, 2006, board hearing. There is, however, positive advances by petitioner. Petitioner has not received disciplinary write-ups. Petitioner continues to take personal responsibility for his crime. Petitioner has viable parole plans. Petitioner continues to participate in self-help programs (AA and Positive Attitude). The psychological assessment of May 02, 2006 is supportive of release. "Petitioner would pose a low risk if he were to be released at this time. (See Exhibit C.)

The Board's decision is not in accord with a proper reading of the relevant statutes, regulations and case law. Although the "some evidence" standard of review provides broad discretion to the Board, it is in fact bound by three requirements: (1) the evidence must be drawn from the factors enumerated in the statutory and regulatory framework; (2) the evidence must be deemed relevant and reliable; and (3) the evidence must reasonably speak to whether the inmate poses a current public safety threat.

Although there is no question that under Rosenkrantz

4.

and Dannenberg the statutory "commitment offense" factor is relevant, and at times may be enough to deny parole, it may in some circumstances rise to the level of a due process violation. That conclusion is consistent with the concern raised by the Ninth Circuit in <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir.2003): that reliance on an ever-frozen, unchanging factor in denying parole may in certain instances violate due process.

A second degree murder (the offense in this case) requires malice – an element which by its nature suggests a certain degree of cruelty and callousness – the facts used by the Board to show the crime is beyond the minimum elements must establish that the crime is in fact especially heinous, atrocious or cruel, to which petitioner's crime of self-defense does meet the forgoing. As will be shown, the Board's findings were not in accord with <u>In re Rosenkrantz</u>, 29 Cal.4th 616; <u>Ronsenkrantz v. Marshall</u>, 444 F.Supp.2d 1063; <u>In re Elkins</u> (2006) 144 Cal.App.4th 475 and <u>In re Scott</u>, 119 Cal.App.4th 871.

In April 2007 this writ of habeas corpus was forwarded to the Los Angeles County Superior Court. On November 19, 2007, the Superior Court denied the writ of habeas, and found contrary to the record and exhibits attached hereto; and stated that petitioner "forced his ex-wife into his vehicle," drove around searching for his ex-wife's boyfriend, and that it was petitioner who retrieved a handgun and shot first, killing

5.

him.   The court went on to find that there was "some evidence"
to   deny   parole:   "The   record   reflects   that   Petitioner   was
convicted   of   public   drunkenness,   possession   of   narcotics,
brandishing a firearm, drunk driving, and pandering.   The court
further found that petitioner "has not sufficiently participated
in self-help programs.  In addition, Petitioner has not upgraded
academically...   Petitioner's   proposed   parole   plans   consist
of residing with his brother in Oregon.  (Not his commitment
county.)   In addition, Petitioner does not have an offer of
employment...   Every factor considered by the Board need not
be stated, especially if it is not persuasive."   (Exhibit E,
pp. 2&3.)

        What the  lower court  failed  to  recognize  is  that
out of state parole plans are acceptable (P.C. § 3003), nor
it is  necessary to have a job offer.  (See Cal.Code of Regs.,
tit. 15 § 2402 Understanding and Plans for Future.)   Moreover,
prior convictions must be violent. (Cal.Code of Regs., tit.
15 Previous Record of Violence.)

        Of great importance is that the lower court's findings
are contrary to this Honorable Court's decision in In re Michael
Montgomery,  2d  Civil  No.  B192544  11/7/07.   "The  Board's
authority to make an exception [to the requirement of setting
a parole date] based on the gravity of a life term inmate's
current or past offenses should not operate so as to swallow
the rule that parole is 'normally' to be granted." (In re
Rosenkrantz, 29 Cal.4th 616, 683.) (Id. p.14.)

                            6.

As stated, the Superior was wrong when determining it was petitioner who sought out the victim with the intend to kill him. The record is clear in this regard, petitioner and his ex-wife were returning from Long Beach when petitioner found the victim was following him. Pulling into a parking lot, the victim stepped from his vehicle and started shooting.

This Court further found, "Establishing that the commitment offense involved some elements more than minimally necessary to sustain a conviction is a step on the path of evaluating a prisoner's current dangerousness, but it is not the final step under the regulations. Due process affords an inmate 'an individualized consideration of all relevant factors.'" (In re Tripp (2007) 150 Cal.App.4th 30, 319, quoting In re Rosenkrantz, supra, 299 Cal.4th 616, 655.) (Id. pp.15&16.)

As was found in Montgomery, this petitioner has an exemplary prison record and the almost unanimous opinions of prison psychologists that petitioner poses a low risk for violence, the only rational conclusion is that petitioner poses little or no threat to public safety.

Of further interest to this Court is that the Superior Court totally ignored the "Preponderance of Evidence" argument herein. The Board of Prison Hearings is required by law to uphold its own rules and regulations and its failure to do is a violation of petitioner's due process rights.

7.

THE BOARD OF PRISON HEARINGS
FAILED TO UPHOLD
THE SOME EVIDENCE REQUIREMENTS
RESULTING IN A VIOLATION OF
PETITIONER'S DUE PROCESS

While there is no federal constitutional right to parole, (Greenholtz v. Inmates of Nebraska Penal (1979) 442 U.S. 1, 11-12) both federal and state courts have recognized that California's parole scheme bestows on prisoners a cognizable liberty interest in parole that is protected by due process. Biggs v. Terhune (9th Cir. 2004) 334 F.3d 910, 914; Armstrong v. Davis (9th Cir. 2001) 275 F.3d 849, 864; McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 903; and In re Rosenkrantz (2002) 29 Cal.4th 616, 655-659 [prisoner's have a liberty interest in parole protected by due process.]

Within the context of parole consideration in California, due process requires that "some evidence" support a decision by the Board to deny parole. (Superintendent v. Hill (1985) 472 U.S. 445, 456; Biggs, supra, 334 F.3d at 915; Rosenkrantz, supra, 29 Cal.4th at 667; In re Smith, 109 Cal.App.4th at 501-503; In re Capistran (2003) 107 Cal.App.4th 1299, 1305; In re Ramirez (2001) 94 Cal.4th 549, 564; In re George Scott (2005) DJDAR 12450.)

Accordingly, this Court must undertake a fact specific inquiry of whether there is evidence to deny parole under California law. (McQuillion, supra, 306, F.3d at 904-906; Biggs, supra, 334 F.3d at 915.) Specifically, the Court must determine whether there is some evidence that petitioner would

currently present an "unreasonable risk of danger to society" if released on parole. (Cal.Code Regs., tit. 15 §2402(a); Penal Code, §3041(b).

## THE BPT HEARING RECORD

### a. Consequences of actions and magnitude

The Rosenkrantz court held the "some evidence" standard is not met when the Board minimizes culpability. It did so after (1) delving into the entire record before the Board as to the relevant issue in question; (2) specifically reviewing evidence that the Board had omitted in making its determination; and (3) assessing the reasonableness of the Board's interpretation of the entirety of there circumstances.

The court will find after reviewing all the evidence before the Board on this issue, no reasonable interpretation of the circumstances would justify finding "some evidence." Indeed, the Board's failure to consider all relevant evidence is consistently deemed, in a variety of contexts, to be arbitrary and capricious and abuse of discretion. See e.g., Envil. Def. Ctr, Inc. v. EPA (2003) 344 F.3d 832, 858 n:35 (holding federal agency has acted in arbitrary and capricious fashion if the agency has "entirely failed to consider an important aspect... [or] its decision... runs counter to the evidence.") According to People v. Neol (2005) Cal.App. Lexis 711, at 148, "The trial Court was not permitted to substitute its conclusion... under circumstances where it could not explain

9.

how this... bit of evidence trumped the otherwise overwhelming counterrailing credible evidence..." This is the same as the Board has done in petitioner's case.

The evidence relied on by the Board must be "reliable," (Regs.. §§ 2402, subd. (b), 2281, subd. (b)); it must have "'"some indicia of reliability."'" (In re Scott (2005) 133 Cal.App.4th 573, 591, 34 Cal.Rptr.3d 905; Biggs, 334 F.3d at 915; McQuillon, 306 F.3d at 904; Jancsek, 833 F.3d at 1390.), Additionally, the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the discretionary authority of the Board. (In re Rosenkrantz (2002) 29 Cal.4th 585, 655. A prisoner is entitled to "an individualized consideration of all relevant factors.") (In re DeLuna, 126 Cal.App.4th at p. 591.) The Board's decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious," and this requirement was not accomplished during petitioner's hearing.   There is nowhere in the record that shows the Board used the California Code of Regulations, title 15 § 2402, and individually cited each factor in relation to their findings.  In order for the Board to meet procedural due process embodied in the California Constitution it must address all fifteen (15) factors, and not give six (6) turgid reasons without implementing the applicable factors for each one.

Petitioner will now address each in numerical order:

10

**(1) Especially atrocious dispassionate and calculated**

The California court implemented what is known as the "beyond the minimum necessary" in relation to the death of a victim (In re Rosenkrantz, 29 Cal.4th at 683.); and the question here is, what evidence indicates that any particular second degree murder was somehow "beyond the minimum necessary to sustain a conviction?" _ In other words, what evidence indicates the commitment offense was "especially atrocious, dispassionate and calculated," given that there typically must be a finding of some level of heinousness, in order for anyone to have been convicted of second degree murder in the first place? Cal.Code Regs tit. 15 § 2402(c)(1); Smith 114 Cal.App.4th at 366-67 (noting that "all second degree murders by definition involve some callousness-i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others."

In order for a crime to be "atrocious, dispassionate and calculated" and meet the "minimum necessary to sustain a conviction," the offense must have been carried out execution-style. Rosenkrantz, supra, 29 Cal.4th at p. 683. Moreover, there had to be multiple victims attacked, injured or killed in the same or separate incidents. ( See Cal.Code Regs, tit. 15 § 2402(a)(1)(A).)

The court in In re George Scott, 133 Cal.App.4th (#) (Oct. 18, 2005) held "[it] is necessary to remember that denial of parole based upon the nature of the offense may

21

rise to the level of a due process violation, as where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (Rosenkrantz, supra, 29 Cal.4th at p.683.)   Therefore an unsuitability determination must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances went beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety." (In re Dannenberg, supra, 34 Cal.4th at p. 1098.) The Scott court went on to explain comparisons, "[In] Rosenkrantz... a full week of careful preparation, rehearsal and execution" took place, "[the] prisoner, fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement, carried out the crime with planning, sophistication or professionalism," is more aggravated or violent, and meets the "minimum necessary." (Rosenkrantz, at p.678.)   Similarly, there was evidence of premeditation in In re Lowe (2005) 130 Cal.App.4th 1405, which also involved a second degree murder conviction.  There the prisoner purchased the gun shortly before the murder, entered his victim's bedroom in the middle of the night while he was asleep, unsuspecting, and in a special relationship of confidence and trust with his killer, 'shot him five times in the head and chest, execution style.' (Id. at p. 1414.)  As this court stated,

12.

this evidence showed the murder 'was a cold-blooded execution' and that the prisoner's 'egregious acts [were] far more aggravated than the minimum necessary to sustain a second degree murder conviction.'" (In re Scott, 119 Cal.App.4th 871, 889-892; In re Van Houten (2004) 116 Cal.App.4th 339; Rosenkrantz v. Marshall, 444 F. Supp.2d 1063; In re Dannenberg, 34 Cal.4th at p. 1098.))

Moreover, the circumstances of petitioner's crime are significantly less egregious than those in other cases in which the nature of the offense was found to support a finding of suitability. (See Rosenkrantz v. Marshall, supra, 444 F. Supp.2d 1063.)

There is no evidence petitioner "tormented, terrorized, or injured his victim before ... shooting him, or that he gratuitously increased or unnecessarily prolonged his pain and suffering." (See In re Scott, 119 Cal.App.4th 871, 892.) Because the relevant evidence shows no more callous disregard for human suffering than is shown by most second degree murder offenses, the Board's use of this factor to conclude that petitioner committed his offense in an "especially atrocious dispassionate and calculated manner" and that the murder was "execution style," is arbitrary and capricious. (In re Rosenkrantz, supra, 29 Cal.4th at 655.)

Petitioner's commitment offense was a result of stress. The stress came from his wife leaving him, and taking his two children away, for the love of another man. The fear

came as a result of the victim shooting at him. (Exh. A p.10)
These circumstances are almost identical to those in In re
Scott, supra, 119 Cal.App.4th 871, 894. ([t]he record   shows
that his unpremeditated offense resulted from some provocation
on the part of the victim ... the circumstances are similar
to those which have reduced criminal liability from murder
to manslaughter, as the emotional pain caused by the departure
or infidelity of a loved one is often seen by juries as
diminishing self-control.) (see, e.g., People v. Bridgehouse
(1956) 47 Cal.2d 406, 414 [303 P.2d 1018].)

         The record is clear, petitioner did not plan, rehearse
and commit the offense with sophistication and professionalism.
Thus the Board's denial does not meet the "minimum necessary"
standard as set forth in Rosenkrantz, or the "some evidence"
standard in Superintendent v. Hill, supra, (1985) 472 U.S.
445.


(2) Inexplicable and trivial

         As to "inexplicable and trivial," the Scott court
continued to say, "To fit the description of very trivial in
relation to the offense requires comparisons; the motive must
be materially less significant (or more "trivial") than those
which drive people to commit the offense in question, and
therefore more indicative of a risk of danger to society if
the prisoner is released than is ordinarily presented." (119
Cal.App.4th at 894.)   If the Scott court's reasoning is

                              14:

correct, the "inexplicable and trivial" standard does not meet the "some evidence" criteria in the Board's findings - for the victim's actions, when shooting at petitioner, were directly related to petitioner's conduct of acting in self-defense.

(3) History of unstable, tumultuous relationships

The Board found "Petitioner has a history of assaultive behavior and unstable, tumultuous relationship with others (Exh. B p.89). The Board may consider misconduct only if it is reliably documented. Within Penal Code § 3043.5, the Board is required when deciding whether to release the person on parole, to "review all information received... to insure that... all current and past convicted offenses have been given adequate consideration." (Emphasis added.) In re Dannenberg, 34 Cal.4th at 1084.

California Code of Regulations, title 15 § 2322 sets forth the criminal history to be considered by the Board, to which, if the crime is over five years old it cannot be used to extend the total period of confinement.

Cal.Code of Regs, tit. 15 § 2326 requires the circumstances surrounding the charge to be reliably documented and an integral part of the crime for which the prisoner is currently committed to prison.

The BPH when finding petitioner unsuitable for parole stated:  "your record of public drunkennes, drunk driving,

15.

brandishing a firearm and pandering, all have led up to the
life crime." (Exh. B p.89)  First, how does drunk driving lead
to murder?   Second, the record explains the brandishing charge,
to which petitioner makes it clear that the weapon was a knife,
not a firearm. (pp.64-65)  And third, the pandering charge
has nothing to do with murder, nor is it a violent crime against
the victim, which is required by Cal.Code of Regs, tit. 15
§ 2402(c)(2).  Moreover, the Board's "reliance on an unchanging
factor, the circumstance of the offense and conduct prior to
imprisonment, runs contrary to rehabilitative goals espoused
by the prison system, and resulted in a due process violation."
In re Rosenkrantz, 29 Cal.4th at 689,


**(4) Petiitoner needs to upgrade vocationally/Needs parole plans**

One of the factors under Cal.Code Regs, tit. 15.,
15. § 2204(d)(8) in finding a prisoner suitable for parole
is "the prisoner has made realistic plans for release or has
developed marketable skills that can be put to use upon
release." (Emphasis added.) It is not required to have both,
one is sufficient.

