# EXHIBIT   5 (Part 2)

EXHIBIT   B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS



| In the matter of the Life ) | |
| Term Parole Consideration ) | CDC Number C-78669 |
| Hearing of: ) | |
| ) | |
| KENNETH DOWELL ) | |

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

NOVEMBER 30, 2006

10:51 A.M.

PANEL PRESENT:

Ms. Janice Eng, Presiding Commissioner
Mr. Doug Filangeri, Deputy Commissioner
J. Vieira, Board of Parole Hearings, Observer

OTHERS PRESENT:

Mr. Kenneth Dowell, Inmate
Ms. Anne Hawkins, Attorney for Inmate
Mr. James Jacobs, Deputy District Attorney
(via videoconference)
Correctional Officer(s), Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

BERENICE BILLINGTON

NORTHERN CALIFORNIA COURT REPORTERS

ii

<u>INDEX</u>

|                          |      | <u>Page</u> |
|--------------------------|------|------|
| Proceedings              | .... | 1    |
| Case Factors             | .... | 10   |
| Pre-Commitment Factors   | .... | 19   |
| Post-Commitment Factors  | .... | 30   |
| Parole Plans             | .... | 47   |
| Closing Statements       | .... | 71   |
| Recess                   | .... | 87   |
| Decision                 | .... | 88   |
| Adjournment              | .... | 97   |
| Transcriber Certification| .... | 98   |

--oOo--

1

1        P R O C E E D I N G S

2            **PRESIDING COMMISSIONER ENG:**   -- Parole

3    Consideration Hearing for Kenneth Dowell,

4    D-O-W-E-L-L, CDC numberC-78669.   Today's date is

5    November 30th, 2006, and the time is 10:51 a.m.   We

6    are located at San Quentin State Prison.   The

7    inmate was received on December 30th, 1983, from

8    Los Angeles County.   His life term began on

9    December 30th, 1983, with a minimum eligible parole

10   date of July 6th, 1992.   The controlling offense

11   for which the inmate has been committed is Murder

12   Two, case number A454394, count one, Penal Code

13   187 -- let's see, with a Shotgun, and then there's

14   another non-controlling offense, count one, Penal

15   Code 266.1, Pandering, and that was on February

16   7th, 1980.   The inmate received a total term of 15

17   years to life.   This hearing is being tape

18   recorded, and for the purpose of voice

19   identification each of us will be required to

20   state our first and last names, spelling out our

21   last name, and sir, when it comes to your turn,

22   once you've spelled out your last name, please

23   also provide us with your CDC number.   So I will

24   begin and we'll move to my right, and don't

25   forget, we have to -- we've got the Deputy DA on

26   video.   My name is Janice Eng, E-N-G,

27   Commissioner.

2

1          DEPUTY COMMISSIONER FILANGERI:  Doug

2    Filangeri, F-I-L-A-N-G-E-R-I, Deputy Commissioner.

3          DEPUTY DISTRICT ATTORNEY JACOBS:  James

4    Jacobs, J-A-C-O-B-S, Deputy District Attorney, Los

5    Angeles County.

6          PRESIDING COMMISSIONER ENG:  Mr. Dowell?

7          INMATE DOWELL:  Dowell, D-O-W-E-L-L, C

8    number, C-78669.

9          PRESIDING COMMISSIONER ENG:  First name?

10          INMATE DOWELL:  Kenneth.

11          PRESIDING COMMISSIONER ENG:  Okay.  Thank

12    you.

13          ATTORNEY HAWKINS:  Anne Hawkins,

14    H-A-W-K-I-N-S, on behalf of Mr. Dowell.

15          PRESIDING COMMISSIONER ENG:  Okay.  Go

16    ahead.

17          MS. VIEIRA:  J. Vieira, V-I-E-I-R-A, Board

18    of Parole Hearings, observing.

19          PRESIDING COMMISSIONER ENG:  Okay.  Thank

20    you.  For the record, we have two correctional

21    officers present for security reasons and they

22    will not be participating in the hearing.  Before

23    we begin, sir, I'd like you to read aloud the ADA

24    Rights and Self-Identification Statement in front

25    of you.  You can begin at any time.

26          INMATE DOWELL:  Okay.

3

1    "The American with Disabilities Act,

2    ADA, is a law to help people with

3    disabilities.  Disabilities are

4    problems that make it harder for

5    some people to see, hear, breathe,

6    talk, walk, learn, think, work, or

7    take care of themselves than it is

8    for others.  Nobody can be kept out

9    of public places or activities

10   because of a disability.  If you

11   have a disability, you have the

12   right to help -- to ask for help to

13   get ready for your BPT Board

14   Hearing, get to the hearing, talk,

15   read forms and papers and understand

16   the hearing process.  BPT will look

17   at what you ask for to make sure

18   that you have a disability that is

19   covered by the ADA and that you have

20   asked for the right kind of help.

21   If you do not get help or if you

22   don't think you got the kind of help

23   you need, ask for the -- for a BPT

24   1074 Grievance Form.  You can also

25   get help to fill it out."
26   PRESIDING COMMISSIONER ENG:  Okay.  Thank

27   you.  The record reflects that you did sign the

4

1    BPT Form 1073 on July 26th, 2006, and this form is

2    a Reasonable Accommodation Notice and Request in

3    accordance with the provisions of the Americans

4    with Disabilities Act, and it indicates that you

5    have checked off that you do not have any

6    disabilities under the ADA.  Is that true, sir?

7              INMATE DOWELL:  I'm dyslexic.

8              PRESIDING COMMISSIONER ENG:  You're

9    dyslexic.

10             INMATE DOWELL:  Yeah.

11             PRESIDING COMMISSIONER ENG:  Okay.

12   However--

13             INMATE DOWELL:  But --

14             PRESIDING COMMISSIONER ENG:  -- you did

15   check off that according to the ADA, though, that

16   you don't --

17             INMATE DOWELL:  Yeah.

18             PRESIDING COMMISSIONER ENG:  -- have any

19   problems.  So I just wanted to be sure that the

20   information is current and correct.

21             INMATE DOWELL:  I don't know.  There's no

22   disabilities that enhanders [sic] from

23   participating in this hearing.

24             PRESIDING COMMISSIONER ENG:  Right.  And

25   that's the important part.  Okay.  So I still have

26   to go through some basic questions regarding ADA--

27             INMATE DOWELL:  Yeah.

5

1          PRESIDING COMMISSIONER ENG:   -- okay?

2          INMATE DOWELL:  Right.

3          PRESIDING COMMISSIONER ENG:  So do you have

4    any problems walking up or down stairs or for

5    distances of 100 yards or more?

6          INMATE DOWELL:  No.

7          PRESIDING COMMISSIONER ENG:  Okay.  And I

8    see that you do have glasses.  And are those for

9    reading and distance?

10         INMATE DOWELL:  Yes.

11         PRESIDING COMMISSIONER ENG:  And are those

12   sufficient for you to be able to read any

13   documents if necessary during the hearing?

14         INMATE DOWELL:  Yes.

15         PRESIDING COMMISSIONER ENG:  Okay.  And do

16   you have any hearing impairments?

17         INMATE DOWELL:  No.

18         PRESIDING COMMISSIONER ENG:  Okay.  Have you

19   ever been included in the Triple CMS or the EOP

20   programs?

21         INMATE DOWELL:  No, I have not.

22         PRESIDING COMMISSIONER ENG:  And you know

23   what those are?

24         INMATE DOWELL:  Yes, I do.

25         PRESIDING COMMISSIONER ENG:  So do you

26   suffer from any disability that would prevent you

27   from participating in today's hearing?

6

1           INMATE DOWELL:  Not that I'm aware of.

2           PRESIDING COMMISSIONER ENG:  Okay.  Good.

3   Counselor, are there any ADA issues that you

4   believe need further discussion regarding your

5   client's ability to go on with the hearing?

6           ATTORNEY HAWKINS:  No.

7           PRESIDING COMMISSIONER ENG:  Okay.  Okay.

8   So this hearing is being conducted pursuant to the

9   Penal Code and the rules and regulations of the

10  Board of Parole Hearings governing parole

11  consideration hearings for life inmates.  The

12  purpose of today's hearing is to once again

13  consider your suitability for parole.  In doing so

14  we'll consider the number and nature of the crimes

15  for which you were committed, your prior criminal

16  and social history, your behavior and programming

17  since your commitment, and your plans if released.

18  We've had the opportunity to review your Central

19  File, and you'll also be given an opportunity to

20  correct or clarify the record.  We will consider

21  your progress since your commitment, your

22  counselor's reports, and your mental health

23  evaluation.  We'll focus on your progress and any

24  new reports since your last hearing, so any change

25  in the parole plans should be brought to our

26  attention.  We'll reach a decision today and

27  inform you whether or not we find you suitable for

7

1    parole and the reasons for our decision.  So if

2    you are found suitable for parole, the length of

3    your confinement will be fully explained to you at

4    that time.  Before we recess for deliberation --

5    deliberations, the District Attorney's

6    representative, your attorney and you yourself

7    will have an opportunity to provide us with a

8    final statement.  Just be sure that in your final

9    statement that you focus on your suitability for

10   parole.  We'll then recess, clear the room and

11   deliberate.  And once we've completed our

12   deliberations, we'll resume the hearing and

13   announce our decision.  California Code of

14   Regulations states that regardless of time served,

15   a life inmate shall be found unsuitable for and

16   denied parole if in the judgment of the panel the

17   inmate would pose an unreasonable risk of danger

18   to society if released from prison.  So you have

19   certain rights.  Those rights include the right to

20   a timely notice of this hearing, the right to

21   review your Central File, and the right to present

22   relevant documents.  So Counselor, has your --

23   have your client's rights been met?

24            ATTORNEY HAWKINS:  Yes.

25            PRESIDING COMMISSIONER ENG:  Okay.  So you

26   have an additional right to be heard by an

27   impartial panel.  You've been introduced to the

8

1    panel.  Do you have any objections to this panel?

2              INMATE DOWELL:  No, I have no objection to

3    it.

4              PRESIDING COMMISSIONER ENG:  Counselor, do

5    you have any objections to the panel?

6              ATTORNEY HAWKINS:  No.

7              PRESIDING COMMISSIONER ENG:  So you will

8    receive a copy of our written tentative decision

9    today.  That decision becomes final within 120

10   days.  A copy of the decision and copy of the

11   transcript will be sent to you.  And on May 1st,

12   2004, regulations regarding your right to appeal a

13   decision made at this hearing were repealed.  So

14   the process now is that you must go through the

15   courts.  So if you have any questions about that

16   process and the procedure, you can talk it over

17   with your legal counsel or you can also review the

18   policy at your prison law library.  Sir, you're

19   not required to admit to or discuss your offense,

20   however, the panel does accept as true the

21   findings of the court.  So you do understand what

22   that means?

23             INMATE DOWELL:  Yes, I understand.

24             PRESIDING COMMISSIONER ENG:  So

25   Commissioner, Filangeri, is there any confidential

26   material that will be used today?

27             DEPUTY COMMISSIONER FILANGERI:  There is no

9

1    confidential material in the file.

2            PRESIDING COMMISSIONER ENG:   Okay.   We've

3    already reviewed the Hearing Checklist with the

4    Deputy DA in Los Angeles, and your attorney has

5    also checked this off, and we do this to make sure

6    that we all have the same set of documents for the

7    hearing, and this is labeled "Exhibit 1."

8    Counselor, are there any additional documents to

9    be submitted to the panel this morning?

10           ATTORNEY HAWKINS:   Yes.   There are a number

11   of letters of recommendation received by Mr.

12   Dowell from family members, a community religious

13   leader, as well as family friends.

14           PRESIDING COMMISSIONER ENG:   Okay.   Thank

15   you.   Do you have any preliminary objections?

16           ATTORNEY HAWKINS:   No.

17           PRESIDING COMMISSIONER ENG:   Okay.   And will

18   your client be speaking with the panel this

19   morning?

20           ATTORNEY HAWKINS:   Yes.   Mr. Dowell is

21   prepared to answer any questions the panel might

22   have.

23           PRESIDING COMMISSIONER ENG:   Okay.   Sir,

24   I'll have to swear you in.   Please raise your

25   right hand.

26           INMATE DOWELL:   (inaudible).

27           PRESIDING COMMISSIONER ENG:   Do you solemnly

10

1    swear or affirm that the testimony that you give

2    at this hearing will be truth, the whole truth,

3    and nothing but the truth?

4         INMATE DOWELL:  Yes.

5         PRESIDING COMMISSIONER ENG:  Okay.  Thank

6    you.  I'm going to read into the record the

7    Statement of Facts, and I'm taking that from the

8    Probation Officer's Report, Page 2.

9              "At about 12:30 in the morning on

10             March 24, 1982, the defendant

11             entered the residence of victim

12             Pauline Dowell, D-O-W-E-L-L,

13             ex-common-law wife, forced her to

14             dress, and stated that he was going

15             to kill her and her boyfriend,

16             victim James Winnet, W-I-N-N-E-T.

17             Defendant then forced her into his

18             red pickup and they drove looking

19             for victim Winnet.  At the time,

20             victim Dowell did not know that

21             there -- they were being followed by

22             victim Winnet.  The defendant

23             stopped the pickup truck and

24             retrieved a handgun from beneath the

25             seat and exited the truck.  Several

26             shots were fired, and the defendant

11

```
 1              told victim Winnet that he was going
 2              to kill him.  At about 1:40 a.m.,
 3              victim Winnet was determined to be
 4              dead.  After defendant shot victim
 5              Winnet, victim Dowell ran from the
 6              scene to call for help.  The
 7              defendant shouted for her to stop,
 8              and when she did not comply, he
 9              fired one shot at her."
10      Sir, is that an accurate description of what -- I
11      know it's a brief description, but is that an
12      accurate description of what happened on that
13      night?
14              INMATE DOWELL:  Yeah, that's the record of
15      the court.  I dispute one item in there.  I never
16      shot at Pauline.  But other than that, it's fairly
17      accurate, yes.
18              PRESIDING COMMISSIONER ENG:  Okay.  Because
19      I thought that she had stated that she thought
20      that you had fired at her.
21              INMATE DOWELL:  I think in the court record
22      it states where she -- doesn't it?  That it says
23      that I did not fire at her, but I could be
24      mistaken there, but --
25              PRESIDING COMMISSIONER ENG:  You were used
26      to dealing with weapons, correct?
27              INMATE DOWELL:  Yes.
```

12

1          PRESIDING COMMISSIONER ENG:  Had you grown

2     up with a lot of guns?

3          INMATE DOWELL:  Yes.

4          PRESIDING COMMISSIONER ENG:  So I'm assuming

5     that by having all those guns, you were used to

6     shooting them also?

7          INMATE DOWELL:  Yes.

8          PRESIDING COMMISSIONER ENG:  Okay.  You were

9     pretty angry at Mr. Winnet.

10          INMATE DOWELL:  At that time I was, yes.

11          PRESIDING COMMISSIONER ENG:  You were angry

12     because he was going to -- he intended to marry

13     Miss Dowell?

14          INMATE DOWELL:  Yeah.  It was a problem of

15     jealousy and anger, for that reason right there,

16     but he was becoming between my children and of

17     course what I thought was my wife, you know, and

18     which those feelings I know now are misgiven, but

19     at that time that's the way I felt, and but I know

20     that those feelings there could never -- you know,

21     were entirely misguided.

22          PRESIDING COMMISSIONER ENG:  And you were

23     separated at the time, weren't you?

24          INMATE DOWELL:  No.

25          PRESIDING COMMISSIONER ENG:  You were still

26     living together?

27          INMATE DOWELL:  Well, we'd been -- my

13

1    clothes were still in the closets.  We hadn't

2    actually moved out apart from one another at the

3    time.

4         PRESIDING COMMISSIONER ENG:  But you -- were

5    you aware that Miss Dowell intended to spit with

6    you, or to separate with you?

7         INMATE DOWELL:  Yeah, we had spoke about it

8    earlier in the week, or week before that, I think

9    it was, but, you know, you never -- those

10   emotions, you never really -- it takes awhile to

11   get over them and everything and that's how -- why

12   I was still angry at the time, I think it was.

13        PRESIDING COMMISSIONER ENG:  Were you

14   abusive to Mrs. Dowell?

15        INMATE DOWELL:  No.

16        PRESIDING COMMISSIONER ENG:  Did you ever

17   hit her in the past?

18        INMATE DOWELL:  One time I did, but that was

19   almost two years prior to that.

20        PRESIDING COMMISSIONER ENG:  Had you hit

21   women before in previous relationships?

22        INMATE DOWELL:  Never.

23        PRESIDING COMMISSIONER ENG:  What caused you

24   to hit her that one time?

25        INMATE DOWELL:  A very heated argument.

26        PRESIDING COMMISSIONER ENG:  Do you remember

27   what it was about?

14

1          INMATE DOWELL:  Infidelity, I believe.

2          PRESIDING COMMISSIONER ENG:  On whose part?

3          INMATE DOWELL:  On her part.

4          PRESIDING COMMISSIONER ENG:  Okay.  Can you

5    think back and remember what triggered -- do you

6    understand what I mean by that?  What triggered

7    you to actually strike out at her?

8          INMATE DOWELL:  Well, I --

9          PRESIDING COMMISSIONER ENG:  What was the

10   moment?

11         INMATE DOWELL:  I think it's when she was

12   yelling at me and actually struck me, I think, or

13   at least pushed me anyway.

14         PRESIDING COMMISSIONER ENG:  And what did

15   you do?

16         INMATE DOWELL:  I think that's when I pushed

17   her back, and I just pushed her at that time.