The record is indisputable, petitioner received a
certificate of achievement in the Maintenance and Operation
of High Pressure Boilers, Vocational Machine Shop and Millwright
Machinist. (Exh B pp.31-33)

As to parole plans, the Court will find petitioner
submitted letters of support from his brother in Oregon, and

16.

an Aunt in the Los Angeles area. (Exh. B pp.46-47) The Board however, refused to accept the parole plans from Oregan, speculating that petitioner's brother had weapons in his house. This analogy is ludicrous. Guns can be acquired in any city within California, and for the Board to reason that petitioner cannot be parole to his brother's house because he might have a gun in the house is without merit. Moreover, during petitioner's previous board hearing, the commissioner encouraged this petitioner to obtain "an interstate transfer to Oregan." (Exh. D p.68)

The United States Congress in 1934 (Penal Code § 11177) set forth an act granting the consent to any two or more states to enter into agreements of compacts. Penal Code § 11177(c) states: "That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this compact (herein called "sending state"), to permit any person convicted of an offense... and placed on... parole to reside in any other state party to this compact... (a) [If] such person is in fact a resident or has his family residing within the receiving state..." Also see Penal Code § 3003(b)(i) "An inmate may be paroled to another state pursuant to any law.".

As previously mentioned, the title 15 § 2402 subd.(d)(8) only requires to have parole plans or a marketable skill. Not both.

5) Petitioner's need for further beneficial self-help and
therapy

   The Court is directed to the Cal.Code of Regs., tit.
15 § 2402(c)(5) where it is clear "The prisoner [must have]
a lengthy history of severe mental problems related to the
offense." There is nowhere within the record showing petitioner
has a mental history related to the offense. Nor is there
anywhere within the title 15 § 2402, requiring a prisoner to
participate in self-help programs.

   More importantly, the Board Commissioner recognizes
that self-help programs may not be available (Exh. B p.97),
and fails to recognize the psychological report at page 4,
where Doctor Inaba addresses self-help: "It would seem that
in the intervening years, Mr. Dowell has participated in self-
help and religious activities that have given him the skills
to conduct himself in a sober and non-violent manner across
settings. He regularly attends AA and is on the waiting list
for Kairos." The Board during petitioner's July 2003 hearing
commended petitioner for his participation in self-help therapy
programs. (Exh. D p.65) How is it, then, that the 2006 Board
can find petitioner unsuitable for parole for failing to attend
self-help programs?

(6) The Board found the Psychological report is not supportive
of release

   The Court is directed to petitioner's psychological

evaluation, where Doctor Inaba states, "He has no present dynamic risk factors such as loss of control or impulsive behavior, lack of compassion, anger, or parnoid or violent thoughts." Under V. Clinician Comments and Summary, Doctor Inaba also found petitioner's "risk of violent recidivism would be low." (Exh C., May 02, 2006, psychological evaluation at page 4)

The Board chose to reject the foregoing and put itself in the position of a Psychologist (Exh. B pp.90-91) and use their own reasoning to deny parole, then assess petitioner as a risk to society.

The State Supreme Court in People v. Burnick, 14 Cal.3d 306, 327; 121 Cal.Rptr. 488; 535 P.2d 352, found "The evidence, as well as the consensus of opinion by responsible scientific authorities, is now unequivocal." (Diamond, the Psychiatric Prediction of Dangerousness (1975) 123 U.Pa. L.Rev. 439, 451.) In the words of spokesmen for the psychiatric profession itself, "Unfortunately, this is the state of art. Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or 'dangerousness.' Neither has any special psychiatric 'expertise' in this area been established." (Task Force Report, Clinical Aspects of the Violent Individual (American Psychiatric Assn., 1974) p.28) And the same studies which proved the inaccuracy of psychiatric predications have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err;

19.

they predict acts of violence which will not in fact take place ("false positives"), thus bringing as "dangerous" many persons who are in reality totally harmless. (See generally id. at pp.23-30.)

It is hard to believe that the Board would set aside a recent Psychological evaluation (May 2006), which support parole, then use an evaluation from September 2000 (Exh. B p.90) to find unsuitability for parole.

What may be of further interest to the Court is that psychiatric evaluations and, "The recommendation shall be submitted to the Director of Corrections and shall not be effective until approved by the director." Penal Code § 5079. In that this is the case, petitioner's psychological evaluations are invalid - for the Director of Corrections did not review and approve the recommendations.

### THE BPH IS REQUIRED TO USE THE PREPONDERANCE OF EVIDENCE STANDARD DURING A PAROLE HEARING

The California Board of Hearings' failure to follow its procedures is fundamentally unfair, and a violation of the Fifth Amendment.

The United States Constitution requires states and their agencies to comply with all the procedures they establish. Carson v. Block, 790 F.2d 562, 565-6. A violation of the BPH's rules authorizes relief in this proceeding if the rules are themselves essential components of due process of law - that

is, if the procedures used by the BPH violates the Constitution. Under 18 U.S.C. § 4218, a parole board's failure to follow administrative rules and regulations violates constitutional provisions. Turner v. Henman, 829 F.2d 612.

Numerous federal courts, including the United States Supreme Court have found "an inmate is entitled to expect the Bureau of prisons to follow its own policies." Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2925, 41 L.Ed.2d 935. In re Rosenkrantz (2000) 80 Cal.App.4th 409, 424-425 also found the Board must determine parole suitability by following its own rules and regulations.

According to Caldwell v. Miller, 790 F.2d 589, 09, "An agency must conform its actions to the procedures that it has adopted." See Pearce v. Director, Office of Workers' Compensation, 647 F.2d 716; VanderMolen v. Stetson, 571 F.2d 617, 624; see also Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.) Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; Services v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403. "An inmate, too, has the right to expect prison officials to follow its policies and regulations." Anderson v. Smith, 697 F.2d 239. Here the proper procedure for the BPH and courts to follow is the "preponderance of evidence" standard within the Cal.Code of Regs. tit. 15 § 2000(50).

Section 2000(a) states: "The following rules of construction apply to the regulations contained in this division..." At the end of § 2000 reference is made to Penal Code § 3041 - thus all prison inmates have a liberty interest pursuant to Cal.Code of Regs. tit. 15 § 2000(50) preponderance of evidence, and not the more stringent "some evidence" standard, which is not mandated by the California State Legislature.

Whenever an abuse of discretion is made by an administrative agency, reviewing courts cannot set it aside unless the court has a definite and firm conviction that a clear violation in judgment has not taken place. Taylor v. United States Parole Commission, 734 F.2d 1152, 1154; Bolani v Immigration & Naturalization Service, 669 F.2d 1157, 1160; McBee v. Bonner, 296 F.2d 235, 237.

Although numerous courts are using the "some evidence" standard as set forth in Superintendent v. Hill, supra, 4/2 U.S. 445, and In re Rosenkrantz supra, 29 Cal.4th 616, the "some evidence" standard is in direct conflict with the Cal.Code of Regs. tit. 15 § 2000(50). The fact is, the law is what it is, and the "some evidence" standard should not be allowed to supersede the mandated preponderance of evidence within the Cal.Code of Regs. title 15 § 2000.

If the Legislature intended for the "some evidence" to be the applicable standard, the Cal.Code of Regs. tit. 15 § 2000(50) would have been repealed.

22.

The Cal.Code of Regs. title 15 § 2402 set forth six (6) factors in finding an inmate unsuitable for parole: (1) Commitment Offense; (2) Previous Record of Violence; (3) Unstable Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors and (6) Institutional Behavior. § 2402 mandates nine (9) "Circumstances Tending to Show Suitability" which are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for Future and (9) Institutional Behavior.

As shown, there are a total of fifteen factors the Board must use to find suitability or unsuitability. If the Board implements the Cal.Code of Regs. title 15 § 2000(50) and uses the preponderance of evidence standard, eight of the above mentioned factors is required to find petitioner unsuitable for parole, not five as was done during the hearing.

According to the Cal.Code of Regs. title 15 § 2281(d)(7) the parole suitability determination process only requires that part one, or part two of § 2402 be satisfied, which is in conflict with the policy of using just one factor to deny parole.

23.

## CONCLUSION

The Board found during petitioner's seventh (7th) parole consideration hearing that petitioner was unsuitable for parole based upon the gravity of the crime. The Ninth Circuit and California Supreme Court made it clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 917; Rosenkrantz, supra, 29 Cal.4th at 689.)

In the circumstances of this case, the Board's reliance upon the facts of petitioner's crime and his commitment offense as a reason to deny parole after 25 years of incarceration, violates due process. First, a continued reliance upon these unchanging factors makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest. Second, the circumstances of the crime and petitioner's criminal history do not amount to some evidence supporting the conclusion that petitioner poses an unreasonable risk of danger if released.

As the Central District Court in Rosenkrantz v. Marshall, 444 F. Supp.2d 1063, 1081 stated:

> Whether the facts of the crime of conviction or other unchanged criteria, affect the parole eligibility decision can only be predicated on the "predictive value" of the unchanged circumstance. Otherwise, if the unchanged circumstance per se can be used to deny parole eligibility, sentencing is taken out of the hands of the judge and totally

deposited in the hands of the BPT. That is,
parole eligibility could be indefinitely and
forever delayed based on the nature of the
crime even though the sentence given set forth
the possibility of parole - a sentence given
with the facts of the crime fresh in the mind
of the judge. While it would not be a
constitutional violation to forego parole
altogether for certain crimes, what the state
cannot constitutionally do is have a sham
system where the judge promises the possibility
of parole, but because of the nature of the
crime, the BPT effectively deletes such from
the system. Nor can a parole system, where
parole is mandated to be determined on
someone's future potential to harm the
community, constitutionally exist where despite
20 or more years of prison life which indicates
the absence of danger to the community in
the future, the BPT commissioners revulsion
towards the crime itself, or some other
unchanged circumstance, constitutes the alpha
and omega of the decision. Nobody elected
the BPT commissioners as sentencing judges.
Rather, in some realistic way, the facts of
the unchanged circumstance must indicate a
present danger to the community if released,
and this can only be assessed not in a vacuum,
after four or five eligibility hearings, but
counterpoised against the backdrop of prison
events. (Bair v. Folsom State Prison, 2005
WL 2219220, *12 n.3 (E.D.Cal. 2005), report
and recommendation adopted by, 2005 WL 3081634
(E.D.Cal. 2005).)

A review of all of petitioner's parole suitability
hearings will reveal each board commissioner used the same
factors to deny parole; and failed to realize that the
commitment offense will never change. Does this constitute
that the jury's findings of second degree murder, and the
possibility of parole were a sham? What is there about the
Penal Code pursuant to "Double Jeopardy" that the Board doesn't
understand when continuing to retry petitioner's case over

25.

and over, from his first parole consideration hearing in 1992 to the present?

The matrix for a second degree murder such as petitioner's, requires 16, 17 or 18 years of incarceration. Taking into account "good time credits," petitioner has now been incarcerated equivalent to 33 years. The question must be asked, is petitioner sentenced to life in prison without the possibility of parole?

It is, therefore, respectfully requested that this Honorable Court find that there is no evidence to support "an unreasonable risk to society," and order petitioner's immediate release.

Dated: December 03, 2007

Kenneth Dowell
Litigant Pro-se

## PROOF OF SERVICE

### C.C.P. section 1013a & 2015.5; 28 U.S.C. section 1746

I, KENNETH DOWELL, am a resident of San Quentin State Prison, in the County of Marin, State of California, am over the age of eighteen (18) years and am a party to the above-entitled action. My State prison address is San Quentin Prison, San Quentin, California 94974.

On December 3, 2007, I served the foregoing information to which was a Writ of Habeas Corpus on the party(s) herein by placing a true copy(s) thereof, enclosed in sealed envelope(s), with postage thereon fully paid, in the United States mail, in a deposit box so provided by the U.S. Postal Service, addressed as follows:

Clerk of the Court for the
Second District Coiurt of Appeals
300 South Spring Street, Floor 2
North Tower
Los Angeles, CA. 90013-1213

Department of Justice
Office of the Attorney General of the
State of California
110 West A Street, Suite 1100
San Diego, CA  92101

There is delivery service by United States mail at the places so addressed, and/or there is regular communication by mail between the place of mailing and the place so addressed. I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of December 2007.

SS _Kenneth Dowell_
Kennet Dowell
Petitioner Pro-se

EXHIBITS

EXHIBIT  . A

COUNTY OF LOS ANGELES

PROBATION OFFICER'S REPORT

COURT'S COPY (ORIGINAL)

REPORT SEQUENCE NO. 1

| DEFENDANT'S NAME(S) | | | | COURT | JUDGE | COURT CASE NO. |
|---|---|---|---|---|---|---|
| KENNETH RAY DOWELL | | | | DEPT. SE-F | MC GINLEY | A454394 |

| ADDRESS | | | | HEARING DATE | DEFENSE ATTY. | PROSECUTOR |
|---|---|---|---|---|---|---|
| TRANSIENT | | | | 11-15-83 | URBAN | FRIEDENBER |

| BIRTHDATE | AGE | SEX | RACE | DPO | AREA OFFICE | PHONE NO. |
|---|---|---|---|---|---|---|
| 10-6-46 | 37 | M | CAUC. | VARTANIAN | RIO HONDO | 692-7011 |

| CITIZENSHIP STATUS | DRIVER'S LICENSE / EXP. DATE |
|---|---|
| U.S. | S02299927/ |

| PROBATION NO. | CII NO. | BOOKING NO. |
|---|---|---|
| X-831389 | 2771712 | 6555492 |

| DAYS IN JAIL THIS CASE | CUSTODY STATUS/RELEASE DATE |
|---|---|
| ☐ ESTIMATED ☒ VERIFIED   237 | JAIL |

TYPE REPORT
  X  Probation and sentence
___ Pre-Conviction (131.3 CCP)
___ Post sentence
___ Diversion (Specify) _____

## PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

CT. 1, 187 PC (MURDER), USE ALLEGATION 1203.06(A)(1) PC AND 12022.5 PC
CT. 2, 207 PC (KIDNAPPING)

FILED

DEC 21 1983

JOHN J. CORCORAN, County Clerk

By _____ Deputy

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

CT. 1, 187 PC (MURDER), 2ND DEGREE PLUS USE ALLEGATION 1203.06(A)(1) PC AND 12022.5 PC.

| DATE OF OFFENSE | TIME | CONVICTED BY | DATE OF CONVICTION/ACQUITTAL |
|---|---|---|---|
| 3-24-83 | UNKNOWN | JURY | 10-13-83 |

COUNT(S) CONTINUED TO P & S FOR DISPOSITION
  NONE-CT. 2, FOUND NOT GUILTY

| PROPOSED PLEA AGREEMENT | SOURCES OF INFORMATION |
|---|---|
| 15 YRS. TO LIFE PLUS 2 YRS. CONSECUTIVE FOR USE. | D.A. FILE, DEFENDANT |

DEFENDANT: ☐ ON PROBATION   ☐ ON PAROLE-REMAINING TIME
☒ PENDING PROBATION VIOLATION ☐ PENDING NEW CASE   HOLDS/WARRANTS: ☒ YES ☐ NO   (SEE PRIOR RECORD SECTION)

## RECOMMENDATION:

☐ PROBATION   ☒ DENIAL   ☐ DIAGNOSTIC STUDY   ☐ CYA   ☐ OTHER _____
  ☐ COUNTY JAIL   ☐ 707.2 WIC
  ☒ STATE PRISON   ☐ 1203.03 PC

75P725B — Prob. 195C (Rev. 7/83)

| PRESENT OFFENSE: (CONTINUED) | SOURCES OF INFORMATION ( age) D.A. FILE | |
|---|---|---|

| CO-DEFENDANT(S) NONE | CASE NO. N/A | DISPOSITION N/A |
|---|---|---|

| BOOKED AS DOWELL, KENNETH RAY | OFFENSE 187 PC (MURDER) 207 PC (KIDNAPPING) | LOCATION IMPERIAL HWY., NORWALK | ARRESTING AGENCY NORWALK SO HOMICIDE |
|---|---|---|---|
| ARREST DATE 3-24-83 | TIME 1:35 A.M. | | |

ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:

AT ABOUT 12:30 IN THE MORNING ON MARCH 24, 1982, THE DEFENDANT ENTERED THE RESIDENCE OF VICTIM PAULINE DOWELL, EX-COMMON-LAW WIFE, FORCED HER TO DRESS AND STATED THAT HE WAS GOING TO KILL HER AND HER BOYFRIEND, VICTIM JAMES WINNET. DEFENDANT THEN FORCED HER INTO HIS RED PICKUP AND THEY DROVE LOOKING FOR VICTIM WINNET. AT THE TIME, VICTIM DOWELL DID NOT KNOW THAT THEY WERE BEING FOLLOWED, BY VICTIM WINNET. THE DEFENDANT STOPPED THE PICKUP TRUCK AND RETRIEVED A HANDGUN FROM BENEATH THE SEAT AND EXITED THE TRUCK. SEVERAL SHOTS WERE FIRED AND THE DEFENDANT TOLD VICTIM WINNET THAT HE WAS GOING TO KILL HIM. AT ABOUT 1:45 A.M. VICTIM WINNET WAS DETERMINED TO BE DEAD.