18   That's all I did, just pushed her.

19         PRESIDING COMMISSIONER ENG:  Did you knock

20   her down?

21         INMATE DOWELL:  No.

22         PRESIDING COMMISSIONER ENG:  So she didn't

23   fall?

24         INMATE DOWELL:  No.

25         PRESIDING COMMISSIONER ENG:  How'd you feel

26   about doing that?

27         INMATE DOWELL:  I felt really, really bad

15

1    about it, and for a long time I really talked to

2    her several times about it and everything, because

3    I know that that really makes women feel powerless

4    and stuff.

5          PRESIDING COMMISSIONER ENG:   Do you think

6    that contributed to her wanting to split up with

7    you?

8          INMATE DOWELL:   It may have.   But mostly the

9    reason why we split up is because I never devoted

10   enough time to our relationship, and that's the

11   main reason that we --

12         PRESIDING COMMISSIONER ENG:   What caused you

13   to get to a point where you would actually shoot

14   and kill Mr. Winnet?   What caused you to get so

15   angry that night?

16         INMATE DOWELL:   Well, I think it's when -- I

17   intended to talk to Pauline about the separation

18   and everything, and then when I found out that Mr.

19   Winnet had taken her car and traded it off to some

20   impound lot or something, and I think that's what

21   really put my emotions over the top, I think.

22         PRESIDING COMMISSIONER ENG:   Why did you

23   focus on him and not on her?

24         INMATE DOWELL:   I love Pauline very much and

25   we have two children together, and, you know, you

26   can't -- you can never have looked the children in

27   the eye again if you would harm their mother or

16

1    something in a serious fashion.  You just would

2    never be able to do that.

3        PRESIDING COMMISSIONER ENG:  Did you

4    typically drive around with a loaded weapon in

5    your vehicle or on your person?

6        INMATE DOWELL:  In the vehicle most of the

7    time.

8        PRESIDING COMMISSIONER ENG:  Why?

9        INMATE DOWELL:  I was -- I grew up that way,

10   and it just carried over from my childhood I

11   guess.

12       PRESIDING COMMISSIONER ENG:  Even though

13   it's against the law?

14       INMATE DOWELL:  Well, in the state I grew up

15   in, it's not against the law as long as it's in

16   plain sight.

17       PRESIDING COMMISSIONER ENG:  I believe that

18   you had a weapon hidden.

19       INMATE DOWELL:  I had one behind the seat,

20   but it was unloaded, and that's true, and the

21   other one was laying on the floorboard.

22       PRESIDING COMMISSIONER ENG:  But even then,

23   I don't think in the County of Los Angeles --

24       INMATE DOWELL:  It's -- it was illegal.  I'm

25   not trying to argue that.

26       PRESIDING COMMISSIONER ENG:  Okay.  Okay.

27   Had you been drinking that night?

17

1          INMATE DOWELL:  Earlier.

2          PRESIDING COMMISSIONER ENG:  Did you ever do

3     drugs?

4          INMATE DOWELL:  No.

5        ·  PRESIDING COMMISSIONER ENG:  Strictly

6     drinking?

7          INMATE DOWELL:  Yeah.

8          PRESIDING COMMISSIONER ENG:  Okay.  You used

9     to get drunk a lot?

10         INMATE DOWELL:  Sometimes, yes.

11         PRESIDING COMMISSIONER ENG:  Would you say

12     that you had a drinking problem?

13         INMATE DOWELL:  Yeah, occasionally.  I

14     mostly would go on binge drinking, you know.

15         PRESIDING COMMISSIONER ENG:  If you have any

16     recollection of those times that you went on binge

17     drinking, would you have a tendency to get easily

18     angered, do you recall?  Or has anybody ever told

19     you that?

20         INMATE DOWELL:  No.  Mostly when I would be

21     binge drinking or something, it was a traffic

22     problem or something that I would have, which is

23     -- you know, the records support that.  I --

24         PRESIDING COMMISSIONER ENG:  Right.

25         INMATE DOWELL:  I have two -- three DUIs,

26     drunk driving, and that's the biggest problem.

27         PRESIDING COMMISSIONER ENG:  Had anybody

18

1   ever told you, you know how the saying goes, that

2   some people are ugly drunks?

3          INMATE DOWELL:  Yeah.

4          PRESIDING COMMISSIONER ENG:  Okay.

5          INMATE DOWELL:  Yeah.  No.

6          PRESIDING COMMISSIONER ENG:  Where some

7   people can turn very nasty --

8          INMATE DOWELL:  Yeah.

9          PRESIDING COMMISSIONER ENG:  -- when they've

10  had a certain amount to drink, and other people --

11         INMATE DOWELL:  Yeah.

12         PRESIDING COMMISSIONER ENG:  -- sometimes

13  get very passive and --

14         INMATE DOWELL:  Right.

15         PRESIDING COMMISSIONER ENG:  -- just sort of

16  blend in with the woodwork.

17         INMATE DOWELL:  Yeah.

18         PRESIDING COMMISSIONER ENG:  So has anybody

19  ever indicated that to you about yourself?

20         INMATE DOWELL:  No, uh-uh, because I don't

21  interact with people normally when I'm drinking.

22         PRESIDING COMMISSIONER ENG:  Did it ever

23  occur to you when you were drinking and driving

24  that you could possibly kill somebody?

25         INMATE DOWELL:  Well, at the time it never,

26  but as years have went by, well, yeah, there's a

27  very likelihood that that would've happened if I

19

1   were to continue doing that.

2       PRESIDING COMMISSIONER ENG:  You said that

3   you have two children.

4       INMATE DOWELL:  Yeah.

5       PRESIDING COMMISSIONER ENG:  And people and

6   drive, you have to think in terms sometimes what

7   would -- how would you feel if a drunk driver

8   killed one of your children.

9       INMATE DOWELL:  Yeah, I understand that.

10  That's exactly what I'm talking about right there.

11      PRESIDING COMMISSIONER ENG:  Okay.  Let's

12  take a look at your prior record.  You did notate

13  that you did have some problems with drunk

14  driving.  The record indicates that you

15  (inaudible) tell that you had any juvenile record.

16  Is that true?

17      INMATE DOWELL:  That's true.

18      PRESIDING COMMISSIONER ENG:  Okay.  So you

19  really started running into problems as an adult,

20  dating back to I guess April 2nd, 1965.  Do you

21  recall that?  I guess this was in Oregon.

22      INMATE DOWELL:  Yeah.

23      PRESIDING COMMISSIONER ENG:  You were

24  arrested and convicted for public drunkenness.

25      INMATE DOWELL:  Yeah.

26      PRESIDING COMMISSIONER ENG:  Then five years

27  later, on January 6, 1970, the Lynnwood Police

20

1    Department arrests, possession of narcotics, and

2    possession of a concealed weapon. What were you

3    doing with narcotics? I thought you told me that

4    you didn't do drugs.

5         INMATE DOWELL: Those were prescription

6    medication that the person that owned the coat I

7    was wearing.

8         PRESIDING COMMISSIONER ENG: Okay.

9         INMATE DOWELL: They were in a pocket of the

10   coat that --

11        PRESIDING COMMISSIONER ENG: What about the

12   concealed weapon?

13        INMATE DOWELL: It was a hunting -- knife

14   that I had on my belt.

15        PRESIDING COMMISSIONER ENG: Okay.

16        INMATE DOWELL: We just got back from a

17   camping trip on the Kern River and --

18        PRESIDING COMMISSIONER ENG: How'd they end

19   up picking you up?

20        INMATE DOWELL: The person -- not -- I

21   wasn't involved, but one of the people in the

22   party had a fight with somebody out in the middle

23   of the street, and somebody called the cops, and

24   we were unloading things there in the driveway and

25   they showed up, and so they stopped everybody and

26   searched them and everything and --.

27        PRESIDING COMMISSIONER ENG: Were you the

21

1    only one out of the group that was arrested?

2         INMATE DOWELL:  No, the other two people

3    that were in the fight also, were arrested also.

4         PRESIDING COMMISSIONER ENG:  Then in March

5    of '74, three-year county probation for failure to

6    pay support.  What was that about?

7         INMATE DOWELL:  My first wife, I missed two

8    child support payments.

9         PRESIDING COMMISSIONER ENG:  Okay.  Then in

10   '77 the Long Beach Police Department arrest for

11   drunk driving.  Found guilty of a misdemeanor and

12   fined.  And then three years later you received

13   the pandering arrest, and you were sentenced to 36

14   months of court probation.  This is the -- this

15   conviction was the one that was merged with the

16   commitment offense --

17        INMATE DOWELL:  Yeah.

18        PRESIDING COMMISSIONER ENG:  -- that I had

19   read into the record.  And that pandering, tell me

20   about that.

21        INMATE DOWELL:  The renter didn't want to

22   pay the rent, and I told her to -- I didn't care

23   how she got it, because the banks tell me that I

24   don't care how you get it, just give the money, so

25   I'm -- that was a very shameful way to do things,

26   but sometimes you just -- you don't think about

27   the repercussions and what you're actually doing

22

1    to people when you tell them things.

2         PRESIDING COMMISSIONER ENG:   Would you have

3    asked a man to --

4         INMATE DOWELL:   No, I don't think so.

5         PRESIDING COMMISSIONER ENG:   -- become a

6    pimp?

7         INMATE DOWELL:   I don't think so.

8         PRESIDING COMMISSIONER ENG:   In terms of

9    your personal history, so you were born and raised

10   in Oregon?

11        INMATE DOWELL:   Yes.

12        PRESIDING COMMISSIONER ENG:   Okay.   When did

13   you come to California?

14        INMATE DOWELL:   Seven -- '68 -- '69, '70.

15        PRESIDING COMMISSIONER ENG:   And what

16   brought you to California?

17        INMATE DOWELL:   A job.   My first wife and a

18   job.

19        PRESIDING COMMISSIONER ENG:   So in Oregon,

20   okay, you completed the eleventh grade.   Did you

21   ever graduate from high school?

22        INMATE DOWELL:   I took a completion test.

23        PRESIDING COMMISSIONER ENG:   So did you get

24   a GED, or no, or you --

25        INMATE DOWELL:   I don't --

26        PRESIDING COMMISSIONER ENG:   -- you did get

27   a diploma though?

23

1      INMATE DOWELL:  Yeah, I got a completion --

2      PRESIDING COMMISSIONER ENG:  A completion.

3  Okay.

4      INMATE DOWELL:  -- a certification of

5  completion.

6      PRESIDING COMMISSIONER ENG:  Okay.  And then

7  you did training as a maintenance mechanic also --

8      INMATE DOWELL:  Yeah.

9      PRESIDING COMMISSIONER ENG:  -- for the

10  community college.  Okay.  It states here that --

11  okay.  You had a previous marriage to Neva,

12  N-E-V-A, McKinley, M-C-capital-K-I-N-L-E-Y.  So is

13  that -- did I pronounce that correctly?  Neva or

14  Neva?

15      INMATE DOWELL:  Neva, I believe.

16      PRESIDING COMMISSIONER ENG:  Neva?

17      INMATE DOWELL:  Yeah.

18      PRESIDING COMMISSIONER ENG:  So that

19  marriage to Neva, was that up in Oregon, and then

20  you moved down here, or did you meet her down here

21  in California?

22      INMATE DOWELL:  I married her in Oregon.

23      PRESIDING COMMISSIONER ENG:  You married her

24  in Oregon.

25      INMATE DOWELL:  Yeah.

26      PRESIDING COMMISSIONER ENG:  Okay.  And --

27  okay.  So you were married for five years and you

24

1   had two children.  Were those children born in

2   Oregon or born here in California?

3          INMATE DOWELL:  One was born in Oregon and

4   one was born in California.

5          PRESIDING COMMISSIONER ENG:  Okay.  So when

6   you decided to uproot from Oregon you had one

7   child and a wife and you moved to --

8          INMATE DOWELL:  We didn't have any children

9   at that time.

10          PRESIDING COMMISSIONER ENG:  Oh.

11          INMATE DOWELL:  We moved to California, had

12   a children, moved back to Oregon, had a child,

13   moved back to California.

14          PRESIDING COMMISSIONER ENG:  Okay.  Okay.

15   And those two children, are they girls, boys?

16          INMATE DOWELL:  One girl, one boy.

17          PRESIDING COMMISSIONER ENG:  Okay.  And how

18   old are they now?

19          INMATE DOWELL:  Thirty-seven the boy is, and

20   34 for the girl.

21          PRESIDING COMMISSIONER ENG:  Do you stay in

22   contact with them?

23          INMATE DOWELL:  Occasionally.  We write once

24   or twice a year.

25          PRESIDING COMMISSIONER ENG:  Where are they?

26          INMATE DOWELL:  La Jolla.

27          PRESIDING COMMISSIONER ENG:  Both of them?

25

1           INMATE DOWELL:  No.  The boy, my son lives

2    in La Jolla, my -- and Dorothy lives in Arizona,

3    in a little town outside Phoenix.

4           PRESIDING COMMISSIONER ENG:  Do they both

5    have families?  Are they married or --

6           INMATE DOWELL:  Yeah, they're both married.

7           PRESIDING COMMISSIONER ENG:  And working,

8    etcetera?

9           INMATE DOWELL:  Yeah.  Right.

10          PRESIDING COMMISSIONER ENG:  Okay.  And have

11   they ever visited you in prison?

12          INMATE DOWELL:  No.  I ask that they don't.

13          PRESIDING COMMISSIONER ENG:  But you talk to

14   them?

15          INMATE DOWELL:  Yes.

16          PRESIDING COMMISSIONER ENG:  Do you ever

17   talk to them about your life crime?

18          INMATE DOWELL:  Yeah.  They understand what

19   happened.

20          PRESIDING COMMISSIONER ENG:  You also have

21   another two children that you had with Pauline

22   Ramirez Dowell, who was your common law wife.

23          INMATE DOWELL:  Right.

24          PRESIDING COMMISSIONER ENG:  Okay.  And

25   girls or boys?

26          INMATE DOWELL:  Two boys.

27          PRESIDING COMMISSIONER ENG:  Two boys.

26

1        INMATE DOWELL:  Yes.

2        PRESIDING COMMISSIONER ENG:  How old are

3   they?

4        INMATE DOWELL:  Twenty-four, the youngest

5   one, and 27 I think -- 28 I believe is the oldest

6   one.

7        PRESIDING COMMISSIONER ENG:  Are you in

8   touch with them?

9        INMATE DOWELL:  Yeah.

10        PRESIDING COMMISSIONER ENG:  Where are they?

11        INMATE DOWELL:  One lives in Los Angeles.

12        PRESIDING COMMISSIONER ENG:  Okay.

13        INMATE DOWELL:  Lives with his mother

14   actually, outside of Los Angeles.

15        PRESIDING COMMISSIONER ENG:  How about the

16   other one?

17        INMATE DOWELL:  And then the oldest one's in

18   prison.

19        PRESIDING COMMISSIONER ENG:  He's in prison.

20        INMATE DOWELL:  Uh-huh.

21        PRESIDING COMMISSIONER ENG:  For what?

22        INMATE DOWELL:  For great bodily injury.

23        PRESIDING COMMISSIONER ENG:  Okay.  So do

24   you speak with either one?

25        INMATE DOWELL:  Yeah.

26        PRESIDING COMMISSIONER ENG:  Do you ever see

27   them?  Well, obviously the one in prison you're

27

1    not going to see for a while.

2         INMATE DOWELL:  No.

3         PRESIDING COMMISSIONER ENG:  Well, what

4    about the younger one?

5         INMATE DOWELL:  No, I don't see him, but I

6    write to them, yeah.

7         PRESIDING COMMISSIONER ENG:  He's never come

8    up to visit?

9         INMATE DOWELL:  No.  I ask they don't come

10   to visit.

11        PRESIDING COMMISSIONER ENG:  You don't want

12   to see them.

13        INMATE DOWELL:  I don't want to.

14        PRESIDING COMMISSIONER ENG:  What about

15   Pauline?

16        INMATE DOWELL:  I write to her occasionally.

17   She writes to me.

18        PRESIDING COMMISSIONER ENG:  Have you talked

19   about the life crime with Pauline?

20        INMATE DOWELL:  Yes.

21        PRESIDING COMMISSIONER ENG:  And about what

22   happened?

23        INMATE DOWELL:  Yes.

24        PRESIDING COMMISSIONER ENG:  And what do you

25   think about what you put her through that night?

26        INMATE DOWELL:  I really feel really

27   terrible about it.  I apologized to her many

28

1    times.  Every time I write her, matter of fact, I
2    apologize to her again, even though this is one
3    thing that through my AA I've learned to come
4    around, but you can't really make amends for this
5    kind of thing.  No matter what you do for these
6    people or anything, you can't take it back, you
7    know, you just -- it's impossible, so -- and then
8    it weighs on you.  Every decision you make, you
9    think about this, because it really -- it does
10   weigh on you.

11        PRESIDING COMMISSIONER ENG:  Well, there are
12   consequences to everyone's actions, aren't there?

13        INMATE DOWELL:  There most certainly is.

14        PRESIDING COMMISSIONER ENG:  What about Mr.
15   Winnet and who he left behind?

16        INMATE DOWELL:  Yeah.

17        PRESIDING COMMISSIONER ENG:  What have you
18   thought about that?

19        INMATE DOWELL:  He didn't have any family.
20   At least that's what I've been told.  But I paid
21   for his funeral and whatever else I could do.

22        PRESIDING COMMISSIONER ENG:  But what have
23   you thought about him as a victim?  Regardless of
24   whether he had family living left, what have you
25   thought about?