AFTER DEFENDANT SHOT VICTIM WINNET, VICTIM DOWELL RAN FROM THE SCENE TO CALL FOR HELP. THE DEFENDANT SHOUTED FOR HER TO STOP AND WHEN SHE DID NOT COMPLY, HE FIRED ONE SHOT AT HER. See Court Transcript

-2- (DOWELL)

VICTIM:

SOURCES OF INFORMATION (IS page)

D.A. FILE

NAME

JAMES MICHAEL WINNET

COUNT(S)

CT. 1

INJURY; PROPERTY LOSS (TYPE / COST / ETC.)

DECEASED

INSURANCE COVERAGE

UNKNOWN.

X   VICTIM LIST CONTINUES NEXT PAGE

VICTIM STATEMENT:

VICTIM WINNET DIED AT THE SCENE.

| RESTITUTION: ☒ YES ☐ NO | | ESTIMATED LOSS TO ALL VICTIMS<br>UNKNOWN | |
|---|---|---|---|
| RESTITUTION ALREADY MADE<br>NO | APPLIED FOR VICTIM INDEMNITY FUND<br>UNK. ☐ YES ☐ NO | VICTIM(S) NOTIFIED OF P&S HEARING<br>☒ YES ☐ NO | |
| DOES DEFENDANT HAVE INSURANCE<br>TO COVER RESTITUTION:<br>☐ YES ☒ NO | | INSURANCE COMPANY NAME, ADDRESS/TELEPHONE NO.<br>N/A | |

-3-   (DOWELL)

76P725R — Prop. 19SC (Rev. 7/83)

ADDITIONAL VICTIMS:

SOURCES OF INFORMATION (t _ _ age)

D.A. FILE

NAME
PAULINE IRENE DOWELL

COUNT(S)
CT. 2

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

NONE

INSURANCE COVERAGE

NONE

_____ VICTIM LIST CONTINUES NEXT PAGE

VICTIM STATEMENT:

VICTIM STATES THAT THE DEFENDANT WAS HER COMMON-LAW HUSBAND FOR TEN YEARS.  SHE HAS MIXED FEELINGS ABOUT WHAT HAPPENED. SHE FEELS A LOT OF GUILT AND FEELS THAT THE OFFENSE WAS PARTLY HER FAULT.  PREVIOUSLY, THE DEFENDANT WARNED (CONTINUE PAGE 5)

NAME

COUNT(S)

INJURY: PROPERTY-LOSS (TYPE / COST / ETC.)

INSURANCE COVERAGE

_____ VICTIM LIST CONTINUES NEXT PAGE

VICTIM STATEMENT:

-4-  (DOWELL)

1  <u>VICTIM</u>:  (CONTINUED)

2  HER TO STAY AWAY FROM THE VICTIM, BUT SHE DID NOT.  SHE IS GLAD

3  THAT THE KIDNAPPING CHARGES WERE DROPPED BECAUSE ~~SHE NEVER FELT~~

4  ~~THAT SHE WAS KIDNAPPED.~~  SHE INDICATES THAT SHE HAS TO LIVE WITH

5  HER GUILT FOR THE REST OF HER LIFE.  SHE FEELS THAT THE DEFENDANT

6  HAS LEARNED HIS LESSON.  SHE WANTS HIM TO GET OFF AS EASY AS

7  POSSIBLE.

8  -5-  (DOWELL)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

PRIOR RECORD:

SOURCES OF INFORMATION (this page)
CII DATED 10-24-8    PROB. RECORDS,
DEFENDANT.

AKA'S:

JUVENILE HISTORY:

NONE.

ADULT HISTORY:

1-6-70      LYNWOOD PD - 11910 H&S (POSS. OF NARCOTICS), 12020 PC
            (CARRYING CONCEALED WEAPON) - ON CHARGE OF 417 PC
            (EXHIBITING FIREARM), 1 YR. PROB., $100 FINE.

9-7-70      HUNTINGTON PARK PD - WARRANTS - ON 10-20-70, 24252 VC
            (LIGHTING EQUIPMENT), $10 FINE SUSPENDED.  12951 VC
            (POSS. OF LICENSE), DISM.

9-26-70     LONG BEACH PD - TRAFFIC WARRANTS - ON 10-1-70, 40508 VC
            (FAILURE TO APPEAR), $20 OR 2 DAYS.  12951 VC (POSS. OF
            LICENSE), $15 OR 1 DAY.  4454(A) VC (REG. CARD), DISM.

3-6-74      ORANGE COUNTY PROB. - NON-SUPPORT - 3 YRS. PROB.

3-11-77     LONG BEACH PD - 23102(A) VC (DRUNK DRIVING) - ON 3-11-77,
            8 DAYS, $315.50 FINE.

9-11-78     SANTA ANA SO - CENTRAL ORANGE COUNTY WARRANT NO.
            78CNO0792, 270 PC (NON-SUPPORT) - ON 12-18-78, DISM.
            FURTHERANCE OF JUSTICE.

2-7-80      LASO - 2661 PC (PANDERING) - THIS REFERS TO NORWALK
            SUPERIOR COURT CASE NO. A448375.  ON 5-15-80, 3 YRS.
            PROB., $350 FINE.  ON 7-29-82, PROB. REVOKED.  VIOL.
            OF PROB. TO TRAIL P&S HEARING ON CASE NO. A454394.

3-24-82     LASO - 187(A) PC (MURDER)

(THIS REFERS TO THE PRESENT OFFENSE.)

-6-  (DOWELL)

PERSONAL HISTORY:

SOURCES OF INFORMATION (the ...ge)
DEFENDANT

| RESIDENCE | TYPE RESIDENCE (LAST) | LENGTH OF OCCUPANCY | MORTGAGE/RENT. PAYMENT | RESIDES WITH/RELATIONSHIP |
|---|---|---|---|---|
| | HOUSE | 3 YRS. | UNKNOWN | SELF |
| RESIDENTIAL STABILITY LAST FIVE YEARS | | CAME TO STATE / FROM | | CAME TO COUNTY / FROM |
| GOOD | | 1970/OREGON | | 1970/OREGON |

Additional information

FORMAL EDUCATION:   COMPLETED THE 11TH GRADE AT EAGLE POINT HIGH SCHOOL IN THE

STATE OF OREGON; HAS TRAINING AS A MAINTENANCE MECHANIC.

| MARRIAGE / PARENTHOOD | MARITAL STATUS | NAME OF SPOUSE./ COHABITANT (LAST) AKA: |
|---|---|---|
| | DIVORCED | POLLY RAMIRES, PAULII DOWELL |
| LENGTH OF UNION 9 YRS. | NO. OF CHILDREN THIS UNION 2 | SUPPORTED BY MOTHER |
| NO. PRIOR MARRIAGES / COHABITATIONS 1 | NO. OF CHILDREN THESE UNIONS 2 | SUPPORTED BY MOTHER |

Additional information   DEFENDANT STARTED LIVING WITH VICTIM POLLY RAMIRES, AKA

PAULINE DOWELL IN 1971. THEY SEPARATED IN 1980 BECAUSE THEY COULD NOT

GET ALONG. SHE IS CURRENTLY EMPLOYED AS A BOOKKEEPER. TWO CHILDREN,

CURRENT AGES NINE AND THREE WERE BORN TO THIS RELATIONSHIP.

IN 1967, DEFENDANT MARRIED THE FORMER NEVA MC KINLEY.

THEY DIVORCED IN 1972. SHE IS EMPLOYED AS A BANK MANAGER. TWO CHILDREN

CURRENT AGES 17 AND 15 WERE BORN TO THIS MARRIAGE.

-7-  (DOWELL)

PERSONAL HISTORY:
(CONTINUED)

SOURCES OF INFORMATION page)
DEFENDANT

SUBSTANCE ABUSE:

__X__ No record, indication, or admission of alcohol or controlled substance abuse.

_____ Occasional social or experimental use of _____ acknowledged.

_____ See below: Indication / admission of significant substance abuse problem.

Referred to Narcotic Evaluator ☐ Yes ☒ No _____ Narcotic Evaluators report attached

Additional information

PHYSICAL / MENTAL / EMOTIONAL HEALTH:

__X__ No indication or claim of significant physical/mental/emotional health problem.

_____ See below: Indication / claim of significant physical/mental/emotional health problem.

Additional information

-8- (DOWELL)

PERSONAL HISTORY: (CONTINUED)

| SOURCES OF INFORMATION (this |
|---|
| DEFENDANT |

| EMPLOYMENT STATUS | ☐ EMPLOYED ☑ UNEMPLOYED | REFERRED TO WORK FURLOUGH ☐ YES ☑ NO | EMPLOYER AWARE OF PRESENT OFFENSE ☐ YES ☑ NO |
|---|---|---|---|
| PRESENT/LAST EMPLOYER / ADDRESS / PHONE KEN'S MACHINE AND WELDING SANTA FE SPRINGS, CA. | OCCUPATION MANAGER | TIME ON JOB 2½ YRS. | GROSS MONTHLY WAGE ABOUT $1600 |
| | EMPLOYMENT STABILITY LAST 5 YEARS GOOD | TYPES OF PREVIOUS EMPLOYMENT MOTORCYCLE MECHANIC, ANIMAL FEEDER, MAINTENANCE WORK. | |

Additional information

DEFENDANT WAS EMPLOYED AT THE TIME OF HIS ARREST.

| FINANCIAL STATUS | INCOME STABILITY POOR | | NET MONTHLY INCOME NONE | |
|---|---|---|---|---|
| PRIMARY INCOME SOURCE NONE | SECONDARY INCOME SOURCE(S) NONE | | EST. TOTAL ASSETS NONE | EST. TOTAL LIABILITIES NONE |
| MAJOR ASSETS / ESTIMATED VALUE NONE | | | | |

MAJOR LIABILITIES / ESTIMATED AMOUNT

NONE

Additional information

-9- (DOWELL)

DEFENDANT'S STATEMENT:

DEFENDANT STATES THAT HE WENT TO TALK TO HIS COMMON-LAW WIFE, VICTIM DOWELL, AT HER HOME. WHILE THERE, SHE TOLD THE DEFENDANT THAT HER BOYFRIEND, VICTIM WINNET HAD TRADED HER CAR AT PARKMAN'S BAIL BONDSMAN FOR "SOMETHING". THEY DROVE TO THE BONDING COMPANY SO DEFENDANT COULD CHECK ON THE CAR. HOWEVER, THERE WAS NO ONE THERE SO THEY STARTED DRIVING BACK. HE SAW HIS EX-COMMON-LAW WIFE'S BOYFRIEND, VICTIM WINNET SO HE PARKED HIS TRUCK AND THE VICTIM PULLED UP BEHIND HIM. VICTIM WINNET STARTED SHOOTING AT HIM FIRST. DEFENDANT SAID THAT HE SHOT BACK. HE INDICATES, "I ALWAYS CARRY A GUN". HE SHOT THE VICTIM FOUR OR FIVE TIMES IN STOMACH AND VICTIM DOWELL TOOK OFF FROM THE SCENE RUNNING. ACCORDING TO THE DEFENDANT, THE POLICE CLAIMED THAT HE KIDNAPPED HIS COMMON-LAW WIFE BUT DEFENDANT SAYS THAT THIS IS NOT TRUE AND THAT SHE WENT WITH HIM ON HER OWN.

AFTER THE SHOOTING, DEFENDANT DID NOT RUN FROM THE SCENE AND SAYS, "I WAITED FOR THE POLICE. I NEVER HAD ANY INTENTION OF KILLING ANYONE. I'M SORRY IT HAPPENED."

INTERESTED PARTIES:

EFFORTS TO REACH THE INVESTIGATING OFFICER, DETECTIVE GRIGGS, LOS ANGELES SHERIFF'S DEPARTMENT HOMICIDE, 974-4341 HAVE MET WITH NEGATIVE RESULTS. HE WAS NOT AT THE OFFICE AND A TELEPHONE MESSAGE WAS LEFT FOR HIM TO CONTACT THE PROBATION OFFICER. AS OF

-10-  (DOWELL)

1   DICTATION, HE HAS NOT RETURNED THE CALL.

2            DEFENDANT WAS UNABLE TO SUPPLY THE PROBATION OFFICER

3   WITH ANY CHARACTER REFERENCES WITH TELEPHONE NUMBERS.

4   EVALUATION:

5            ALTHOUGH THIS DEFENDANT DOES HAVE A CRIMINAL RECORD,

6   HIS BEHAVIOR IN THE PRESENT OFFENSE APPEARS TO BE OUT OF CHARACTER

7   FOR HIM.  HIS PAST RECORD DOES NOT INCLUDE ANY ACTS OF VIOLENCE.

8            IT SEEMS THAT THE DEFENDANT WAS STILL EMOTIONALLY

9   INVOLVED WITH HIS COMMON-LAW WIFE AND THAT HIS VIOLENT BEHAVIOR

10  RESULTED FROM JEALOUSY.  HE COMMITTED A VERY CRUEL AND CALLOUS

11  ACT.  JUSTICE WOULD BEST BE SERVED BY HIS COMMITMENT TO STATE

12  PRISON FOR THE MAXIMUM TIME POSSIBLE.

13           SENTENCING CONSIDERATIONS:

14  CIRCUMSTANCES IN AGGRAVATION:

15       1.  THE PLANNING WITH WHICH THE CRIME WAS CARRIED
             OUT INDICATED PREMEDITATION.
16
         2.  THE DEFENDANT'S PRIOR CONVICTIONS AS AN ADULT
17           ARE OF INCREASING SERIOUSNESS.

18       3.  THE DEFENDANT WAS ON PROBATION WHEN HE COMMITTED
             THE CRIME.
19
    CIRCUMSTANCES IN MITIGATION:
20
    THERE APPEAR TO BE NO MITIGATING FACTORS.
21

22           IF DEFENDANT IS SENTENCED TO STATE PRISON, THE

23  HIGH-BASE TERM IS RECOMMENDED.

    -11-  (DOWELL)

RECOMMENDATION:

          IT IS RECOMMENDED THAT PROBATION BE DENIED AND THE

DEFENDANT BE SENTENCED TO STATE PRISON WITH PREIMPRISONMENT CREDIT

OF 237 DAYS.

RESPECTFULLY SUBMITTED,

KENNETH E. KIRKPATRICK,
PROBATION OFFICER


BY _Charla A. Vartanian_
    CHARLENE A. VARTANIAN, DEPUTY
    RIO HONDO AREA OFFICE
    692-7011, X285

READ AND APPROVED:                              I HAVE READ AND CONSIDERED
                                                THE FOREGOING REPORT OF THE
                                                PROBATION OFFICER.