26        INMATE DOWELL:  Well, I realize that this
27   ended all his dreams, and as a person, I know that

29

1  he had dreams and which is the same as everybody

2  else did, and when you kill somebody, well, then

3  you take all that from them, and it puts a burden

4  on you, and you can't -- and since you can't erase

5  something like that, no matter what you do, no

6  matter how bad it makes you feel, or anything

7  else, you can't start -- it's over with.  You

8  can't stop it.

9        PRESIDING COMMISSIONER ENG:  When you pulled

10  out that shotgun, because I -- if my recollection

11  is correct, that you had a handgun first?

12        INMATE DOWELL:  Yes.

13        PRESIDING COMMISSIONER ENG:  And I think

14  both of you were shooting at each other?

15        INMATE DOWELL:  Yes.

16        PRESIDING COMMISSIONER ENG:  Did you hit

17  anything at that point?

18        INMATE DOWELL:  I'm not sure.

19        PRESIDING COMMISSIONER ENG:  Okay.  But then

20  you went for the shotgun.

21        INMATE DOWELL:  Yeah.  Because I emptied the

22  handgun.

23        PRESIDING COMMISSIONER ENG:  Right.  At that

24  point did you want to kill him?  Was that your

25  intent?

26        INMATE DOWELL:  Well, I was in the heat of

27  the battle at that time, and, yes, I --

30

1           PRESIDING COMMISSIONER ENG: You wanted him
2      dead?
3           INMATE DOWELL:  Yeah.
4           PRESIDING COMMISSIONER ENG:  Okay.  So is
5      there anything that I've left out in terms of your
6      personal life or your background, or in terms of
7      your previous convictions, etcetera?  Is there
8      anything that I've missed --
9           INMATE DOWELL:  I don't think so.
10          PRESIDING COMMISSIONER ENG:  -- that you'd
11     like me to add or discuss?
12          INMATE DOWELL:  Not that I'm aware of.  I
13     don't think you missed anything.
14          PRESIDING COMMISSIONER ENG:  Okay.  Okay.
15     We'll move on, and Commissioner Filangeri will go
16     over your post-conviction factors.
17          DEPUTY COMMISSIONER FILANGERI:  Thank you,
18     Commissioner.  The purpose of this segment of the
19     hearing is to detail your prison behavior since
20     the last time you appeared before the Board.  The
21     records suggest that you were postponed on
22     November of 2005 because there was no new psych
23     report as had been ordered in 2003, which was your
24     last actual hearing, July 17th.  Does that sound
25     right to you?
26          INMATE DOWELL:  That's correct, yes.
27          DEPUTY COMMISSIONER FILANGERI:  I'm going to

31

1    be making reference to several documents along the

2    way, the first of which is the report from the

3    correctional counselor, I. Tate, T-A-T-E.  It --

4    his signature is not dated, but the report shows

5    June 2006.  Over on post-conviction factors

6    there's a lengthy text covering your entire prison

7    experience, from 12/30/83 when you were received

8    from Los Angeles, to present.  The only thing

9    specific to your behavior since the last hearing

10   starts about five lines up from the bottom of that

11   section on page 5, saying that your period at the

12   hearing was denied two years.  The November 2005

13   hearing was postponed.  Case factors reviewed in

14   absentia for annual review, programs not modified.

15   Then we go down to therapy and self-help groups

16   since the last hearing.  It looks like you got

17   certificates from Introduction to the Lathe,

18   Introduction to Mailing Machines, Introduction to

19   Bench Work.  So you've been working in the --

20            INMATE DOWELL:  In vocational Machine Shop.

21            DEPUTY COMMISSIONER FILANGERI:  Vocational

22   Machine Shop.

23            INMATE DOWELL:  Right.

24            DEPUTY COMMISSIONER FILANGERI:  That's

25   terrific.  And I saw of interest in there was the

26   certificate of achievement from Maintenance and

27   Operation of High Pressure Boiler.  It was

32

1    actually a certificate of completion of a 12-month

2    course in that; is that right?

3            INMATE DOWELL: That's correct, yes.

4            DEPUTY COMMISSIONER FILANGERI: That was in

5    '89. And there was some sort of home study course

6    on Modern Metal Cutting that you completed in

7    September of 2002?

8            INMATE DOWELL: Yes.

9            DEPUTY COMMISSIONER FILANGERI: Was that

10   correspondence?

11           INMATE DOWELL: Yes, it was correspondence.

12           DEPUTY COMMISSIONER FILANGERI: How'd you

13   arrange that?

14           INMATE DOWELL: Through the vocational

15   Machine Shop.

16           DEPUTY COMMISSIONER FILANGERI: Now you've

17   had a lot of experience working in PIA. As I look

18   through here, I saw stuff like -- well, maybe

19   we've already covered it. I saw something in voc

20   Machine on 2002 and 2003, and it was difficult for

21   me to tell whether -- it looked like you were

22   getting vocational Machine Shop credit and

23   completing courses, but it looked like they also

24   relied on you to repair things.

25           INMATE DOWELL: Yes.

26           DEPUTY COMMISSIONER FILANGERI: Was it kind

27   of a two-way street there?

33

1        INMATE DOWELL:  Yes.

2        DEPUTY COMMISSIONER FILANGERI:  All right.

3    And you've had some experience repairing things in

4    the past.

5        INMATE DOWELL:  Yeah.  I started the

6    apprenticeship in 1962 actually to be a --

7        DEPUTY COMMISSIONER FILANGERI:  On the

8    street?

9        INMATE DOWELL:  On the street, to be a

10   machine -- a millwright machinist.

11       DEPUTY COMMISSIONER FILANGERI:  I see.  How

12   far'd you get in that?

13       INMATE DOWELL:  I worked in it for 12 years.

14       DEPUTY COMMISSIONER FILANGERI:  The

15   probation officer's report said that you were a

16   manager in a motorcycle repair shop.  Your duties

17   involved --

18       INMATE DOWELL:  Yeah, doing machine work.

19       DEPUTY COMMISSIONER FILANGERI:  Repairing

20   motorcycles.

21       INMATE DOWELL:  Yeah.

22       DEPUTY COMMISSIONER FILANGERI:  So you were

23   actually fabricating parts for bikes?

24       INMATE DOWELL:  That's right.

25       DEPUTY COMMISSIONER FILANGERI:  What kind of

26   bikes?

27       INMATE DOWELL:  Harley-Davidsons, Hondas,

34

1    BMWs.

2            DEPUTY COMMISSIONER FILANGERI:  Really all

3    different kinds of bikes.

4            INMATE DOWELL:  Yes.

5            DEPUTY COMMISSIONER FILANGERI:  It wasn't

6    any particular specialty?

7            INMATE DOWELL:  Mostly on Harley-Davidsons,

8    redoing the valves on the older machines.

9            DEPUTY COMMISSIONER FILANGERI:  They go

10   through valves pretty quick, do they?

11           INMATE DOWELL:  Yeah, but you can't -- you

12   couldn't -- at that time you couldn't buy them

13   so--

14           DEPUTY COMMISSIONER FILANGERI:  So you were

15   turning new valves?

16           INMATE DOWELL:  Yeah.  I was converting car

17   valves to fit into the motorcycles.

18           DEPUTY COMMISSIONER FILANGERI:  Wow.  Wow,

19   that's pretty sophisticated.  Okay.  Let me see,

20   what else did I see in here?  Well, your

21   disciplinary history is very noteworthy in terms

22   of its absence of anything.  I guess you got a

23   general counseling chrono for possession of

24   dangerous property in 2002.  What kind of property

25   was that?

26           INMATE DOWELL:  Those were actually

27   screwdrivers and some pliers that were in a locker

35

1   that I had control of.

2          DEPUTY COMMISSIONER FILANGERI:   Was that in

3   the industries area, or your job site --

4          INMATE DOWELL:   No --

5          DEPUTY COMMISSIONER FILANGERI:   -- or was it

6   at your house?

7          INMATE DOWELL:   -- at that time, I was doing

8   clerical work at that time and they were in a

9   locker in the office that I shared with an

10  officer.

11         DEPUTY COMMISSIONER FILANGERI:   You just

12  can't stop fixing things, can you?

13         INMATE DOWELL:   No.  And the write-up was

14  because I had a inmate combination lock on the

15  locker.

16         DEPUTY COMMISSIONER FILANGERI:   I see.

17         INMATE DOWELL:   Even though they all had

18  keys for it, but --

19         DEPUTY COMMISSIONER FILANGERI:   Yeah.

20         INMATE DOWELL:   -- they give -- they said

21  that that gave me sole access to the tools.

22         DEPUTY COMMISSIONER FILANGERI:   Oh, so they

23  weren't your tools?

24         INMATE DOWELL:   No, they belonged to one of

25  the officers -- two of the officers.

26         DEPUTY COMMISSIONER FILANGERI:   The officers

27  put them in there?

36

1          INMATE DOWELL:  Yeah.

2          DEPUTY COMMISSIONER FILANGERI:  Did you say

3     that at your --

4          INMATE DOWELL:  Yeah, they knew that.

5          DEPUTY COMMISSIONER FILANGERI:  Why'd they

6     give you a counseling chrono?

7          INMATE DOWELL:  Because they were supposed

8     to have a -- an inventory sheet on them and nobody

9     -- everybody failed to put an inventory sheet on

10    them.

11         DEPUTY COMMISSIONER FILANGERI:  So just to

12    cover their backsides.

13         INMATE DOWELL:  Yes.

14         DEPUTY COMMISSIONER FILANGERI:  I see.  I

15    didn't see anything else remarkable about the

16    probation -- sorry, the correctional counselor's

17    report.  I want to turn now to the psychological

18    evaluation.  It's dated May 2, 2006.  It's

19    provided by Michelle Lynn Inaba, I-N-A-B-A, Ph.D.

20    Under -- on page 2, under "Clinical Assessment,"

21    she describes you as functioning within normal

22    limits.  She does mention a history of dyslexia

23    and that you commented, that you still have

24    difficulty sounding out some words for reading,

25    but that seemed to be the only -- anything outside

26    the norm.  Axis I diagnostic impression was

27    Bereavement, Alcohol Abuse in a Controlled

37

1   Environment, and Adult Antisocial Behavior by

2   History;   Axis II, No Contributory Personality

3   Disorder, and she gives you a Global Assessment of

4   Functioning Score of 78.   Then she goes into an

5   assessment of dangerousness.   Under "Violence

6   History," she says that you grew up in an

7   environment in which you had ready access to

8   firearms, you handled guns at a young age, guns

9   were seen as a necessary tool for ranch work, and

10   you had a weapons charge prior to the commitment

11   offense.   The commitment offense involved shooting

12   the victim.   As an older man, however, you no

13   longer feel the need to handle conflict situations

14   aggressively, she notes.   Under "Controlled

15   Environment," you've remained disciplinary free

16   since your last appearance before the Board.   In

17   fact, you've been disciplinary free through your

18   whole institutional history, and she says that you

19   would be expected to be at a low risk of violence

20   in a controlled environment.   If released to the

21   community, she says you -- she makes notes of

22   static risk factors: history of alcohol abuse,

23   male gender, male victim, previous criminality,

24   past use of firearm, and victim injury.   On the

25   other hand, she says that you have no present

26   dynamic risk factors, such as loss of control or

27   impulsive behavior, lack of compassion, anger, or

38

1   paranoid or violent thoughts.  Also noted that she
2   believes your plans for how to use your time if
3   paroled seem to be constructive and realistic.  In
4   her "Comments and Summary" she says you're not a
5   person who is comfortable talking about or
6   expressing your feelings, and she believes you no
7   longer need to display the same level of
8   aggression.  "He participated in self-help,
9   religious activities," and they've helped give you
10  the skills to conduct yourself in a sober and
11  nonviolent manner across settings.  She mentions
12  you regularly attend AA.  I should speak to that,
13  because, you know, I only saw one chrono about AA
14  and it was in December of 2005, or the fourth
15  quarter of 2005.  Are you still in AA?
16         INMATE DOWELL:  Yes, I am.
17         DEPUTY COMMISSIONER FILANGERI:  How come
18  they're not sending chronos?  They used to send
19  chronos like --
20         INMATE DOWELL:  I don't know why --
21         DEPUTY COMMISSIONER FILANGERI:  -- every
22  couple of three months.
23         INMATE DOWELL:  -- it's not in the record.
24         DEPUTY COMMISSIONER FILANGERI:  Did you
25  bring any?
26         INMATE DOWELL:  Yeah, I have some in my
27  self-help side.

39

1          DEPUTY COMMISSIONER FILANGERI:  Okay.  Let

2     me see.  We're down on the bottom of page 4 now I

3     think.  The examiner says, "With greater maturity,

4     it would be expected that a man would have more

5     consistent behavior control and a lessening of the

6     anger."  She thought you fell into this category.

7     Overall, your risk of violent recidivism would be

8     low at the present time providing you remain

9     abstinent from use of alcohol and drugs, and any

10     return to use of intoxicants would change your

11     prognosis.  In looking over the rest of your file

12     I found a couple of things that I thought we worth

13     noting.  For instance, your last test of Adult

14     Basic Education reading level was two point three.

15     That was February of 2003.

16          INMATE DOWELL:  Two point three?

17          DEPUTY COMMISSIONER FILANGERI:  Two point

18     three.

19          INMATE DOWELL:  That's pretty low, isn't it?

20          DEPUTY COMMISSIONER FILANGERI:  Well, I just

21     wondered if you'd care to comment on that?

22          INMATE DOWELL:  I was given a special test.

23          DEPUTY COMMISSIONER FILANGERI:  A special

24     test.

25          INMATE DOWELL:  Yeah.  Because they wanted

26     me to take the GED exam, and so I took the whole

27     thing, and I failed my math because I have a

40

1    problem transposing the numbers.

2         DEPUTY COMMISSIONER FILANGERI:  Okay.

3         INMATE DOWELL:  And so they gave me a

4    special test to give me an extra 30 minutes on the

5    math portion of the test so that I wouldn't have

6    to worry about hurrying on it and transposing my

7    numbers.

8         DEPUTY COMMISSIONER FILANGERI:  The

9    documents I saw didn't show any math score at all.

10   It just showed the reading score.

11        INMATE DOWELL:  Yeah.

12        DEPUTY COMMISSIONER FILANGERI:  Two of them.

13        INMATE DOWELL:  The scores that I've seen in

14   the past, like on the TABE test, was always been

15   eleven point five and a twelve point something.

16        DEPUTY COMMISSIONER FILANGERI:  Well, I did

17   see one in July of 2002 for twelve point nine.

18        INMATE DOWELL:  Yeah.

19        DEPUTY COMMISSIONER FILANGERI:  Which

20   would've been maxing it.

21        INMATE DOWELL:  Yeah.

22        DEPUTY COMMISSIONER FILANGERI:  Just for

23   reading.

24        INMATE DOWELL:  Yeah.

25        DEPUTY COMMISSIONER FILANGERI:  And I

26   noticed you were in a pre-GED class, according to

27   the chronos, between '97 and '99.

41

1      INMATE DOWELL:  Yeah.  I took -- they wanted

2  me to prepare for the GED test, and so I was

3  taking this pre-course, and but even though I was

4  taking this pre-course, I signed up for the GED

5  three times, but they never allowed me to take the

6  test.

7      DEPUTY COMMISSIONER FILANGERI:  Why not?

8      INMATE DOWELL:  Because they said because of

9  the dyslexia that it wasn't going to allow me

10  until they gave me this special test or something,

11  and they never did do the special test, and that

12  was under the -- I can't remember the testing

13  person's name now, I can't remember his name, but

14  he passed away here last year, and that's the last

15  that -- that's when all the -- everything stopped,

16  so I was never allowed to continue with whatever,

17  if they're going to give me the math portion test

18  over again for the extended time on it or not, I'm

19  not sure.

20      DEPUTY COMMISSIONER FILANGERI:  Well, I saw

21  that you were in pre-GED from '97 to '99, a couple

22  years, got positive chronos in that.  They said

23  that you were enthusiastic, but of course your

24  dyslexia --

25      INMATE DOWELL:  Yeah.

26      DEPUTY COMMISSIONER FILANGERI:  -- was

27  difficult for you to deal with, and that seemed

42

1   almost inconsistent with the July of 2002 twelve

2   point nine score, and then that certainly seemed

3   consistent with the February 2003 two point three

4   score, but all I can do is ask you to comment on

5   it and you seemed to have that.  Anything else you

6   want to say about that?

7        INMATE DOWELL:  No.  I didn't even know what

8   the score was on that test.  This was the first

9   time that I'd ever taken it.  It was a special

10  test, it wasn't a regular reading test, or a

11  regular math test or anything.  They weren't like

12  any other test I've ever taken.

13       DEPUTY COMMISSIONER FILANGERI:  Okay.

14  Anything else about your prison behavior you want

15  to call the panel's attention to?

16       INMATE DOWELL:  I have taken five other

17  self-help programs.

18       DEPUTY COMMISSIONER FILANGERI:  Do you want

19  to comment on those?

20       INMATE DOWELL:  Yeah.  Well, I took one on

21  Parenting and it helped me a lot on how to deal

22  with my own grief and everything, of how my crime

23  affected my children and everything, and also on

24  how to present it in a way to my children that

25  would allow us to be --

26       DEPUTY COMMISSIONER FILANGERI:  Sorry, I got

27  to turn the tape over.

43

1        INMATE DOWELL:  Okay.

2        DEPUTY COMMISSIONER FILANGERI:  I hate to

3    interrupt you like this, but the good news is this

4    aggravating beeping --

5        [Thereupon, the tape was turned over.]