_Richard L. Matson_
RICHARD L. MATSON, SDPO

(SUBMITTED 11-9-83)
(RECEIVED 11-9-83)                              JUDGE OF THE SUPERIOR COURT
(TYPED 11-10-83)
CAV:RC  (7)

---

          IF PROBATION IS GRANTED, IT IS RECOMMENDED THAT THE

COURT DETERMINES DEFENDANT'S ABILITY TO PAY COST OF PROBATION SERVICES

PURSUANT TO SECTION 1203.1B PENAL CODE; AND, IF CONFINEMENT IN COUNTY

JAIL IS ORDERED AS A CONDITION OF PROBATION, THE COURT DETERMINES

DEFENDANT'S ABILITY TO PAY COST OF CONFINEMENT CHARGES PURSUANT TO

SECTION 1203.1C PENAL CODE.

          -12-  (DOWELL)

EXHIBIT   B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS



| | |
|---|---|
| In the matter of the Life )<br>Term Parole Consideration )<br>Hearing of: )<br>  )<br>KENNETH DOWELL )<br>——————————————————————— ) | CDC Number C-78669 |

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

NOVEMBER 30, 2006

10:51 A.M.

PANEL PRESENT:

Ms. Janice Eng, Presiding Commissioner
Mr. Doug Filangeri, Deputy Commissioner
J. Vieira, Board of Parole Hearings, Observer

OTHERS PRESENT:

Mr. Kenneth Dowell, Inmate
Ms. Anne Hawkins, Attorney for Inmate
Mr. James Jacobs, Deputy District Attorney
(via videoconference)
Correctional Officer(s), Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| | | |
|---|---|---|
| _____ | No | See Review of Hearing |
| _____ | Yes | Transcript Memorandum |

**BERENICE BILLINGTON**

**NORTHERN CALIFORNIA COURT REPORTERS**



1

<u>P R O C E E D I N G S</u>

1
2        **PRESIDING COMMISSIONER ENG:** -- Parole
3    Consideration Hearing for Kenneth Dowell,
4    D-O-W-E-L-L, CDC numberC-78669.  Today's date is
5    November 30th, 2006, and the time is 10:51 a.m.  We
6    are located at San Quentin State Prison.  The
7    inmate was received on December 30th, 1983, from
8    Los Angeles County.  His life term began on
9    December 30th, 1983, with a minimum eligible parole
10   date of July 6th, 1992.  The controlling offense
11   for which the inmate has been committed is Murder
12   Two, case number A454394, count one, Penal Code
13   187 -- let's see, with a Shotgun, and then there's
14   another non-controlling offense, count one, Penal
15   Code 266.1, Pandering, and that was on February
16   7th, 1980.  The inmate received a total term of 15
17   years to life.  This hearing is being tape
18   recorded, and for the purpose of voice
19   identification each of us will be required to
20   state our first and last names, spelling out our
21   last name, and sir, when it comes to your turn,
22   once you've spelled out your last name, please
23   also provide us with your CDC number.  So I will
24   begin and we'll move to my right, and don't
25   forget, we have to -- we've got the Deputy DA on
26   video.  My name is Janice Eng, E-N-G,
27   Commissioner.

3

1           "The American with Disabilities Act,

2           ADA, is a law to help people with

3           disabilities.  Disabilities are

4           problems that make it harder for

5           some people to see, hear, breathe,

6           talk, walk, learn, think, work, or

7           take care of themselves than it is

8           for others.  Nobody can be kept out

9           of public places or activities

10          because of a disability.  If you

11          have a disability, you have the

12          right to help -- to ask for help to

13          get ready for your BPT Board

14          Hearing, get to the hearing, talk,

15          read forms and papers and understand

16          the hearing process.  BPT will look

17          at what you ask for to make sure

18          that you have a disability that is

19          covered by the ADA and that you have

20          asked for the right kind of help.

21          If you do not get help or if you

22          don't think you got the kind of help

23          you need, ask for the -- for a BPT

24          1074 Grievance Form.  You can also

25          get help to fill it out."
26          PRESIDING COMMISSIONER ENG:  Okay.  Thank

27   you.  The record reflects that you did sign the

5

1        PRESIDING COMMISSIONER ENG:   -- okay?

2        INMATE DOWELL:  Right.

3        PRESIDING COMMISSIONER ENG:  So do you have

4   any problems walking up or down stairs or for

5   distances of 100 yards or more?

6        INMATE DOWELL:  No.

7        PRESIDING COMMISSIONER ENG:  Okay.  And I

8   see that you do have glasses.  And are those for

9   reading and distance?

10        INMATE DOWELL:  Yes.

11        PRESIDING COMMISSIONER ENG:  And are those

12   sufficient for you to be able to read any

13   documents if necessary during the hearing?

14        INMATE DOWELL:  Yes.

15        PRESIDING COMMISSIONER ENG:  Okay.  And do

16   you have any hearing impairments?

17        INMATE DOWELL:  No.

18        PRESIDING COMMISSIONER ENG:  Okay.  Have you

19   ever been included in the Triple CMS or the EOP

20   programs?

21        INMATE DOWELL:  No, I have not.

22        PRESIDING COMMISSIONER ENG:  And you know

23   what those are?

24        INMATE DOWELL:  Yes, I do.

25        PRESIDING COMMISSIONER ENG:  So do you

26   suffer from any disability that would prevent you

27   from participating in today's hearing?

7

1   parole and the reasons for our decision.  So if
2   you are found suitable for parole, the length of
3   your confinement will be fully explained to you at
4   that time.  Before we recess for deliberation --
5   deliberations, the District Attorney's
6   representative, your attorney and you yourself
7   will have an opportunity to provide us with a
8   final statement.  Just be sure that in your final
9   statement that you focus on your suitability for
10  parole.  We'll then recess, clear the room and
11  deliberate.  And once we've completed our
12  deliberations, we'll resume the hearing and
13  announce our decision.  California Code of
14  Regulations states that regardless of time served,
15  a life inmate shall be found unsuitable for and
16  denied parole if in the judgment of the panel the
17  inmate would pose an unreasonable risk of danger
18  to society if released from prison.  So you have
19  certain rights.  Those rights include the right to
20  a timely notice of this hearing, the right to
21  review your Central File, and the right to present
22  relevant documents.  So Counselor, has your --
23  have your client's rights been met?
24          **ATTORNEY HAWKINS:**  Yes.
25          **PRESIDING COMMISSIONER ENG:**  Okay.  So you
26  have an additional right to be heard by an
27  impartial panel.  You've been introduced to the

9

1   confidential material in the file.

2        PRESIDING COMMISSIONER ENG:  Okay.  We've

3   already reviewed the Hearing Checklist with the

4   Deputy DA in Los Angeles, and your attorney has

5   also checked this off, and we do this to make sure

6   that we all have the same set of documents for the

7   hearing, and this is labeled "Exhibit 1."

8   Counselor, are there any additional documents to

9   be submitted to the panel this morning?

10       ATTORNEY HAWKINS:  Yes.  There are a number

11  of letters of recommendation received by Mr.

12  Dowell from family members, a community religious

13  leader, as well as family friends.

14       PRESIDING COMMISSIONER ENG:  Okay.  Thank

15  you.  Do you have any preliminary objections?

16       ATTORNEY HAWKINS:  No.

17       PRESIDING COMMISSIONER ENG:  Okay.  And will

18  your client be speaking with the panel this

19  morning?

20       ATTORNEY HAWKINS:  Yes.  Mr. Dowell is

21  prepared to answer any questions the panel might

22  have.

23       PRESIDING COMMISSIONER ENG:  Okay.  Sir,

24  I'll have to swear you in.  Please raise your

25  right hand.

26       INMATE DOWELL:  (inaudible).

27       PRESIDING COMMISSIONER ENG:  Do you solemnly

11

1          told victim Winnet that he was going

2          to kill him.  At about 1:40 a.m.,

3          victim Winnet was determined to be

4          dead.  After defendant shot victim

5          Winnet, victim Dowell ran from the

6          scene to call for help.  The

7          defendant shouted for her to stop,

8          and when she did not comply, he

9          fired one shot at her."

10   Sir, is that an accurate description of what -- I

11   know it's a brief description, but is that an

12   accurate description of what happened on that

13   night?

14          INMATE DOWELL:  Yeah, that's the record of

15   the court.  I dispute one item in there.  I never

16   shot at Pauline.  But other than that, it's fairly

17   accurate, yes.

18          PRESIDING COMMISSIONER ENG:  Okay.  Because

19   I thought that she had stated that she thought

20   that you had fired at her.

21          INMATE DOWELL:  I think in the court record

22   it states where she -- doesn't it?  That it says

23   that I did not fire at her, but I could be

24   mistaken there, but --

25          PRESIDING COMMISSIONER ENG:  You were used

26   to dealing with weapons, correct?

27          INMATE DOWELL:  Yes.

13

1   clothes were still in the closets. We hadn't

2   actually moved out apart from one another at the

3   time.

4        PRESIDING COMMISSIONER ENG: But you -- were

5   you aware that Miss Dowell intended to spit with

6   you, or to separate with you?

7        INMATE DOWELL: Yeah, we had spoke about it

8   earlier in the week, or week before that, I think

9   it was, but, you know, you never -- those

10  emotions, you never really -- it takes awhile to

11  get over them and everything and that's how -- why

12  I was still angry at the time, I think it was.

13       PRESIDING COMMISSIONER ENG: Were you

14  abusive to Mrs. Dowell?

15       INMATE DOWELL: No.

16       PRESIDING COMMISSIONER ENG: Did you ever

17  hit her in the past?

18       INMATE DOWELL: One time I did, but that was

19  almost two years prior to that.

20       PRESIDING COMMISSIONER ENG: Had you hit

21  women before in previous relationships?

22       INMATE DOWELL: Never.

23       PRESIDING COMMISSIONER ENG: What caused you

24  to hit her that one time?

25       INMATE DOWELL: A very heated argument.

26       PRESIDING COMMISSIONER ENG: Do you remember

27  what it was about?

15

1  about it, and for a long time I really talked to

2  her several times about it and everything, because

3  I know that that really makes women feel powerless

4  and stuff.

5       PRESIDING COMMISSIONER ENG:  Do you think

6  that contributed to her wanting to split up with

7  you?

8       INMATE DOWELL:  It may have.  But mostly the

9  reason why we split up is because I never devoted

10  enough time to our relationship, and that's the

11  main reason that we --

12       PRESIDING COMMISSIONER ENG:  What caused you

13  to get to a point where you would actually shoot

14  and kill Mr. Winnet?  What caused you to get so

15  angry that night?

16       INMATE DOWELL:  Well, I think it's when -- I

17  intended to talk to Pauline about the separation

18  and everything, and then when I found out that Mr.

19  Winnet had taken her car and traded it off to some

20  impound lot or something, and I think that's what

21  really put my emotions over the top, I think.

22       PRESIDING COMMISSIONER ENG:  Why did you

23  focus on him and not on her?

24       INMATE DOWELL:  I love Pauline very much and

25  we have two children together, and, you know, you

26  can't -- you can never have looked the children in

27  the eye again if you would harm their mother or

17

1          INMATE DOWELL:   Earlier.

2          PRESIDING COMMISSIONER ENG:   Did you ever do

3    drugs?

4          INMATE DOWELL:   No.

5          PRESIDING COMMISSIONER ENG:   Strictly

6    drinking?

7          INMATE DOWELL:   Yeah.

8          PRESIDING COMMISSIONER ENG:   Okay.  You used

9    to get drunk a lot?

10         INMATE DOWELL:   Sometimes, yes.

11         PRESIDING COMMISSIONER ENG:   Would you say

12   that you had a drinking problem?

13         INMATE DOWELL:   Yeah, occasionally.  I

14   mostly would go on binge drinking, you know.

15         PRESIDING COMMISSIONER ENG:   If you have any

16   recollection of those times that you went on binge

17   drinking, would you have a tendency to get easily

18   angered, do you recall?  Or has anybody ever told

19   you that?

20         INMATE DOWELL:   No.  Mostly when I would be

21   binge drinking or something, it was a traffic

22   problem or something that I would have, which is

23   -- you know, the records support that.  I --

24         PRESIDING COMMISSIONER ENG:   Right.

25         INMATE DOWELL:   I have two -- three DUIs,

26   drunk driving, and that's the biggest problem.

27         PRESIDING COMMISSIONER ENG:   Had anybody

19

1    were to continue doing that.

2        PRESIDING COMMISSIONER ENG:  You said that

3    you have two children.

4        INMATE DOWELL:  Yeah.

5        PRESIDING COMMISSIONER ENG:  And people and

6    drive, you have to think in terms sometimes what

7    would -- how would you feel if a drunk driver

8    killed one of your children.

9        INMATE DOWELL:  Yeah, I understand that.

10   That's exactly what I'm talking about right there.

11       PRESIDING COMMISSIONER ENG:  Okay.  Let's

12   take a look at your prior record.  You did notate

13   that you did have some problems with drunk

14   driving.  The record indicates that you

15   (inaudible) tell that you had any juvenile record.

16   Is that true?

17       INMATE DOWELL:  That's true.

18       PRESIDING COMMISSIONER ENG:  Okay.  So you

19   really started running into problems as an adult,

20   dating back to I guess April 2nd, 1965.  Do you

21   recall that?  I guess this was in Oregon.

22       INMATE DOWELL:  Yeah.

23       PRESIDING COMMISSIONER ENG:  You were

24   arrested and convicted for public drunkenness.

25       INMATE DOWELL:  Yeah.

26       PRESIDING COMMISSIONER ENG:  Then five years

27   later, on January 6, 1970, the Lynnwood Police

21

1    only one out of the group that was arrested?

2         INMATE DOWELL:  No, the other two people

3    that were in the fight also, were arrested also.

4         PRESIDING COMMISSIONER ENG:  Then in March

5    of '74, three-year county probation for failure to

6    pay support.  What was that about?

7         INMATE DOWELL:  My first wife, I missed two

8    child support payments.

9         PRESIDING COMMISSIONER ENG:  Okay.  Then in

10   '77 the Long Beach Police Department arrest for

11   drunk driving.  Found guilty of a misdemeanor and

12   fined.  And then three years later you received

13   the pandering arrest, and you were sentenced to 36

14   months of court probation.  This is the -- this

15   conviction was the one that was merged with the

16   commitment offense --

17        INMATE DOWELL:  Yeah.

18        PRESIDING COMMISSIONER ENG:  -- that I had

19   read into the record.  And that pandering, tell me

20   about that.

21        INMATE DOWELL:  The renter didn't want to

22   pay the rent, and I told her to -- I didn't care

23   how she got it, because the banks tell me that I

24   don't care how you get it, just give the money, so

25   I'm -- that was a very shameful way to do things,

26   but sometimes you just -- you don't think about

27   the repercussions and what you're actually doing

23

1          INMATE DOWELL: Yeah, I got a completion --

2          PRESIDING COMMISSIONER ENG: A completion.

3    Okay.

4          INMATE DOWELL: -- a certification of

5    completion.

6          PRESIDING COMMISSIONER ENG: Okay. And then

7    you did training as a maintenance mechanic also --

8          INMATE DOWELL: Yeah.

9          PRESIDING COMMISSIONER ENG: -- for the

10   community college. Okay. It states here that --

11   okay. You had a previous marriage to Neva,

12   N-E-V-A, McKinley, M-C-capital-K-I-N-L-E-Y. So is

13   that -- did I pronounce that correctly? Neva or

14   Neva?

15         INMATE DOWELL: Neva, I believe.

16         PRESIDING COMMISSIONER ENG: Neva?

17         INMATE DOWELL: Yeah.

18         PRESIDING COMMISSIONER ENG: So that

19   marriage to Neva, was that up in Oregon, and then

20   you moved down here, or did you meet her down here

21   in California?

22         INMATE DOWELL: I married her in Oregon.

23         PRESIDING COMMISSIONER ENG: You married her

24   in Oregon.

25         INMATE DOWELL: Yeah.

26         PRESIDING COMMISSIONER ENG: Okay. And --

27   okay. So you were married for five years and you

25

1          INMATE DOWELL:  No.  The boy, my son lives

2    in La Jolla, my -- and Dorothy lives in Arizona,

3    in a little town outside Phoenix.