6        DEPUTY COMMISSIONER FILANGERI:  This is side

7    two of the tape recorded hearing transcript for

8    Kenneth Dowell, D-O-W-E-L-L, C like Charles,

9    78669.  This is a Subsequent Parole Consideration

10   Hearing.  You were going to tell me about this

11   grief --

12       INMATE DOWELL:  Yeah.

13       DEPUTY COMMISSIONER FILANGERI:  -- class?

14       INMATE DOWELL:  The Parenting class that I--

15       DEPUTY COMMISSIONER FILANGERI:  Parenting.

16       INMATE DOWELL:  -- I've taken.  Well, it

17   helped me to deal with the grief that I was

18   feeling, because the grief of the hardships and

19   everything that I caused my children and

20   everything, and it helped me deal with them in a

21   way that we could be as friends, and father and

22   son, and father and daughter, you know, with my

23   one -- this -- with Charlotte and --

24       DEPUTY COMMISSIONER FILANGERI:  Yeah.  I saw

25   that you got self-help activities noted by the

26   counselor in '96, Alternative to Violence; in '94,

27   the Self-Esteem Program; in '95, Human Growth and

44

1   Development.  Has there been any self-help since

2   '95?

3           INMATE DOWELL:  Well, I go to self-help

4   every Sunday now.  It's put on by the LDS church.

5           DEPUTY COMMISSIONER FILANGERI:  I see.

6           INMATE DOWELL:  Yeah.  We go --

7           DEPUTY COMMISSIONER FILANGERI:  So you go to

8   church.

9           INMATE DOWELL:  -- we go services and also

10  we -- there -- it's a self-help group meeting.

11          DEPUTY COMMISSIONER FILANGERI:  Is that

12  documented in any way?

13          INMATE DOWELL:  Just the one letter from our

14  -- from Mr. Guthrie, the bishop.

15          DEPUTY COMMISSIONER FILANGERI:  This appears

16  to be letterhead from James W. Guthrie,

17  G-U-T-H-R-I-E, dated August 1, 2005?

18          INMATE DOWELL:  Yeah.

19          DEPUTY COMMISSIONER FILANGERI:  Has there

20  been any documentation since the last time you

21  appeared before the panel?

22          INMATE DOWELL:  He was going to send another

23  letter for this hearing here, but I guess he got

24  busy and failed to do so.

25          DEPUTY COMMISSIONER FILANGERI:  Okay.  And

26  do you remember what this letter says?

27          INMATE DOWELL:  Just basically that I've

45

1   been there, that even though I'm not a member of

2   the church at this time, I attend services and

3   self-help group.

4        DEPUTY COMMISSIONER FILANGERI:   I don't see

5   anything in here about self-help.

6        INMATE DOWELL:   Oh.

7        DEPUTY COMMISSIONER FILANGERI:   It says that

8   though you're not a member of the church, you've

9   taken part in discussions of gospel principles and

10  on occasion has even taught lessons to the group.

11       INMATE DOWELL:   It's on the movement sheet

12  that way I guess, yeah.  I guess he failed to put

13  it in the letter, so that's my mistake.

14       DEPUTY COMMISSIONER FILANGERI:   Yeah,

15  there's nothing in the letter that seems to sound

16  anything more than church.  Well, I mean this is

17  your hearing to --

18       INMATE DOWELL:   Yeah.

19       DEPUTY COMMISSIONER FILANGERI:   -- for you

20  to clarify that sort of stuff.

21       INMATE DOWELL:   Yeah.

22       DEPUTY COMMISSIONER FILANGERI:   Okay.  So I

23  guess I should say, other than the AA and other

24  than the church-going --

25       INMATE DOWELL:   Yeah.

26       DEPUTY COMMISSIONER FILANGERI:   -- has there

27  been any self-help since '95?

46

1        INMATE DOWELL:  No.

2        DEPUTY COMMISSIONER FILANGERI:  All right.

3   Anything else you want to bring the panel's

4   attention to about your prison behavior?

5        INMATE DOWELL:  No, not that I -- I can't

6   think of anything else.

7        DEPUTY COMMISSIONER FILANGERI:  Miss

8   Hawkins, is there anything you wanted to point our

9   attention to bring to our attention --

10        ATTORNEY HAWKINS:  No.

11        DEPUTY COMMISSIONER FILANGERI:  -- about

12   prison behavior?

13        ATTORNEY HAWKINS:  It's been covered.

14        DEPUTY COMMISSIONER FILANGERI:  Thanks.

15   Then I'll give it back to Commissioner Eng.  Thank

16   you.

17        PRESIDING COMMISSIONER ENG:  Let's talk

18   about your parole plans, Mr. Dowell.  What are

19   they?

20        INMATE DOWELL:  Well, I want to go live with

21   brother in Oregon.

22        PRESIDING COMMISSIONER ENG:  Is that Bryan,

23   B-R-Y-A-N, Dowell?

24        INMATE DOWELL:  Yes.

25        PRESIDING COMMISSIONER ENG:  Okay.  And for

26   the record, that you did submit a letter, and this

27   dated 11/16/05, from your brother Bryan Dowell,

47

1    D-O-W-E-L-L, in Mehama, M -- how do you pronounce

2    that?

3          INMATE DOWELL:  Mehama.  Mehama.

4          PRESIDING COMMISSIONER ENG:  M-E-H-A-M-A.

5          INMATE DOWELL:  Mehama.

6          PRESIDING COMMISSIONER ENG:  Mehama.

7          INMATE DOWELL:  Yeah.

8          PRESIDING COMMISSIONER ENG:  Mehama, Oregon.

9    Okay.  And in this letter he states that you are

10   welcome to stay in his home with his son and

11   himself any time that you want and for as long as

12   you wish.  He has a drug and alcohol free home and

13   feels that it would be a good home for you.  How

14   old's his son?

15         INMATE DOWELL:  His son?  Twelve or fifteen,

16   I think.

17         PRESIDING COMMISSIONER ENG:  Is your brother

18   divorced, or widowed, or --

19         INMATE DOWELL:  Separated.

20         PRESIDING COMMISSIONER ENG:  Separated?

21         INMATE DOWELL:  Yeah.

22         PRESIDING COMMISSIONER ENG:  Does he own his

23   own home?

24         INMATE DOWELL:  Yes.

25         PRESIDING COMMISSIONER ENG:  How large is

26   it?

27         INMATE DOWELL:  Three-bedroom, I believe.

48

1          PRESIDING COMMISSIONER ENG:  He only has the

2    one son?

3          INMATE DOWELL:  One child.

4          PRESIDING COMMISSIONER ENG:  Okay.  What

5    does your brother do?

6          INMATE DOWELL:  He's a millwright for one of

7    the sawmill companies up there, a warehouser I

8    believe.

9          PRESIDING COMMISSIONER ENG:  How old is he,

10   your brother?

11         INMATE DOWELL:  Forty-seven, I think.

12         PRESIDING COMMISSIONER ENG:  So what would

13   you do up there?

14         INMATE DOWELL:  I'll find a job in a machine

15   shop, or I'll buy and sell equipment (inaudible).

16         PRESIDING COMMISSIONER ENG:  Is your brother

17   in a position to support you financially for an

18   indefinite amount of time?

19         INMATE DOWELL:  Yeah, I'm sure he is.  I

20   mean I don't plan on not going without employment

21   for, you know, for very long.

22         PRESIDING COMMISSIONER ENG:  Have you ever

23   talked to your brother about what type of impact

24   it could have on his son by you moving in with

25   them?

26         INMATE DOWELL:  Yeah, I've written him a

27   couple of times.  He doesn't seem to think that --

49

1   his son I think stays with his mom two or three

2   days a week, I think, so I don't think there'd be

3   a -- you know, any inconvenience or anything.

4          PRESIDING COMMISSIONER ENG: So I'm assuming

5   -- because you stated that the way you were raised

6   was with a lot guns. Is that -- I'm assuming that

7   your brother was raised the same way.

8          INMATE DOWELL: Yeah. I don't even think he

9   has any guns, or Bryan, I don't think has any

10  guns.

11         PRESIDING COMMISSIONER ENG: Do you know for

12  a fact through how he's raised his son in -- I

13  don't know if that's a small town in Oregon.

14         INMATE DOWELL: It's a very small town.

15  It's about I think 2300 population, I believe.

16  It's bigger than -- it's bigger than Fall City,

17  which is where my mom and dad have their house --

18  had their house at, just shortly away -- a short

19  distance from there, and that was a city of only

20  like 300 population, the same size town that I

21  grew up in.

22         PRESIDING COMMISSIONER ENG: You understand

23  why I asked you these questions about the weapons?

24         INMATE DOWELL: Yeah, I understand it.

25         PRESIDING COMMISSIONER ENG: Having weapons

26  in and around you was part of your everyday life.

27         INMATE DOWELL: Yeah.

50

1           PRESIDING COMMISSIONER ENG:  I can only

2   assume that your brother continues to abide by

3   that, living in a small town.

4           INMATE DOWELL:  Oh.

5           PRESIDING COMMISSIONER ENG:  It concerns the

6   panel --

7           INMATE DOWELL:  Yeah.

8           PRESIDING COMMISSIONER ENG:  -- that you

9   would want to go and live in that same type of

10  situation where you're going to be surrounded by

11  weapons again.

12          INMATE DOWELL:  I don't think my brother has

13  any guns.

14          PRESIDING COMMISSIONER ENG:  Sir, I'm sure

15  you --

16          INMATE DOWELL:  Yeah.

17          PRESIDING COMMISSIONER ENG:  -- could

18  understand the concern that --

19          INMATE DOWELL:  Yeah.

20          PRESIDING COMMISSIONER ENG:  -- the panel

21  might have with that, and the thought.

22          INMATE DOWELL:  Yeah.

23          PRESIDING COMMISSIONER ENG:  Okay.  And I'm

24  not saying it does, I don't know.

25          INMATE DOWELL:  Yeah.

26          PRESIDING COMMISSIONER ENG:  But it is a

27  thought.  Okay.  So we've got that letter.  We

51

1   also have a letter that's dated October 21st of

2   2005 from Julia Perales,

3   P-E-R-A-L-E-S.  So who is this woman?

4          INMATE DOWELL:  A aunt by marriage.

5          PRESIDING COMMISSIONER ENG:  She states that

6   she's known you for over 30 years, ex-husband to

7   her niece, Pauline.  Okay.  And were does she

8   live?

9          INMATE DOWELL:  Los Angeles.

10         PRESIDING COMMISSIONER ENG:  Los Angeles.

11  Okay.  But I think that the -- it looks like this

12  is just a general support letter, unless I'm

13  missing something.

14         INMATE DOWELL:  No, I think that's what it

15  is right here.

16         PRESIDING COMMISSIONER ENG:  Okay.

17         INMATE DOWELL:  I mean --

18         PRESIDING COMMISSIONER ENG:  Okay.

19         INMATE DOWELL:  -- I could stay there if I

20  -- but I wouldn't want to burden her to stay

21  there.

22         PRESIDING COMMISSIONER ENG:  Okay.  And then

23  we also have -- I don't know who the -- this is

24  from a Margaret -- how do you -- A-N-D-A-V-A-Z-O?

25         INMATE DOWELL:  Yeah.  I'm not sure how to

26  pronounce that.

27         PRESIDING COMMISSIONER ENG:  And there's no

52

1   date, there's no signature. I don't know where

2   she's from. So why don't you tell me who this is.

3        INMATE DOWELL: That's Pauline's sister.

4        PRESIDING COMMISSIONER ENG: Pauline's

5   sister?

6        INMATE DOWELL: Yes. But she's married to

7   somebody else.

8        PRESIDING COMMISSIONER ENG: Okay.

9        INMATE DOWELL: Married to someone.

10       PRESIDING COMMISSIONER ENG: Okay. We have

11  a letter. It's just a -- it's general letter.

12       INMATE DOWELL: Yeah.

13       PRESIDING COMMISSIONER ENG: Okay. Okay.

14  She down in Los Angeles too?

15       INMATE DOWELL: Yes.

16       PRESIDING COMMISSIONER ENG: And then again

17  that -- we've got a general support letter dated

18  August 1st, 2005 from James Guthrie, G-U-T-H-R-I-E,

19  that Commissioner Filangeri has also stated on the

20  record, and this gentleman is with the Church of

21  Jesus Christ of Latter Day Saints, and it's a

22  general support letter. So, okay. Sir, do you

23  have any plans whatsoever for parole within Los

24  Angeles County or within California?

25       INMATE DOWELL: I would have -- really have

26  no place to live in L.A. County. If I went, I

27  would have to -- if I was to ask my aunt there to

53

1   live with her, well, I would -- I'd feel that I

2   was putting her out and would not -- and I would

3   -- I wouldn't feel comfortable doing that, and I

4   would have to live in a halfway house or something

5   of that nature, when I first went out there, to go

6   live there because --

7        PRESIDING COMMISSIONER ENG:  Have you made

8   any inquiries into --

9        INMATE DOWELL:  Well --

10       PRESIDING COMMISSIONER ENG:  -- alternatives

11  within California?

12       INMATE DOWELL:  Actually I did for 2005

13  hearing that I had, the last hearing, and none of

14  -- all of those people right there, until I

15  actually had a date would they even accept an

16  application.

17       PRESIDING COMMISSIONER ENG:  It would help

18  if we could see the letters that you had written--

19       INMATE DOWELL:  Yeah.

20       PRESIDING COMMISSIONER ENG:  -- to show us,

21  to show the panel --

22       INMATE DOWELL:  Yeah.

23       PRESIDING COMMISSIONER ENG: -- the level of

24  effort that you're making in terms of --

25       INMATE DOWELL:  Yeah.

26       PRESIDING COMMISSIONER ENG:  -- trying to

27  set yourself up.

54

1          INMATE DOWELL:  Yeah.

2          PRESIDING COMMISSIONER ENG:  It's very

3    important, which I'm sure you understand, that the

4    more documentation you can supply to the panel, it

5    shows us, versus you just sitting there and

6    telling us --

7          INMATE DOWELL:  Yeah.

8          PRESIDING COMMISSIONER ENG:  -- that you're

9    taking control and that you have plans and goals

10   and how your -- you know, what are the steps that

11   you're taking towards that goal.

12         INMATE DOWELL:  Yeah.

13         PRESIDING COMMISSIONER ENG:  Because

14   obviously you want to be able to be

15   self-sufficient --

16         INMATE DOWELL:  Yes.

17         PRESIDING COMMISSIONER ENG:  -- okay, once

18   you're paroled, so we urge that -- you know, we

19   need to see the documentation to show us that

20   you're, you know --

21         INMATE DOWELL:  Yeah.

22         PRESIDING COMMISSIONER ENG:  -- you've got

23   things set up, and also for financial support.

24   It's very, very important.  It's very difficult,

25   even without having a record of incarceration, for

26   people to find positions and employment out there

27   so -- and the panel does understand that it's

55

1    very, very difficult for anyone who's incarcerated

2    to line up jobs.  However, we want to see, again,

3    documentation as to who are you contacting out

4    there, what organizations are you trying to use to

5    seek employment, a lot of different things that

6    you can do --

7         INMATE DOWELL:  Yeah.

8         PRESIDING COMMISSIONER ENG:  -- and supply

9    us with the documentation of that, okay?  But

10   again, that's why it's very, very important to

11   show that even someone who's going to offer

12   residential, okay, support to you, to also very

13   specifically state what other support are they

14   offering to you, are they offering financial

15   support in the interim until you can get on your

16   feet and find employment and start making some

17   money.  Does that make sense to you?

18        INMATE DOWELL:  Yeah.

19        PRESIDING COMMISSIONER ENG:  So -- because,

20   you know, there is a transition period that anyone

21   has to go through.  I mean --

22        INMATE DOWELL:  Right.  I'm aware of that.

23        PRESIDING COMMISSIONER ENG:  You know,

24   you've been in for 23 years.

25        INMATE DOWELL:  Yes.

26        PRESIDING COMMISSIONER ENG:  It's a

27   different world out there.

56

1        INMATE DOWELL:  Yes.

2        PRESIDING COMMISSIONER ENG:  So, you know,

3    nobody expects to you to all of a sudden walk out

4    the gate and have everything totally set up for

5    you.

6        INMATE DOWELL:  That's --

7        PRESIDING COMMISSIONER ENG:  It's a

8    transition period.

9        INMATE DOWELL:  That's exactly why I wanted

10   to go to my brother's house in Oregon.

11       PRESIDING COMMISSIONER ENG:  We understand

12   that, but I also believe that previous panels have

13   told you that we cannot parole you out of state --

14       INMATE DOWELL:  Yeah.

15       PRESIDING COMMISSIONER ENG:  Which, because

16   not knowing what the agreements are between

17   different states, you really need to have parole

18   plans specific to if not Los Angeles County,

19   another county where you've got a full support

20   network set up and where you have the best chances

21   of -- you know, to succeed out there, but we --

22   our hands are relatively tied regarding paroling

23   people out of state, okay?  Have I missed anything

24   in terms of your other plans?

25       INMATE DOWELL:  I don't know if my --

26       PRESIDING COMMISSIONER ENG:  Anything else?

27       INMATE DOWELL:  The letter I put in there.

57

1     for parole plans that I gave the counselor or not.

2     I don't know if she put it in the file or not,

3     because I plan --

4          PRESIDING COMMISSIONER ENG:  Well, the

5     only--

6          INMATE DOWELL:  -- but --

7          PRESIDING COMMISSIONER ENG:  Yeah.

8          INMATE DOWELL:  My parole plans really

9     centered around going --

10         PRESIDING COMMISSIONER ENG:  Oregon.

11         INMATE DOWELL:  -- to my brother's house and

12    where I could go to the community college there

13    and learn how to operate computers and different

14    things.  Even though we have computerized machines

15    at the machine shop, those are different than the

16    computers that you run type -- you know, to do

17    typing and stuff like that on.