4          PRESIDING COMMISSIONER ENG:  Do they both

5    have families?  Are they married or --

6          INMATE DOWELL:  Yeah, they're both married.

7          PRESIDING COMMISSIONER ENG:  And working,

8    etcetera?

9          INMATE DOWELL:  Yeah.  Right.

10         PRESIDING COMMISSIONER ENG:  Okay.  And have

11   they ever visited you in prison?

12         INMATE DOWELL:  No.  I ask that they don't.

13         PRESIDING COMMISSIONER ENG:  But you talk to

14   them?

15         INMATE DOWELL:  Yes.

16         PRESIDING COMMISSIONER ENG:  Do you ever

17   talk to them about your life crime?

18         INMATE DOWELL:  Yeah.  They understand what

19   happened.

20         PRESIDING COMMISSIONER ENG:  You also have

21   another two children that you had with Pauline

22   Ramirez Dowell, who was your common law wife.

23         INMATE DOWELL:  Right.

24         PRESIDING COMMISSIONER ENG:  Okay.  And

25   girls or boys?

26         INMATE DOWELL:  Two boys.

27         PRESIDING COMMISSIONER ENG:  Two boys.

27

1   not going to see for a while.

2           INMATE DOWELL:   No.

3           PRESIDING COMMISSIONER ENG:   Well, what

4   about the younger one?

5           INMATE DOWELL:   No, I don't see him, but I

6   write to them, yeah.

7           PRESIDING COMMISSIONER ENG:   He's never come

8   up to visit?

9           INMATE DOWELL:   No.   I ask they don't come

10   to visit.

11           PRESIDING COMMISSIONER ENG:   You don't want

12   to see them.

13           INMATE DOWELL:   I don't want to.

14           PRESIDING COMMISSIONER ENG:   What about

15   Pauline?

16           INMATE DOWELL:   I write to her occasionally.

17   She writes to me.

18           PRESIDING COMMISSIONER ENG:   Have you talked

19   about the life crime with Pauline?

20           INMATE DOWELL:   Yes.

21           PRESIDING COMMISSIONER ENG:   And about what

22   happened?

23           INMATE DOWELL:   Yes.

24           PRESIDING COMMISSIONER ENG:   And what do you

25   think about what you put her through that night?

26           INMATE DOWELL:   I really feel really

27   terrible about it.   I apologized to her many

29

1   he had dreams and which is the same as everybody

2   else did, and when you kill somebody, well, then

3   you take all that from them, and it puts a burden

4   on you, and you can't -- and since you can't erase

5   something like that, no matter what you do, no

6   matter how bad it makes you feel, or anything

7   else, you can't start -- it's over with.  You

8   can't stop it.

9       PRESIDING COMMISSIONER ENG:  When you pulled

10  out that shotgun, because I -- if my recollection

11  is correct, that you had a handgun first?

12      INMATE DOWELL:  Yes.

13      PRESIDING COMMISSIONER ENG:  And I think

14  both of you were shooting at each other?

15      INMATE DOWELL:  Yes.

16      PRESIDING COMMISSIONER ENG:  Did you hit

17  anything at that point?

18      INMATE DOWELL:  I'm not sure.

19      PRESIDING COMMISSIONER ENG:  Okay.  But then

20  you went for the shotgun.

21      INMATE DOWELL:  Yeah.  Because I emptied the

22  handgun.

23      PRESIDING COMMISSIONER ENG:  Right.  At that

24  point did you want to kill him?  Was that your

25  intent?

26      INMATE DOWELL:  Well, I was in the heat of

27  the battle at that time, and, yes, I --

31

1   be making reference to several documents along the

2   way, the first of which is the report from the

3   correctional counselor, I. Tate, T-A-T-E.  It --

4   his signature is not dated, but the report shows

5   June 2006.  Over on post-conviction factors

6   there's a lengthy text covering your entire prison

7   experience, from 12/30/83 when you were received

8   from Los Angeles, to present.  The only thing

9   specific to your behavior since the last hearing

10  starts about five lines up from the bottom of that

11  section on page 5, saying that your period at the

12  hearing was denied two years.  The November 2005

13  hearing was postponed.  Case factors reviewed in

14  absentia for annual review, programs not modified.

15  Then we go down to therapy and self-help groups

16  since the last hearing.  It looks like you got

17  certificates from Introduction to the Lathe,

18  Introduction to Mailing Machines, Introduction to

19  Bench Work.  So you've been working in the --

20        INMATE DOWELL:  In vocational Machine Shop.

21        DEPUTY COMMISSIONER FILANGERI:  Vocational

22  Machine Shop.

23        INMATE DOWELL:  Right.

24        DEPUTY COMMISSIONER FILANGERI:  That's

25  terrific.  And I saw of interest in there was the

26  certificate of achievement from Maintenance and

27  Operation of High Pressure Boiler.  It was

33

1        INMATE DOWELL: Yes.

2        DEPUTY COMMISSIONER FILANGERI: All right.

3  And you've had some experience repairing things in

4  the past.

5        INMATE DOWELL: Yeah. I started the

6  apprenticeship in 1962 actually to be a --

7        DEPUTY COMMISSIONER FILANGERI: On the

8  street?

9        INMATE DOWELL: On the street, to be a

10  machine -- a millwright machinist.

11        DEPUTY COMMISSIONER FILANGERI: I see. How

12  far'd you get in that?

13        INMATE DOWELL: I worked in it for 12 years.

14        DEPUTY COMMISSIONER FILANGERI: The

15  probation officer's report said that you were a

16  manager in a motorcycle repair shop. Your duties

17  involved --

18        INMATE DOWELL: Yeah, doing machine work.

19        DEPUTY COMMISSIONER FILANGERI: Repairing

20  motorcycles.

21        INMATE DOWELL: Yeah.

22        DEPUTY COMMISSIONER FILANGERI: So you were

23  actually fabricating parts for bikes?

24        INMATE DOWELL: That's right.

25        DEPUTY COMMISSIONER FILANGERI: What kind of

26  bikes?

27        INMATE DOWELL: Harley-Davidsons, Hondas,

35

1   that I had control of.

2      DEPUTY COMMISSIONER FILANGERI:   Was that in

3   the industries area, or your job site --

4      INMATE DOWELL:   No --

5      DEPUTY COMMISSIONER FILANGERI:   -- or was it

6   at your house?

7      INMATE DOWELL:   -- at that time, I was doing

8   clerical work at that time and they were in a

9   locker in the office that I shared with an

10  officer.

11     DEPUTY COMMISSIONER FILANGERI:   You just

12  can't stop fixing things, can you?

13     INMATE DOWELL:   No.  And the write-up was

14  because I had a inmate combination lock on the

15  locker.

16     DEPUTY COMMISSIONER FILANGERI:   I see.

17     INMATE DOWELL:   Even though they all had

18  keys for it, but --

19     DEPUTY COMMISSIONER FILANGERI:   Yeah.

20     INMATE DOWELL:   -- they give -- they said

21  that that gave me sole access to the tools.

22     DEPUTY COMMISSIONER FILANGERI:   Oh, so they

23  weren't your tools?

24     INMATE DOWELL:   No, they belonged to one of

25  the officers -- two of the officers.

26     DEPUTY COMMISSIONER FILANGERI:   The officers

27  put them in there?

37

1    Environment, and Adult Antisocial Behavior by

2    History;   Axis II, No Contributory Personality

3    Disorder, and she gives you a Global Assessment of

4    Functioning Score of 78.   Then she goes into an

5    assessment of dangerousness.  Under "Violence

6    History," she says that you grew up in an

7    environment in which you had ready access to

8    firearms, you handled guns at a young age, guns

9    were seen as a necessary tool for ranch work; and

10   you had a weapons charge prior to the commitment

11   offense.   The commitment offense involved shooting

12   the victim.   As an older man, however, you no

13   longer feel the need to handle conflict situations

14   aggressively, she notes.   Under "Controlled

15   Environment," you've remained disciplinary free

16   since your last appearance before the Board.   In

17   fact, you've been disciplinary free through your

18   whole institutional history, and she says that you

19   would be expected to be at a low risk of violence

20   in a controlled environment.   If released to the

21   community, she says you -- she makes notes of

22   static risk factors: history of alcohol abuse,

23   male gender, male victim, previous criminality,

24   past use of firearm, and victim injury.   On the

25   other hand, she says that you have no present

26   dynamic risk factors, such as loss of control or

27   impulsive behavior, lack of compassion, anger, or

39

1        DEPUTY COMMISSIONER FILANGERI:  Okay.  Let

2    me see.  We're down on the bottom of page 4 now I

3    think.  The examiner says, "With greater maturity,

4    it would be expected that a man would have more

5    consistent behavior control and a lessening of the

6    anger."  She thought you fell into this category.

7    Overall, your risk of violent recidivism would be

8    low at the present time providing you remain

9    abstinent from use of alcohol and drugs, and any

10   return to use of intoxicants would change your

11   prognosis.  In looking over the rest of your file

12   I found a couple of things that I thought we worth

13   noting.  For instance, your last test of Adult

14   Basic Education reading level was two point three.

15   That was February of 2003.

16        INMATE DOWELL:  Two point three?

17        DEPUTY COMMISSIONER FILANGERI:  Two point

18   three.

19        INMATE DOWELL:  That's pretty low, isn't it?

20        DEPUTY COMMISSIONER FILANGERI:  Well, I just

21   wondered if you'd care to comment on that?

22        INMATE DOWELL:  I was given a special test.

23        DEPUTY COMMISSIONER FILANGERI:  A special

24   test.

25        INMATE DOWELL:  Yeah.  Because they wanted

26   me to take the GED exam, and so I took the whole

27   thing, and I failed my math because I have a

41

1        INMATE DOWELL:  Yeah.  I took -- they wanted

2   me to prepare for the GED test, and so I was

3   taking this pre-course, and but even though I was

4   taking this pre-course, I signed up for the GED

5   three times, but they never allowed me to take the

6   test.

7        DEPUTY COMMISSIONER FILANGERI:  Why not?

8        INMATE DOWELL:  Because they said because of

9   the dyslexia that it wasn't going to allow me

10  until they gave me this special test or something,

11  and they never did do the special test, and that

12  was under the -- I can't remember the testing

13  person's name now, I can't remember his name, but

14  he passed away here last year, and that's the last

15  that -- that's when all the -- everything stopped,

16  so I was never allowed to continue with whatever,

17  if they're going to give me the math portion test

18  over again for the extended time on it or not, I'm

19  not sure.

20       DEPUTY COMMISSIONER FILANGERI:  Well, I saw

21  that you were in pre-GED from '97 to '99, a couple

22  years, got positive chronos in that.  They said

23  that you were enthusiastic, but of course your

24  dyslexia --

25       INMATE DOWELL:  Yeah.

26       DEPUTY COMMISSIONER FILANGERI:   -- was

27  difficult for you to deal with, and that seemed

43

1          INMATE DOWELL:  Okay.

2          DEPUTY COMMISSIONER FILANGERI:  I hate to

3    interrupt you like this, but the good news is this

4    aggravating beeping --

5          [Thereupon, the tape was turned over.]

6          DEPUTY COMMISSIONER FILANGERI:  This is side

7    two of the tape recorded hearing transcript for

8    Kenneth Dowell, D-O-W-E-L-L, C like Charles,

9    78669.  This is a Subsequent Parole Consideration

10   Hearing.  You were going to tell me about this

11   grief --

12         INMATE DOWELL:  Yeah.

13         DEPUTY COMMISSIONER FILANGERI:  -- class?

14         INMATE DOWELL:  The Parenting class that I--

15         DEPUTY COMMISSIONER FILANGERI:  Parenting.

16         INMATE DOWELL:  -- I've taken.  Well, it

17   helped me to deal with the grief that I was

18   feeling, because the grief of the hardships and

19   everything that I caused my children and

20   everything, and it helped me deal with them in a

21   way that we could be as friends, and father and

22   son, and father and daughter, you know, with my

23   one -- this -- with Charlotte and --

24         DEPUTY COMMISSIONER FILANGERI:  Yeah.  I saw

25   that you got self-help activities noted by the

26   counselor in '96, Alternative to Violence; in '94,

27   the Self-Esteem Program; in '95, Human Growth and

45

1 been there, that even though I'm not a member of

2 the church at this time, I attend services and

3 self-help group.

4     DEPUTY COMMISSIONER FILANGERI: I don't see

5 anything in here about self-help.

6     INMATE DOWELL: Oh.

7     DEPUTY COMMISSIONER FILANGERI: It says that

8 though you're not a member of the church, you've

9 taken part in discussions of gospel principles and

10 on occasion has even taught lessons to the group.

11     INMATE DOWELL: It's on the movement sheet

12 that way I guess, yeah. I guess he failed to put

13 it in the letter, so that's my mistake.

14     DEPUTY COMMISSIONER FILANGERI: Yeah,

15 there's nothing in the letter that seems to sound

16 anything more than church. Well, I mean this is

17 your hearing to --

18     INMATE DOWELL: Yeah.

19     DEPUTY COMMISSIONER FILANGERI: -- for you

20 to clarify that sort of stuff.

21     INMATE DOWELL: Yeah.

22     DEPUTY COMMISSIONER FILANGERI: Okay. So I

23 guess I should say, other than the AA and other

24 than the church-going --

25     INMATE DOWELL: Yeah.

26     DEPUTY COMMISSIONER FILANGERI: -- has there

27 been any self-help since '95?

47

1    D-O-W-E-L-L, in Mehama, M -- how do you pronounce

2    that?

3           INMATE DOWELL:  Mehama.  Mehama.

4           PRESIDING COMMISSIONER ENG:  M-E-H-A-M-A.

5           INMATE DOWELL:  Mehama.

6           PRESIDING COMMISSIONER ENG:  Mehama.

7           INMATE DOWELL:  Yeah.

8           PRESIDING COMMISSIONER ENG:  Mehama, Oregon.

9    Okay.  And in this letter he states that you are

10   welcome to stay in his home with his son and

11   himself any time that you want and for as long as

12   you wish.  He has a drug and alcohol free home and

13   feels that it would be a good home for you.  How

14   old's his son?

15          INMATE DOWELL:  His son?  Twelve or fifteen,

16   I think.

17          PRESIDING COMMISSIONER ENG:  Is your brother

18   divorced, or widowed, or --

19          INMATE DOWELL:  Separated.

20          PRESIDING COMMISSIONER ENG:  Separated?

21          INMATE DOWELL:  Yeah.

22          PRESIDING COMMISSIONER ENG:  Does he own his

23   own home?

24          INMATE DOWELL:  Yes.

25          PRESIDING COMMISSIONER ENG:  How large is

26   it?

27          INMATE DOWELL:  Three-bedroom, I believe.

49

1   his son I think stays with his mom two or three

2   days a week, I think, so I don't think there'd be

3   a -- you know, any inconvenience or anything.

4        PRESIDING COMMISSIONER ENG:  So I'm assuming

5   -- because you stated that the way you were raised

6   was with a lot guns.  Is that -- I'm assuming that

7   your brother was raised the same way.

8        INMATE DOWELL:  Yeah.  I don't even think he

9   has any guns, or Bryan, I don't think has any

10  guns.

11       PRESIDING COMMISSIONER ENG:  Do you know for

12  a fact through how he's raised his son in -- I

13  don't know if that's a small town in Oregon.

14       INMATE DOWELL:  It's a very small town.

15  It's about I think 2300 population, I believe.

16  It's bigger than -- it's bigger than Fall City,

17  which is where my mom and dad have their house --

18  had their house at, just shortly away -- a short

19  distance from there, and that was a city of only

20  like 300 population, the same size town that I

21  grew up in.

22       PRESIDING COMMISSIONER ENG:  You understand

23  why I asked you these questions about the weapons?

24       INMATE DOWELL:  Yeah, I understand it.

25       PRESIDING COMMISSIONER ENG:  Having weapons

26  in and around you was part of your everyday life.