18         PRESIDING COMMISSIONER ENG:  Okay.  Well,

19    we've sent out Penal Code Section 3042 Notices,

20    and these notices go to agencies that have a

21    direct interest in your case.  I have not seen any

22    written responses from any of the agencies,

23    however, we do have a representative of the Los

24    Angeles County District Attorney's Office who is

25    present via video conference and who I'm sure will

26    be making a statement regarding your parole

27    suitability prior to us recessing for

58

1    deliberations.   Right now I don't have any further

2    questions.   Commissioner Filangeri, do you have

3    any further questions to ask Mr. Dowell?

4            DEPUTY COMMISSIONER FILANGERI:   Thank you,

5    Commissioner Eng.   When Commissioner Eng asked you

6    about the pandering conviction, you said you

7    offered this gal an opportunity to work off some

8    money she owed you?

9            INMATE DOWELL:   I didn't offer her.   I told

10   her that she should go stand on the corner, or I

11   would send her to somebody that would her out.

12           DEPUTY COMMISSIONER FILANGERI:   You would

13   send to her somebody that would help her out.

14           INMATE DOWELL:   Yes.

15           DEPUTY COMMISSIONER FILANGERI:   What did

16   that mean?

17           INMATE DOWELL:   That meant that I knew

18   somebody that was in the business of pandering

19   and--

20           DEPUTY COMMISSIONER FILANGERI:   She was just

21   going to make the connection?

22           INMATE DOWELL:   Yeah.

23           DEPUTY COMMISSIONER FILANGERI:   That was it?

24   There wasn't any other discussion?

25           INMATE DOWELL:   There wasn't any other

26   discussion.

27           DEPUTY COMMISSIONER FILANGERI:   Now I want

59

1   to read something out of the record then, because

2   it's -- that's not exactly consistent with what

3   the record suggests.  Geez, I didn't lose it, did

4   I?

5        INMATE DOWELL:  Well, I did explain to her

6   that how this person would work.

7        DEPUTY COMMISSIONER FILANGERI:  Well, why

8   don't you tell me everything you think I ought to

9   know about this.

10       INMATE DOWELL:  Yeah.  Well, that's -- I

11  didn't know how much -- all I told her was that

12  the guy would see that nobody would hurt her or

13  anything like that, and that's all I -- and that's

14  -- and that he would always be in the next room.

15       DEPUTY COMMISSIONER FILANGERI:  Anything

16  else?

17       INMATE DOWELL:  No, that's it right.  I --

18       DEPUTY COMMISSIONER FILANGERI:  How many

19  times did you talk?  How many times did you talk

20  to her about this?

21       INMATE DOWELL:  One time.

22       DEPUTY COMMISSIONER FILANGERI:  One time.

23  Well, it's part of the decision package here.  It

24  talks about a Sergeant Nottingham,

25  N-O-T-T-I-N-G-H-A-M, and Deputy Peavey, P-E-A-V-Y,

26  responding to a victim's residence regarding a

27  complaint that she had been solicited to pander on

60

1   2/5/1980. It says that the victim said the

2   suspect had come to the victim's residence on each

3   occasion attempting to talk her into becoming a

4   prostitute and that in this way she could pay off

5   the back rent, and that she would also be -- that

6   she would also make some money. It says it

7   happened in Tuesday, January 29th, 1980, Friday,

8   February 1st, 1980, and Monday, February 4th, 1980.

9   She goes on to say that her mother was a part --

10  or the mother told the deputy that it was a party

11  -- that she was a party of the conversation, a

12  witness to the conversation, and that suspect

13  stated to the victim, quote, "You won't have to

14  hustle here, it will be like dates. The guys I'll

15  send over will take you out, they're guys that I

16  owe favors. I'll collect the money from them."

17  Does that sound familiar?

18          INMATE DOWELL: I think I did on the one --

19  on the conversation that we had, yes.

20          DEPUTY COMMISSIONER FILANGERI: He goes on

21  to write about how the deputies were set up to

22  surveil the apartment, and actually inside the

23  closet inside the apartment, when the victim went

24  to a phone booth and suggested that she had

25  rethought the idea of doing this and invited you

26  over to talk about it some more. Late in the

27  afternoon, about 4:50 hours, you responded to that

61

1   location.  You and the victim seated yourselves in
2   the dinette table in the kitchen.  Suspect and
3   victim then became engaged in conversation.  The
4   following was overhead by the deputies who were in
5   the house:

6           Quote, Suspect: "If you don't want
7           to sell your ass, I don't know how
8           else you'll be able to pay the back
9           rent."  Victim: "How will it work?"
10          Suspect: "You won't have to turn
11          tricks in front of your kids.  I
12          won't be that cold.  I'll pick you
13          up and take you to a motel and I'll
14          wait in the next room.  Then I'll
15          send the customers to your room."
16          Victim: "Then what?"  Suspect:
17          "The customer will say, 'Is Kenny
18          here?' and that will let you know
19          that they're all right.  I know a
20          few prostitutes, and they tell me
21          that they get 20 or 30 dollars an
22          hour.  You can spend a couple of
23          hours with each customer, then you
24          can collect the money or they can
25          pay me, or I'll settle up with you
26          later."
27  They go on to quote the conversation.  Do you recall

62

1  anything like that?

2      INMATE DOWELL:  That was the one

3  conversation that we had with -- when her mother

4  was present, but -- and then when they came over,

5  she was telling me that the decision was not to do

6  that, and we had that conversation at that time

7  right there.

8      DEPUTY COMMISSIONER FILANGERI:  And what

9  happened next?

10     INMATE DOWELL:  And they arrested me.

11     DEPUTY COMMISSIONER FILANGERI:  Who arrested

12  you?

13     INMATE DOWELL:  The sheriff's department

14  arrested me.

15     DEPUTY COMMISSIONER FILANGERI:  Were they

16  right there when you were having the conversation?

17     INMATE DOWELL:  No.  I went outside.  I was

18  -- I went outside, and then came outside and

19  arrested me.

20     DEPUTY COMMISSIONER FILANGERI:  So they were

21  inside where you were inside.

22     INMATE DOWELL:  Yeah.

23     DEPUTY COMMISSIONER FILANGERI:  And then

24  they stepped out to arrest you.

25     INMATE DOWELL:  Yeah.  But we already

26  decided that we weren't going to do this, and then

27  I went on outside.

63

1       DEPUTY COMMISSIONER FILANGERI:  So there

2  must have been more conversation than what they

3  quoted, because there wasn't anything in there --

4       INMATE DOWELL:  Yeah.

5       DEPUTY COMMISSIONER FILANGERI:  -- that said

6  you weren't going to do it.

7       INMATE DOWELL:  Yeah, well, I -- that's why

8  I went outside, and it was it, and I -- they came

9  out -- and then they came out and arrested me.

10       DEPUTY COMMISSIONER FILANGERI:  The report

11  reflects that the people in the closet gave the

12  prearranged arrest signal over the radio, which

13  then summoned the detectives, who were outside, to

14  the door.  The victim actually answered the door

15  while you were still inside the house.

16       INMATE DOWELL:  Yeah.

17       DEPUTY COMMISSIONER FILANGERI:  They entered

18  the house, and that's where you were placed under

19  arrest.

20       INMATE DOWELL:  No, I think I was out on the

21  porch and I was -- I think I was leaving, but it

22  might have been, yeah, because I can't really

23  recall every detail of it.

24       DEPUTY COMMISSIONER FILANGERI:  How about

25  this 417?  Oh, excuse me.  You were -- I should

26  point out that you were on probation from that

27  conviction when you committed the life crime.

64

1        INMATE DOWELL:  Yes, I was.

2        DEPUTY COMMISSIONER FILANGERI:  All right.

3   What about this 417 way back in 1970?  Do you

4   remember that?  Oh, 4-7 -- I'm sorry, exhibited a

5   firearm.  You were convicted of exhibiting a

6   firearm?

7        INMATE DOWELL:  Oh, yeah.

8        DEPUTY COMMISSIONER FILANGERI:  Do you

9   recall that?

10       INMATE DOWELL:  Yeah.  That was the one that

11  I explained that where we were coming back from a

12  camping trip and we were unloading the things, and

13  then everybody was drinking and two people got in

14  argument, in a fight, and somebody called the

15  cops, and then they came there, we were out in the

16  driveway, and it was about dusk in the evening

17  hours, and it was -- I don't know, September, I

18  guess, so it was a little chilly.  I had a -- my

19  friend's coat on, and -- because I had misplaced

20  mine, I didn't know if it was in the -- bundled up

21  in the stuff and everything, and his was laying on

22  the seat, so I just put it on, and he was being

23  treated for alcoholism, and so he was taking these

24  pills, and I had them in the pocket, and I had

25  this knife, hunting knife on my side, and then

26  they arrested me, charged me with possession, took

27  me down to the -- and then they charged me

65

1   possession of a weapon, and then when it went to

2   court and everything, they said it was for

3   brandishing a firearm.  I pleaded guilty for

4   brandishing a firearm, and then we went to -- and

5   I was on probation for a year for that, and then--

6           DEPUTY COMMISSIONER FILANGERI:  You have a

7   really good memory of that.

8           INMATE DOWELL:  I done the probation.  Oh,

9   yeah, well, it actually happened --

10          DEPUTY COMMISSIONER FILANGERI:  Right.

11          INMATE DOWELL:  -- to me right there.

12          DEPUTY COMMISSIONER FILANGERI:  So you're

13  saying you pled guilty to brandishing a firearm --

14          INMATE DOWELL:  Yeah.

15          DEPUTY COMMISSIONER FILANGERI:  -- because

16  you had a sheath knife in the sheath --

17          INMATE DOWELL:  Yeah.

18          DEPUTY COMMISSIONER FILANGERI:  -- on the

19  side of your --

20          INMATE DOWELL:  Belt.

21          DEPUTY COMMISSIONER FILANGERI:  -- belt.

22          INMATE DOWELL:  Yeah.  And they said it was

23  an illegal weapon because it was covered up with a

24  coat.

25          DEPUTY COMMISSIONER FILANGERI:  And how did

26  you justify pleading guilty to brandishing a

27  firearm?

66

1   INMATE DOWELL:  Well, they said plead guilty

2 to this and you'll have probation for a year, and

3 I said okay.

4   DEPUTY COMMISSIONER FILANGERI:  Okay.  I

5 think that's -- no, I think that's all the

6 questions I had.  Thanks very much.

7   PRESIDING COMMISSIONER ENG:  Okay.  Mr.

8 Jacobs, do you have any questions to pose to Mr.

9 Dowell?

10   DEPUTY DISTRICT ATTORNEY JACOBS:  Yes, I do.

11 Mr. Dowell referred to Pauline as his wife.  Was

12 he married to her?

13   PRESIDING COMMISSIONER ENG:  Mr. Dowell,

14 were you married to Pauline?

15   INMATE DOWELL:  We were married in a common

16 law marriage.

17   PRESIDING COMMISSIONER ENG:  Did you hear

18 the response, Mr. Jacobs?

19   DEPUTY DISTRICT ATTORNEY JACOBS:  Yes.  And

20 how long did the prisoner live with her?

21   INMATE DOWELL:  From 1970 to 1979 I think it

22 was, '78 or '79.

23   PRESIDING COMMISSIONER ENG:  So eight or

24 nine years.

25   INMATE DOWELL:  Yeah.

26   PRESIDING COMMISSIONER ENG:  You were living

27 together.

67

1      INMATE DOWELL:  Yes.

2      PRESIDING COMMISSIONER ENG:  Okay.

3      DEPUTY DISTRICT ATTORNEY JACOBS:  Why did

4   the prisoner not marry her?

5      INMATE DOWELL:  Pauline was previously

6   married to someone else already.

7      PRESIDING COMMISSIONER ENG:  So she was not

8   divorced at the time that you were living

9   together?

10      INMATE DOWELL:  No.

11      PRESIDING COMMISSIONER ENG:  All right.

12      DEPUTY DISTRICT ATTORNEY JACOBS:  The

13   prisoner I believe stated that he only hit Pauline

14   one time.  I have a police report here, this would

15   be page 8 of the Homicide Supplemental Report

16   within the Lifer Package, and it states that in

17   September of 1980, when she was living in a house

18   on Seafort Avenue, the suspect came to the house

19   and kicked in her bedroom door and began yelling

20   and threatening her.  Did that occur?

21      PRESIDING COMMISSIONER ENG:  Sir, do you

22   have any recollection of that?

23      INMATE DOWELL:  That's the argument I was

24   speaking of that we -- that when -- and I was

25   living there at the time.

26      PRESIDING COMMISSIONER ENG:  This is the one

27   that escalated to the point that you pushed her?

68

1          INMATE DOWELL:  Yeah.

2          PRESIDING COMMISSIONER ENG:  Okay.

3          DEPUTY DISTRICT ATTORNEY JACOBS:  On the

4     next page, that would be page 9, it states that

5     she said during their 12-year relationship the

6     suspect has beat her up on numerous occasions and

7     threatened anybody that she has ever gone out

8     with.  Is that true or not true?

9          INMATE DOWELL:  That's incorrect.  I don't--

10          PRESIDING COMMISSIONER ENG:  So why would

11    she make that claim?

12          INMATE DOWELL:  I have no idea.

13          DEPUTY DISTRICT ATTORNEY JACOBS:  Okay.

14    Now the prisoner has indicated that he has no

15    chronos for AA; is that correct?

16          INMATE DOWELL:  No, I have chronos for AA.

17          PRESIDING COMMISSIONER ENG:  Weren't they in

18    -- what -- you attended -- wasn't the last time I

19    thought was in '95?  Is that what you said?  Or

20    no, wait a minute.

21          INMATE DOWELL:  The last time I attended was

22    the first week of November.

23          PRESIDING COMMISSIONER ENG:  That's right.

24    That's right.  Because I have in here -- I thought

25    that you like -- there's documentation  --

26          DEPUTY DISTRICT ATTORNEY JACOBS:  Has he

27    got--

69

1        PRESIDING COMMISSIONER ENG:   -- from 1991 to

2    the present, correct?  That was your -- yes.  No,

3    he has them.

4        DEPUTY DISTRICT ATTORNEY JACOBS:   Okay.

5    Does he have recent chronos?

6        PRESIDING COMMISSIONER ENG:  Didn't you say

7    you had November?

8        INMATE DOWELL:  Yeah.  I have October

9    chronos.

10       PRESIDING COMMISSIONER ENG:  October

11   chronos?

12       INMATE DOWELL:  Yes.

13       DEPUTY DISTRICT ATTORNEY JACOBS:  Do you

14   have any -- does the prisoner have any other

15   chronos for the years 2006 or 2005?

16       INMATE DOWELL:  What, AA chronos?

17       DEPUTY DISTRICT ATTORNEY JACOBS:  That'll be

18   correct.

19       INMATE DOWELL:  Yeah, I believe there are

20   some in the file.

21       DEPUTY DISTRICT ATTORNEY JACOBS:

22   Commissioner, is there any in the file?  I have no

23   record of such.

24       DEPUTY COMMISSIONER FILANGERI:  I didn't --

25   I'm sorry.

26       PRESIDING COMMISSIONER ENG:  For AA, yeah.

27       DEPUTY COMMISSIONER FILANGERI:  The last AA

70

1   chrono I saw in the file, as I said earlier, was

2   in December of 2005 for the fourth quarter of

3   2005.  That's the last one.

4            INMATE DOWELL:  Yeah.

5            PRESIDING COMMISSIONER ENG:  That's what I

6   thought.

7            DEPUTY COMMISSIONER FILANGERI:  I looked for

8   more, and didn't see them, if any of you hear

9   that.

10           INMATE DOWELL:  Yeah.

11           ATTORNEY HAWKINS:  He meant --

12           DEPUTY DISTRICT ATTORNEY JACOBS:

13   (inaudible).

14           PRESIDING COMMISSIONER ENG:  I got confused.

15           DEPUTY DISTRICT ATTORNEY JACOBS:  The last

16   question is, in the 2002 hearing that the -- that

17   was held with the prisoner, does the prisoner

18   remember Commissioner Moore telling him that

19   "Although you said you had gone to AA one day a

20   month, in order to get chronos you have to

21   participate on a daily basis, or I mean on a

22   weekly basis"?  Does the prisoner remember that

23   statement made to him?

24           INMATE DOWELL:  Yes, something like that.

25   That was two or three hearings ago.

26           PRESIDING COMMISSIONER ENG:  No, I believe

27   Mr. Jacobs is referring to the 2003 Board Hearing;

71

1   is that correct, Mr. Jacobs?

2          DEPUTY DISTRICT ATTORNEY JACOBS:  No, 2002

3   Board Hearing.

4          PRESIDING COMMISSIONER ENG:  Oh, the 2002

5   Board Hearing, I'm sorry.  Okay.

6          DEPUTY DISTRICT ATTORNEY JACOBS:  Yes.

7          PRESIDING COMMISSIONER ENG:  Yeah.

8          DEPUTY DISTRICT ATTORNEY JACOBS:  My next

9   question would be what self-help does the Latter

10  Day Saints Church provide other than regular

11  church services?

12         INMATE DOWELL:  Discussions of life

13  experiences.

14         DEPUTY DISTRICT ATTORNEY JACOBS:  I have no

15  further questions.

16         PRESIDING COMMISSIONER ENG:  Okay.

17  Counselor, do you have any questions that you'd

18  like to pose to your client at this point?