27       INMATE DOWELL:  Yeah.

50

1        PRESIDING COMMISSIONER ENG:   I can only

2   assume that your brother continues to abide by

3   that, living in a small town.

4        INMATE DOWELL:   Oh.

5        PRESIDING COMMISSIONER ENG:   It concerns the

6   panel --

7        INMATE DOWELL:   Yeah.

8        PRESIDING COMMISSIONER ENG:   -- that you

9   would want to go and live in that same type of

10  situation where you're going to be surrounded by

11  weapons again.

12       INMATE DOWELL:   I don't think my brother has

13  any guns.

14       PRESIDING COMMISSIONER ENG:   Sir, I'm sure

15  you --

16       INMATE DOWELL:   Yeah.

17       PRESIDING COMMISSIONER ENG:   -- could

18  understand the concern that --

19       INMATE DOWELL:   Yeah.

20       PRESIDING COMMISSIONER ENG:   -- the panel

21  might have with that, and the thought.

22       INMATE DOWELL:   Yeah.

23       PRESIDING COMMISSIONER ENG:   Okay.   And I'm

24  not saying it does, I don't know.

25       INMATE DOWELL:   Yeah.

26       PRESIDING COMMISSIONER ENG:   But it is a

27  thought.   Okay.   So we've got that letter.   We

52

1   date, there's no signature.  I don't know where

2   she's from.  So why don't you tell me who this is.

3          INMATE DOWELL:   That's Pauline's sister.

4          PRESIDING COMMISSIONER ENG:   Pauline's

5   sister?

6          INMATE DOWELL:   Yes.  But she's married to

7   somebody else.

8          PRESIDING COMMISSIONER ENG:   Okay.

9          INMATE DOWELL:   Married to someone.

10         PRESIDING COMMISSIONER ENG:   Okay.  We have

11  a letter.  It's just a -- it's general letter.

12         INMATE DOWELL:   Yeah.

13         PRESIDING COMMISSIONER ENG:   Okay.  Okay.

14  She down in Los Angeles too?

15         INMATE DOWELL:   Yes.

16         PRESIDING COMMISSIONER ENG:   And then again

17  that -- we've got a general support letter dated

18  August 1st, 2005 from James Guthrie, G-U-T-H-R-I-E,

19  that Commissioner Filangeri has also stated on the

20  record, and this gentleman is with the Church of

21  Jesus Christ of Latter Day Saints, and it's a

22  general support letter.  So, okay.  Sir, do you

23  have any plans whatsoever for parole within Los

24  Angeles County or within California?

25         INMATE DOWELL:   I would have -- really have

26  no place to live in L.A. County.  If I went, I

27  would have to -- if I was to ask my aunt there to

54

1          INMATE DOWELL:  Yeah.

2          PRESIDING COMMISSIONER ENG:  It's very

3   important, which I'm sure you understand, that the

4   more documentation you can supply to the panel, it

5   shows us, versus you just sitting there and

6   telling us --

7          INMATE DOWELL:  Yeah.

8          PRESIDING COMMISSIONER ENG:  -- that you're

9   taking control and that you have plans and goals

10  and how your -- you know, what are the steps that

11  you're taking towards that goal.

12         INMATE DOWELL:  Yeah.

13         PRESIDING COMMISSIONER ENG:  Because

14  obviously you want to be able to be

15  self-sufficient --

16         INMATE DOWELL:  Yes.

17         PRESIDING COMMISSIONER ENG:  -- okay, once

18  you're paroled, so we urge that -- you know, we

19  need to see the documentation to show us that

20  you're, you know  --

21         INMATE DOWELL:  Yeah.

22         PRESIDING COMMISSIONER ENG:  -- you've got

23  things set up, and also for financial support.

24  It's very, very important.  It's very difficult,

25  even without having a record of incarceration, for

26  people to find positions and employment out there

27  so -- and the panel does understand that it's

56

1        INMATE DOWELL:  Yes.

2        PRESIDING COMMISSIONER ENG:  So, you know,

3    nobody expects to you to all of a sudden walk out

4    the gate and have everything totally set up for

5    you.

6        INMATE DOWELL:  That's --

7        PRESIDING COMMISSIONER ENG:  It's a

8    transition period.

9        INMATE DOWELL:  That's exactly why I wanted

10   to go to my brother's house in Oregon.

11       PRESIDING COMMISSIONER ENG:  We understand

12   that, but I also believe that previous panels have

13   told you that we cannot parole you out of state --

14       INMATE DOWELL:  Yeah.

15       PRESIDING COMMISSIONER ENG:  Which, because

16   not knowing what the agreements are between

17   different states, you really need to have parole

18   plans specific to if not Los Angeles County,

19   another county where you've got a full support

20   network set up and where you have the best chances

21   of -- you know, to succeed out there, but we --

22   our hands are relatively tied regarding paroling

23   people out of state, okay?  Have I missed anything

24   in terms of your other plans?

25       INMATE DOWELL:  I don't know if my --

26       PRESIDING COMMISSIONER ENG:  Anything else?

27       INMATE DOWELL:  The letter I put in there

58

1    deliberations.  Right now I don't have any further

2    questions.  Commissioner Filangeri, do you have

3    any further questions to ask Mr. Dowell?

4           DEPUTY COMMISSIONER FILANGERI:  Thank you,

5    Commissioner Eng.  When Commissioner Eng asked you

6    about the pandering conviction, you said you

7    offered this gal an opportunity to work off some

8    money she owed you?

9           INMATE DOWELL:  I didn't offer her.  I told

10   her that she should go stand on the corner, or I

11   would send her to somebody that would her out.

12          DEPUTY COMMISSIONER FILANGERI:  You would

13   send to her somebody that would help her out.

14          INMATE DOWELL:  Yes.

15          DEPUTY COMMISSIONER FILANGERI:  What did

16   that mean?

17          INMATE DOWELL:  That meant that I knew

18   somebody that was in the business of pandering

19   and--

20          DEPUTY COMMISSIONER FILANGERI:  She was just

21   going to make the connection?

22          INMATE DOWELL:  Yeah.

23          DEPUTY COMMISSIONER FILANGERI:  That was it?

24   There wasn't any other discussion?

25          INMATE DOWELL:  There wasn't any other

26   discussion.

27          DEPUTY COMMISSIONER FILANGERI:  Now I want

60

1    2/5/1980. It says that the victim said the

2    suspect had come to the victim's residence on each

3    occasion attempting to talk her into becoming a

4    prostitute and that in this way she could pay off

5    the back rent, and that she would also be -- that

6    she would also make some money. It says it

7    happened in Tuesday, January 29th, 1980, Friday,

8    February 1st, 1980, and Monday, February 4th, 1980.

9    She goes on to say that her mother was a part --

10    or the mother told the deputy that it was a party

11    -- that she was a party of the conversation, a

12    witness to the conversation, and that suspect

13    stated to the victim, quote, "You won't have to

14    hustle here, it will be like dates. The guys I'll

15    send over will take you out, they're guys that I

16    owe favors. I'll collect the money from them."

17    Does that sound familiar?

18          **INMATE DOWELL:** I think I did on the one --

19    on the conversation that we had, yes.

20          **DEPUTY COMMISSIONER FILANGERI:** He goes on

21    to write about how the deputies were set up to

22    surveil the apartment, and actually inside the

23    closet inside the apartment, when the victim went

24    to a phone booth and suggested that she had

25    rethought the idea of doing this and invited you

26    over to talk about it some more. Late in the

27    afternoon, about 4:50 hours, you responded to that

62

1    anything like that?

2         INMATE DOWELL:   That was the one

3    conversation that we had with -- when her mother

4    was present, but -- and then when they came over,

5    she was telling me that the decision was not to do

6    that, and we had that conversation at that time

7    right there.

8         DEPUTY COMMISSIONER FILANGERI:   And what

9    happened next?

10        INMATE DOWELL:   And they arrested me.

11        DEPUTY COMMISSIONER FILANGERI:   Who arrested

12   you?

13        INMATE DOWELL:   The sheriff's department

14   arrested me.

15        DEPUTY COMMISSIONER FILANGERI:   Were they

16   right there when you were having the conversation?

17        INMATE DOWELL:   No.  I went outside.  I was

18   -- I went outside, and then came outside and

19   arrested me.

20        DEPUTY COMMISSIONER FILANGERI:   So they were

21   inside where you were inside.

22        INMATE DOWELL:   Yeah.

23        DEPUTY COMMISSIONER FILANGERI:   And then

24   they stepped out to arrest you.

25        INMATE DOWELL:   Yeah.  But we already

26   decided that we weren't going to do this, and then

27   I went on outside.

64

1          INMATE DOWELL:  Yes, I was.

2          DEPUTY COMMISSIONER FILANGERI:   All right.

3     What about this 417 way back in 1970?  Do you

4     remember that?  Oh, 4-7 -- I'm sorry, exhibited a

5     firearm.  You were convicted of exhibiting a

6     firearm?

7          INMATE DOWELL:  Oh, yeah.

8          DEPUTY COMMISSIONER FILANGERI:   Do you

9     recall that?

10         INMATE DOWELL:  Yeah.  That was the one that

11    I explained that where we were coming back from a

12    camping trip and we were unloading the things, and

13    then everybody was drinking and two people got in

14    argument, in a fight, and somebody called the

15    cops, and then they came there, we were out in the

16    driveway, and it was about dusk in the evening

17    hours, and it was -- I don't know, September, I

18    guess, so it was a little chilly.  I had a -- my

19    friend's coat on, and -- because I had misplaced

20    mine, I didn't know if it was in the -- bundled up

21    in the stuff and everything, and his was laying on

22    the seat, so I just put it on, and he was being

23    treated for alcoholism, and so he was taking these

24    pills, and I had them in the pocket, and I had

25    this knife, hunting knife on my side, and then

26    they arrested me, charged me with possession, took

27    me down to the -- and then they charged me

66

1        **INMATE DOWELL:**  Well, they said plead guilty

2    to this and you'll have probation for a year, and

3    I said okay.

4        **DEPUTY COMMISSIONER FILANGERI:**  Okay.  I

5    think that's -- no, I think that's all the

6    questions I had.  Thanks very much.

7        **PRESIDING COMMISSIONER ENG:**  Okay.  Mr.

8    Jacobs, do you have any questions to pose to Mr.

9    Dowell?

10       **DEPUTY DISTRICT ATTORNEY JACOBS:**  Yes, I do.

11   Mr. Dowell referred to Pauline as his wife.  Was

12   he married to her?

13       **PRESIDING COMMISSIONER ENG:**  Mr. Dowell,

14   were you married to Pauline?

15       **INMATE DOWELL:**  We were married in a common

16   law marriage.

17       **PRESIDING COMMISSIONER ENG:**  Did you hear

18   the response, Mr. Jacobs?

19       **DEPUTY DISTRICT ATTORNEY JACOBS:**  Yes.  And

20   how long did the prisoner live with her?

21       **INMATE DOWELL:**  From 1970 to 1979 I think it

22   was, '78 or '79.

23       **PRESIDING COMMISSIONER ENG:**  So eight or

24   nine years.

25       **INMATE DOWELL:**  Yeah.

26       **PRESIDING COMMISSIONER ENG:**  You were living

27   together.

68

1          INMATE DOWELL:  Yeah.

2          PRESIDING COMMISSIONER ENG:  Okay.

3          DEPUTY DISTRICT ATTORNEY JACOBS:  On the

4    next page, that would be page 9, it states that

5    she said during their 12-year relationship the

6    suspect has beat her up on numerous occasions and

7    threatened anybody that she has ever gone out

8    with.  Is that true or not true?

9          INMATE DOWELL:  That's incorrect.  I don't--

10         PRESIDING COMMISSIONER ENG:  So why would

11   she make that claim?

12         INMATE DOWELL:  I have no idea.

13         DEPUTY DISTRICT ATTORNEY JACOBS:  Okay.

14   Now the prisoner has indicated that he has no

15   chronos for AA; is that correct?

16         INMATE DOWELL:  No, I have chronos for AA.

17         PRESIDING COMMISSIONER ENG:  Weren't they in

18   -- what -- you attended -- wasn't the last time I

19   thought was in '95?  Is that what you said?  Or

20   no, wait a minute.

21         INMATE DOWELL:  The last time I attended was

22   the first week of November.

23         PRESIDING COMMISSIONER ENG:  That's right.

24   That's right.  Because I have in here -- I thought

25   that you like -- there's documentation --

26         DEPUTY DISTRICT ATTORNEY JACOBS:  Has he

27   got--

70

1    chrono I saw in the file, as I said earlier, was

2    in December of 2005 for the fourth quarter of

3    2005.  That's the last one.

4           INMATE DOWELL:  Yeah.

5           PRESIDING COMMISSIONER ENG:  That's what I

6    thought.

7           DEPUTY COMMISSIONER FILANGERI:  I looked for

8    more, and didn't see them, if any of you hear

9    that.

10         INMATE DOWELL:  Yeah.

11         ATTORNEY HAWKINS:  He meant --

12         DEPUTY DISTRICT ATTORNEY JACOBS:

13    (inaudible).

14         PRESIDING COMMISSIONER ENG:  I got confused.

15         DEPUTY DISTRICT ATTORNEY JACOBS:  The last

16    question is, in the 2002 hearing that the -- that

17    was held with the prisoner, does the prisoner

18    remember Commissioner Moore telling him that

19    "Although you said you had gone to AA one day a

20    month, in order to get chronos you have to

21    participate on a daily basis, or I mean on a

22    weekly basis"?  Does the prisoner remember that

23    statement made to him?

24         INMATE DOWELL:  Yes, something like that.

25    That was two or three hearings ago.

26         PRESIDING COMMISSIONER ENG:  No, I believe

27    Mr. Jacobs is referring to the 2003 Board Hearing;

72

1    murder.  Some of his statements about the crime

2    are at odds with the proof, and he has not

3    programmed in the manner requested by the Board.

4    In regards to responsibility, he tends to minimize

5    his responsibility in several ways.  With the

6    exception of the 2006 report, he refers to himself

7    as being young and foolish at the time of the

8    murder and part of the reason why he committed it.

9    I would like to point out to the Board that the

10   prisoner was 36 years of age at the time, four

11   years shy of that psychiatrically magic age of 40

12   when murder becomes unthinkable.  The man had four

13   children and had gone through one real marriage

14   and one common law marriage.  For him to even

15   attempt to use this as a mitigating circumstance

16   demonstrates that he really doesn't understand the

17   dynamics that led him to kill Mr. Winnet.  As Dr.

18   Inaba stated in her 2000 psych report, "It's

19   important for the prisoner to psychologically" --

20   let me rephrase that.  "It is important for the

21   prisoner to psychologically to maintain an image

22   of himself as a nonviolent person at the expense

23   of truly trying to understand the personality and

24   behavioral characteristics which had led to the

25   murder."  And in addition, he still attempts to

26   blame his voluntary intoxication for the crime,

27   even though he denied use of alcohol to the

74

1    execution pure and simple.  And although Pauline's
2    girlfriend might have backtracked a bit regarding
3    her kidnapping when she talked to the probation
4    officer, she never altered her statements in
5    regards to the shooting.  Although the prisoner
6    was charged with a first degree special
7    circumstance murder, the jury gave him a break and
8    convicted him of second degree murder.
9    Disregarding the prisoner's statements of intent
10   both to Pauline and to Mr. Winnet, it is rather
11   obvious that the shooting, if not the murder, was
12   premeditated because the prisoner not only parked
13   his car behind a wall and snuck into Pauline's
14   apartment in hopes of catching her in bed with Mr.
15   Winnet, the Board recalls he entered in the dark
16   of night and yanked the blankets off of her,
17   demanding to know where Mr. Winnet was.  He also
18   searched the neighborhood for the victim, and when
19   he found him, he was armed not only with one gun,
20   which he claimed to use for protection because he
21   carried large sums of money, but two guns, both of
22   which he emptied at Mr. Winnet.  Other statements
23   peripheral to the crime intending to show the
24   prisoner in good light are his representations to
25   some correctional counselors that he owned his own
26   business, which in fact was a part-time backyard
27   fix-it shop that brought in about 250 dollars a

76

1    was parked.  In fact, he tells a correctional

2    counselor that he drove back to Pauline's

3    apartment, parked in the stall in the apartment

4    parking lot, and that's when he got wedged in.