19         ATTORNEY HAWKINS:  No.

20         PRESIDING COMMISSIONER ENG:  Okay.  We'll

21  move on to closing statements.  Mr. Jacobs?

22         DEPUTY DISTRICT ATTORNEY JACOBS:  Thank you.

23  It's the position of the District Attorney's

24  Office of Los Angeles County that the prisoner

25  still represents a danger to the community should

26  he be released on parole, and the reason for that

27  is that he minimizes his responsibility for the

72

1    murder.  Some of his statements about the crime

2    are at odds with the proof, and he has not

3    programmed in the manner requested by the Board.

4    In regards to responsibility, he tends to minimize

5    his responsibility in several ways.  With the

6    exception of the 2006 report, he refers to himself

7    as being young and foolish at the time of the

8    murder and part of the reason why he committed it.

9    I would like to point out to the Board that the

10   prisoner was 36 years of age at the time, four

11   years shy of that psychiatrically magic age of 40

12   when murder becomes unthinkable.  The man had four

13   children and had gone through one real marriage

14   and one common law marriage.  For him to even

15   attempt to use this as a mitigating circumstance

16   demonstrates that he really doesn't understand the

17   dynamics that led him to kill Mr. Winnet.  As Dr.

18   Inaba stated in her 2000 psych report, "It's

19   important for the prisoner to psychologically" --

20   let me rephrase that.  "It is important for the

21   prisoner to psychologically to maintain an image

22   of himself as a nonviolent person at the expense

23   of truly trying to understand the personality and

24   behavioral characteristics which had led to the

25   murder."  And in addition, he still attempts to

26   blame his voluntary intoxication for the crime,

27   even though he denied use of alcohol to the

73

1    probation officer, and did not appear intoxicated
2    to his girlfriend, who had lived with him for ten
3    years.  We now know that the prisoner has an
4    alcohol abuse problem.  So what has he done about
5    it?  He's attended AA intermittently so he could
6    maintain his pay job and attend night school, and
7    that was in the 1998 Board Report.  The prisoner's
8    problem is alcohol, and that should be his number
9    one focus.  According to his post-conviction
10   progress reports, the prisoner has attended a
11   total of 36 months of AA since 1983.  That's 36
12   months out of 276 months, or 13 percent of the
13   time.  I feel very uncomfortable with this number
14   because the prisoner was warned that in order to
15   get quarterly chronos he would have to attend AA
16   more than once a month.  If he would rather hold a
17   pay position than attend AA regularly, then he
18   shouldn't expect a parole date when it comes time
19   to review his case.  In regards to his statements
20   in regards to the crime, he claims self-defense,
21   but the evidence is against him, which was
22   believed by a jury, and that is that the prisoner
23   pulled a weapon, a handgun, fired two shots at Mr.
24   Winnet before Mr. Winnet ever armed himself.  When
25   he sufficiently wounded Mr. Winnet, and Mr. Winnet
26   raised his arms in surrender, the prisoner then
27   emptied a 12-gauge shotgun into him, which was an

74

1   execution pure and simple.  And although Pauline's

2   girlfriend might have backtracked a bit regarding

3   her kidnapping when she talked to the probation

4   officer, she never altered her statements in

5   regards to the shooting.  Although the prisoner

6   was charged with a first degree special

7   circumstance murder, the jury gave him a break and

8   convicted him of second degree murder.

9   Disregarding the prisoner's statements of intent

10  both to Pauline and to Mr. Winnet, it is rather

11  obvious that the shooting, if not the murder, was

12  premeditated because the prisoner not only parked

13  his car behind a wall and snuck into Pauline's

14  apartment in hopes of catching her in bed with Mr.

15  Winnet, the Board recalls he entered in the dark

16  of night and yanked the blankets off of her,

17  demanding to know where Mr. Winnet was.  He also

18  searched the neighborhood for the victim, and when

19  he found him, he was armed not only with one gun,

20  which he claimed to use for protection because he

21  carried large sums of money, but two guns, both of

22  which he emptied at Mr. Winnet.  Other statements

23  peripheral to the crime intending to show the

24  prisoner in good light are his representations to

25  some correctional counselors that he owned his own

26  business, which in fact was a part-time backyard

27  fix-it shop that brought in about 250 dollars a

75

1    month, according to the probation report.  He also

2    held himself out in various reports as a high

3    school graduate but he could never produce proof

4    of such, and the probation report for the life

5    crime has him dropping out after completing the

6    eleventh grade.  The most glaring example of the

7    prisoner's inability or refusal to face the truth

8    is the statement he gave to his correctional

9    counselor (inaudible).  He claims that Pauline

10   called him the day before regarding her car, and

11   he came over in the early morning hours to discuss

12   this with her.  This is the first time the

13   prisoner has claimed Pauline contacted him and

14   asked him to come over.  In fact, when the

15   prisoner did come over to Pauline's bedroom in the

16   dark and yanked the sheets off of her, he asked

17   her, "Where is Wolf?"  He makes no mention of the

18   death threats made towards both Pauline and the

19   victim Winnet, nor does he discuss searching for

20   the victim, both at the bail bond's office and

21   twice at a local bar.  He never explained why he

22   parked his truck in the Zodi's parking lot, which

23   was separated from Pauline's apartment complex by

24   a cement block wall that was so high that Pauline

25   had to climb up on a van and have the prisoner

26   boost her onto the wall in order to get over the

27   wall from her apartment to where his pickup truck

76

1    was parked.  In fact, he tells a correctional

2    counselor that he drove back to Pauline's

3    apartment, parked in the stall in the apartment

4    parking lot, and that's when he got wedged in.

5    The only problem with that statement is that the

6    prisoner's pickup, Winnet's van, Winnet's corpse,

7    and prisoner's arrest all took place in the Zodi's

8    parking lot, which again, was separated from the

9    apartment complex that Pauline lived in by a tall

10   cinderblock wall.  He claims Winnet pulled his gun

11   first and that the prisoner -- and that he shot

12   him in self-defense.  Never happened.  Forget --

13   he forgets to mention that he emptied his .38 into

14   Winnet and Winnet attempted to surrender.  He then

15   -- the prisoner then returned to his truck, got a

16   shotgun, and emptied that into the victim.  He is

17   not required to admit the crime nor is he required

18   to discuss the crime with the Board or CDC staff,

19   however, the prisoner chose to discuss the facts

20   of this case, and as expected, he will be candid

21   and truthful.  If he is otherwise, it's a sure

22   indication that he's not ready for parole.

23   Lastly, the Board and various clinicians and

24   correctional counselors have either ordered or

25   suggested that the prisoner get a GED, yet the

26   prisoner has not yet done so.  He has attained

27   high marks in Heating and Refrigeration, and even

77

```
 1   if he has dyslexia, he is obviously capable of
 2   earning his GED, however, he might have to give up
 3   his pay job in order to do so, which will cut into
 4   his comfort zone.  He -- the prisoner has to make
 5   a decision: does he want to comply with the
 6   Board's requests and suggestions to prepare
 7   himself for parole, or would he rather program in
 8   a manner that suits him?  The choice is his.  I
 9   also note that the motive for the murder was
10   jealousy, and Pauline said she broke up with the
11   prisoner because he beat her up.  The prisoner has
12   obvious anger and relationship issues, yet he's
13   taken only three courses in self-help outside of
14   the his occasional AA.  Dr. Inaba in his -- in her
15   2000 psych report recommended that the prisoner
16   should participate in programs that offer violence
17   prevention strategies, victim awareness, coping
18   with dyslexia, relationship skills, and substance
19   abuse relapse prevention.  The prisoner would also
20   benefit from psychotherapy which would offer an
21   opportunity -- him an opportunity to face his
22   insight into his own impulses and behavior.  He
23   could benefit from therapy and participation in
24   psycho-educational groups.  The lack of sufficient
25   programming was also noted by the 2003 panel.  In
26   summation, if the prisoner can't abide by the
27   requests and recommendations of the Board and CDC
```

78

1    personnel, why should we suppose that he will obey

2    the orders and suggestions of his parole officer?

3    If the prisoner is given an order that he finds

4    offensive, that interferes with his enjoyment of

5    life, why should we believe that he will go along

6    with the requests by the parole officer in the

7    community when he fails to do so in a controlled

8    environment?  If he will build himself up with

9    puff pieces in prison, why should we expect him to

10   be candid with his parole officer?  In almost

11   every psych report condition, their opinion of the

12   prisoner's violence potential on his abstinence

13   from alcohol but he won't regularly attend AA

14   here.  Why should we believe he would do so in the

15   free society?  Actions speak louder than words,

16   and the prisoner's actions shout out that he's not

17   ready for parole.  Just based upon the prisoner's

18   recitation of his most recent version of the

19   crime, a multi-year denial seems warranted.  Thank

20   you.

21        PRESIDING COMMISSIONER ENG:  Thank you.

22   Miss Hawkins, closing statement?

23        ATTORNEY HAWKINS:  As Mr. Jacobs' statement

24   makes clear and some of the questions that were

25   asked today and answers provided by Mr. Dowell, in

26   the years leading up to the commitment offense,

27   it's clear that Mr. Dowell lived an (inaudible)

79

1    life.  He had only an eighth grade education, he

2    had a drinking problem, he didn't properly know

3    how to deal with --

4         PRESIDING COMMISSIONER ENG:  Excuse me one

5    second.  Mr. Jacobs, can you put it on --

6         DEPUTY DISTRICT ATTORNEY JACOBS:  Yes.

7         PRESIDING COMMISSIONER ENG:  -- mute?  Could

8    you put yours on mute, because we can hear all the

9    papers moving.

10        DEPUTY DISTRICT ATTORNEY JACOBS:  Oh, I'm

11   sorry.

12        PRESIDING COMMISSIONER ENG:  That's all

13   right.  Thank you.  Okay.  Continue.  I'm sorry.

14        ATTORNEY HAWKINS:  That's all right.  He

15   didn't know how to deal with emotions that seem

16   fairly commonplace to us, such as jealousy and

17   anger.  As Mr. Jacobs pointed out, he wasn't a

18   young child when he committed this offense.  At

19   the same time, given his family background, the

20   way he was raised, the community that lived in, he

21   simply was ill equipped to deal with the types of

22   situations that he was put into.  None of these

23   facts obviously forgive or excuse his actions, or

24   the murder that he committed, and Mr. Dowell is

25   not here today to suggest that; rather, it's to

26   show you the type of person that he was back then,

27   and the limited tools that he had to deal with

80

1   this situation.  It's clear that in the 23 years
2   that he's been incarcerated that he's changed,
3   that he has taken advantage of the programming
4   that has been offered to him, particularly in the
5   last three years, since the 2004 hearing, when the
6   Board recommended to him that he regularly attend
7   AA meetings.  He has not attended them
8   sporadically, as suggested, but rather made a
9   concerted effort to go on a more regular basis,
10  and he has understood, as pointed out in the psych
11  assessment, why that is important and why that
12  would be necessary when he is released back into
13  back into society to have the support of
14  Alcoholics Anonymous.  In addition to that, the
15  main constant in Mr. Dowell's life here in prison
16  has clearly been his vocational experience.  He's
17  received numerous laudatory chronos pointing out
18  his successful development, how he's helped out
19  San Quentin.  I am sure that they will be sorry to
20  see him leave, but it will be something that will
21  help him to reenter back into society to provide
22  financial stability for himself.  Throughout his
23  time in prison, Mr. Dowell's self-development has
24  gone hand-in-hand with his spiritual development,
25  and he has been -- he hasn't become a member of
26  LDS.  He'll need to be baptized in order to do
27  that, and he plans to do that when he is released,

1    but LDS is well known for being the type of church

2    that not only it has a well in the community but

3    is alcohol and substance free, as well as violence

4    free, and Mr. Dowell's siblings are all members of

5    the LDS church in their very small community, as

6    he explained earlier today, and he has every

7    intention to attend an LDS church whether he's

8    able to obtain an interstate transfer to Oregon,

9    or whether he is released into the Los Angeles

10   County.  Clearly, the LDS community is vibrant and

11   present in both of those communities.  Mr. Dowell

12   has worked hard during his years in prison to

13   maintain contact with his family members.  He has

14   expressed, as he explained today, a desire that

15   his children not visit him in prison, but at the

16   same time he has tried to maintain a relationship

17   with them by writing letters, as well as to

18   friends and family, despite the fact that he is

19   dyslexic.  I think there's been a lot of emphasis

20   placed on the fact that Mr. Dowell has not been

21   able to obtain his GED.  At the same time, it's

22   not true that he hasn't tried to do so.  He

23   clearly took the test recently and was unable to

24   pass the mathematics portion.  I think there may

25   be a misunderstanding about the -- his condition

26   of dyslexia, which does affect his reading

27   ability, but as he mentioned, causes him to

82

1    transpose numbers, which is indicia of dyslexia

2    and would affect his math abilities, and that he

3    has tried, through the prison system and with his

4    counselor, to figure out how to take this test in

5    a specialized manner, but has not yet been able to

6    do so, but they are among his plans.  At the last

7    Board Hearing the District Attorney stated that,

8    quote, "Mr. Dowell is one of those individuals

9    that strikes me that he holds the key to his

10   prison cell," and the DA argued that Mr. Dowell

11   had not taken the actions to use that key.  And at

12   the Board -- at the Board's recommendation, they

13   said to him that in two years, which has now been

14   extended to three years, if he had continued to

15   attend AA meetings and otherwise demonstrated that

16   he could remain disciplinary free, which he has

17   clearly done, that he would have demonstrated his

18   readiness to go back into society, and Mr. Dowell

19   in addition to doing those things that have been

20   asked of him, has really demonstrated that he has

21   become a more reflective person.  He's able to

22   discuss the facts of the crime.  He did not sit

23   here today and claim self-defense about what

24   happened.  Many of the reports that were read by

25   the DA were things that were discussed in the

26   1995, 1998 time period.  Since then, Mr. Dowell

27   has continued to go to AA, has continued to go to

83

1   his LDS self-help program.  One would hope that in

2   eight years' time that he would be given a chance

3   to demonstrate that he has learned something, that

4   he has changed, and to simply quote passages from

5   things that have happened so long ago simply is

6   not fair, nor is it the proper assessment --

7           [Thereupon, a new tape was begun.]

8           **DEPUTY COMMISSIONER FILANGERI:**  Side one of

9   tape two of the Parole Consideration Hearing for

10   Mr. Kenneth Dowell, D-O-W-E-L-L, C number 78669.

11   Sorry for the interruption.  Go ahead.

12           **ATTORNEY HAWKINS:**  Many of the concerns that

13   have been expressed in the psych reports in the

14   past, as well as by the Board, is an issue that

15   exists for every single inmate here in San

16   Quentin, which is basically they exist in a

17   controlled environment, how are we to know that

18   when released back into society that they will

19   continue to do certain things, continue to have

20   behavior that is acceptable, and Mr. Dowell has

21   demonstrated that those activities which he finds

22   necessary in order to survive inside are the exact

23   same things that he will do when he is released

24   out into society, those things being AA.  Clearly

25   those groups exist outside.  LDS, the church is

26   there for him.  His family is there for him also

27   in the LDS community.  His vocational expertise,

84

1   which he has clearly demonstrated, as gone through

2   by the panel here today, and will hopefully

3   transition him properly into society.  He has

4   expressed that the Oregon situation seems ideal

5   for him, and as Commissioner Eng pointed out,

6   there are -- there is clearly the additional peril

7   of obtaining interstate transfer.  Mr. Dowell has

8   looked into that situation along with his

9   counselor here at San Quentin and is in the

10   situation which he mentioned with respect to the

11   halfway houses, which is, until he has been

12   granted parole, he cannot set the wheels in motion

13   to obtain that transfer, but he has put all the

14   pieces in place so that when he is able to start

15   that process, he will be in the best position

16   possible to obtain that transfer.  Assuming that

17   doesn't happen at time, Mr. Dowell does have

18   family in the L.A. area.  His aunt has indicated

19   that she would be willing to take him in.

20   Even though he feels that it would be a burden,

21   there is still that possibility, and he has looked

22   into some halfway houses, and clearly the job

23   skills, they exist no matter where he goes.  So

24   there is a stable environment out there.  There

25   are institutions in place that are the same as the

26   ones here that will continue to help him, and it's

27   clear that while nothing can change the harm that

85

1  Mr. Dowell caused, and he expressed that here

2  today, that he has changed himself.  He is not the

3  person that, as he stated, sometimes didn't think

4  about the repercussions of his actions, rather,

5  he's a person who now, because of the skills and

6  the tools that he's gained by being here for the

7  past 23 years, is someone who can become a

8  productive member of society, and his minimum

9  eligible parole date, as mentioned, was 1992.

10  He's gone through a lot since then.  He has served

11  the time that is commensurate with his sentence

12  and demonstrated that it's time for him to be

13  released.  Thank you.

14       PRESIDING COMMISSIONER ENG:  Mr. Dowell,

15  this is your opportunity to address the panel

16  regarding your parole suitability if you so

17  choose.

18       INMATE DOWELL:  I feel that I am suitable

19  for parole today for the simple reason that I --

20  as my attorney has stated, I have taken a number

21  of classes and everything to get in touch with my

22  inner self and my feelings about what caused me to

23  do some of these things, and my inability to have

24  the forethought of empathy before you take your

25  actions of why -- of when you do something.