5    The only problem with that statement is that the

6    prisoner's pickup, Winnet's van, Winnet's corpse,

7    and prisoner's arrest all took place in the Zodi's

8    parking lot, which again, was separated from the

9    apartment complex that Pauline lived in by a tall

10    cinderblock wall.  He claims Winnet pulled his gun

11    first and that the prisoner -- and that he shot

12    him in self-defense.  Never happened.  Forget --

13    he forgets to mention that he emptied his .38 into

14    Winnet and Winnet attempted to surrender.  He then

15    -- the prisoner then returned to his truck, got a

16    shotgun, and emptied that into the victim.  He is

17    not required to admit the crime nor is he required

18    to discuss the crime with the Board or CDC staff,

19    however, the prisoner chose to discuss the facts

20    of this case, and as expected, he will be candid

21    and truthful.  If he is otherwise, it's a sure

22    indication that he's not ready for parole.

23    Lastly, the Board and various clinicians and

24    correctional counselors have either ordered or

25    suggested that the prisoner get a GED, yet the

26    prisoner has not yet done so.  He has attained

27    high marks in Heating and Refrigeration, and even

78

1   personnel, why should we suppose that he will obey

2   the orders and suggestions of his parole officer?

3   If the prisoner is given an order that he finds

4   offensive, that interferes with his enjoyment of

5   life, why should we believe that he will go along

6   with the requests by the parole officer in the

7   community when he fails to do so in a controlled

8   environment?  If he will build himself up with

9   puff pieces in prison, why should we expect him to

10  be candid with his parole officer?  In almost

11  every psych report condition, their opinion of the

12  prisoner's violence potential on his abstinence

13  from alcohol but he won't regularly attend AA

14  here.  Why should we believe he would do so in the

15  free society?  Actions speak louder than words,

16  and the prisoner's actions shout out that he's not

17  ready for parole.  Just based upon the prisoner's

18  recitation of his most recent version of the

19  crime, a multi-year denial seems warranted.  Thank

20  you.

21          PRESIDING COMMISSIONER ENG:  Thank you.

22  Miss Hawkins, closing statement?

23          ATTORNEY HAWKINS:  As Mr. Jacobs' statement

24  makes clear and some of the questions that were

25  asked today and answers provided by Mr. Dowell, in

26  the years leading up to the commitment offense,

27  it's clear that Mr. Dowell lived an (inaudible)

80

1   this situation.  It's clear that in the 23 years

2   that he's been incarcerated that he's changed,

3   that he has taken advantage of the programming

4   that has been offered to him, particularly in the

5   last three years, since the 2004 hearing, when the

6   Board recommended to him that he regularly attend

7   AA meetings.  He has not attended them

8   sporadically, as suggested, but rather made a

9   concerted effort to go on a more regular basis,

10  and he has understood, as pointed out in the psych

11  assessment, why that is important and why that

12  would be necessary when he is released back into

13  back into society to have the support of

14  Alcoholics Anonymous.  In addition to that, the

15  main constant in Mr. Dowell's life here in prison

16  has clearly been his vocational experience.  He's

17  received numerous laudatory chronos pointing out

18  his successful development, how he's helped out

19  San Quentin.  I am sure that they will be sorry to

20  see him leave, but it will be something that will

21  help him to reenter back into society to provide

22  financial stability for himself.  Throughout his

23  time in prison, Mr. Dowell's self-development has

24  gone hand-in-hand with his spiritual development,

25  and he has been -- he hasn't become a member of

26  LDS.  He'll need to be baptized in order to do

27  that, and he plans to do that when he is released,

82

 1   transpose numbers, which is indicia of dyslexia
 2   and would affect his math abilities, and that he
 3   has tried, through the prison system and with his
 4   counselor, to figure out how to take this test in
 5   a specialized manner, but has not yet been able to
 6   do so, but they are among his plans.  At the last
 7   Board Hearing the District Attorney stated that,
 8   quote, "Mr. Dowell is one of those individuals
 9   that strikes me that he holds the key to his
10   prison cell," and the DA argued that Mr. Dowell
11   had not taken the actions to use that key.  And at
12   the Board -- at the Board's recommendation, they
13   said to him that in two years, which has now been
14   extended to three years, if he had continued to
15   attend AA meetings and otherwise demonstrated that
16   he could remain disciplinary free, which he has
17   clearly done, that he would have demonstrated his
18   readiness to go back into society, and Mr. Dowell
19   in addition to doing those things that have been
20   asked of him, has really demonstrated that he has
21   become a more reflective person.  He's able to
22   discuss the facts of the crime.  He did not sit
23   here today and claim self-defense about what
24   happened.  Many of the reports that were read by
25   the DA were things that were discussed in the
26   1995, 1998 time period.  Since then, Mr. Dowell
27   has continued to go to AA, has continued to go to

84

1    which he has clearly demonstrated, as gone through

2    by the panel here today, and will hopefully

3    transition him properly into society.  He has

4    expressed that the Oregon situation seems ideal

5    for him, and as Commissioner Eng pointed out,

6    there are -- there is clearly the additional peril

7    of obtaining interstate transfer.  Mr. Dowell has

8    looked into that situation along with his

9    counselor here at San Quentin and is in the

10   situation which he mentioned with respect to the

11   halfway houses, which is, until he has been

12   granted parole, he cannot set the wheels in motion

13   to obtain that transfer, but he has put all the

14   pieces in place so that when he is able to start

15   that process, he will be in the best position

16   possible to obtain that transfer.  Assuming that

17   doesn't happen at time, Mr. Dowell does have

18   family in the L.A. area.  His aunt has indicated

19   that she would be willing to take him in.

20   Even though he feels that it would be a burden,

21   there is still that possibility, and he has looked

22   into some halfway houses, and clearly the job

23   skills, they exist no matter where he goes.  So

24   there is a stable environment out there.  There

25   are institutions in place that are the same as the

26   ones here that will continue to help him, and it's

27   clear that while nothing can change the harm that

86

1    that we should not do that because we could run

2    over people, or fail to hit the brakes on time

3    anyway, even though you don't attend [sic] to

4    those things, those are things that you know that

5    can happen to you, and by going to AA and working

6    the steps through that, I've actually been going

7    to AA since 1987, and when I was incarcerated in

8    Soledad penitentiary, though I started AA there,

9    and I carried it all the way through.  There was a

10   period of about three years here that I could not

11   attend on a regular basis to AA, but since the

12   last parole hearing prior to this one, I have

13   attended weekly for, and I've only missed -- in

14   six years I think I've missed seven meetings, and

15   I do work the steps completely, and where you take

16   your step four and you take that searching and

17   moral inventory of yourself and what brought you

18   to this point in your life, and what you've done

19   to other people, and so that all of these things,

20   every time you make a decision to do something,

21   plays a real important role in what your next step

22   and what you're going to do, and some of the

23   things, I'm not very proud of some of the things

24   that I've done over my life and everything, and

25   but I can't correct those things.  That's one

26   factor in my life that I will always have to do

27   nothing but pray that I have forgiveness in order

88

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    DEPUTY COMMISSIONER FILANGERI:  Okay.  Back

4    on record.

5    PRESIDING COMMISSIONER ENG:  Okay.  The time

6    is 1:03 p.m., and let the record note that

7    everyone who was in the room prior to our recess

8    has now returned.  In the matter of Kenneth

9    Dowell, the panel has reviewed all the information

10   received and relied on the following circumstances

11   in concluding that the prisoner is not suitable

12   for parole and would pose an unreasonable risk of

13   danger to society or a threat to public safety if

14   released from prison.  In reference, the

15   commitment offense was carried out in an

16   especially cruel and/or callous manner.  There

17   were multiple victims attacked, injured and/or

18   killed in the same or separate incidents,

19   basically, your common law wife and Mr. Winnet.

20   The offense was carried out in a very

21   dispassionate and calculated manner, such as

22   execution style murder.  Specifically, Mr. Winnet

23   had his hands up after the two of you were

24   exchanging gunfire, had his hands up and was

25   giving up, and you still proceeded to take your

26   shotgun and shoot him again and which caused his

27   KENNETH DOWELL  C-78669   DECISION PAGE 1 11/30/06

90

1    probation, and I can't remember if you were on

2    probation at the time of the life offense or not.

3    The prisoner has programmed in a limited manner

4    while incarcerated, and failed to upgrade

5    educationally and vocationally as previously

6    recommended by the Board.  He's not sufficiently

7    participated in beneficial documented self-help

8    and/or therapy programs.  The psychological.

9    report, and I'm going to refer to both of these.

10   The recent one, dated May 2nd of 2006, and the one

11   dated September 27th of 2000, because they were

12   both authored by the same doctor, Michelle Inaba,

13   I-N-A-B-A.  We found that the recent one is

14   conditionally supportive but felt that it really

15   failed to answer the previous panel's requests,

16   specifically -- let me see if I can find it.  The

17   previous panel had asked the psychologist to

18   address the significance of alcohol as it related

19   to the commitment offense, and to estimate the

20   prisoner's ability to refrain from the use of same

21   when released, the extent to which the prisoner

22   has explored the commitment offense and come to

23   terms with the underlying causes and the need for

24   future therapy programs while incarcerated.  When

25   you take a look at the psychological evaluation of

26   2006, one thing that I became very alarmed at is

27   KENNETH DOWELL   C-78669    DECISION PAGE 3 11/30/06

92

1    you know, you would find a job is not adequate.

2    It's really very, very important, sir, that you

3    have -- when you come to a panel, that you have

4    very -- you know, as current letters as possible.

5    Things change with people on the outside.  One day

6    people are here, the next day they may not be, so

7    you want to have the most current letters of

8    support to present to the panel, and make sure

9    that they're very, very specific in what they are

10   offering to you.  So they have to be very specific

11   about your housing and what does that mean, will

12   you have your own room, are they providing

13   transportation to you, are they providing

14   financial support indefinitely to you so that you

15   can transition?  You know, make it as specific as

16   possible.  Also in terms of employment plans,

17   provide letters that you are sending out to

18   organizations inquiring about possible employment,

19   and keep records of all that.  And I've seen many

20   inmates come in with a whole synopsis, where

21   they've got it listed the date that they sent

22   things out and when they received responses, who

23   it went to, you know, and all different things.

24   There's a lot of different things that you can do

25   to show the panel that you're in control of your

26   own destiny, along with who have you written to in

27   KENNETH DOWELL  C-78669  DECISION PAGE 5 11/30/06

94

1    outside, safety nets, so to speak, so that should

2    you end up in a situation where there are weapons

3    there and there's drinking and stuff, that what do

4    you have set up for yourself to make sure that you

5    wouldn't fall back into a situation where you

6    could lose control, get angry, and end up becoming

7    violent.  Regarding 3042 responses, the District

8    Attorney of Los Angeles County has expressed

9    rather vehemently their opposition to parole at

10   this time.  The panel makes the following

11   findings.  The prisoner needs documented self-help

12   in order to face, discuss, understand and cope

13   with stress in a nondestructive manner.  Until

14   progress is made, the prisoner continues to be

15   unpredictable and a threat to others.

16   Nevertheless, the prisoner should be commended for

17   being disciplinary free for all these years, and

18   also the fact that I believe it was Commissioner

19   Filangeri stated back in January 18th of 1989 you

20   completed a 12-month course in Operation and

21   Maintenance of High Pressure Boilers, and plus,

22   you should be commended for your recent

23   re-involvement in vocational training.  However,

24   these positive aspects in your behavior do not

25   outweigh the factors of unsuitability.  In a

26   separate decision the hearing panel finds that the

27   KENNETH DOWELL   C-78669    DECISION PAGE 7 11/30/06

96

1   wife and two children and let them go. The

2   prisoner's had a history of criminality or

3   misconduct that includes the public drunkenness,

4   you know, your prior record, brandishing a

5   firearm, drunken driving and pandering, and again,

6   a history of unstable, tumultuous relationships

7   with others, and this is evidenced by the claim of

8   abuse by your common law wife, Pauline, and then

9   your pandering conviction. Again, the recent

10  psychological report dated May 2nd, 2006, and

11  authored by Dr. Inaba, I-N-A-B-A, the

12  improvements, there were a lot of improvements

13  that -- within the new report as opposed to her

14  2000 report, and again, both of these reports were

15  done by the same doctor. There were many

16  improvements, although not well supported, and

17  basically suggests that your gains are recent and

18  would require a longer period of observation and

19  evaluation. Again, the prisoner has not completed

20  the necessary programming, which is essential to

21  his adjustment and needs additional time to gain

22  such programming. So again, failed to

23  participated and complete any documented

24  self-help. Therefore, a longer period of

25  observation and evaluation of the prisoner is

26  required before the Board should find that the

27  KENNETH DOWELL  C-78669  DECISION PAGE 9 11/30/06

98

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Berenice Billington, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 97, and which recording was duly recorded at SAN QUENTIN STATE PRISON, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH DOWELL, CDC No. C-78669, on November 30, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated January 31, 2007, at Sacramento County, California.

_Berenice Billington_

_____

Berenice Billington
Transcriber
NORTHERN CALIFORNIA COURT REPORTERS

EXHIBIT   C

DOWELL, Kenneth  C-78669                                          May 2, 2006

# PSYCHOSOCIAL EVALUATION
# FOR THE BOARD OF PRISON TERMS
# JUNE 2006 LIFER HEARING
# SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

I.      Identifying Information:     Mr. Dowell is a 59 year old (DOB 10-6-46), Caucasian male who is serving a Life sentence for murder in the second degree. He is presently serving a 15-year to life sentence at San Quentin State Prison. This report is based on a review of Mr. Dowell's central files, medical record and a face-to-face interview conducted in the staff offices of San Quentin State Prison. Mr. Dowell was informed of the limits of confidentiality in that information provided would be included in a report to the Board of Prison Terms. Mr. Dowell stated that he understood this and was able to demonstrate an understanding of the purpose of the interview. He denied any need for assistance or for any adaptive aides and stated that he was fully able to participate in the interview. Only Mr. Dowell and the examiner were present at the interview.

Mr. Dowell's developmental history, family history, psychosocial development and sexual orientation, military history, educational history, employment and income history, and substance abuse history have been thoroughly reviewed and presented in previous reports and will not be repeated here. The reader is referred to the June 2002 report by this examiner for this information.

II.     Plans if Granted Release:
A. Housing:  Mr. Dowell would be able to live with his aunt if he is paroled. She would be willing to provide housing for him until he is able to provide his own housing. If he were allowed to parole out of state, he would return to the state of Oregon where his family owns property. He believes that he would be able to work out an arrangement with his brother to live in a house that his brother owns.

B. Employment:  Mr. Dowell belongs to the Millwright's Union and considers himself to be employable as a Millwright. His brother works for Weyerhaeuser as an electrician and will help Mr. Dowell get employment with that company. Mr. Dowell is also in the process of researching companies in the Los Angeles area that might have jobs for which he would be qualified.

DOWELL, Kenneth C-78669                                   May 2, 2006

Mr. Dowell would need to have approximately $5,000 worth of tools in order to start working. He believes that he might be eligible for assistance with this from the state Employment Development Department or from his family.

C. Social Support/Services: Mr. Dowell plans to organize his social life around participation in Alcoholics Anonymous and his church. He has been participating in LDS church activities at San Quentin. He stated that he has resumed participation in religious activities after an absence of many years. He attended the Episcopal Church as a child but did not attend church after the age of fifteen.

Another inmate approached Mr. Dowell and invited him to attend an LDS group in San Quentin. Mr. Dowell reported that he had been feeling that something was missing from his life. Since attending the group, he has begun to feel more complete. He plans to become baptized when he is out of prison. Since joining this group he has given up all swearing and the use of tobacco, and caffeine and attends a group that provide guidance for living a Christian life.