26  Before you drink two beers, or three beers, and

27  get in a car and go driving somewhere, to think

86

```
 1   that we should not do that because we could run
 2   over people, or fail to hit the brakes on time
 3   anyway, even though you don't attend [sic] to
 4   those things, those are things that you know that
 5   can happen to you, and by going to AA and working
 6   the steps through that, I've actually been going
 7   to AA since 1987, and when I was incarcerated in
 8   Soledad penitentiary, though I started AA there,
 9   and I carried it all the way through.  There was a
10   period of about three years here that I could not
11   attend on a regular basis to AA, but since the
12   last parole hearing prior to this one, I have
13   attended weekly for, and I've only missed -- in
14   six years I think I've missed seven meetings, and
15   I do work the steps completely, and where you take
16   your step four and you take that searching and
17   moral inventory of yourself and what brought you
18   to this point in your life, and what you've done
19   to other people, and so that all of these things,
20   every time you make a decision to do something,
21   plays a real important role in what your next step
22   and what you're going to do, and some of the
23   things, I'm not very proud of some of the things
24   that I've done over my life and everything, and
25   but I can't correct those things.  That's one
26   factor in my life that I will always have to do
27   nothing but pray that I have forgiveness in order
```

87

1    to exist in my life and everything, and I thank

2    you.

3          PRESIDING COMMISSIONER ENG:   Okay.   We'll

4    now recess for deliberation.   The time is 12:32.

5                    R E C E S S

6                     --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

88

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3        DEPUTY COMMISSIONER FILANGERI:  Okay.  Back

4   on record.

5        PRESIDING COMMISSIONER ENG:  Okay.  The time

6   is 1:03 p.m., and let the record note that

7   everyone who was in the room prior to our recess

8   has now returned.  In the matter of Kenneth

9   Dowell, the panel has reviewed all the information

10  received and relied on the following circumstances

11  in concluding that the prisoner is not suitable

12  for parole and would pose an unreasonable risk of

13  danger to society or a threat to public safety if

14  released from prison.  In reference, the

15  commitment offense was carried out in an

16  especially cruel and/or callous manner.  There

17  were multiple victims attacked, injured and/or

18  killed in the same or separate incidents,

19  basically, your common law wife and Mr. Winnet.

20  The offense was carried out in a very

21  dispassionate and calculated manner, such as

22  execution style murder.  Specifically, Mr. Winnet

23  had his hands up after the two of you were

24  exchanging gunfire, had his hands up and was

25  giving up, and you still proceeded to take your

26  shotgun and shoot him again and which caused his

27  KENNETH DOWELL   C-78669    DECISION PAGE 1 11/30/06

89

1   demise.  The offense was carried out in a manner

2   which demonstrates an exceptionally callous

3   disregard for human suffering, and the motive for

4   the crime is inexplicable or very trivial in

5   relation to the offense, and it was really based

6   on jealousy.  These conclusions are drawn from the

7   Statement of Facts, which I had previously read

8   into the record earlier, and again, it's very

9   difficult for us to understand what was in your

10   mind at that time where you had ample time to

11   cease and desist in the killing of Mr. Winnet.

12   The two of you, he got out of his vehicle, you got

13   out of your vehicle, you started shooting him and

14   he was trying to give up, and you proceeded to

15   grab another weapon, and ended up killing the man.

16   The prisoner has an escalating pattern of criminal

17   conduct.  Specifically, your record of public

18   drunkenness, drunk driving, brandishing a firearm

19   and pandering, that all have led up to the life

20   crime.  You've got a somewhat history of unstable

21   or tumultuous relationships with others,

22   specifically with Pauline, who was the victim and

23   your common law wife.  The inmate has failed

24   previous grants of probation, failed to profit

25   from society's attempts to correct his

26   criminality, and the attempts included adult

27   **KENNETH DOWELL  C-78669    DECISION PAGE 2 11/30/06**

90

1    probation, and I can't remember if you were on

2    probation at the time of the life offense or not.

3    The prisoner has programmed in a limited manner

4    while incarcerated, and failed to upgrade

5    educationally and vocationally as previously

6    recommended by the Board.  He's not sufficiently

7    participated in beneficial documented self-help

8    and/or therapy programs.  The psychological

9    report, and I'm going to refer to both of these.

10   The recent one, dated May 2nd of 2006, and the one

11   dated September 27th of 2000, because they were

12   both authored by the same doctor, Michelle Inaba,

13   I-N-A-B-A.  We found that the recent one is

14   conditionally supportive but felt that it really

15   failed to answer the previous panel's requests,

16   specifically -- let me see if I can find it.  The

17   previous panel had asked the psychologist to

18   address the significance of alcohol as it related

19   to the commitment offense, and to estimate the

20   prisoner's ability to refrain from the use of same

21   when released, the extent to which the prisoner

22   has explored the commitment offense and come to

23   terms with the underlying causes and the need for

24   future therapy programs while incarcerated.  When

25   you take a look at the psychological evaluation of

26   2006, one thing that I became very alarmed at is

27   KENNETH DOWELL   C-78669    DECISION PAGE 3 11/30/06

91

1   on the bottom of page 3 of the 2006 evaluation,
2   Dr. Inaba states that: "He would not expect to
3   have a problem with relapse into the use of
4   alcohol as he, quote, 'hasn't thought about
5   drinking for years,' unquote." The panel finds
6   that that is not an adequate explanation for what
7   the previous panel was asking for. So, however,
8   the 2006 report, she does go on to state that any
9   return to the use of intoxicants would change his
10  prognosis, but failed to say how that would change
11  his prognosis and what risk there would be to the
12  community, but states that he would be expected to
13  be at low risk of violence in a controlled
14  environment. The reason why I state that, go back
15  to the 2000 psychological evaluation by Dr. Inaba,
16  is that it was fairly negative but yet still
17  didn't -- the 2006 one didn't adequately address
18  any of the risks and the concerns that Dr. Inaba
19  had stated in the 2000 one. In reference to the
20  -- your parole plans, sir, we feel that the
21  prisoner lacks realistic parole plans in that he
22  does have any viable residential plans in the last
23  county of legal residence, that being Los Angeles
24  County, let alone in the state of California, your
25  parole plans are in Oregon, and he does not have
26  acceptable employment plans. Just to state that,
27  **KENNETH DOWELL   C-78669   DECISION PAGE 4 11/30/06**

92

1    you know, you would find a job is not adequate.

2    It's really very, very important, sir, that you

3    have -- when you come to a panel, that you have

4    very -- you know, as current letters as possible.

5    Things change with people on the outside.  One day

6    people are here, the next day they may not be, so

7    you want to have the most current letters of

8    support to present to the panel, and make sure

9    that they're very, very specific in what they are

10   offering to you.  So they have to be very specific

11   about your housing and what does that mean, will

12   you have your own room, are they providing

13   transportation to you, are they providing

14   financial support indefinitely to you so that you

15   can transition?  You know, make it as specific as

16   possible.  Also in terms of employment plans,

17   provide letters that you are sending out to

18   organizations inquiring about possible employment,

19   and keep records of all that.  And I've seen many

20   inmates come in with a whole synopsis, where

21   they've got it listed the date that they sent

22   things out and when they received responses, who

23   it went to, you know, and all different things.

24   There's a lot of different things that you can do

25   to show the panel that you're in control of your

26   own destiny, along with who have you written to in

27   **KENNETH DOWELL   C-78669      DECISION PAGE 5 11/30/06**

93

1    terms of halfway houses.  We -- there are a lot of
2    other inmates in your situation that do not have
3    any support system, any family within the state of
4    California or within -- you know, let alone in the
5    last county of residence, but they have managed to
6    reach out and try to find and line up various
7    organizations that can help them, that can provide
8    a roof over their head, and they've provided us
9    with documentation about that, and I'd also highly
10   recommend that you don't just have one, that you
11   have backup plans, because if one doesn't come
12   through, what are your backup plans?  Because, you
13   know, one thing happens when there's a -- if and
14   when you're granted a date, it does go through a
15   very rigorous review process, everything has to be
16   confirmed.  So it's in your best interest to have
17   backup plans.  It would also be in your best
18   interest to give evidence of what type of support
19   network you are setting up for yourself on the
20   outside.  What we look for, sir, is every possible
21   thing that you've thought of for your success on
22   the outside, because the last thing anybody here
23   or yourself should want is for you to end up being
24   incarcerated again and in violating anything, so
25   in order for you to be successful, you need to
26   make sure that you have everything set up on the
27   **KENNETH DOWELL  C-78669   DECISION PAGE 6 11/30/06**

94

1    outside, safety nets, so to speak, so that should

2    you end up in a situation where there are weapons

3    there and there's drinking and stuff, that what do

4    you have set up for yourself to make sure that you

5    wouldn't fall back into a situation where you

6    could lose control, get angry, and end up becoming

7    violent.  Regarding 3042 responses, the District

8    Attorney of Los Angeles County has expressed

9    rather vehemently their opposition to parole at

10   this time.  The panel makes the following

11   findings.  The prisoner needs documented self-help

12   in order to face, discuss, understand and cope

13   with stress in a nondestructive manner.  Until

14   progress is made, the prisoner continues to be

15   unpredictable and a threat to others.

16   Nevertheless, the prisoner should be commended for

17   being disciplinary free for all these years, and

18   also the fact that I believe it was Commissioner

19   Filangeri stated back in January 18th of 1989 you

20   completed a 12-month course in Operation and

21   Maintenance of High Pressure Boilers, and plus,

22   you should be commended for your recent

23   re-involvement in vocational training.  However,

24   these positive aspects in your behavior do not

25   outweigh the factors of unsuitability.  In a

26   separate decision the hearing panel finds that the

27   KENNETH DOWELL  C-78669   DECISION PAGE 7 11/30/06

95

1   prisoner has been convicted of murder and it is

2   not reasonable to expect that parole would be

3   granted at a hearing during the next three years.

4   The specific reasons for this finding are as

5   follows. The prisoner, again, committed the

6   offense in an especially cruel manner, and again I

7   refer back to what I read into the record from the

8   Statement of Facts, that you took your common law

9   wife, supposedly against her will, in your vehicle

10   and ended up confronting her, the man that she

11   wanted to marry, I believe, ended up confronting

12   him, taking a few shots at him with your handgun,

13   and then reaching for a shotgun after he had his

14   hands up and wanted to give up, and shooting him,

15   and ended up killing him. Multiple victims were

16   attacked, injured and/or killed in the same

17   incident. Basically your common law wife,

18   Pauline, was one of the victims, and obviously the

19   deceased, Mr. Winnet. The offense was carried out

20   in a very dispassionate and/or calculated manner.

21   It was carried out in a manner, which demonstrates

22   an exceptionally callous disregard for human

23   suffering, and the motive for the crime was

24   inexplicable or very trivial in relation to the

25   offense. It really was based on your jealousy and

26   your unwillingness to give up on your common law

27   KENNETH DOWELL, C-78669   DECISION PAGE 8 11/30/06

96

1   wife and two children and let them go.  The

2   prisoner's had a history of criminality or

3   misconduct that includes the public drunkenness,

4   you know, your prior record, brandishing a

5   firearm, drunken driving and pandering, and again,

6   a history of unstable, tumultuous relationships

7   with others, and this is evidenced by the claim of

8   abuse by your common law wife, Pauline, and then

9   your pandering conviction.  Again, the recent

10  psychological report dated May 2nd, 2006, and

11  authored by Dr. Inaba, I-N-A-B-A, the

12  improvements, there were a lot of improvements

13  that -- within the new report as opposed to her

14  2000 report, and again, both of these reports were

15  done by the same doctor.  There were many

16  improvements, although not well supported, and

17  basically suggests that your gains are recent and

18  would require a longer period of observation and

19  evaluation.  Again, the prisoner has not completed

20  the necessary programming, which is essential to

21  his adjustment and needs additional time to gain

22  such programming.  So again, failed to

23  participated and complete any documented

24  self-help.  Therefore, a longer period of

25  observation and evaluation of the prisoner is

26  required before the Board should find that the

27  KENNETH DOWELL  C-78669    DECISION PAGE 9 11/30/06

97

1    prisoner is suitable for parole.  The panel

2    recommends that the prisoner remain disciplinary

3    free; if available, upgrade vocationally and

4    educationally; also if available, participate in

5    documented self-help and therapy, again, if

6    available.  And I believe that concludes my

7    reading of the decision.  Commissioner --

8            DEPUTY COMMISSIONER FILANGERI:  No, thank

9    you.

10           PRESIDING COMMISSIONER ENG:  -- Filangeri?

11   Okay.  Okay.  This hearing is now over.  The time

12   is 1:18.

13                A D J O U R N M E N T

14                     -oOo-

15

16

17

18

19

20

21

22

23   PAROLE DENIED THREE YEARS

24   THIS DECISION WILL BE FINAL ON: ___MAR 3 0 2007___

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   KENNETH DOWELL  C-78669   DECISION PG 10 11/30/06

EXHIBIT   C

98

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Berenice Billington, a duly designated
transcriber, NORTHERN CALIFORNIA COURT REPORTERS,
do hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total two in number and cover a total of pages
numbered 1 - 97, and which recording was duly
recorded at SAN QUENTIN STATE PRISON, at SAN
QUENTIN, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH
DOWELL, CDC No. C-78669, on November 30, 2006, and
that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated January 31, 2007, at Sacramento
County, California.

_____
Berenice Billington
Transcriber
NORTHERN CALIFORNIA COURT REPORTERS

DOWELL, Kenneth  C-78669                                    May 2, 2006

# PSYCHOSOCIAL EVALUATION
# FOR THE BOARD OF PRISON TERMS
# JUNE 2006 LIFER HEARING
# SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

I.      <u>Identifying Information:</u>     Mr. Dowell is a 59 year old (DOB 10-6-46), Caucasian
male who is serving a Life sentence for murder in the second degree.  He is presently
serving a 15-year to life sentence at San Quentin State Prison.  This report is based on
a review of Mr. Dowell's central files, medical record and a face-to-face interview
conducted in the staff offices of San Quentin State Prison. Mr. Dowell was informed
of the limits of confidentiality in that information provided would be included in a
report to the Board of Prison Terms.  Mr. Dowell stated that he understood this and
was able to demonstrate an understanding of the purpose of the interview.  He denied
any need for assistance or for any adaptive aides and stated that he was fully able to
participate in the interview.  Only Mr. Dowell and the examiner were present at the
interview.

Mr. Dowell's developmental history, family history, psychosocial development and sexual
orientation, military history, educational history, employment and income history, and
substance abuse history have been thoroughly reviewed and presented in previous reports and
will not be repeated here.  The reader is referred to the June 2002 report by this examiner for
this information.

II.     <u>Plans if Granted Release:</u>
A. <u>Housing</u>:  Mr. Dowell would be able to live with his aunt if he is paroled.  She would be
willing to provide housing for him until he is able to provide his own housing.  If he were
allowed to parole out of state, he would return to the state of Oregon where his family owns
property.  He believes that he would be able to work out an arrangement with his brother to
live in a house that his brother owns.

B. <u>Employment</u>:  Mr. Dowell belongs to the Millwright's Union and considers himself to be
employable as a Millwright.  His brother works for Weyerhaeuser as an electrician and will
help Mr. Dowell get employment with that company.  Mr. Dowell is also in the process of
researching companies in the Los Angeles area that might have jobs for which he would be
qualified.

DOWELL, Kenneth   C-78669                                         May 2, 2006

Mr. Dowell would need to have approximately $5,000 worth of tools in order to start working.   He believes that he might be eligible for assistance with this from the state Employment Development Department or from his family.

C. Social Support/Services:  Mr. Dowell plans to organize his social life around participation in Alcoholics Anonymous and his church.   He has been participating in LDS church activities at San Quentin.  He stated that he has resumed participation in religious activities after an absence of many years.  He attended the Episcopal Church as a child but did not attend church after the age of fifteen.

Another inmate approached Mr. Dowell and invited him to attend an LDS group in San Quentin.  Mr. Dowell reported that he had been feeling that something was missing from his life.  Since attending the group, he has begun to feel more complete.  He plans to become baptized when he is out of prison.  Since joining this group he has given up all swearing and the use of tobacco, and caffeine and attends a group that provide guidance for living a Christian life.

Mr. Dowell is a single man and has no romantic relationships at the present time.  He had a long-term relationship with a woman who died of stomach cancer in 2003.  She was instrumental in getting Mr. Dowell involved in AA. after she observed that he had a drinking problem.  They maintained a correspondence and close friendship for 19 years before she passed away.

**CLINICAL ASSESSMENT**

III. Current Mental Status/Treatment Needs:

Mr. Dowell appeared to be his stated age.  He was well groomed and dressed in standard CDC inmate clothing.  He appeared to be fully alert, and was oriented in all spheres.  He was able to spell WORLD forward and backwards, in spite of having a history of dyslexia.  He stated that he still has difficulty sounding out some words when reading.  His thought was coherent, linear and logical with no evidence of thought disorder.   His intellectual functioning appeared to be in the average range.  He seemed quite nervous at first and stated that the interviews caused him to feel that way.  Mood was dysthymic with some brightening as he became more engaged in the interview.  Mr. Dowell was soft-spoken and spoke with some hesitancy.  His is a taciturn man, not given to elaboration of speech.  He reported no vegetative signs of depressed mood such as loss of appetite, fatigue or poor sleep.  He became sad and emotional when discussing the death of a close woman friend.  He denied any suicidal or homicidal thoughts.  His judgement appeared to be adequate for most situations.  He demonstrated some capacity for insight.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      V62.82  Bereavement
             305.00   Alcohol Abuse (in controlled environment)
             V71.01  Adult Antisocial Behavior (by history)

Dowell, Kenneth   C-78669          2    San Quentin                   May 2, 2006

DOWELL, Kenneth  C-78669                                    May 2, 2006

|  |  |
|---|---|
| AXIS II: | V71.09  No contributory Personality Disorder (avoidant, obsessive-compulsive traits) |
| AXIS III: | Arthritis, allergies |
| AXIS IV: | Stressors:  Incarceration, Loss of Social Support |
| AXIS V: | GAF = 78 |

IV.    Assessment of Dangerousness:

The following is a risk assessment and not intended to predict future dangerousness with complete accuracy.  A risk assessment is based on enumeration of factors found to be statistically associated with a greater likelihood of violent behavior.  Some individuals found to have a rating of low risk for violence, become violent, while individuals who have factors suggesting high risk for violence, may never commit a future violent act.