Mr. Dowell is a single man and has no romantic relationships at the present time. He had a long-term relationship with a woman who died of stomach cancer in 2003. She was instrumental in getting Mr. Dowell involved in AA. after she observed that he had a drinking problem. They maintained a correspondence and close friendship for 19 years before she passed away.

**CLINICAL ASSESSMENT**

III. Current Mental Status/Treatment Needs:

Mr. Dowell appeared to be his stated age. He was well groomed and dressed in standard CDC inmate clothing. He appeared to be fully alert, and was oriented in all spheres. He was able to spell WORLD forward and backwards, in spite of having a history of dyslexia. He stated that he still has difficulty sounding out some words when reading. His thought was coherent, linear and logical with no evidence of thought disorder. His intellectual functioning appeared to be in the average range. He seemed quite nervous at first and stated that the interviews caused him to feel that way. Mood was dysthymic with some brightening as he became more engaged in the interview. Mr. Dowell was soft-spoken and spoke with some hesitancy. His is a taciturn man, not given to elaboration of speech. He reported no vegetative signs of depressed mood such as loss of appetite, fatigue or poor sleep. He became sad and emotional when discussing the death of a close woman friend. He denied any suicidal or homicidal thoughts. His judgement appeared to be adequate for most situations. He demonstrated some capacity for insight.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:        V62.82   Bereavement
               305.00   Alcohol Abuse (in controlled environment)
               V71.01   Adult Antisocial Behavior (by history)

DOWELL, Kenneth  C-78669                                    May 2, 2006

AXIS II:       V71.09  No contributory Personality Disorder (avoidant, obsessive-compulsive traits)
AXIS III:      Arthritis, allergies
AXIS IV:       Stressors:  Incarceration, Loss of Social Support
AXIS V:        GAF = 78

<u>IV.</u>   <u>Assessment of Dangerousness:</u>
The following is a risk assessment and not intended to predict future dangerousness with complete accuracy.  A risk assessment is based on enumeration of factors found to be statistically associated with a greater likelihood of violent behavior.  Some individuals found to have a rating of low risk for violence, become violent, while individuals who have factors suggesting high risk for violence, may never commit a future violent act.

<u>A.  Violence History:</u>  As presented previously, Mr. Dowell grew up in an environment In which he had ready access to firearms.  He learned to handle guns at a young age.  Guns were seen as a necessary tool for ranch work.  He had a weapons charge prior to his commitment offense.  His commitment offense involved the shooting of his victim.

As an older man, Mr. Dowell no longer feels a need to handle conflict situations aggressively.  As stated by Mr. Dowell, "It's a macho thing when you're younger.  You can handle it yourself.  As you gain maturity, you can defuse situations."  He denied that he would need to use a weapon to deal with any situation.

When asked what he would do if someone tried to harm his family member, he stated, "If you try to hurt my family, I'm going to try to stop you.  I'm not going to murder you or hurt you.  If you can't stand between them and stop it, you can call the police.  I wouldn't handle it myself.  You would use non-violent means."

<u>B. In a Controlled Environment:</u>
Mr. Dowell has remained disciplinary free since his last appearance before the Board.  Based in his institutional record and present functioning, he would be expected to be at low risk of violence in a controlled environment.

<u>C. If Released to the Community:</u>
Mr. Dowell has the following static risk factors:  a history of alcohol abuse, male gender, male victim, previous criminality, past use of a weapon, and victim injury.  He has **no** present dynamic risk factors such as recent loss of control or impulsive behavior, lack of compassion, anger, or paranoid or violent thoughts.

Mr. Dowell readily admits that as a younger man, he "wasn't a model citizen."  He now seems to feel ashamed of the things he did as a younger man.  He recounted how he suggested that his tenant prostitute herself in order to pay her rent and stated that for him it was "all about the money."  He believes that he now knows much more about relationships and sees things differently since he stopped drinking.  He would not expect to have a problem with relapse into the use of alcohol as he "hasn't thought about drinking for years."

DOWELL, Kenneth  C-78669                                                                May 2, 2006

In the community his plan for avoiding relapse would be to associate with people who don't drink; go to non-alcoholic social events, and avoid going places where alcohol is served.

Mr. Dowell has made a commitment to live a clean and sober lifestyle and has insight into problems of judgement that were caused by his use of alcohol.  He comes from a family that has a history of alcoholism.

Although he owned his own business in the past, Mr. Dowell plans to be an employee in the future.  He still sees himself as working long days as he states that he was "raised that way.  In order to take care of yourself and be self-sufficient, you must work."  He recalled that from the age of 10 or 11, if he was not in school, he was working.  His leisure time would be spent in church or AA sponsored activities.  He also has hobbies such as wood working that he would be interested in pursuing.  His plans for how to use his time if paroled seem to be constructive and realistic.

V. Clinician Comments and Summary:
There have been some changes in Mr. Dowell's presentation since this examiner last evaluated him in 2000.  Mr. Dowell has a greater understanding of the impact of his crime on the lives of others, including the victim's family and his own children.  He has one son who is in prison and a son and a daughter with whom he has very little contact.

He now acknowledges that jealousy as well as alcohol was a factor in his crime.  He has previously contended that the crime occurred when he was trying to help his former common-law wife get her vehicle back from her fiance.  Mr. Dowell continues to relate that he does not believe that he would have sought to harm the victim had the victim not been armed with a gun when he exited his vehicle, and that he therefore acted in self-defense.  His account is not consistent with eyewitness testimony.

Mr. Dowell is not a person who is comfortable talking about or expressing his feelings.  He acknowledges that he was capable of violence in the past, but no longer has a need to display the same level of aggression.

It would seem that in the intervening years, Mr. Dowell has participated in self-help and religious activities that have given him the skills to conduct himself in a sober and non-violent manner across settings.  He regularly attends AA and is on the waiting list for Kairos.

Mr. Dowell has suffered the loss of a close friend and has come to see the importance of accepting help from others.  He continues to be hard working, mild-mannered and socially compliant.  With greater maturity, it would be expected that a man would have more consistent behavioral control and a lessening of anger.  This would seem to be the case with Mr. Dowell.  In addition, his identification with pro-social groups such as AA and the LDS church is also a positive change that would further lessen any risk of future violent behavior.  Overall, his risk of violent recidivism would be low at the present time, provided he remains abstinent from the use of alcohol and drugs.

DOWELL, Kenneth  C-78669                                    May 2, 2006

Any return to the use of intoxicants would change his prognosis.  Mr. Dowell presently experiences some emotional distress, subsequent to the death of someone who was very important to him.  He has support persons in the institution, with whom he can discuss this loss.  There is no indication that his emotional distress would increase the likelihood that he would engage in criminal or violent acts.  If anything, this loss has caused Mr. Dowell to seek support from others in a manner that would further lessen the risk of future violence.


_Michel Lynn Inaba, Ph.D._                           5-2-06

Michel Lynn Inaba, Ph.D.                              Date
Contract Psychologist

EXHIBIT   D

65

1    viable residential plans in the last county of

2    legal residence, and he does not have acceptable

3    employment plans.  And the Hearing Panel notes that

4    responses to 3042 notices indicate an opposition to

5    a finding of parole suitability, specifically by

6    the District Attorney of Los Angeles County.  We do

7    want to commend the prisoner for his certification

8    for operating boilers, his pre-GED class, his

9    modern metal cutting, and an Alternatives to

10   Violence class that he had taken, and a self-esteem

11   program, and human growth and development.  He is

12   also receiving above average work reports for his

13   work.  However, these positive aspects of his

14   behavior do not outweigh the factors of

15   unsuitability.  Mr. Dowell, this is going to be a

16   two-year denial at this time.  You -- It has been

17   recommended since 1993 and in 2000 by the doctor,

18   by prior Panels that you continue to stay in AA and

19   get some self-help.  And that has not occurred.  In

20   a separate decision, the Hearing Panel finds it is

21   not reasonable to expect that parole would be

22   granted at a hearing during the following two

23   years.  And the specific reasons are as follows,

24   that the prisoner committed the offense in a very

25   cruel manner.  Specifically that he sought out the

26   victim and was prepared to confront him as he had a

27   KENNETH RAY DOWELL C-78669   DECISION PAGE 5 7/17/03

68

1   offense, and I think you need to read all the

2   reports, specifically the transcript, so that

3   you're better prepared about what you say about

4   your crime the next time you come before this

5   Board.  I wish you good luck.

6        PRESIDING COMMISSIONER DALY:  And I do want

7   to state, try to get the information out.  You need

8   to start preparing right now on your parole plans.

9   Even if a hearing is postponed, anything that comes

10  in between now and your next parole hearing is

11  usable.  So you need to really try to get an answer

12  back from those.  See what you can do about getting

13  an interstate transfer if that is your wish to

14  transfer up to Oregon.  And I know that that is a

15  possibility.  But that's going to be very

16  important.  We'll conclude the hearing.  It is

17  4:35.

18        INMATE DOWELL:  Thank you.

19                  --oOo--

20

21

22

23

24

25  PAROLE DENIED TWO YEARS

26  FINAL DATE OF THIS DECISION_____OCT 15 2003_____

27  KENNETH RAY DOWELL C-78669  DECISION PAGE 8 7/17/03

EXHIBIT    E

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 26, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
                    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceeding: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered Petitioner's application for a Writ of Habeas Corpus filed on June 12, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole. See Cal. Code Reg. tit., 15, § 2402; *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 667.

Petitioner was received in the Department of Corrections on December 30, 1983, after a conviction for second degree murder. He was sentenced to 15 years to life imprisonment. His minimum parole eligibility date was July 6, 1992. The record reflects that on March 24, 1982, Petitioner killed the victim, the boyfriend of his ex-common law wife, during a shoot out between Petitioner and the victim.

The Board found Petitioner unsuitable for release on parole after a parole consideration hearing held on November 30, 2006. Petitioner was denied parole for three years. The Board concluded that Petitioner was unsuitable for release on parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors including the circumstances of the commitment offense, Petitioner's criminal history, his unstable social history, his insufficient participation in self-help programs, and his lack of viable parole plans.

1

| Minutes Entered |
|---|
| 10/26/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 26, 2007 | | | Deputy Clerk |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Reporter |
| | NONE | Bailiff | NONE | |

| | | (Parties and Counsel checked if present) |
|---|---|---|
| | BH004727 In re, KENNETH DOWELL,          Petitioner, On Habeas Corpus | Counsel for Petitioner: <br><br> Counsel for Respondent: |

The Court finds that there is some evidence to support the Board's finding that the commitment offense was committed in an especially cruel manner in that multiple victims were attacked, injured or killed, the offense was carried out in a dispassionate and calculated manner, the offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering, and the motive for the crime was trivial in relation to the offense. Cal. Code Regs., tit. 15, § 2402(c)(1). The record reflects that at the time of the commitment offense, Petitioner was separated from his common law wife (ex-wife). The ex-wife was dating another man (boyfriend), who she planned to marry. Petitioner was jealous and angry with the boyfriend, because Petitioner thought that the boyfriend was coming between Petitioner and his ex-wife and children. On March 24, 1982, Petitioner entered the residence of his ex-wife. Petitioner stated that he was going to kill his ex-wife and her boyfriend. Petitioner forced his ex-wife into his vehicle. The two drove around searching for the boyfriend. The boyfriend happened to be following Petitioner. Petitioner stopped his vehicle and retrieved a handgun located beneath the seat. Petitioner told the boyfriend that he was going to kill him. Petitioner and the boyfriend fired shots. When Petitioner's handgun no longer had any ammunition, he retrieved a shotgun from his vehicle and continued to shoot at the boyfriend. The boyfriend was shot several times and died from the wounds. After Petitioner shot the boyfriend, the ex-wife ran away from the scene.

The Court finds that there is some evidence to support the Board's finding that Petitioner's previous criminal record showed an escalating pattern of criminal conduct. The Board may properly consider Petitioner's criminal history as a factor relevant to determining whether Petitioner is suitable

2

| Minutes Entered |
|---|
| 10/26/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

#### DEPT 100

| Date: | OCTOBER 26, 2007 | | | Deputy Clerk |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
           Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

for release on parole. Cal. Code Regs., tit. 15, § 2402(b). The record reflects that Petitioner was convicted of public drunkenness, possession of narcotics, brandishing a firearm, drunk driving, and pandering. Petitioner was on probation for the pandering offense when he committed the commitment offense. Petitioner has failed to profit from previous grants of probation by committing new offenses. Thus, the record contains some evidence that Petitioner was undeterred by the earlier attempts to correct his criminality.

In making its determination, the Board also noted that Petitioner has previously abused his ex-wife during their relationship. The Court finds that there is some evidence to support the Board's finding that Petitioner has a history of unstable social relationships. Cal. Code Regs., tit. 15, § 2402(c)(3).

The Court finds that there is some evidence to support the Board's finding that Petitioner has not sufficiently participated in self-help programs. The Board noted that Petitioner has not participated in any recent self-help programs. In addition, Petitioner has not upgraded academically as recommended by the Board during the last parole hearing. The record does reflect that Petitioner has participated in several types of vocational training.

The Court finds that there is some evidence to support the Board's finding that Petitioner lacks realistic parole plans. See Cal. Code Regs., tit. 15, § 2402(d)(7). The record reflects that Petitioner does not have a place to reside in the last county of legal residence. Petitioner's proposed parole plans consist of residing with his brother in Oregon. In addition, Petitioner does not have an offer of

3

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## DEPT 100

| Date: | OCTOBER 26, 2007 | | | | Deputy Clerk |
|---|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | | Reporter |
| | NONE | Bailiff | NONE | | |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
                Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

employment. The lack of housing and employment offers reflect that Petitioner is not yet suitable for parole.

The Board considered several favorable factors, including Petitioner's disciplinary record and his participation in numerous vocational programs and Alcoholic Anonymous. However, the Board found that these positive factors did not outweigh the factors tending to show unsuitability.

Although the denial of a parole date based solely on the nature of the commitment offense after a long period of incarceration may raise serious questions involving an inmate's liberty interest in parole, this is only true where the inmate has shown exemplary behavior and considerable evidence of rehabilitation. *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 917. Here, the Board did not base its decision to deny parole solely on the commitment offense, but also weighed Petitioner's prior criminal record, his unstable relationship with his common law wife, his limited participation in self-help programs, and his lack of viable parole plans.

Petitioner argues that his due process rights have been violated, because the Board failed to specifically address every factor enumerated in California Rule of Regulation, title 15, section 2402, subdivisions (c) and (d). This argument is without merit. Every factor considered by the Board need not be stated, especially if it is not persuasive. *In re Ramirez* (2001) 94 C.A. 4th 549 (disapproved on other grounds by *In Re Dannenberg* (2205) 34 Cal. 4th 1061).

Based on the above factors, the Court finds that there is "some evidence" in the record to support the Board's determination that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole. Penal Code § 3041(b).

4

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | OCTOBER 26, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
          Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Accordingly, the petition is denied.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Kenneth Dowell
C-78669
San Quentin State Prison
San Quentin, California 94964

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

5

Minutes Entered
10/26/07
County Clerk

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012<br><br>PLAINTIFF/PETITIONER:<br><br>KENNETH DOWELL | **FILED**<br>LOS ANGELES SUPERIOR COURT<br><br>NOV 1 9 2007<br><br>BY _____ DEPUTY |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004727 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- ☐ Order Extending Time
- ☐ Order to Show Cause
- ☐ Order for Informal Response
- ☐ Order for Supplemental Pleading

- ☑ Order re: Writ of Habeas Corpus Denied
- ☐ Order
- ☐ Order re:
- ☐ Copy of Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

November 19, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
Alexandre J. Aldana

Kenneth Dowell
C-78669
San Quentin State Prison
San Quentin, California 94964

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101 .
Attn: Ms. Cynthia Lumely