A.  Violence History:  As presented previously, Mr. Dowell grew up in an environment In which he had ready access to firearms. He learned to handle guns at a young age.  Guns were seen as a necessary tool for ranch work.  He had a weapons charge prior to his commitment offense. His commitment offense involved the shooting of his victim.

As an older man, Mr. Dowell no longer feels a need to handle conflict situations aggressively.  As stated by Mr. Dowell, "It's a macho thing when you're younger.  You can handle it yourself.  As you gain maturity, you can defuse situations."  He denied that he would need to use a weapon to deal with any situation.

When asked what he would do if someone tried to harm his family member, he stated, "If you try to hurt my family, I'm going to try to stop you.  I'm not going to murder you or hurt you.  If you can't stand between them and stop it, you can call the police.  I wouldn't handle it myself.  You would use non-violent means."

B. In a Controlled Environment:

Mr. Dowell has remained disciplinary free since his last appearance before the Board.  Based in his institutional record and present functioning, he would be expected to be at low risk of violence in a controlled environment.

C. If Released to the Community:

Mr. Dowell has the following static risk factors: a history of alcohol abuse, male gender, male victim, previous criminality, past use of a weapon, and victim injury.  He has no present dynamic risk factors such as recent loss of control or impulsive behavior, lack of compassion, anger, or paranoid or violent thoughts.

Mr. Dowell readily admits that as a younger man, he "wasn't a model citizen."  He now seems to feel ashamed of the things he did as a younger man.  He recounted how he suggested that his tenant prostitute herself in order to pay her rent and stated that for him it was "all about the money."  He believes that he now knows much more about relationships and sees things differently since he stopped drinking.  He would not expect to have a problem with relapse into the use of alcohol as he "hasn't thought about drinking for years."

Dowell, Kenneth  C-78669          3    San Quentin                  May 2, 2006

DOWELL, Kenneth   C-78669                                        May 2, 2006

In the community his plan for avoiding relapse would be to associate with people who don't drink; go to non-alcoholic social events, and avoid going places where alcohol is served.

Mr. Dowell has made a commitment to live a clean and sober lifestyle and has insight into problems of judgement that were caused by his use of alcohol.  He comes from a family that has a history of alcoholism.

Although he owned his own business in the past, Mr. Dowell plans to be an employee in the future.  He still sees himself as working long days as he states that he was "raised that way. In order to take care of yourself and be self-sufficient, you must work."  He recalled that from the age of 10 or 11, if he was not in school, he was working.  His leisure time would be spent in church or AA sponsored activities.  He also has hobbies such as wood working that he would be interested in pursuing.  His plans for how to use his time if paroled seem to be constructive and realistic.

V. Clinician Comments and Summary:
There have been some changes in Mr. Dowell's presentation since this examiner last evaluated him in 2000.  Mr. Dowell has a greater understanding of the impact of his crime on the lives of others, including the victim's family and his own children.  He has one son who is in prison and a son and a daughter with whom he has very little contact.

He now acknowledges that jealousy as well as alcohol was a factor in his crime.  He has previously contended that the crime occurred when he was trying to help his former common-law wife get her vehicle back from her fiance.  Mr. Dowell continues to relate that he does not believe that he would have sought to harm the victim had the victim not been armed with a gun when he exited his vehicle, and that he therefore acted in self-defense.  His account is not consistent with eyewitness testimony.

Mr. Dowell is not a person who is comfortable talking about or expressing his feelings.  He acknowledges that he was capable of violence in the past, but no longer has a need to display the same level of aggression.

It would seem that in the intervening years, Mr. Dowell has participated in self-help and religious activities that have given him the skills to conduct himself in a sober and non-violent manner across settings.  He regularly attends AA and is on the waiting list for Kairos.

Mr. Dowell has suffered the loss of a close friend and has come to see the importance of accepting help from others.  He continues to be hard working, mild-mannered and socially compliant.  With greater maturity, it would be expected that a man would have more consistent behavioral control and a lessening of anger.  This would seem to be the case with Mr. Dowell.  In addition, his identification with pro-social groups such as AA and the LDS church is also a positive change that would further lessen any risk of future violent behavior. Overall, his risk of violent recidivism would be low at the present time, provided he remains abstinent from the use of alcohol and drugs.

Dowell, Kenneth   C-78669            4    San Quentin                    May 2, 2006

DOWELL, Kenneth   C-78669                                    May 2, 2006

Any return to the use of intoxicants would change his prognosis.  Mr. Dowell presently experiences some emotional distress, subsequent to the death of someone who was very important to him.  He has support persons in the institution, with whom he can discuss this loss.  There is no indication that his emotional distress would increase the likelihood that he would engage in criminal or violent acts.  If anything, this loss has caused Mr. Dowell to seek support from others in a manner that would further lessen the risk of future violence.


_____                    5-2-06
Michel Lynn Inaba, Ph.D.                                     Date
Contract Psychologist

EXHIBIT   D

65

1   viable residential plans in the last county of

2   legal residence, and he does not have acceptable

3   employment plans.  And the Hearing Panel notes that

4   responses to 3042 notices indicate an opposition to

5   a finding of parole suitability, specifically by

6   the District Attorney of Los Angeles County.  We do

7   want to commend the prisoner for his certification

8   for operating boilers, his pre-GED class, his

9   modern metal cutting, and an Alternatives to

10  Violence class that he had taken, and a self-esteem

11  program, and human growth and development.  He is

12  also receiving above average work reports for his

13  work.  However, these positive aspects of his

14  behavior do not outweigh the factors of

15  unsuitability.  Mr. Dowell, this is going to be a

16  two-year denial at this time.  You -- It has been

17  recommended since 1993 and in 2000 by the doctor,

18  by prior Panels that you continue to stay in AA and

19  get some self-help.  And that has not occurred.  In

20  a separate decision, the Hearing Panel finds it is

21  not reasonable to expect that parole would be

22  granted at a hearing during the following two

23  years.  And the specific reasons are as follows,

24  that the prisoner committed the offense in a very

25  cruel manner.  Specifically that he sought out the

26  victim and was prepared to confront him as he had a

27  **KENNETH RAY DOWELL C-78669   DECISION PAGE 5 7/17/03**

64

1      violence prevention strategies,

2      victim awareness, strategies for

3      coping with dyslexia, relationship

4      skills, and substance abuse relapse

5      prevention.  Mr. Dowell would also

6      benefit from intervention such as

7      psychotherapy, which would offer the

8      opportunity to increase his insight

9      into his own impulses and behavior."

10   And it was also noted in the psychiatric report

11   that was prepared in September of 1993 by

12   Dr. Dupre, D-U-P-R-E, that it was recommended that

13   the inmate continue vocational training, self-help

14   group participation, upgrading his education, and

15   disciplinary-free programming, which were all

16   thought to be helpful towards proper

17   resocialization into society, and internalization

18   of traditional societal values.  Continuing his AA

19   group meetings is strongly encouraged.  In the

20   event that the subject is paroled, a comprehensive

21   outpatient substance abuse treatment program should

22   be instituted within the treatment plan.  And as

23   was noted in the hearing today, the inmate has not

24   been participating in AA since 1996, and he has no

25   current self-help programs.  The prisoner does lack

26   realistic parole plans in that he does not have

27   **KENNETH RAY DOWELL C-78669  DECISION PAGE 4 7/17/03**

68

1    offense, and I think you need to read all the

2    reports, specifically the transcript, so that

3    you're better prepared about what you say about

4    your crime the next time you come before this

5    Board.  I wish you good luck.

6        PRESIDING COMMISSIONER DALY:  And I do want

7    to state, try to get the information out.  You need

8    to start preparing right now on your parole plans.

9    Even if a hearing is postponed, anything that comes

10   in between now and your next parole hearing is

11   usable.  So you need to really try to get an answer

12   back from those.  See what you can do about getting

13   an interstate transfer if that is your wish to

14   transfer up to Oregon.  And I know that that is a

15   possibility.  But that's going to be very

16   important.  We'll conclude the hearing.  It is

17   4:35.

18        INMATE DOWELL:  Thank you.

19                   --oOo--

20

21

22

23

24

25   PAROLE DENIED TWO YEARS

26   FINAL DATE OF THIS DECISION_____OCT 15 2003_____

27   KENNETH RAY DOWELL C-78669  DECISION PAGE 8 7/17/03

69

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, APRIL ALLEN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 68, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH RAY DOWELL, CDC No. C-78669, on JULY 17, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 30, 2003, at Sacramento County, California.

_April Allen_____
April Allen
Transcriber
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT   E

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| | | | | |
|---|---|---|---|---|
| Date: | OCTOBER 26, 2007 | | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

<table>
<tr><td></td><td colspan="2">(Parties and Counsel checked if present)</td></tr>
<tr><td></td><td>BH004727<br>In re,<br>KENNETH DOWELL,<br>          Petitioner,<br>On Habeas Corpus</td><td>Counsel for Petitioner:<br><br>Counsel for Respondent:</td></tr>
</table>

Nature of Proceeding: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered Petitioner's application for a Writ of Habeas Corpus filed on June 12, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole. See Cal. Code Reg. tit., 15, § 2402; *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 667.

Petitioner was received in the Department of Corrections on December 30, 1983, after a conviction for second degree murder. He was sentenced to 15 years to life imprisonment. His minimum parole eligibility date was July 6, 1992. The record reflects that on March 24, 1982, Petitioner killed the victim, the boyfriend of his ex-common law wife, during a shoot out between Petitioner and the victim.

The Board found Petitioner unsuitable for release on parole after a parole consideration hearing held on November 30, 2006. Petitioner was denied parole for three years. The Board concluded that Petitioner was unsuitable for release on parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors including the circumstances of the commitment offense, Petitioner's criminal history, his unstable social history, his insufficient participation in self-help programs, and his lack of viable parole plans.

1

| Minutes Entered |
|---|
| 10/26/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

### DEPT 100

| | | | | | |
|---|---|---|---|---|---|
| Date: | OCTOBER 26, 2007 | | | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | | Deputy Clerk |
| | NONE | Bailiff | NONE | | Reporter |

<div align="center">(Parties and Counsel checked if present)</div>

|  |  |
|---|---|
| BH004727<br>In re,<br>KENNETH DOWELL,<br>           Petitioner,<br>On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: |

The Court finds that there is some evidence to support the Board's finding that the commitment offense was committed in an especially cruel manner in that multiple victims were attacked, injured or killed, the offense was carried out in a dispassionate and calculated manner, the offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering, and the motive for the crime was trivial in relation to the offense. Cal. Code Regs., tit. 15, § 2402(c)(1). The record reflects that at the time of the commitment offense, Petitioner was separated from his common law wife (ex-wife). The ex-wife was dating another man (boyfriend), who she planned to marry. Petitioner was jealous and angry with the boyfriend, because Petitioner thought that the boyfriend was coming between Petitioner and his ex-wife and children. On March 24, 1982, Petitioner entered the residence of his ex-wife. Petitioner stated that he was going to kill his ex-wife and her boyfriend. Petitioner forced his ex-wife into his vehicle. The two drove around searching for the boyfriend. The boyfriend happened to be following Petitioner. Petitioner stopped his vehicle and retrieved a handgun located beneath the seat. Petitioner told the boyfriend that he was going to kill him. Petitioner and the boyfriend fired shots. When Petitioner's handgun no longer had any ammunition, he retrieved a shotgun from his vehicle and continued to shoot at the boyfriend. The boyfriend was shot several times and died from the wounds. After Petitioner shot the boyfriend, the ex-wife ran away from the scene.

The Court finds that there is some evidence to support the Board's finding that Petitioner's previous criminal record showed an escalating pattern of criminal conduct. The Board may properly consider Petitioner's criminal history as a factor relevant to determining whether Petitioner is suitable

<div align="center">2</div>

| Minutes Entered |
|---|
| 10/26/07 |
| County Clerk |

## *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| | | | |
|---|---|---|---|
| Date: | OCTOBER 26, 2007 | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

<table>
<tr><td colspan="2" align="center">(Parties and Counsel checked if present)</td></tr>
<tr><td>BH004727<br>In re,<br>KENNETH DOWELL,<br>        Petitioner,<br>On Habeas Corpus</td><td>Counsel for Petitioner:<br><br>Counsel for Respondent:</td></tr>
</table>

for release on parole.  Cal. Code Regs., tit. 15, § 2402(b).  The record reflects that Petitioner was convicted of public drunkenness, possession of narcotics, brandishing a firearm, drunk driving, and pandering.  Petitioner was on probation for the pandering offense when he committed the commitment offense.  Petitioner has failed to profit from previous grants of probation by committing new offenses.  Thus, the record contains some evidence that Petitioner was undeterred by the earlier attempts to correct his criminality.

In making its determination, the Board also noted that Petitioner has previously abused his ex-wife during their relationship.  The Court finds that there is some evidence to support the Board's finding that Petitioner has a history of unstable social relationships. Cal. Code Regs., tit. 15, § 2402(c)(3).

The Court finds that there is some evidence to support the Board's finding that Petitioner has not sufficiently participated in self-help programs.  The Board noted that Petitioner has not participated in any recent self-help programs.  In addition, Petitioner has not upgraded academically as recommended by the Board during the last parole hearing.  The record does reflect that Petitioner has participated in several types of vocational training.

The Court finds that there is some evidence to support the Board's finding that Petitioner lacks realistic parole plans.  See Cal. Code Regs., tit. 15, § 2402(d)(7).  The record reflects that Petitioner does not have a place to reside in the last county of legal residence.  Petitioner's proposed parole plans consist of residing with his brother in Oregon.  In addition, Petitioner does not have an offer of

3

| Minutes Entered |
|---|
| 10/26/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| | | | |
|---|---|---|---|
| Date: | OCTOBER 26, 2007 | Judge | A. ALDANA | Deputy Clerk |
| Honorable: | STEVEN R. VAN SICKLEN | Bailiff | NONE | Reporter |
| | NONE | | | |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
              Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

employment.  The lack of housing and employment offers reflect that Petitioner is not yet suitable for parole.

The Board considered several favorable factors, including Petitioner's disciplinary record and his participation in numerous vocational programs and Alcoholic Anonymous.  However, the Board found that these positive factors did not outweigh the factors tending to show unsuitability.

Although the denial of a parole date based solely on the nature of the commitment offense after a long period of incarceration may raise serious questions involving an inmate's liberty interest in parole, this is only true where the inmate has shown exemplary behavior and considerable evidence of rehabilitation.  *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 917.  Here, the Board did not base its decision to deny parole solely on the commitment offense, but also weighed Petitioner's prior criminal record, his unstable relationship with his common law wife, his limited participation in self-help programs, and his lack of viable parole plans.

Petitioner argues that his due process rights have been violated, because the Board failed to specifically address every factor enumerated in California Rule of Regulation, title 15, section 2402, subdivisions (c) and (d).  This argument is without merit.  Every factor considered by the Board need not be stated, especially if it is not persuasive.  *In re Ramirez* (2001) 94 C.A. 4th 549 (disapproved on other grounds by *In Re Dannenberg* (2205) 34 Cal. 4th 1061).

Based on the above factors, the Court finds that there is "some evidence" in the record to support the Board's determination that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole. Penal Code § 3041(b).

4

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | |
|---|---|---|---|
| Date: | OCTOBER 26, 2007 | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004727
In re,
KENNETH DOWELL,
                    Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Accordingly, the petition is denied.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Kenneth Dowell
C-78669
San Quentin State Prison
San Quentin, California 94964

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

5

Minutes Entered
10/26/07
County Clerk

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |

COURTHOUSE ADDRESS:
   Clara Shortridge Foltz Criminal Justice Center
   210 West Temple Street
   Los Angeles, CA  90012

PLAINTIFF/PETITIONER:

   KENNETH DOWELL

**FILED**
LOS ANGELES SUPERIOR COURT
NOV 1 9 2007
BY _____ DEPUTY

**CLERK'S CERTIFICATE OF MAILING**
CCP, § 1013(a)
Cal. Rules of Court, rule 2(a)(1)

CASE NUMBER:
BH004727

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time
☐ Order to Show Cause
☐ Order for Informal Response
☐ Order for Supplemental Pleading
☑ Order re: Writ of Habeas Corpus Denied
☐ Order
☐ Order re:
☐ Copy of  Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

November 19, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
   Alexandre J. Aldana

Kenneth Dowell
C-78669
San Quentin State Prison
San Quentin, California 94964

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101 .
Attn: Ms. Cynthia Lumely

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE



| In re | B204310 |
|---|---|
| KENNETH RAY DOWELL | (Los Angeles County Super. Ct. No. A454394) (Steven R. Van Sicklen, Judge) |
| on | ORDER |
| Habeas Corpus. | |

BY THE COURT:

The petition for writ of habeas corpus, filed December 13, 2007, has been read and considered. Sufficient evidence supports the Board of Prison Terms denial of parole. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1080, 1082; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677; see *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 917.) Accordingly, the petition is denied.

2008 JAN 22 AM 10: 23

ATTORNEY GENERAL
SAN DIEGO